Richard A. Zimmerman, Esq.
Attorney for Plaintiff
233 Broadway – Suite 2202
New York, NY 10279
Richard A. Zimmerman (RZ 0963)
(212) 962-1818
Patrick C. Crilley (PC 9057)
*Of Counsel*
(212) 619-1919

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
PINK GOOSE, (CAYMAN) LTD.,

            **Plaintiff,**

            -against-

SUNWAY TRADERS LLC,
SUNWAY GROUP, SUNWAY TRADING
GROUP LTD., SUNWAY GROUP
INTERNATIONAL HOLDINGS,
SUNWAY GROUP IMPORT, SUNWAY
LOGISTICS, and LINTON EQUITIES B.V.I.,

            **Defendants.**
-------------------------------------------------------X

**ECF CASE**

**08 Civ. 02351 (HB)**

**DECLARATION OF
ANTHONY ROBERT
SWINNERTON**

    Pursuant to 28 U.S.C. §1746, Anthony Robert Swinnerton, Solicitor of the Supreme Court, of Cannongate House, 64, Cannon Street, London EC4N 6AE declare as follows:

    1.    I am a solicitor of the Supreme Court and I was admitted as a solicitor in 1973 and I am a partner in the firm of Swinnerton Moore.

    2.    I make this declaration to advise the Court of English law regarding the nature of an action to enforce an arbitration award as a judgment in the courts of the United Kingdom.



3. I have been advised that the Plaintiff in this action has an arbitration award in its favor rendered in London in August 2002.

4. The procedure to enforce an arbitration award as a judgment is set out in Section 66 of the Arbitration Act 1996 and provides:

> "66. Enforcement of the award
> (1) An award made by the tribunal pursuant to an arbitration agreement may, by leave of the court, be enforced in the same manner as a judgment or order of the court to the same effect.
> (2) Where leave is so given, judgment may be entered in terms of the award.
> (3) Leave to enforce an award shall not be given where, or to the extent that, the person against whom it is sought to be enforced shows that the tribunal lacked substantive jurisdiction to make the award. The right to raise such an objection may have been lost (see section 73).
> (4) Nothing in this section affects the recognition or enforcement of an award under any other enactment or rule of law, in particular under Part II of the Arbitration Act 1950 (enforcement of awards under Geneva Convention) or the provisions of Part III of this Act relating to the recognition and enforcement of awards under the New York Convention or by an action on the award".

5. The procedure to enforce an award as a judgment involves making an application to the court and this should be made upon an arbitration claim form supported by written evidence such as an affidavit or witness statement which, in the Commercial Court in London, should be left with the Admiralty and Commercial Registry. The affidavit or witness statement should exhibit the arbitration agreement and the original award or copies thereof, and should state the name and the usual or last known place of abode or business of the applicant and the person against whom it is sought to enforce the award, and either that the award has not been complied with or the extent to which it has not been complied with at the date of the application. The applicant must produce before the court the original award (or a duplicate) and a copy thereof, together with an affidavit or witness statement as above, verifying both the original, the copy award, and the arbitration agreement. In the Commercial Court a reference number will be



given on signing judgment or issuing execution as on the commencement of a claim. The award will be marked with a seal.

6.   The nature of the action to enforce an arbitration award as a judgment is a common law claim. It is an action which arises out of a breach of an implied agreement between the parties that is contained in the arbitration agreement in the underlying contract. It is not an action on the underlying contract that contained the arbitration agreement, rather, it is a new cause of action on the arbitration award itself.

7.   The procedure to enforce an arbitration award as a judgment is very much an administrative procedure and could be used for awards relating to any dispute, be it commercial, trade, building, matrimonial. In the circumstances I cannot see that this procedure could or could properly be classed as a maritime action or maritime procedure.

8.   This point of law was best determined in *The Bumbesti* [1999] 2 Lloyds Rep 481 (copy attached) wherein the Honorable Aikens J of the Admiralty Court dismissed a claim brought in admiralty to arrest a vessel in connection with an action to enforce an arbitration award as a judgment. In explaining the point of law, Aikens J stated

> In English law it is clear that if a claim for damages is referred to arbitration and an arbitration award is made awarding the payment of damages, this creates a new right of action for the enforcement of the award that replaces the original cause of action. Strictly speaking, the doctrine of "merger" does not apply in the way that it does to an action brought in Court and there could be debate on the precise juridical basis for the rule relating to awards. (Internal citation omitted.) But it has been accepted since at least *Gascoyne v. Edwards*, (1826) 1 Y. & J. 19, that a claimant cannot bring a further claim in personam on the original cause of action once he has an award.

9.   Aiken J relied on the Court of Appeals decision in *The Beldis*, (1936) 53 Ll.L.Rep. 255 [1936] P. 51, wherein the Court, reversed the judgment of the lower court, and

dismissing a claim in rem against a vessel brought in connection with an action on an arbitration award. Aiken J, in referring to the President of the Court of Appeals in *The Beldis*, noted,

> He pointed out that a plaintiff claiming on the award has only to plead and prove "that certain matters in dispute have been submitted to an arbitrator and that he has made his award in the plaintiff's favor". The President emphasized that it was not necessary, indeed positively wrong, to plead the nature of the original dispute. He concluded that he was not prepared to hold that "a claim upon an award held under the arbitration clause in a charter party is a claim arising out of any agreement made in relation to or use or hire of a ship". He held it was a common law claim upon the award and nothing else.
> \*\*\*
> He further continued, "it would in my judgment be plainly wrong to say that under s. 2 sub-s.1 of the 1869 Act a County Court has Admiralty jurisdiction to entertain an action on an award upon a voluntary submission, merely because the arbitration was held pursuant to an arbitration clause in a Charter-party for the reference of disputes arising out of that charter-party."

10. Aiken J., following *Beldis*, then concluded that the Admiralty Court had no jurisdiction to consider the claim before him, struck out the action and the claimform against the vessel, set aside the service of the claim form in rem, and decided that the "arrest of the vessel cannot be maintained in respect of this claim."

11. Accordingly, under the authority stated in *The Beldis* and followed in *The Bumbesti*, it is clear that an action to enforce an arbitration award is not an admiralty action under English law.

**I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

Anthony Robert Swinnerton

Executed on May 2, 2008
London, England.

Case 1:08-cv-02351-HB   Document 12   Filed 05/02/2008   Page 5 of 14

QUEEN'S BENCH DIVISION
(ADMIRALITY COURT)

June 16, 17; 22, 1999

THE "BUMBESTI"

Before Mr. Justice AIKENS

**Admiralty practice - Action in rem - Jurisdiction - Arrest of vessel - Abuse of process of Court - Dispute under charter referred to arbitration in Romania - Action founded on award - Whether Court had jurisdiction in rem in respect of claim made by claimants - Whether arrest an abuse of process because claimants already had security for claim made - Supreme Court Act, 1981, s.20(2)(h).**

By a charter-party dated Feb. 27, 1995, the defendant Romanian corporation bareboat chartered their vessel *Dacia* to the claimants for a period of three years expiring on Mar. 27, 1998. The charter was governed by Romanian law and all disputes under the charter were to be referred to arbitration in Romania.

The claimants alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. The Constantza Court of Arbitration made two awards. Award No. 1 dated Mar. 3, 1998 ordered the defendants to return her to the claimants for the balance of the charter period and awarded damages to the claimants of U.S.$186,532. In Award No. 12 dated Nov. 10, 1998 the claimants were awarded a further U.S.$238,072 as damages for the wrongful early determination of the charter.

The arbitration awards were appealed. The appeal from Award No. 1 was dismissed by the Constantza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constantza Court of Appeal in April, 1999 but leave was granted to appeal to the Supreme Court. The defendants obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

On Feb. 4, 1999, in attempting to enforce the awards the claimants applied to the Constantza Court for execution of all movables and immovables of the defendants. Subsequently two bulk carriers, *Tirgu Lapus* and *Tirgu Neamt* owned by the defendants were arrested in Constantza and remained detained by the order of the Constantza Court.

On June 8, 1999 a claim form in this action was issued stating that the claimants brought their actions founded on Award No. 12. On June 9, 1999 *Bumbesti* was arrested in Liverpool and the sworn evidence to lead to the arrest stated that Award No. 12 remained wholly unsatisfied and that the aid of the Court was sought "to enforce payment of or security for the same". In respect of Award No. 1 two bank letters of guarantee were put up following the arrest of *Bumbesti* in Greece and the Netherlands and were sufficient to meet any liability that the defendants had on that award.

The defendants applied to set aside these proceedings and or to release *Bumbesti* from arrest the issues for decision being: (1) Whether the Admiralty Court had jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constantza Court; (2) assuming that the Court had jurisdiction, whether *Bumbesti* should be released from arrest because the claimants already had adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constantza so that the arrest of *Bumbesti* was an abuse of the process of the Court.

The only basis of the Court's in rem jurisdiction relied on by the claimants was s. 20(2)(*h*) of the Supreme Court Act, 1981 which provided inter alia that the Admiralty Court had jurisdiction to hear and determine -

. . .any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship . . .

-*Held*, by Q.B. (Adm. Ct.) (AIKENS, J.), that (1) in order to succeed on their claim the claimants had to plead and prove the individual submission to the Constantza Court of Arbitration and Award No. 12 that they made on Apr. 12, 1999 pursuant to that submission; but no more than that need be proved; there was no need to plead and prove the underlying dispute under the charter (*see* p. 484, col. 2; p. 485, col. 1);

(2) the claim in this case was the action on the awards and clearly arose out of the agreement to refer to arbitration the disputes that had arisen under the bareboat charter; but that agreement to refer disputes was not, itself, an agreement in relation to the use or hire of a ship since the arbitration agreement to refer was a contract that was distinct from the principal contract, i.e. the bareboat charter (*see* p. 487, col. 2);

(3) the agreement to refer to arbitration disputes that had arisen under a charter-party must be agreements that were indirectly "in relation to the use or hire of a ship", but they were not agreements that were sufficiently directly "in relation to the use or hire of a ship"; the arbitration agreement was, at least, one step removed from the "use or hire" of a ship; the breach of contract relied on to found the present claim had nothing to do with the use or hire of a ship; it concerned the implied term to fulfil any award made pursuant to the agreement to refer disputes; and the breach of contract relied on when suing on the award did not have the reasonably direct connection with the use or hire of the ship that was necessary to found jurisdiction (*see* p. 487, col. 2; p. 488, col. 1);

(4) on the proper construction of par. (*h*) an action on an award was not one on an agreement which was "in relation to the use or hire of a ship"; and the Court had no jurisdiction to consider the claim under par. (*h*) of s. 20(2) of the Supreme Court Act, 1981 (*see* p. 488, col. 1);

-*The Beldis*, (1936) 53 Ll.L.Rep. 255, applied.

(5) the action and the claim form must be struck out and the service of the claim form in rem must be set

aside; the arrest of the vessel could not be maintained in respect of the claim (*see* p. 488, col. 1);

(6) on the evidence it was very unlikely that the two detained vessels in Romania would achieve more than a scrap value price if sold at Constantza; it was inherently more likely that the vessels would be sold for delivery rather than further afield and the sale value of the vessels at Constantza was between U.S.$300,000 and U.S.$340,000, i.e. enough to meet the claimants' claim (*see* p. 489, col. 1);

(7) the security obtained by the claimants for Award No. 12 in the form of detention of the two vessels by the Constantza Court was adequate security for the enforcement of that claim; and provided that the defendants confirmed that they would undertake not to disturb the enforcement proceedings in Constantza, *Bumbesti* would be released from arrest (*see* p. 489, col. 2).

---

The following cases were referred to in the judgment:

*Alina*, The (C.A.) (1880) L.R. 5 Ex. 227;

*Antonis P Lemos*, The (H.L.) [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711;

*Beldis*, The (C.A.) (1936) 53 Ll.L.Rep. 255; [1936] P. 51;

Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G., [1981] 2 Lloyd's Rep. 446;

Bloemen (F.J.) Pty. Ltd. v. Council of the City of Gold Coast, (P.C.) [1973] A.C. 115;

Bremer Oeltransport G.m.b.H. v. Drewry, (C.A.) (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753;

*Eschersheim*, The (H.L.) [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; (Q.B. (Adm. Ct.)) [1974] 2 Lloyd's Rep. 188; [1975] 1 W.L.R. 83;

Gascoyne v. Edwards, (1826) 1 Y. & J. 19;

Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co., (H.L.) [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255;

Harbour Assurance (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd., (C.A.) [1993] 1 Lloyd's Rep. 455; [1993] Q.B. 701;

Heyman v. Darwins Ltd., (H.L.) (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356;

*Rena K*, The [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377;

*Saint Anna*, The [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895;

*Zeus*, The (1888) 13 P.D. 188.

---

This was an application by the defendants the owners and/or demise charterers of the vessel *Bumbesti* to release the vessel from arrest and/or to set aside the proceedings brought against the vessel by the claimants S.C. Rolinay Sea Star Srl on the grounds inter alia that the arrest was an abuse of process of the Court because the claimants already had adequate security in respect of the claims made and that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants.

Mr. Christopher Smith (instructed by Messrs. Hill Dickinson, Liverpool) for the claimants; Mr. David Garland (instructed by Messrs. Ince & Co.) for the defendants.

The further facts are stated in the judgment of Mr. Justice Aikens.

Judgment was reserved.

Tuesday June 22, 1999

---

### JUDGMENT

**Mr. Justice AIKENS:** This is an application to set aside these proceedings and/or to release the vessel *Bumbesti* from arrest. The claim form was issued on June 8, 1999 and the vessel was arrested in Liverpool on June 9, 1999. Initially the application notice sought an order to set aside the arrest. The ground stated was that the arrest was an abuse of the process of the Court because the claimants already had adequate security in respect of the claims made. However, Mr. Garland for the defendants/applicants made it clear in opening his application that the defendants had a further ground, which was that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants. During the hearing I gave leave to amend the application notice to include this point. Accordingly the application is now put on two bases, which are: (1) that the action in rem and/or the claim form should be set aside under CPR Part 3, r. 3.4(2)(b), on the ground that the Court has no jurisdiction in rem in respect of the claim sought to be made by the claimants in these proceedings. If this ground is successful, then the vessel must be released from arrest, subject to any caveats against release. Ground (2) is that the vessel should be released from arrest pursuant to the Admiralty Court's power to do so under par. 6.6(1)(b) of the Admiralty Court Practice Direction which supplements CPR Part 49, on the basis that the arrest is an abuse of the Court process because the claimants

[1999] Vol. 2  
Q.B. (Adm. Ct.)

LLOYD'S LAW REPORTS  
The "Bumbesti"

483  
AIKENS, J.

already have adequate security for the claim made.

## 2. *The facts*

The defendants are Compania de Navigatie Mari- timie Petromin S.A., which is a Romanian corporation. They were the owners of the vessel *Dacia*. The vessel was bareboat chartered to the claimants by a charter-party dated Feb. 27, 1995. The charter was for three years and was due to expire on Mar. 27, 1998. The charter provided (by cl. 26) that it was governed by Romanian law. Clause 26 also stipulated that disputes would be "solved" by arbitration which was to be organized by the "Chamber of Commerce, Industry and Navigation of Constantza County in accordance with the Rules of Arbitrational Procedure" of that chamber. Clause 55 of the charter provided that disputes between the parties were to be "solved in accordance with the laws of the Romanian State, such laws governing this Charter (see Clause 26)". It was therefore common ground at the hearing that the proper law of the charter was Romanian law and that the procedural law of the arbitrations which have taken place was Romanian law.

3. Disputes did arise under the charter. The claimants, as charterers, alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. Two awards were made by the Constantza Court of Arbitration. They were called Arbitration Award No. 1 and No. 12. Award No. 1, dated Mar. 3, 1998, ordered the defendants, as owners of the vessel, to return her to the claimants for the balance of the charter period, i.e. 53 days. The claimants were also awarded damages of U.S.$186,532 and further sums in respect of stamp duty and legal fees. The vessel was not returned for the balance of the charter. In Arbitration Award No. 12, dated Nov. 10, 1998, the tribunal awarded the claimants a further U.S.$238,072 as damages for the wrongful early determination of the charter. It also awarded further sums in respect of stamp duty and costs. The total sum awarded to the claimants was therefore U.S.$424,604 plus stamp duty and lawyers' fees.

4. The claimants appealed the arbitration awards. The appeal from Award No. 1 was dismissed by the Constantza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constantza Court of Appeal in April, 1999. However, leave has been granted to appeal to the Supreme Court and the hearing will take place on Dec. 2, 1999. The defendants have obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

5. The claimants have attempted to enforce the two awards. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution of all movables and immovables of the defendants in order to meet the sums due on both awards. In respect of Award No. 1 the claimants have put up two bank letters of guarantee following the arrest of *Bumbesti* in Greece and the Netherlands. Those bank guarantees are, in my judgment, sufficient to meet any liability that the defendants have on that award. The bank guarantee in Greece is the subject of proceedings there, but I am satisfied that, quite apart from the vessels in Constantza, the claimants have adequate security for Award No. 1.

6. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution against the defendants in respect of the two awards. Subsequently, two identical bulk carriers that are owned by the defendants, *Tirgu Lapus* and the *Tirgu Neamt*, were seized in Constantza pursuant to commands of the Court of Constantza made on Feb. 9, 1999. The commands required the defendants to pay the sums due under the two awards within 24 hours, or, if they failed to do so, then the vessels, which were identified in the Commands, would be "prosecuted and auctioned off". The exact legal characterization of the process by which the vessels have been detained is in dispute between the parties. But the present position appears to be that both vessels remain detained by order of the Constantza Court, despite attempts by the defendants to rescind the orders. Further, an order for the sale, by public auction, of the two vessels was made by the Court at some date in April, 1999. The auction was set to take place on Apr. 30, 1999. A buyer was found for the two vessels at a price of U.S.$660,000 for the pair, but the deposit was not lodged in time. So the sale was cancelled. Subsequently, on June 8, 1999, the order permitting enforcement against *Tirgu Lapus* was cancelled by the Constantza Court. However, two stamped certificates (one for each vessel), both dated June 15, 1999 and issued by the Constantza harbour master's office, state, in English, that the vessels are arrested. That state of affairs is accepted by both parties.

7. The claim form in this action was issued on June 8, 1999. It states that the claimants bring their action "founded on" the arbitration award dated Nov. 10, 1998 (i.e. Award No. 12). On the following day, June 9, 1999, *Bumbesti* was arrested in Liverpool. The sworn evidence to lead the arrest states that the Award No.12 remains wholly unsatisfied and that the aid of the Court is sought "to enforce payment of or security for the same". The sworn evidence states that security of U.S.$300,000 is sought.

| [1999] Vol. 2 | LLOYD'S LAW REPORTS | 484 |
| Q.B. (Adm. Ct.) | The "Bumbesti" | AIKENS, J. |

8. *The issues*

The principal issues are:

(1) whether the Admiralty Court has jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constantza Court. The only basis of the Court's in rem jurisdiction relied on by the claimants is s. 20(2) par. (*h*) of the Supreme Court Act, 1981. By that paragraph the Admiralty Court has jurisdiction to hear and determine "any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship". (It is common ground that if the claim comes within that paragraph then, pursuant to s. 21(4) of the 1981 Act the in rem jurisdiction of the Court could be invoked. No point was taken by the defendants on s. 21(4)(a) that this claim did not "arise in connection with a ship");

(2) assuming that the Admiralty Court has jurisdiction, then whether *Bumbesti* should be released from arrest because the claimants already have adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constantza, so that the arrest of *Bumbesti* is an abuse of the process of the Court.

9. *Principal issue one: The nature of the claim to enforce Award No. 12*

The proper law governing the arbitration procedure and Award No. 12 was agreed to be Romanian law. However, I received no evidence that Romanian law differs from English law on the nature of an arbitration award and the effect of an award being made. In English law it is clear that if a claim for damages is referred to arbitration and an arbitration award is made awarding the payment of damages, this creates a new right of action for the enforcement of the award that replaces the original cause of action. Strictly speaking the doctrine of "merger" does not apply in the way that it does to an action brought in Court and there could be debate on the precise juridical basis for the rule relating to awards: see Mustill & Boyd on Commercial Arbitration, 2nd. ed., p. 410. But it has been accepted since at least *Gascoyne v. Edwards*, (1826) 1 Y. & J. 19 that a claimant cannot bring a further claim in personam on the original cause of action (if the original cause of action was for damages) once he has an award. (As noted below, it is possible to bring an action in rem: see *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377.)

10. The "brief details of claim" endorsed on the claim form in this case state:

The Claimants bring their action founded on the Arbitration Award dated 10 November 1998, made by The Chamber of Commerce, Industry, Navigation and Agriculture, (CCINA), Constantza, Romania. The said award was in respect of the premature termination of the charterparty dated March 1995, of the *MV "Dacia"*, at that time owned by the Defendant.

It is therefore clear that the claim is one to enforce the award. What is the nature of a claim to enforce an award? It could be a claim for a debt, being the sum awarded. Alternatively it could be a claim for liquidated damages, for a breach, by the party due to pay, of an implied obligation to fulfil the award made. Both solutions have been suggested in the cases. However, the preferred analysis by the Court of Appeal in the leading case of *Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753 was that a claim on an award is a claim for damages for the breach of an implied term in the submission to arbitration that any award made would be fulfilled: see particularly per Lord Justice Slesser at p. 138; p. 764 with whom Lord Justice Romer agreed. That analysis was adopted by Lord Pearson in giving the advice of the Privy Council in *F. J. Bloemen Pty. Ltd. v. Council of the City of Gold Coast*, [1973] A.C. 115 at p. 126. He emphasized that in the case of an arbitration award a new cause of action arises once the award is made, but that the award "cannot be viewed in isolation from the submission under which it was made". Therefore a claimant wishing to enforce an award in English proceedings has to prove not only the award, but also the submission to arbitration which gave the arbitrators power to make their award and which contained the implied term that the parties would fulfil any award made pursuant to the submission.

11. That gives rise to a further question: which "submission" to arbitration is being referred to here? As Mr. Justice Mustill made clear in *Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G.*, [1981] 2 Lloyd's Rep. 446 at p. 455, there are two "submissions" which govern the arbitration of disputes under a substantive contract. First, there is the contract to submit future disputes to arbitration; this will often be annexed to the substantive contract between the parties, in this case the bareboat charter-party. Secondly, there is the contract that is created when a particular disputes arises and the parties refer that dispute to arbitration. The implied term to fulfil the award made must, in my view, be contained in the contract that is created between the parties when the individual dispute arises and it is referred to arbitration. However, in practice there is bound to be reference to the initial general submission to refer disputes to arbitration, as that is the basis upon which individual references will be made.

12. On this analysis, in order to succeed on their claim, the claimants must plead and prove the individual submission to the Constantza Court of arbitration and Award No. 12 that they made on

Apr. 12, 1999 pursuant to that submission. But no more than that need be proved. There is no need to plead and prove the underlying dispute arising under the charter-party.

13. *Is the claim to enforce the award within s. 20(2)(h) of the SCA, 1981*

The next question must be: does this claim to enforce the award fall within the terms of s. 20(2)(*h*) of the Supreme Court Act, 1981? Mr. Smith says that it does and he relies upon the decision of Mr. Justice Sheen in *The Saint Anna*, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895, in which the Judge held that an action to enforce an award made in respect of a contract for the hire of a ship was within par. (*h*). Mr. Garland has submitted that *The Saint Anna* was wrongly decided and that Mr. Justice Sheen should have followed the decision of the Court of Appeal in *The Beldis*, (1936) 53 Ll.L.Rep. 255; [1936] P. 51, which, he said, was binding. In view of these submissions, it is necessary to consider briefly the statutory history of par. (*h*) and some of the decisions that have dealt with it.

14. *The statutory history of par. (h)*

The history has been considered by the House of Lords in a number of recent cases: see *The Eschersheim*, [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; *Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co.*, [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255; and *The Antonis P Lemos*, [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711. From these cases the history of par. (*h*) is established as follows:

(1) Paragraph (*h*) in the 1981 Act reproduced, in the same words, par. (*h*) of s. 1(1) of the Administration of Justice Act, 1956. That section had been enacted to give force in England to the International Convention for the Unification of Certain Rules relating to the Arrest of Seagoing Ships made in Brussels on May 10, 1952 ("the Arrest Convention"). In the Arrest Convention a number of "maritime claims" in respect of which a ship could be arrested are set out at art. 1 under the terms of the Convention. The wording of the Convention is exactly reproduced in the Scottish section of the 1956 Act (s. 47(2) (*d*) and (*e*)). But although two paragraphs have been rolled into one in s. 1(1)(*h*) of the 1956 Act, their effect is not materially different.

(2) The wording of the Arrest Convention list of "maritime claims" was itself based upon the list of the types of claim set out in s. 22(1)(*a*)(*xii*) (1) of the Supreme Court of Judicature (Consolidation) Act, 1925, for which the Admiralty jurisdiction of the High Court could be invoked. This re-enacted s. 5(1)(*a*) of the Administration of Justice Act, 1920. That was the first Act to confer Admiralty jurisdiction on the High Court to consider this type of claim. Neither the High Court of Admiralty, nor its successor (from 1875), the Probate Divorce and Admiralty Division of the High Court, had jurisdiction over claims of the type now covered by par. (*h*).

(3) However, prior to 1920 the County Court did have a limited Admiralty jurisdiction for that type of claim. The jurisdiction was conferred by the County Courts Admiralty Jurisdiction Act, 1868, amended by the County Courts Admiralty Jurisdiction Amendment Act, 1869. Section 2(1) of the latter Act provided that County Courts appointed to have Admiralty jurisdiction could try and determine "any claim arising out of any agreement made in relation to the use or hire of any ship. . .".

(4) Therefore the wording in the 1981 Act can trace its ancestry back to the 1869 Act. The difference in the words used are not significant, as Mr. Justice Brandon observed in *The Eschersheim*: see [1974] 2 Lloyd's Rep. 188 at p. 195, col. 1; [1975] 1 W.L.R. 83 at p. 93G.

15. *The early cases on the construction of par. (h)*

The three House of Lords' cases I have referred to have also considered the Courts' construction of the predecessors of par. (*h*) and that paragraph in the 1981 Act. The Courts construed the 1869 Act paragraph restrictively. They were reluctant to give the County Court a wider Admiralty jurisdiction than the High Court, particularly in relation to charter-party disputes, as that would interfere with the common law Courts which had always asserted exclusive jurisdiction in such cases. Thus it was only in *The Alina*, (1880) L.R. 5 Ex. 227 that the Court of Appeal held that claims arising out of charter-parties were covered by s. 2(1) of the 1869 Act. But in a significant case after *The Alina*, *The Zeus*, (1888) 13 P.D. 188, the Divisional Court held that a claim arising out of a contract to load a ship with coals was not within s. 2 of the 1869 Act. Mr. Garland relied on that case and the fact that it was approved in the House of Lords in both the *Gatoil* case (see p. 187, col. 2; p. 270E per Lord Keith of Kinkel) and *The Antonis P Lemos* (see per Lord Brandon at p. 290, col. 2-p. 291, col. 1; p. 730 G-H). In those cases the House of Lords held that *The Zeus* was authority for a narrow construction of the words "relating to" in s. 2 of the 1869 Act and its statutory successor paragraphs.

16. *The Beldis, (1936) 53 Ll.L.Rep. 255 [1936] P. 51*

The wording of s. 2(1) of the 1869 Act was again considered by the Court of Appeal (The President,

Sir Boyd Merriman, Lord Justice Scott and Mr. Justice Swift) in *The Beldis*, (1936 53 Ll.L.Rep. 255; [1936] P. 51. A claim had been referred to arbitration to recover overpaid charter hire in respect of a charter for a ship called *Belfri*. An award was made in favour of the plaintiffs in the subsequent action, Anglo Soviet Shipping Co. They started a County Court action in rem against a sister-ship of *Belfri*, called *Beldis*. The claim was to recover the sum awarded by the tribunal. The defendant owners did not appear and judgment was entered against them in default. The mortgagees then intervened. The parties put one agreed issue before the County Court Judge. That was whether an Admiralty action in rem could be maintained against *Beldis* when the original claim arose out of a charter-party for *Belfri*. He decided that it could be maintained. When the matter came before the Court of Appeal the President raised the issue of whether there was jurisdiction in rem to deal with this type of claim at all. It appears from the report of the argument (see p. 58 of [1936] P.) that Mr. Owen Bateson for the appellant mortgagees did not take up the jurisdiction point, although he did refer the Court to three cases on the issue, including *The Zeus*.

17. In a reserved judgment the Court held that the claim on the award did not come within s. 2(1) of the 1869 Act. Therefore the County Court could not exercise jurisdiction in rem. The President accepted that if the action had been for the claims that were the subject of the reference to the arbitrator, then they would have fallen within the section, following *The Alina*: see p. 264; p. 61. But he held that this was entirely different from a claim on the award. He pointed out that a plaintiff claiming on an award has only to plead and prove "that certain matters in dispute have been submitted to an arbitrator and that he has made his award in the plaintiff's favour". The President emphasized that it was not necessary, indeed positively wrong, to plead the nature of the original dispute. He concluded that he was not prepared to hold that "a claim upon an award held under the arbitration clause in a charterparty is a claim arising out of any agreement made in relation to the use or hire of a ship". He held it was a "common law claim upon the award and nothing else". The President went on to hold that, if there had been jurisdiction, it was not possible to bring the action in rem against a sistership that was unconnected with the cause of action. Both Lord Justice Scott and Mr. Justice Swift agreed on the second point of decision.

18. Lord Justice Scott noted that when the 1869 Act was passed, there was a statutory means for enforcing arbitration awards by obtaining from one of the three common law Courts a rule absolute for payment of the sum awarded: see p. 274; p. 82.

Therefore, he remarked, it was unlikely that an Admiralty jurisdiction would be created to enforce an arbitration award, unless the statutory wording clearly did so. He concluded that the wording of s. 2(1) clearly did *not* confer this jurisdiction. He also pointed out that the history of the statutory extension of the Admiralty Court's jurisdiction in the 1840 and 1861 Acts was in

> . . .precise, plain and carefully guarded terms; and, in the case of those founded on contract, the cause of action was one directly based upon the maritime contract described in the section.

In his view, because of this approach, it would be "entirely wrong to hold that an action on an award arising out of such a maritime contract was included by the words of" the 1840 and 1861 Acts which gave the Admiralty Court jurisdiction over certain types of contractual claim e.g. in relation to towage and bills of lading. He concluded that the legislature must have adopted a similar approach to the County Court jurisdiction in Admiralty. He therefore concluded:

> . . .it would in my judgment be plainly wrong to say that under s. 2 sub-s.1 of the 1869 Act a County Court has Admiralty jurisdiction to entertain an action upon an award upon a voluntary submission, merely because the arbitration was held pursuant to an arbitration clause in a Charter-party for the reference of disputes arising out of that charter-party.

19. The decision in *The Beldis* stood undisturbed until 1983. In *The Eschersheim* Mr. Justice Brandon commented on it (at p. 196, col. 1; p. 94F-G), saying that the basis of the decision was that the relevant claim did not arise out of the agreement (i.e. the charter-party), although the agreement related to the use or hire of a ship. He commented that that ground of decision in the *The Beldis* "does not seem to be consistent with *Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753, which was apparently not cited". As already noted, the Court of Appeal in that case had held that an action on an award was founded on the breach of an implied term in the agreement to submit the differences of which the award was the result. Therefore the Court held that, for the purposes of the existing O. XI r. 1(*e*), the claim on an award was one "to enforce a contract made within the jurisdiction". (This was so, even though the award itself was made in Hamburg.) I am not sure that Mr. Justice Brandon was correct to suggest that in *The Beldis* the Court of Appeal was emphasizing that it was the first part of the sentence of the section (i.e. "claim arising out of any agreement") that was not fulfilled. The President

refers to the whole sentence at p. 264, col. 1; p. 63 and Lord Justice Scott recognized that the action on the award arose "indirectly" out of the maritime contract: see p. 274, col. 2; p. 83. However, it should be noted that Mr. Justice Brandon did not say that *The Beldis* was decided per incuriam although he clearly had doubts about it.

20. *The Saint Anna*, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895

The issue of whether an action on an award could be the subject of an Admiralty action in rem arose in this case, in which the plaintiffs sought judgment in default of defence. The action was on an award made in favour of charterers and against the owners of *Saint Anna*. That vessel had been arrested and sold by the Admiralty Marshal at the suit of numerous claimants. The plaintiffs had issued a writ in rem against the proceeds of sale of the vessel. Mr. Justice Sheen heard argument only from the plaintiffs, but both *The Beldis* and *Bremer Oeltransport* were cited, as were the passages of Mr. Justice Brandon in *The Eschersheim* and relevant text books. Having referred to both cases, Mr. Justice Sheen concluded: (1) that *Bremer Oeltransport* was clear authority for the proposition that an action based upon an award is an action for the enforcement of the contract which contains the submission to arbitration, i.e. the charter-party; (2) an action to enforce an award necessitates pleading and proving the arbitration submission and the award; (3) a claim to enforce a charter-party is within the Admiralty jurisdiction of the High Court; (4) because one ground of decision of *The Beldis* was inconsistent with *Bremer Oeltransport* -

. . .that leaves me free to decide which authority I should follow. As the decision in [*Bremer*] was not brought to the attention of the Court of Appeal during argument in *The Beldis* and as I find myself convinced by the reason in the latter case, I have no hesitation in following it.

21. Mr. Smith drew my attention to the fact that *The Saint Anna* has been followed in the Hong Kong and Singapore Courts. He also submitted that it has been referred to in text books without criticism, save for a cautionary note in Dicey & Morris on The Conflict of Laws (12th ed.; pp. 605 and 608). So far as Counsel can discern, there is no reported decision either following it or dissenting from it in England. However, in the *Gatoil* case in the House of Lords, Lord Keith of Kinkel refers, without comment, to the decision of the Court of Appeal in *The Beldis* but *The Saint Anna* was not cited. Nor was it in *The Antonis P Lemos*.

22. *Conclusion on principal issue one: Is a claim on an arbitration award within par. (h) of s. 20(2) of the Supreme Court Act, 1981?*

I have come to the conclusion that the answer I must give to this question is "no". I think that it is not within the paragraph as a matter of construction. I also consider that I am bound by the decision of the Court of Appeal in *The Beldis*. My reasons are as follows:

(1) The "claim" in this case is the action on the award. That "claim" clearly "arises out of" the agreement to refer the disputes that had arisen under the bareboat charter-party. In *The Antonis P Lemos* the House of Lords held that the phrase "arises out of" in par. (*h*) should be given a broad construction, so as to mean "in connection with": see p. 290, cols. 1 and 2; p. 731F. Upon the analysis of the Court of Appeal in *Bremer Oeltransport* a claim on an award "arises out of" or is "in connection with", the agreement to refer the particular dispute to arbitration, or the agreement to refer future disputes generally to arbitration.

(2) However, that agreement to refer disputes is not, itself, an "agreement in relation to the use or hire of a ship". This is because the arbitration agreement, whether it is the individual reference or the general agreement to refer, is a contract that is distinct from the principal contract, i.e. the bareboat charter-party in this case. The distinction between the contracts is, as Mr. Garland submitted, made clear in cases such as *Heyman v. Darwins Ltd.*, (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356; and *Harbour Assurance (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd.*, [1993] 1 Lloyd's Rep. 455; [1993] Q.B. 701; and see s. 7 of the Arbitration Act, 1996.

(3) In *The Antonis P Lemos*, at p. 289, col. 2; p. 730 F-G, the House of Lords accepted that the authorities on par. (*h*) of the 1981 Act and its statutory predecessors made it clear that a narrow meaning must be given to the expression "in relation to" in that paragraph. The agreement to refer to arbitration individual disputes that have arisen out of a charter-party, or the agreement to refer future disputes in general that arise out of a charter-party, must be agreements that are *indirectly* "in relation to the use or hire of a ship". But, in my view, they are not agreements that are *sufficiently directly* "in relation to the use or hire of a ship". The arbitration agreement is, at least, one step removed from the "use or hire" of a ship. The breach of contract relied upon to found the present claim has nothing to do with the use or hire of the ship; it concerns the implied term to fulfil any award made pursuant to the agreement to refer disputes. In my view the breach of the contract relied on when suing on an award does not have the

"reasonably direct connection with" the use or hire of the ship that Lord Keith held in the *Gatoil* case was necessary to found jurisdiction under this paragraph: see p. 188, col. 1; p. 271A-B.

(4) Therefore, upon the proper construction of par. (*h*), an action on an award is not one on an agreement which is "in relation to the use or hire of a ship". This was the conclusion of the Court of Appeal in *The Beldis*. The current paragraph is the statutory successor to the wording that was considered in that case. Unless there is some material distinction in the wording, then I believe that I must follow the construction given by the Court of Appeal to the wording in that case. There is no significant distinction, as Mr. Justice Brandon pointed out in *The Eschersheim*: see p. 195, col. 1; p. 93G.

(5) With great respect to Mr. Justice Sheen I cannot accept his view that the decision in *The Beldis* was "inconsistent with" the *Bremer Oeltransport* case. The latter case was not dealing with the proper construction of this head of Admiralty jurisdiction. And the analysis in both cases of the constituents of an action on an arbitration award is remarkably similar. Both make it clear that the submission to arbitration must be pleaded and proved as well as the award itself.

(6) Even assuming that an action on an award is one "in connection with" the underlying submission to refer, there remains the question, critical to the present issue, of whether that submission is sufficiently directly related to the use or hire of a ship to make the matter fall within par. (*h*). That point was not at issue in *Bremer Oeltransport*, but it was in *The Beldis*, which decided the point against the claimants. I am satisfied that the decision was not "per incuriam" and that I must follow it.

23. Therefore I have concluded that Mr. Garland is correct in his submission that the Admiralty Court has no jurisdiction to consider this claim under par. (*h*) of s. 20(2) of the Supreme Court Act, 1981. Accordingly, the action and the claim form must be struck out and the service of the claim form in rem must be set aside. It must also follow that the arrest of the vessel cannot be maintained in respect of this claim.

24. *The second principal issue: that the arrest is an abuse of the process of the Court as the claimants already have adequate security*

This point obviously only arises if I am wrong on the first issue. Both parties accept that the Court has the power to release the vessel from arrest under par. 6.6(1) of the Practice Direction forming the Admiralty Court Guide. Mr. Smith for the claimants accepted that there should be a release if the Court is satisfied that the claim to enforce Award No. 12 is otherwise adequately secured. The only "security" considered was the detention of the two vessels at Constantza. There was some debate as to how "adequate" the security had to be. Mr. Smith contended that the security had to be as good as the arrest of *Bumbesti* both in terms of amount and the "quality" of the protection. But he accepted that the nature of the protection of the security did not have to equate exactly with an arrest by the English Admiralty Court. Mr. Garland ultimately accepted these tests. Therefore there are two issues that I have to deal with under this heading: (1) is the correct value of the vessels, as detained in Constantza sufficient to discharge the claim: and (2) is the protection over the vessels that is provided by the Constantza Court order adequate?

25. *The amount of the claim on Award No. 12*

As already noted, the total claim under Award No. 12 is for damages of U.S.$238,072, plus stamp duty and lawyers' fees. The parties agreed that the latter two figures probably amount to about U.S.$9000, making a total of U.S.$247,072. Under the award there is no entitlement to interest on the principal sum. Even if I assume that interest can be awarded somehow, then the maximum figure for which the claimants could legitimately seek security is, in my view, U.S.$300,000.

26. *Value of the vessels as detained in Constantza*

The evidence on value was conflicting. *Tirgu Neamt* is 21 years old, is in class but is laid up. *Tirgu Lapus* is nearly 21 years old and has been out of class since October, 1998. A Romanian company has put a "market value" on *Tirgu Neamt* of U.S.$750,000. Mr. Garland says that should be accepted and as the vessels are identical, it is the market value of *Tirgu Lapus* also. But if the vessels were sold in Constantza, whether pursuant to a Court auction or privately, it would be at a "forced sale" value. The valuation report does not say that the figure of U.S.$750,000 represents the sum that would be obtained in a "forced sale" of the vessels in their present condition and I am sure that sum would not be realized.

27. Mr. Garland next relies on the figure that was offered by a Cypriot company that had agreed to buy the vessels through the Constantza Court but then failed to pay the deposit. The total price for both vessels was agreed at U.S.$660,000. As this sale did not go ahead I am sceptical about the utility of the sum agreed. I am also sceptical about the "offer" apparently made to the defendants by N. G. Moundreas Shipping S.A. on June 9, 1999. The price "offered" for both vessels was U.S.$470,000. There was no evidence of how this offer came to be

Case 1:08-cv-02351-HB   Document 12   Filed 05/02/2008   Page 13 of 14

[1999] Vol. 2                   LLOYD'S LAW REPORTS                   489
Q.B. (Adm. Ct.)                   The "Bumbesti"                   AIKENS, J.

made and, given that the vessels were detained in Constantza at the time, I must doubt whether it was a genuine offer.

28. Lastly there is evidence of the value of the vessels from the well known ship sale and purchase brokers English White Shipping Ltd. That gives a valuation of U.S.$600,000 for each of the vessels, assuming them to be "in seaworthy condition, capable of proceeding under their own power, in average condition for their age and in Class". I have concluded that these conditions are not satisfied in either case. *Tirgu Lapus* is out of class and the Romanian company's valuation report on *Tirgu Neamt* states that "in order for the vessel to be operated on [sic], high investments are necessary". That must mean that *Tirgu Neamt* is probably neither seaworthy, nor capable of proceeding under her own power nor in average condition for her age, even if she is still, technically, in Class.

29. English White also gives a scrap valuation of the vessels. The net value would depend on where the vessels were to be delivered, because the cost of towage to any destination far from Constantza would be high. The two scrap markets suggested by English White are the Indian sub-continent and Turkey. If the vessels were sold for delivery to the former, the net sale proceeds would probably be only U.S.$40,000; if for delivery to the latter the net proceeds would be about U.S.$340,000. There is no evidence as to which destination would be more likely.

30. On the evidence I have concluded that it is very unlikely that the two vessels would achieve much more than a scrap value price if sold at Constantza. But there is evidence of an available scrap market in Turkey. It seems to me inherently more likely that the vessels would be sold for delivery there rather than further afield. Therefore, although the evidence is not entirely satisfactory, I have concluded that the sale value of the vessels at Constantza is between U.S.$300,000 and U.S.$340,000, i.e. enough to meet the claimants' claim.

31. *The nature of the protection of the security given by the Constantza Court order*

Mr. Smith submits that the vessels are not in the custody of the Constantza Court in the same way that vessels under arrest in an Admiralty action in rem are in the custody of the Admiralty Marshal. Therefore the protection given by the Constantza Court order is not as good as that of an arrest in England. There was some evidence of the nature of the detention of the vessels by the Constantza Court. The original application for execution was no specifically an "Admiralty" provision, but is a form of execution available against all assets. But the "commandment" made on Feb. 9, 1999 against each vessel was issued under arts. 914 and 915 of the Romanian Commercial Code and is an Admiralty provision. That deals with the seizure and enforcement of existing judgments against vessels. The commandment gives the claimant a priority over subsequent claimants in receiving payment out of the proceeds of sale of the vessel. It is accepted by the Romanian lawyers acting for the defendants that the effect of the suspension (by the Supreme Court) of the execution of Award No. 12 does not affect the seizure of the two vessels: see the fax of Musat & Associatii dated June 17, 1999: exhibited to PEM 2. Mr. Smith also accepted that the effect of the seizure was that the defendants could not attempt to sell the vessels, except with the approval of the Constantza Court.

32. There was controversy as to whether the defendants could lawfully use the vessels for trading while remaining seized by the Romanian Court. I asked Mr. Garland if his clients would be prepared to give an undertaking not to use the vessels while remaining seized by the Constantza Court. The undertaking that the defendants are prepared to give, assuming that the arrest in the English proceedings was set aside, is set out in a fax from Ince. & Co. to the Court dated June 18, 1999 (although only sent on June 21), as follows:

> Not to disturb the enforcement proceedings against the two vessels detained in Constantza pending determination of the appeal to the Romanian Supreme Court, this undertaking specifically reserving [the Defendants'] right to apply to the court on 13 July for the suspension of the right of sale to continue throughout that period.

That undertaking would, I think, adequately preserve the rights of the claimants on the two vessels given the existing orders of the Contantza Court over the vessels.

33. *Conclusions on the second principal issue*

I have concluded that the security obtained by the claimants for Award No. 12, in the form of the detention of the two vessels by the Constantza Court, is adequate security for the enforcement of that claim. Accordingly, provided that the defendants confirm that they will give the undertaking set out in Ince's fax of June 18, I propose to release *Bumbesti* from arrest in this action. I should, however, note two further points. First, I was informed by Mr. Smith that the claimants would be issuing further proceedings in rem against *Bumbesti* and so they had issued a caveat against the release of the vessel. The proposed proceedings were in the form of a claim, brought in rem, based on the original cause of action under the bareboat charter.

| [1999] Vol. 2 | LLOYD'S LAW REPORTS | 490 |
| Q.B. (Adm. Ct.) | The "Bumbesti" | AIKENS, J. |

The right to bring this form of action is said to be based on the decision of Mr. Justice Brandon in *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377. In that case Mr. Justice Brandon held that a cause of action in rem does not merge with a judgment made in personam, but remains available so long as the judgment in personam remains unsatisfied. He also accepted that this principle could apply to arbitration awards: see p. 559, col. 2 to p. 560, cols. 1 and 2; pp. 405B to 406F. I do not know whether the claimants will maintain their caveat in the light of my conclusion on principal issue two.

34. Secondly, I note that the claimants were prepared to undertake to release their security over the two vessels in Constantza if the arrest of *Bumbesti* were to be maintained. As I have held that it should not be, this undertaking is irrelevant.