UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

PINK GOOSE (CAYMAN) LTD.,

                      Plaintiff,

     - against -

SUNWAY TRADERS LLC,
SUNWAY GROUP, SUNWAY TRADING GROUP LTD.,:
SUNWAY GROUP INTERNATIONAL HOLDINGS,
SUNWAY GROUP IMPORT, SUNWAY LOGISTICS,
and LINTON EQUITIES B.V.I.,

                  Defendants.
----------------------------------------------------------------X

08 CV 2351 (HB)

ECF CASE

## DECLARATION OF MICHAEL SMITH IN OPPOSITION
## TO SUNWAY-GROUP CO. LTD.'S MOTION TO VACATE

I, Michael Smith, hereby declare as follows pursuant to 28 U.S.C. § 1746:

1.   I am a solicitor and partner of Mills & Co., Milburn House, Dean Street, Newcastle Upon Tyne, NE1 1 LE, and represent the plaintiff Pink Goose (Cayman) Ltd. I qualified as a solicitor in 1988 and have practised shipping law since then.

2.   I have read the declaration of Mr Swinnerton. Whilst in most circumstances I would agree with him that a claim to enforce an arbitration award will not be a maritime claim which would permit the English court to issue a warrant of arrest, there will be circumstances, when the claim leading to the award involves maritime matters, that a claim to enforce the award will be a maritime claim.

3.   The provision of English law which sets out which claims are maritime claims is section 20 of the Supreme Court Act 1981. The parts of the section relevant to this matter are as follows:

    *20(1)   The Admiralty jurisdiction of the High Court shall be as follows, that is to say –*

    *(a)   jurisdiction to hear and determine any of the questions and claims mentioned in sub-section (2);*

    ...

    *(2)   The questions and claims referred in sub-section (1)(a) are –*

1

...

 (h) *any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship;*

4. I believe that an arbitration award on a claim pursuant to a charterparty falls within section 20(2)(h). Mr Swinnerton relies upon the decision in The "Bumbesti" in support of his view that such a claim is not a maritime claim. It is correct that in The "Bumbesti" Mr Justice Aikens stated that an arbitration award on a claim pursuant to a charterparty did not fall within that section. In doing so, however, he refused to follow an earlier decision in The "Saint Anna" [1983] 1 Lloyd's Rep 637. In that case Mr Justice Sheen took exactly the opposite view to that of Mr Justice Aikens. He held that a claim to enforce an arbitration award based upon a voyage charter was a claim arising out of an agreement relating to the carriage of goods in a ship and therefore within the Admiralty jurisdiction.

5. Both of the decisions in The "Bumbesti" and The "Saint Anna" are first instance decisions. As such they are not binding authority upon another court but are merely persuasive. For the following three reasons, I believe that another court considering the issue would follow the decision of Mr Justice Sheen in The "Saint Anna":

(a) The views expressed by Mr Justice Aikens in The "Bumbesti" were not necessary to his decision and were therefore obiter dicta. In addition to holding that the claim to reinforce the award was not a maritime claim so that the arrest was not justified, he also held that the arrest should be set aside because the Plaintiffs already had sufficient security (see pages 488 and 489 of the report). Indeed, this was the original basis of the Plaintiffs' application to set aside the arrest of the vessel. The views expressed by Mr Justice Aikens being obiter dicta, the decision would, therefore, be given less weight by another court.

(b) Mr Justice Sheen who gave the decision in The "Saint Anna" was an Admiralty judge. As such his views on the extent of the Admiralty Court's jurisdiction would carry more weight than those of Mr Justice Aikens who, although a well respected Commercial Court judge, would not have the same degree of familiarity with the Admiralty jurisdiction.

(c) As set out below, as a matter of principle the decision of Mr Justice Sheen is to be preferred.

6. Under English law the phrase *"arising out of"* in section 20(2)(h) is to be given a wide meaning. Thus in The "Antonis P. Lemos" [1985] 1 Lloyd's Rep 280, the House of Lords (the ultimate appeal court in England) held that the phrase should be given *"a broad and liberal construction"* (see page 286 of the report).

7. In that case the Appellants who were owners of the vessel had chartered the vessel to a company called Sammisa. They in turn had sub-chartered the vessel to the Respondents, Samick Lines, who had sub-sub-chartered the vessel to Agri Industries. Under the sub-

sub-charter the Respondents warranted that the vessel's maximum draft on arrival at the discharge port would not exceed 32' in salt water. When, however, the vessel arrived at her discharge port of Alexandria the draft did exceed 32'. By reason of this the Respondents were held liable for the costs of lightering the vessel. To recover those costs they commenced proceedings against the Appellants in tort.

8.      The House of Lords held that although the Respondents' claim was not made pursuant to a charterparty between them and the Appellants and in fact was not even made pursuant to any contract, nevertheless it was still a claim arising out of a charterparty (ie. an agreement relating to the carriage of goods in a ship). Lord Brandon stated inter alia at page 286 of the report:

> "*Lord Justice Parker, in his judgment in the Court of Appeal, accepted the proposition put forward by the respondents that, since the provisions of 1981 Act relating to the Admiralty Jurisdiction of the High Court was designed to give domestic effect to an international convention, [the 1952 Arrest Convention] a broad and liberal construction should be given to them. There is ample authority to support this as a general proposition, to some of which Lord Justice Parker referred in his judgment. I have no doubt that the proposition is, in general, correct, and that Lord Justice Parker was right to accept if*" (my insertion in parentheses).

9.      On the basis of this decision, I believe that a claim under an award made pursuant to a claim under a charterparty is just as much a claim arising out of an agreement relating to the carriage of goods in a ship as a claim in tort connected with a charterparty.

10.     In The "Bumbesti" Mr Justice Aikens recognised that an action on the award did at least in some sense arise out of the charterparty. At paragraph 22(1) at page 487 of the report he stated:

> "*The "claim" in this case is the action on the award. That "claim" clearly "arises out of" the agreement to refer the disputes that had arisen under the bareboat charterparty. In The "Antonis P. Lemos" the House of Lords held that the phrase "arises out of" in par (h) should be given a broad construction, so as to mean "in connection with": see p290, cols. 1 and 2; p731f. Upon the analysis of the Court of Appeal in Bremer Oeltransport a claim on an award "arises out of" or is "in connection with", the agreement to refer the particular dispute to arbitration, or an agreement to refer future disputes to a mutual arbitration.*"

11.     Having so held, however, Mr Justice Aikens proceeded to decide in paragraphs 22(2) and (3) that the agreement to refer disputes was not itself an "*agreement in relation to the use or hire of a ship*" as that agreement arose upon the submission of the dispute to arbitration rather than in the agreement to arbitrate set out in the charterparty. Thus whilst he held that a claim on an award did "*indirectly*" arise out of a charterparty he believed it did not do so "*sufficiently directly*"   .

12.    I believe that Mr Justice Aikens was wrong in reaching this conclusion. Even if the agreement upon which the claim to enforce the award was based was the agreement to submit disputes to arbitration made on the commencement of arbitration rather than the agreement to arbitrate in the charterparty, this would not prevent the claim from being one within section 20(2)(h). Taking the *"broad and liberal construction"* of the phrase (as required by the House of Lords in The *"Antonis P. Lemos"*, the claim based on the agreement to submit made on the commencement of arbitration would be just as much a claim arising out of the charterparty as a claim in tort, which the House of Lords in The "Antonis P. Lemos" held was a maritime claim.

13.    The distinction between a claim arising directly or indirectly was not one made by either section 20 or by the other authorities.

14.    What is more, I believe that Mr Justice Aikens' characterisation of a claim to enforce an award as one based upon an agreement entered into on the submission of the claim to arbitration rather than pursuant to the charterparty is incorrect. In The "Saint Anna" the court held that the claim to enforce the award was one made pursuant to the charterparty. Thus at page 638 of the report, Mr Justice Sheen stated;

       *"The statement of claim endorsed on the writ recites the relevant terms of the charter-party and alleges, correctly in my judgment, that it was an implied term of the arbitration agreement contained in the charter-party that each party would pay to the other any sum found due by the arbitrators appointed in accordance with that agreement"* (my emphasis).

15.    The decision of Mr Justice Sheen in The "Saint Anna" is supported by a decision of the Court of Appeal. In Bremer Oeltransport, GmbH v Drewry a dispute arose under a charterparty which had been made in London. Pursuant to clause 18 of the charterparty, the dispute was referred to an arbitration in Hamburg. The Defendant who was resident in Paris failed to pay the award made against him. Accordingly the Plaintiff brought a claim in the English courts to enforce the award. As the Defendant was not resident in the jurisdiction the Plaintiff required the permission of the court to issue and serve the writ on the Defendant in Paris (ie. to proceed with the claim). One of the grounds on which the Plaintiff sought permission to proceed with the claim was that the claim was to enforce a contract made within the jurisdiction. Pursuant to the court rules this was indeed a basis on which the court could exercise jurisdiction against a non-resident defendant. The Defendant, however, argued that the Plaintiff's claim was not one to enforce the charterparty (which had been made in England) but rather a claim to enforce the award which had been made in Hamburg.

16.    The Court of Appeal decided that permission to issue and serve a writ in Paris would be given. Lord Justice Slesser stated at page 138 of the report:

       *"Without, therefore, finally determining whether an action may or may not be brought on an implied contract in the award itself, I am clearly of opinion that it may be brought*

4

*upon an agreement containing a term to refer disputes, and that the present claim is properly pleaded as arising from such an agreement.*

*It is, therefore, an action for the enforcement of a contract made within the jurisdiction."*

17.   Accordingly, the Court of Appeal clearly held that the claim to enforce the arbitration award was made pursuant to the charterparty which contained the arbitration agreement rather than any agreement which arose upon the commencement of the arbitration proceedings.

18.   Further support for the decisions in The "Saint Anna" and in Bremer Oeltransport v Drewry can be found in the decision FJ Bloemen Pty Limited v The Council of the City of Gold Coast [1972] 3 All ER 357. This was a decision of the Privy Council. The Privy Council is the ultimate Appeal Court for a number of commonwealth jurisdictions including at that time Australia. Although decisions of the Privy Council are not binding authority upon English courts, they are (given that the Privy Council is generally composed of the same judges as the House of Lords) extremely persuasive.

19.   In that case, the Plaintiff had obtained an arbitration award pursuant to a contract. The contract contained a provision (clause 35) requiring that the Defendant pay interest on unpaid sums due under the contract. Although the arbitrator made an award of a small amount of interest in his award, the Plaintiff later sought in court proceedings to recover full interest on the amount of the award.

20.   One of the grounds on which the Defendant contested the Plaintiff's entitlement to recover interest was that by clause 35 the Plaintiff was entitled to interest only on amounts due under the contract. The Defendant argued that the monies awarded were not monies due under the contract but under the further agreement represented by the award. The Privy Council disagreed and Lord Pearson stated at page 363 of the report:

*"It is true -- as the cases above referred to show -- that when an arbitrator fixes a sum to be paid by one party to the submission by way of damages for breach of contract the award creates a fresh cause of action superseding that arising out of the breach. But it does not appear to their Lordships to follow from that that the cause of action which comes into existence when the award is made cannot be said to arise under the contract which contains the submission. The award of an arbitrator differs materially from a judgment. The Plaintiff's right to sue and the court's right to give judgment for him if he proves his case are not derived from the agreement of the parties and the judgment when given is an entirely fresh departure. The award and arbitrator on the other hand cannot be viewed in isolation from the submission under which it was made. It was this sort of consideration which led the Court of Appeal in the Bremer Oeltransport GmbH v Drewry to hold that an action brought to recover a sum awarded by an award made in Hamburg under a submission contained in a contract made in London was an action brought to enforce a contract made within the jurisdiction and their Lordships think that the same reasoning applies here".*

21.   Accordingly, the decision of the Court of Appeal in the Bremer Oeltransport case was endorsed by the Privy Council. The Privy Counsel held that a cause of action which comes into existence when an arbitration award is made can be said to arise under the contract which contained the submission to arbitration and that that contract (ie the one containing the submission) was the substantive contract rather than an agreement entered into on the commencement of arbitration.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of May 2008 at Newcastle Upon Tyne, England.

MICHAEL SMITH

6

# EXHIBIT 1

[1983] Vol. 1                          Lloyd's Rep.                                    637

## QUEEN'S BENCH DIVISION
## (ADMIRALTY COURT)

Feb. 24, 1983

## THE "SAINT ANNA"

### Before Mr. Justice SHEEN

Admiralty practice – Ac ion on arbitration award – Arbitrators found in favour of plaintiffs – Plaintiffs issued writ in rem against proceeds of sale of vessel – Whether Court had jurisdiction to give judgment for plaintiffs – Whether plaintiffs could be paid out of proceeds of sale of vessel.

By a tanker voyage charter, made in London on June 2, 1977, in a modified Exxonvoy 1969 form the plaintiffs chartered the vessel *Saint Anna* (formerly *Agni*) from her owners for the carriage of a quantity of fuel oil from one port in northern Europe to one or two ports in Italy. The charter provided inter alia that the carriage of the cargo was to be subject to the Hague Rules and that all disputes were to be referred to arbitration in London.

A dispute arose between the parties in respect of a cargo of fuel oil which the plaintiffs alleged was short-delivered at the discharge port in Sicily. The dispute was referred to arbitration and the arbitrators found in favour of the plaintiffs. The award was not satisfied and no payment had been made in respect of it.

On Oct. 6, 1981, Mr. Justice Parker gave leave to enforce the award dated Aug. 16, 1979, pursuant to s. 26 of the Arbitration Act, 1950, in the same manner as a judgment or order to the same effect. The award was not registered as a judgment.

In 1979, mortgagees of *Saint Anna* issued a writ in rem claiming arrears of principal and interest and *Saint Anna* was arrested in Ellesmere Port on July 20, 1979. On Aug. 13, 1979, Mr. Justice Neill ordered that *Saint Anna* be appraised and sold by the Admiralty Marshal pendente lite. Pursuant to that order *Saint Anna* was sold on Dec. 16, 1979. The proceeds of sale were brought into Court and there was sufficient money in Court to satisfy all the claims of which the Court had knowledge.

On Feb. 24, 1982, the plaintiffs issued a writ in rem out of the Admiralty Registry against the proceeds of sale of *Saint Anna*. The plaintiffs alleged that it was an implied term of the arbitration agreement contained in the charter that each party would pay to the other any sum found due by the arbitrators, that a dispute arose under the charter, that the parties appointed their arbitrators and that the arbitrators found that certain sums were due from the owners of *Saint Anna* to the plaintiffs. The plaintiffs applied for judgment in default of service of a defence.

—*Held*, by Q.B. (Adm. Ct.) (SHEEN, J.), that (1) an action based on an award was an action for the enforcement of the contract which contained the submission to arbitration and there could be no doubt that an action for the enforcement of a voyage charter was a claim within the Admiralty jurisdiction of this Court (*see* p. 640, col. 1);

—*Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133 applied.

(2) the essential elements of an action on an award were that the plaintiffs had to plead and prove both the agreement and the award; here the action arose out of the charter-party, and in the circumstances the claim was within the Admiralty jurisdiction of this Court and there would be judgment for the plaintiffs on their claim (*see* p. 641, col. 1).

The following cases were referred to in the judgment:

*Beldis*, The, (C.A.) (1936) 53 Ll.L.Rep. 255; [1936] P. 51;
*Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753;
*Eschersheim*, The, [1974] 2 Lloyd's Rep. 188; [1975] 1 W.L.R. 83; (C.A.) [1976] 1 Lloyd's Rep. 81; [1976] 1 W.L.R. 339; (H.L.) [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430;
*Henrich Bjorn*, The, (1885) 10 P.D. 44;
*Tarmarea S.R.L. v. Rederiaktiebolaget Sally*, [1979] 2 Lloyd's Rep. 439; [1979] 1 W.L.R. 1320.

This was a motion for judgment in default of service of a defence. The plaintiffs, the charterers, issued a writ in rem against the defendants, the owners of *Saint Anna* claiming that the defendants were bound to pay the sums due under the arbitration award to the plaintiffs and that such sums should be paid out of the proceeds of sale of *Saint Anna*.

Mr. Timothy Charlton (instructed by Messrs. Clyde & Co.) for the plaintiffs.

The further facts are stated in the judgment of Mr. Justice Sheen.

Judgment was reserved.

Tuesday, Mar. 1, 1983

## JUDGMENT

Mr. Justice SHEEN: This is a motion for judgment in default of service of a defence.

| [1983] Vol. 1 | Lloyd's Rep. | 638 |
| Q.B. (Adm. Ct.) | The "Saint Anna" | Sheen, J. |

The plaintiffs' claim arises in this way. By a tanker voyage charter-party made in London on June 2, 1977, in a modified "Exxonvoy 1969" form, the plaintiffs hired the Greek tanker *Saint Anna* (then known as *Agnli*) from her owners, who were Croydon Corporation of Panama, for the carriage of a quantity of fuel oil from one port in northern Europe to one or two ports in Italy.

That charter-party contained the following relevant terms:

20 (b) the carriage of cargo under this Charter Party and under all bills of lading issued for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vii) of this clause . . .

(i) CLAUSE PARAMOUNT. [- which incorporated the Hague Rules, and which I need not set out in full -]

24 ARBITRATION. Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to Arbitration in the City of New York or in the City of London whichever place is specified in Part I of this Charter pursuant to the laws relating to arbitration there in force, before a board of three persons consisting of one arbitrator to be appointed by the Owner, one by the Charterer, and one by the two so chosen. The decision of any two of the three on any point or points shall be final.

Part I specified the place of arbitration to be London.

A dispute arose between the plaintiffs and the defendants in respect of a cargo of fuel oil which the plaintiffs alleged was short-delivery at the discharge port in Sicily. The plaintiffs' claim arising out of the alleged short-delivery was a claim which, in the absence of the submission to arbitration, could have been brought by an action in rem in this Court provided that the writ was issued within one year of completion of discharge.

On June 20, 1978, solicitors acting on behalf of the plaintiffs appointed Mr. R. W. Reed as arbitrator on behalf of the owners as claimants. In due course the defendants appointed Mr. Donald Davies as their arbitrator. Those arbitrators did not appoint a third arbitrator. Their failure to do so did not deprive them Or jurisdiction. (See: *Tarmarsa S.R.L. v. Rederiaktiebolaget Sally*, [1979] 2 Lloyd's Rep. 439; [1979] 1 W.L.R. 1320).

On Aug. 16, 1979, the arbitrators published their final award by which they adjudged that

the owners of *Saint Anna*, the defendants in this action, forthwith pay to the plaintiffs the sum of U.S. $105,923.87 together with interest at the rate of 8 per cent. per annum as from July 1, 1977, to the date of the award. The arbitrators further awarded and adjudged that the owners do bear and pay their own and the charterers' costs in the reference and that the owners do bear and pay the cost of the award, which amounted to £580. The defendants have not paid the sums due under that award.

Thus the facts with which I am concerned can be summarized in this way:

(1) There was a contract (the charter-party) between the plaintiffs and the defendants for the carriage of oil in the ship *Saint Anna*.

(2) That charter-party contained an agreement to submit disputes to arbitration.

(3) A dispute arose out of the charter.

(4) Arbitrators were appointed in accordance with the agreement. Those arbitrators made an award in the plaintiffs' favour.

(5) That award has not been satisfied. Indeed, there has been no payment made in respect of it.

For the sake of completeness I should say that on Oct. 6, 1981, Mr. Justice Parker gave leave to enforce the arbitration award dated Aug. 16, 1979, pursuant to s. 26 of the Arbitration Act, 1950, in the same manner as a judgment or order to the same effect. The award has not been registered as a judgment.

In recent years many actions in rem have been brought against the ship *Saint Anna*. In 1979 mortgagees of *Saint Anna* issued a writ in rem, claiming arrears of principal and interest due under the mortgage. *Saint Anna* was arrested in Ellesmere Port on July 20, 1979. On Aug. 13, 1979, the vacation Judge, Mr. Justice Neill, ordered that *Saint Anna* be appraised and sold by the Admiralty Marshal pendente lite. Pursuant to that order *Saint Anna* was sold on Dec. 16, 1979.

The proceeds of sale were brought into Court. There is sufficient money in Court to satisfy all the claims of which the Court has knowledge.

On Feb. 24, 1982, the plaintiffs issued a writ in rem out of the Admiralty Registry against the proceeds of sale of the ship *Saint Anna*. The statement of claim endorsed on the writ recites the relevant terms of the charter-party and alleges, correctly in my judgment, that it was an implied term of the arbitration agreement contained in the charter-party that each party would pay to the other any sum found due by the arbitrators appointed in accordance with

| [1983] Vol. 1 | Lloyd's Rep. | 639 |
| Q.B. (Adm. Ct.) | The "Saint Anna" | Sheen, J. |

that agreement. It is further alleged that a dispute arose under the charter-party and that the parties appointed their arbitrators, who found that certain sums were due from the owners of *Saint Anna* to the plaintiffs.

All the relevant facts have been proved to my satisfaction. There is no defence to the claim. Why, then, have I no jurisdiction to give judgment for the plaintiffs for the sums due to them, so that they can be paid out of the proceeds of sale of *Saint Anna*?

The answer to that question given by the editors of "Russell on Arbitration" (20th ed.) at p. 350 is-

. . . An action to enforce an award cannot be brought as an action in rem, even where the dispute giving rise to the award is such that if it had not been submitted to arbitration the claimant could have proceeded in rem.

The authority cited for that proposition is *The Beldis*, (1936) 53 Ll.L.Rep. 255; [1936] P. 51. The authors of "Commercial Arbitration" published by Butterworths in 1982 express the same view, but in words which are challenged by Mr. Charlton. They say (at p. 369):

An action on an award made under an arbitration clause in a charterparty or bill of lading is not a "claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship", and cannot be brought as an Admiralty action in rem.

In both books it is said that it may be possible to proceed on the original cause of action in rem and to ignore the unsatisfied award. But that remedy is lost with the expiration of the time limit within which a claim must be brought.

The Admiralty jurisdiction of the High Court is laid down in s. 20 of the Supreme Court Act, 1981, which provides as follows:

20. (1) The Admiralty jurisdiction of the High Court shall be as follows, that is to say:

(a) Jurisdiction to hear and determine any of the questions and claims mentioned in subsection (2);

(2) The questions and claims referred to in subsection (1) (a) are:

(h) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship . . .

Mr. Charlton contends that this action is a claim arising out of an agreement relating to the carriage of goods in a ship. He drew my attention to a number of dicta in *The*

*Eschersheim*, [1976] 2 Lloyd's Rep. 1; [1976] 1 Lloyd's Rep. 81; [1975] 1 W.L.R. 83; [1974] 2 Lloyd's Rep. 188 in which Judges have expressed their views upon the construction of s. 1 of the Administration of Justice Act, 1956, which then prescribed the Admiralty jurisdiction of the High Court. Mr. Justice Brandon said (at p. 195 and 94)

I think that all the paragraphs of section 1(1) of the Act of 1956, including paragraph (h), should be construed in the usual way, that is to say by giving the words used their ordinary and natural meaning in the context in which they appear.

In the Court of Appeal ([1976] 1 Lloyd's Rep. 81; [1976] 1 W.L.R. 339), Lord Justice Cairns said (at pp. 86 and 348)

. . . in my opinion there is no good reason for excluding from the expression "an agreement for the use or hire of a ship" any agreement which an ordinary business man would regard as being within it.

In the House of Lords, Lord Diplock (at pp. 8 and 438) said-

I see no reason in that context for not giving to them their ordinary wide meaning.

If, in respect of the claim which is the subject matter of this action, one asks the question "does that claim arise out of the agreement relating to the carriage of oil in *Saint Anna*?", the answer must be "Yes".

Does the fact that this action is based upon the award made by the arbitrators have the effect that it can no longer be said that the claim arises out of an agreement for the carriage of oil in *Saint Anna*? To answer that question it is necessary to examine the nature of an action based upon an arbitration award. In *Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753 a charter-party had been made in London which provided that any dispute arising during the execution of the charter-party should be settled by arbitration in Hamburg. Disputes arose between the parties which were submitted to arbitration in Hamburg. An award was made against the defendant. The plaintiffs issued a writ against the defendant for the amount due under the award and sought leave to serve it on the defendant in France. The question which arose for decision was whether the action was for the enforcement of a contract made within the jurisdiction - namely, the submission to arbitration contained in the charter-party. The Court of Appeal considered the authorities on the question whether in an action on an award the action is founded on the award (which was

[1983] Vol. 1             Lloyd's Rep.             640

Q.B. (Adm. Ct.)          The "Saint Anna"          Sheen, J.

made in Hamburg) or on the agreement to submit the differences from which the award results. Lord Justice Slesser said (at pp. 138 and 764):

It would appear, therefore, that the greater weight of authority is in favour of the view that in an action on the award the action is really founded on the agreement to submit the difference of which the award is the result . . . It is sufficient for the purpose of the plaintiffs here to show that, at any rate, they are entitled to say that on their claim they are suing on the charterparty made in London and more particularly on the submission to arbitration therein contained. The few cases which appear to support the view that an action may be brought upon the award in my view do not exclude in any event an action brought upon the agreement to refer differences and for this purpose, in my view, the submissions are here sufficiently stated to be in the charterparty of November 1929. Without, therefore, finally determining whether an action may or may not be brought on an implied contract in the award itself, I am clearly of opinion that it may be brought upon an agreement containing a term to refer disputes, and that the present claim is properly pleaded as arising from such an agreement. It is, therefore, an action for the enforcement of a contract made within the jurisdiction.

That decision of the Court of Appeal is clear authority for the proposition that an action based on an award is an action for the enforcement of the contract which contains the submission to arbitration. In the instant case that is the charter-party. There can be no doubt that an action for the enforcement of a voyage charter is a claim within the Admiralty jurisdiction of this Court.

If that decision of the Court of Appeal were the only relevant authority there would be no doubt that this action is within the Admiralty jurisdiction and has been properly brought against the proceeds of sale of *Saint Anna*. But the later decision of the Court of Appeal in *The Beldis*, (1936) 53 Ll.L.Rep. 255; [1936] P. 51, insofar as it is relevant to the instant case, does not seem to be consistent with the decision in *Bremer Oeltransport G.m.b.H. v. Drewry*, which was not cited in argument. Mr. Justice Brandon drew attention to this inconsistency in *The Eschersheim at* pp. 196 and 94.

In *The Beldis* an action in rem had been brought in a County Court against the defendants, who were the owners of the Norwegian ship *Beldis* for money payable by the defendants to the plaintiffs under an arbitrator's award in respect of overpayment of freight

under a charter-party relating to another of the defendants' ships, namely *Belfri*. The defendants failed to appear and judgment was entered against them by default. Before 1956 in this country an action in rem could not be brought against a "sister ship" of the particular ship in respect of which the cause of action arose. The appellants were mortgagees of *Beldis*, who intervened in the action. By agreement an issue was submitted to the County Court Judge as to whether the plaintiffs' action in rem against *Beldis* was maintainable in view of the fact that the plaintiffs' claim in the action arose out of a charter-party of *Belfri*. The County Court Judge decided in favour of the plaintiffs, relying upon a dictum of the Court of Appeal in regard to procedure in rem in *The Henrich Bjorn*, (1885) 10 P.D. 44 that—

. . . the arrest need not be of the ship in question but may be of any property of the defendant in the realm.

The Court of Appeal held that the dictum in the *Henrich Bjorn* was obiter and was erroneous. The Court held that the procedure in rem either in the Admiralty Court or in the County Court does not permit the arrest of a ship or other property of a defendant unconnected with the cause of action. On that ground alone the appeal would have been allowed. During the course of Counsels' submissions the President raised the question whether there was any jurisdiction to deal with the matter at all, suggesting that the issue arose under an arbitration (see pp. 263 and 56). It is quite clear from the reports that neither Counsel was ready to deal with this point and, as I have said, the decision of the Court of Appeal in *Bremer Oeltransport v. Drewry* was not referred to. The President in the course of his judgment said (at pp. 264 and 61):

There was in fact no evidence before the County Court judge as to the nature of the dispute arising under the charterparty of the *Belfri* but the arbitrator's award has been put in before us, and I am prepared to assume that both the claim on which he gave his award in favour of the plaintiffs, and the counterclaim which he dismissed, arose in respect of matters relating to the use or hire of the *Belfri* under the charterparty . . . But in my opinion the claim in this action was not based on that foundation at all. It was an action upon the award. The award does not in fact show upon its face what was the nature of the claim made by the plaintiffs, nor is there any reason why it should do so, though incidentally it happens to show the nature of the counterclaim which was dismissed. The particulars of the claim contain no reference to the nature of the dispute, or disputes, arising under the charterparty.

| [1983] Vol. 1 | Lloyd's Rep. | 641 |
| Q.B. (Adm. Ct.) | The "Saint Anna" | Sheen, J. |

Later he said:

> . . . Quite plainly the cause of action is founded, in the summons in this case, [my underlining] upon the award itself, and has no relation to the original dispute which gave rise to the arbitration. That being so, I should not be prepared to hold, even if the matter were free from authority, that a claim upon an award held under the arbitration clause in a charterparty is a claim arising out of any agreement made in relation to the use or hire of a ship. I think that it is a common law claim upon an award and nothing else.

Lord Justice Scott put it differently. He said (at pp. 274, 82 and 83):

> In my view it would be entirely wrong to hold that an action on an award arising indirectly out of such a maritime contract was included by the words of the above sections.

[He was referring to sections of the Admiralty Courts Acts, 1840 and 1861].

Lord Justice Scott acknowledges that the action on the award arose indirectly out of the charter-party. In a discussion about the essential elements of an action on an award the authors of "Commercial Arbitration" say (at p. 568):

> We submit that the better view is that the plaintiff must plead and prove both the arbitration agreement and the award: both are essential elements in his cause of action.

If that statement is accurate, as I think it is, then it seems to me that this action arises out of the charter-party. One ground of the decision of the Court of Appeal in *The Beldis* is inconsistent with the decision of the Court of Appeal in *Bremer Oeltransport v. Drewry*. This leave me free to decide which authority I should follow. As the decision in the latter case was not brought to the attention of the Court of Appeal during argument in *The Beldis*, and as I find myself convinced by the reasoning in the latter case, I have no hesitation in following it. I therefore hold that this claim is within the Admiralty jurisdiction of this Court and I give judgment for the plaintiffs on their claim.

I cannot pretend that it does not give me pleasure to be able to decide this point as I have done, because the result enables this Court to do justice in a way which would be denied to it if creditors could not bring proceedings in rem merely because they faithfully honoured their agreement to submit to arbitration a dispute which is clearly within the Admiralty jurisdiction. I have only heard argument from one side, but that argument was fully and fairly presented by Mr. Charlton, to whom I am indebted.

# EXHIBIT 2

Case 1:08-cv-02351-HB    Document 15    Filed 05/09/2008    Page 14 of 35

[1985] Vol. 1

**Lloyd's Rep.**

## HOUSE OF LORDS

### Jan. 14, 1985

---

### SAMICK LINES CO. LTD.
### v.
### OWNERS OF THE SHIP
### "ANTONIS P. LEMOS"

### (THE "ANTONIS P. LEMOS")

Before Lord SCARMAN, Lord DIPLOCK, Lord ROSKILL, Lord BRANDON OF OAKBROOK and Lord TEMPLEMAN

Admiralty practice – Action in rem – Warrant of arrest – Application to set aside warrant and writ – Whether action lay outside jurisdiction of High Court – Whether application should be granted.

By a charter-party dated Feb. 22, 1980, Containertank Corporation, the disponent owners, let the vessel *Antonis P. Lemos* to the charterers, Sammisa Co. Ltd. for a period of one year which was renewable.

By a charter dated Oct. 16, 1981, Sammisa as owners let the vessel to the plaintiffs, Samick Lines Co. Ltd. of Seoul, for one time chartered trip.

On Oct. 20 and 21, 1982, the vessel loaded a quantity of corn at Houston, Texas for carriage to Alexandria. On arrival at Alexandria, on Nov. 11, 1981, the vessel was unable to berth because her draught exceeded 32 ft. and some of her cargo had to be discharged into lighters. The operation caused delay and involved the plaintiffs in additional expense in respect of which they claimed damages from the owners of the vessel, the defendants.

The plaintiffs contended that the master of *Antonis P. Lemos* was negligent in allowing his vessel to be loaded to such an extent that her

draught on arrival in Alexandria was excessive and that the defendants were liable for such negligence or alternatively for the negligence of some other servant who might have failed to notify the master of his vessel's destination before completion of loading. There was no contract between the plaintiffs and the defendants and the plaintiffs' claim lay solely in negligence.

On May 20, 1983, a writ was issued and the plaintiffs applied for the issue of a warrant of arrest. The action was brought pursuant to s. 20 (2) (*h*) of the Supreme Court Act, 1981, which provided that the Admiralty Court had jurisdiction to hear and determine–

(*h*) any claim arising out of any agreement relating to the carriage of goods in a ship or the use or hire of a ship.

The issue for decision was whether the plaintiffs' claim was a claim arising out of an agreement relating to the use or hire of a ship.

The defendants applied to set aside the writ in rem against that ship and for an order that the ship be released from arrest and that the warrant of arrest be set aside on the grounds that by reason of its subject matter the claim in this action lay outside that part of the jurisdiction of the High Court in respect of which any action in rem might be brought.

–*Held*, by Q.B. (Adm. Ct.), (SHEEN, J.), that on the assumption that the plaintiffs' claim was valid (1) the fact that the claim was framed in tort was not by itself decisive but there had to be a contractual nexus between the parties; the submission by the plaintiffs that although the relationship between the plaintiffs and the defendants was not a contractual one, the relationship of proximity which gave rise to the duty of care arose by reason of a series of contracts one of which was the charter-party, would be rejected; a claim in negligence arising in such circumstances was not a claim which arose out of any agreement relating to the hire of a ship; to come within par. (*h*) of s. 20 (1) the claim had to have its origins in an agreement between the plaintiffs and the defendants;

(2) the plaintiffs could however plead their cause of action without reference to the charter-party and in the circumstances *Antonis P. Lemos*

[1985] Vol. 1
H.L.

Lloyd's Rep.
The "Antonis P. Lemos"

284
Lord Roskill

would be released from arrest; the plaintiffs would be given leave to appeal and *Antonis P. Lemos* released from arrest on condition that (1) the defendants gave to the plaintiffs security for their claim in an acceptable form and (2) the plaintiffs gave an undertaking acceptable to the defendants to pay the cost of putting up security if their appeal was dismissed.

On appeal by the plaintiffs:

*-Held*, by C.A. (CUMMING-BRUCE and PARKER, L.JJ.), that (1) if the plaintiff could establish that his claim arose out of an agreement of the relevant kind, i.e., an agreement relating to the carriage of goods in a ship or to the use or hire of a ship, then even if such agreement was not one between himself and the defendants that claim fell within par. (*h*);

(2) on the ordinary meaning of the words in s. 20, the plaintiffs' claim was a claim arising out of a relevant agreement notwithstanding that such agreement was not between the plaintiffs and the defendants and the appeal would be allowed.

On appeal by the owners:

*-Held*, by H.L. (Lord SCARMAN, Lord DIPLOCK, Lord ROSKILL, Lord BRANDON OF OAKBROOK and Lord TEMPLEMAN), that (1) the expression "arising out of" in s. 20 (2) (*h*) of the 1981 Act should be given its wider meaning to include claims in tort in that (a) a domestic statute designed to give effect to an international convention should in general be given a broad and liberal construction; (b) there was a clear indication in the arrangement and wording of art. 1 of the Convention for the Arrest of Sea-going ships, 1952, that the expression was there used in the wider sense; (c) it could not have been intended to substitute the narrower meaning for the expression "arising out of" in s. 1 of the Administration of Justice Act, 1956 and s. 20 (2) (*h*) of the 1981 Act for the wider meaning which it clearly had in the convention and (d) the English authorities supported the wider meaning of the expression; the plaintiffs were entitled to sue the defendants in tort (*see* p. 290, cols. 1 and 2);

*-The St. Elefterio*, [1957] 1 Lloyd's Rep. 283 and *The Sennar*, [1983] 1 Lloyd's Rep. 295, applied.

(2) the Court of Appeal were right in holding that if the plaintiffs could establish that their claim arose out of an agreement of the relevant kind, i.e., an agreement relating to the carriage of goods in a ship or to the use or hire of a ship, then even if such agreement was not one made directly between the plaintiffs and defendants, that claim fell within s. 20 (2) (*h*) and the appeal would be dismissed (*see* p. 291, col. 1).

The following cases were referred to in the judgment of Lord Brandon:

*Aifanourios*, The, 1980 S.C. 346;

*Gatoil International Inc. v. Arkwright Boston Mutual Insurance Co. & Others*, (H.L.) [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74;

*Nuova Raffaelina*, The, (1871) L.R. 3 A. & E. 483;

*St. Elefterio*, The, [1957] 1 Lloyd's Rep. 283; [1957] P. 179;

*Sennar*, The, [1983] 1 Lloyd's Rep. 295;

*Union of India v. E. B. Aaby's Rederi A/S*, (H.L.) [1974] 2 Lloyd's Rep. 57; [1975] A.C. 797;

*Zeus*, The, (1883) 13 P.D. 188.

This was an appeal by the defendants, the owners of *Antonis P. Lemos* from the decision of the Court of Appeal ([1984] 1 Lloyd's Rep. 465) allowing the appeal of the plaintiffs, Samick Lines Ltd. from the decision of Mr. Justice Sheen ([1983] 2 Lloyd's Rep. 310) in which he held that the Court had no jurisdiction to hear the plaintiffs' claim against the defendants.

Mr. Mark Saville, Q.C. and Mr. Jonathan Gaisman (instructed by Messrs. Richards Butler & Co.) for the defendants; Mr. Bernard Rix, Q.C. and Mr. Peter Hayward (instructed by Messrs. Holman Fenwick & Willan) for the plaintiffs.

The further facts are stated in the judgment of Lord Brandon of Oakbrook.

Judgment was reserved.

Thursday, Feb. 21, 1985

## JUDGMENT

**Lord SCARMAN:** My Lords, I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend, Lord Brandon of Oakbrook. I agree with it, and for the reasons he gives I would dismiss the appeal.

**Lord DIPLOCK:** My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Brandon of Oakbrook. I agree with it, and for the reasons which he gives I would dismiss the appeal.

**Lord ROSKILL:** My Lords, I have had the advantage of reading in draft the speech to be delivered by my noble and learned friend, Lord Brandon of Oakbrook. I agree with him, and for the reasons which he gives I would dismiss the appeal.

Lloyd's Rep.
The "Antonis P. Lemos"

Lord BRANDON OF OAKBROOK: My Lords, this appeal raises a question of statutory construction relating to the Admiralty jurisdiction of the High Court.

The case concerns a Greek-registered ship, the *Antonis P. Lemos* ("the vessel"), which is and was at all material times wholly owned by the appellants.

By a time charter dated Feb. 22, 1980, ("the head charter") Containerbank Corporation, acting as managers of the vessel for the appellants, chartered her to Sammisa Ltd. ("the head charterers") for a period of 10-12 months, later extended by agreement for a further 6-12 months, both periods at the head charterers' option. The head charter contained a provision allowing the head charterers to sub-charter the vessel, subject to an obligation to inform Containerbank Corporation of their doing so.

By a sub-time charter dated Oct. 16, 1981, ("the sub-charter") the head charterers sub-chartered the vessel to the respondents, Samick Lines Co. Ltd. ("the sub-charterers") for one time charter trip. The sub-charter contained a provision similar to that in the head charter, allowing the sub-charterers to sub-sub-charter the vessel, subject to an obligation to inform the sub-charterers of their doing so.

Nearly a month before the making of the sub-charter the respondents had already, by a voyage charter dated Sept. 21, 1980 ("the sub-sub-charter"), chartered to Agri Industries ("the sub-sub-charterers") a ship to be nominated to carry a full cargo of heavy grains and for sorghums and for soya beans from a North American port to Alexandria or Port Said, at the sub-sub-charterers' option. Later, after the making of the sub-charter, the respondents nominated the vessel for the purposes of the sub-sub-charter, and the sub-sub-charterers chose Alexandria as the port of discharge. The sub-sub-charter contained an express guarantee by the respondents that the vessel's maximum draught on arrival at the port of discharge would not exceed 32 ft. in salt water.

In performance of the sub-sub-charter, the vessel on Oct. 20 and 21, 1981, loaded a full cargo of corn at Houston, Texas, for carriage to Alexandria. When the vessel arrived at the latter port on Nov. 11, 1981, however, her draught exceeded 32 ft. in salt water, in consequence of which she had to be lightened before berthing, and delay in her discharge occurred. By reason of these matters, the respondents had to pay the cost of lightening, which they would not otherwise have had to do, and incurred certain other expenses and losses.

In order to recover the cost, expenses and losses so incurred, the respondents on May 20, 1983, began an action in rem against the vessel in the Admiralty Court, and arrested her in that action in order to obtain security for their claim.

The endorsement on the back of the writ by which such action was begun reads:

The plaintiffs, as sub-charterers of the defendants' ship ANTONIS P. LEMOS under a time-charter dated 16 October 1981 made between Sammisa Co. Ltd. as owners and the plaintiffs as charterers, claim damages for the loss suffered by them by reason of the negligence of the defendants, their servants or agents in causing permitting or suffering the said ship to load a quantity of corn at Houston, Texas, USA on 20 and 21 October 1981 such that her draft on arrival at Alexandria, Egypt on 11 November 1981 exceeded 32 feet rendering her unable to berth without lightening.

The claim so endorsed is, as your Lordships will have observed, founded solely on the tort of negligence, and is not founded on any breach of any contract made directly between the two parties to the action.

By notice of motion dated May 24, 1983, the appellants (defendants in the action) applied to the Admiralty Court for an order that the writ and warrant of arrest be set aside and the vessel released, on the ground that the Admiralty Court had no Admiralty jurisdiction, and therefore no jurisdiction in rem against the vessel, in respect of the claim.

On May 27, 1983, Mr. Justice Sheen having heard the appellants' motion, decided the question raised by it in their favour, and made an order substantially in the terms sought by them. He gave the respondents leave to appeal to the Court of Appeal, and, in order to protect the position of both parties in the event of an appeal being brought, made his order conditional on (1) the appellants giving security for the claim in an acceptable form and (2) the respondents undertaking to pay the appellants' cost of giving such security in the event of any appeal brought by the former proving unsuccessful.

By notice of appeal dated Aug. 19, 1983, the respondents appealed to the Court of Appeal against the order of Mr. Justice Sheen. The Court of Appeal (Lord Justices Cumming-Bruce and Parker) heard the appeal on Jan. 30 and 31, 1984, and on Feb. 14, 1984, Lord Justice Parker delivered a reserved judgment, with which Lord Justice Cumming-Bruce agreed, allowing the appeal and reversing the order of Mr. Justice Sheen. The Court of Appeal further gave leave

[1985] Vol. 1
H.L.

Lloyd's Rep.
The "Antonis P. Lemos"

286
Lord Brandon of
Oakbrook

to the appellants to appeal to your Lordships' House.

My Lords, it is common ground that the sole question for determination in this appeal is whether the respondents' claim, having regard to its nature and the facts on which it is based, comes within that part of the Admiralty jurisdiction of the High Court which is derived from s. 20 (2) (h) of the Supreme Court Act 1981. For the purpose of determining that question, it is necessary to assume, without deciding, that the respondents have an arguable case in law in respect of their claim.

If, on the one hand, the claim does not come within s. 20 (2) (h) of the 1981 Act, the Admiralty Court, to which the Admiralty jurisdiction of the High Court is assigned, has no Admiralty jurisdiction, as distinct from any other jurisdiction which it may have, to hear and determine it, and accordingly no power to arrest the vessel as security for such claim. On that view, which Mr. Justice Sheen took, the respondents' action was not properly brought, and the vessel was not properly arrested in it. The result of that would be that the writ by which the action was begun should be set aside, and the security substituted for the vessel given up and cancelled.

If, on the other hand, the claim comes within s. 20 (2) (h) of the 1981 Act, the Admiralty Court has Admiralty jurisdiction to hear and determine it, and further, by virtue of s. 21 (4) of the same Act, has power to exercise such jurisdiction in rem against the vessel. On that view, which the Court of Appeal took, the respondents' action was properly brought, the warrant of arrest was properly issued and the vessel was properly arrested as security for the claim. The result of that would be that the appellants' attempt to have the writ by which the action was begun set aside, and the security substituted for the vessel given up and cancelled, must fail.

Your Lordships have now to choose between these two contrary views. In order to do this, it is first necessary to set out the relevant terms of s. 20 of the Supreme Court Act, 1981. That section provides:

(1) The Admiralty jurisdiction of the High Court shall be as follows, that is to say - (a) jurisdiction to hear and determine any of the questions and claims mentioned in subsection (2); . . . (2) The questions and claims referred to in subsection (1) (a) are - . . . (h) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship;

My Lords, the appellants put forward two alternative contentions with regard to the construction of s. 20 (2) (h) of the 1981 Act. Their primary contention was that s. 20 (2) (h) applied only to claims of a purely contractual character, founded on some agreement of the kinds referred to in it and made directly between the two parties to an action; and that the paragraph did not extend to other claims founded on tort, even though such claims were connected, directly or indirectly, with such an agreement. Their second and alternative contention was that, even if s. 20 (2) (h) extended also to claims in tort, it only did so if they were directly connected with some agreement of the kinds referred to in it, and provided further (and this was the crucial limitation) that the agreement concerned was one made between the two parties to the action themselves. In terms of the present case this would mean some agreement made directly between the appellants and the respondents relating to the carriage of goods in the vessel, or to the use or hire of the vessel, which it is common ground was never made. If either of these two contentions is accepted as correct, the respondents' claim would plainly not come within s. 20 (2) (h). Mr. Justice Sheen, whose judgment is reported in [1983] 2 Lloyd's Rep. 310, rejected the first contention but accepted the second. Hence his decision in favour of the appellants. The Court of Appeal, the judgment of which is reported in [1984] 1 Lloyd's Rep. 464, rejected the first contention, and also rejected what I have described as the crucial limitation in the second contention. Hence the decision of that Court in favour of the respondents.

Before considering whether the decision of the Court of Appeal was right or not, it is necessary to draw attention to certain preliminary matters. The first matter is that the provisions of the 1981 Act which deal with the Admiralty jurisdiction of the High Court are the successors of earlier provisions in the Administration of Justice Act, 1956, and are, so far as material, in substantially the same terms. The second matter is that Part I of the 1956 Act was, as had long been recognized, enacted in order to give effect in England to the adherence of the United Kingdom to the International Convention for the Unification of Certain Rules relating to the Arrest of Sea-going Ships, made at Brussels on May 10, 1952 ("the Convention"). Lord Justice Parker, in his judgment in the Court of Appeal, accepted the proposition put forward by the respondents that, since the provisions of the 1981 Act relating to the Admiralty jurisdiction of the High Court was designed to give domestic effect to an international convention, a broad and liberal construction should be given to them. There is ample authority to support this as

[1985] Vol. 1
H.L.

Lloyd's Rep.
The "Antonis P. Lemos"

287

Lord Brandon of
Oakbrook

a general proposition, to some of which Lord Justice Parker referred in his judgment. I have no doubt that the proposition is, in general, correct, and that Lord Justice Parker was right to accept it.

So far as the appellants' first contention is concerned, it is clear from the judgment of Mr. Justice Sheen that it was argued before him and that, following authority to which I shall refer shortly, he declined to accept it. It appears from the judgment of Lord Justice Parker in the Court of Appeal, that the contention was only faintly argued before that Court, so that, understandably enough, it was more or less brushed aside by him. Before your Lordships the contention was fully developed by Counsel for the appellants, Mr. Saville, and it follows that it is necessary for your Lordships to examine it fully yourselves.

Such authorities as there are on this question, both at first instance in the Admiralty Court, are against the appellants' contention. In *The St. Elefterio*, [1957] 1 Lloyd's Rep. 283; [1957] P. 179, the question arose whether a claim for damages caused by the ante-dating of bills of lading, which was founded on the tort of deceit or possibly negligence, was within s. 1 (1) (*h*) of the 1956 Act, which was the predecessor of, and in the same terms as, s. 20 (2) (*h*) of the 1981 Act. It was held by Mr. Justice Willmer that the claim was within that provision. He said, at pp. 286 and 183:

. . . In my judgment the words of section 1 (1) (*h*) of the Act of 1956 . . . are . . . wide enough to cover claims whether in contract or in tort arising out of any agreement relating to the carriage of goods in a ship.

That decision stood unchallenged for some 26 years until the present case, having been followed by Mr. Justice Sheen, in relation to s. 20 (2) (*h*) of the 1981 Act in *The Sennar* [1983] 1 Lloyd's Rep. 295, another case of a claim in tort in respect of the ante-dating of a bill of lading.

In his able address to your Lordships, Mr. Saville recognized that these authorities were against the first contention for the appellants, and would have to be overruled if that contention was accepted. He relied, however, on six points, which he developed under three main heads, as supporting the view that the contention was, despite these authorities, correct. These six points, in the sequence in which I think that it is convenient to state them, were as follows. The first point was that the expression "arising out of", as contained in s. 20 (2) (*h*) of the 1981 Act, was, on the ordinary

and natural meaning of the words used, the equivalent of the narrower expression "arising under" and not of the wider expression "connected with". The second point was that, if the expression "arising out of", as contained in s. 20 (2) (*h*) of the 1981 Act, was given the wider meaning of "connected with", a number of later paragraphs of s. 20 (2) would be unnecessary, because their subject-matter would already be covered by par. (*h*). The third point was that the narrower construction of the expression "arising out of" was supported by *The Nuova Raffaelina*, (1871) L.R. 3 A. & E. 483. The fourth point was that there was authority in your Lordships' House for the proposition that, in one context at least, the expression "arising out of" had the same meaning as the expression "arising under". The fifth point was that your Lordships' House had, in a recent appeal from Scotland, given a narrow rather than a wide construction to another expression contained in s. 20 (2) (*h*) of the 1981 Act, namely, the expression "relating to". The sixth point was that the French text of the Convention was, equally with the English text, the official text of it; that, if the expression "arising out of", as contained in the English text, was ambiguous, it was legitimate to look at the French text in order to resolve the ambiguity; and that, if the French text was looked at, it supported the appellants' case. I shall consider each of these points in turn.

With regard to the first point, I would readily accept that in certain contexts the expression "arising out of" may, on the ordinary and natural meaning of the words used, be the equivalent of the expression "arising under", and not that of the wider expression "connected with". In my view, however, the expression "arising out of" is, on the ordinary and natural meaning of the words used, capable, in other contexts, of being the equivalent of the wider expression "connected with". Whether the expression "arising out of" has the narrower or the wider meaning in any particular case must depend on the context in which it is used.

With regard to the second point, it is necessary to bear in mind that the list of claims in s. 20 (2) of the 1981 Act is derived from art. 1 (1) of the Convention, which contains a list of what are there called "maritime claims". Paragraph (*h*) of s. 20 (2) is derived from sub-pars. (*d*) and (*e*) of art. 1 (1), although the arrangement and wording of s. 1 (1) of the 1956 Act, and s. 20 (2) of the 1981 Act, do not, as I shall have reason to point out again later, correspond with the arrangement and wording of art. 1 (1) itself. It was clearly the agreed policy of the states which negotiated the Convention to have, in art. 1 (1) of it, a full and complete list of specific maritime claims or kinds of claim, rather

Case 1:08-cv-02351-HB   Document 15   Filed 05/09/2008   Page 19 of 35
i-law.com
Page 6 of 9

[1985] Vol. 1
H.L.

Lloyd's Rep.
The "Antonis P. Lemos"

288
Lord Brandon of
Oakbrook

than a few general formulations comprehending them all. Having regard to this policy, some degree of overlap between the specific claims and kinds of claim listed in art. 1 (1) seems to me to have been natural and inevitable, and this overlap is reproduced in s. 20 (2) of the 1981 Act. In relation to this it was rightly conceded by Mr. Saville that, even if the expression "arising out of" in par. (h) of s. 20 (2) of the 1981 Act was given the narrower meaning for which he contended, there would still be some overlap between different paragraphs of s. 20 (2). In view of these considerations I do not think that this second point has any real force.

With regard to the third point, I do not think that, on a proper understanding of *The Nuova Raffaelina*, (1871) L.R. 3 A. & E. 483, it supports the appellants' contention. In that case it was held by the High Court of Admiralty, affirming the Liverpool Court of Passage, that a claim by chartering brokers, brought in rem against a ship, to recover commission payable by the owners of such ship under the terms of a charter effected by such brokers, was not a claim "arising out of any agreement relating to a ship" or "in relation to the carriage of goods in a ship" within the meaning of s. 2 of the County Courts Admiralty Jurisdiction Amendment Act, 1869. In my view the ground on which that case was decided was simply that chartering brokers, who had negotiated the charter of a ship containing a stipulation for the payment by the owners of such ship of a commission to them, were not entitled to enforce that stipulation, because they were not themselves parties to the charter, although, if the charterers had sued as trustees for the brokers, the claim might have been properly brought under the section of the 1869 Act relied on. On that view of the case, it does not lay down any principle with regard to the contraction of the expression "arising out of", as used in that much earlier statutory provision comparable to s. 20 (2) (h) of the 1981 Act.

With regard to the fourth point, reliance was placed on the observations of two of their Lordships in *Union of India v. E. B. Aaby's Rederi A/S*, [1974] 2 Lloyd's Rep. 57; [1975] A.C. 797. That case concerned the scope of the expression "arising out of", as used in the Centrocon arbitration clause in a charter, which provided that "all disputes arising out of this contract" should be referred to arbitration in London. Viscount Dilhorne at pp. 65 and 814G-H, and Lord Salmon at pp. 67 and 817A-B, both said that the expression "arising out of", as there used, meant the same as the expression "arising under". As I indicated earlier, I do not doubt that, in some contexts, such as an arbitration clause in a commercial contract, it would be right to treat the first of these two

expressions as the equivalent of the second. It does not follow, however, that it would be right to do so in all contexts, and in particular in the context of provisions derived from, and intended to give domestic effect to, an international convention, which require, in general, to be given a broad and liberal construction. For these reasons I do not consider that the observations of two of their Lordships in the case referred to should be taken as applicable to the construction of the expression "arising out of", in s. 20 (2) (h) of the 1981 Act.

With regard to the fifth point, the decision of your Lordships' House relied on was *Gatoil International Inc. v. Arkwright-Boston, Mutual Insurance Co. & Others*, [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74 ("the *Gatoil* case"). That case raised the question whether a claim by insurers and an insurance broker for the recovery of premiums due under a marine insurance policy on cargo was a claim arising out of—

. . . any agreement relating to the carriage of goods in any ship whether by charterparty or otherwise . . .

as used in s. 47 (2) (e) of the 1956 Act, which is in Part V of that Act dealing with Admiralty jurisdiction and arrestment of ships in Scotland. Your Lordships' House, reversing the Second Division of the Inner House of the Court of Session, held that the words in question did not cover such a claim. In so doing, your Lordships' House preferred to give the expression "relating to", as used in s. 47 (2) of the 1956 Act, the narrower, rather than the wider, of the two meanings which it was accepted that it was capable of having. Lord Keith of Kinkel, with whom all the other members of the appellate committee agreed (although Lord Wilberforce gave additional reasons for the decision, based on an examination of the travaux préparatoires preceding the conclusion of the Convention), examined a considerable number of English authorities, beginning with those concerned with the construction of s. 2 of the 1869 Act, and going on to more modern authorities on s. 1 (1) (h) of the 1956 Act and s. 20 (2) (h) itself. Having reviewed these authorities, he regarded two of them as strongly supporting the conclusion that the expression "relating to", as used in s. 47 (2) of the 1956 Act, should be given its narrower, rather than its wider, construction. These two authorities were *The Zeus*, (1883) 13 P.D. 188 in England, and *The Aifanourios*, 1980 S.C. 346 in Scotland. In *The Zeus* Sir James Hannen P. had to deal with the question whether a claim under a contract to load a ship with coals was within s. 2 of the 1869 Act. He held that it was not. In *The Aifanourios* Lord

[1985] Vol. 1
H.L.

**Lloyd's Rep.**
**The "Antonis P. Lemos"**

289

Lord Brandon of
Oakbrook

Wylie had to deal with the question whether a claim by an insurance association for the payment of release calls under a contract of insurance on a ship and her cargo was within either pars. (d) or (e) of s. 47 (2) of the 1956 Act, which together corresponded in Scotland with s. 1 (1) (h) of the same Act in England. He held that it did not.

It is, no doubt, tempting to say that, because your Lordships' House in the *Gatoil* case [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74 gave a narrow, rather than a wide, meaning to the expression "relating to", as used in pars. (d) and (e) of s. 47 (2) of the 1956 Act, it should likewise give a narrow, rather than a wide, meaning to the expression "arising out of" in s. 20 (2) (h) of the 1981 Act. In my view, however, this temptation should be resisted, on the ground that there are two significant differences between the two expressions.

The first difference is this. In art. 1 (1) of the Convention the expression "arising out of" is placed so as to govern all the maritime claims, or kinds of claim, which are listed in the succeeding pars. (a) to (g). This arrangement was followed in s. 47 (2) of the 1956 Act applying to Scotland. So far as England is concerned, however, and also Northern Ireland (see s. 55 of the 1956 Act), the arrangement and wording of art. 1 (1) of the Convention were not, for reasons which I have never understood, similarly followed in s. 1 (1) of the Act. On the contrary, there are to be found in s. 1 (1) of the 1956 Act a re-arrangement and rewording of the claims as set out in art. 1 (1) of the Convention, as a result of which the expression "arising out of" no longer governs all the claims listed in pars. (a) to (g), but is transferred so that it appears in only three of those paragraphs, par. (h) the subject-matter of which has already been discussed, par. (g) which deals with claims in general average and par. (r) which deals with claims in bottomry.

With the arrangement and wording of art. 1 (1) of the Convention as followed in s. 47 (2) of the 1956 Act applicable in Scotland, the expression "arising out of" governs, as I have already indicated, all the claims listed in pars. (a) to (g). If one substitutes in art. 1 (1) the expression "arising under" for the expression "arising out of", it is immediately apparent that the former expression simply makes no sense in relation to most of the claims set out in pars. (a) to (g). Indeed, it only makes any real sense in relation to pars. (d) and (e). By contrast, if one substitutes in art. 1 (1) the expression "connected with" for the expression "arising out of", it makes complete sense in relation to all the claims listed in pars. (a) to (g), including pars. (d) and (e), which are the crucial paragraphs in this

case. These considerations make it abundantly clear that, in art. 1 (1) of the Convention, as followed in s. 47 (2) of the 1956 Act applicable in Scotland, the expression "arising out of" cannot have the narrower meaning of "arising under", but must rather have the wider meaning of "connected with". It cannot have been the intention of the legislature that, as a result of the re-arrangement and rewording of art. 1 (1) of the Convention in s. 1 (1) of the 1956 Act applicable in England and Northern Ireland, involving the transfer of the expression "arising out of" so that it no longer governs all the claims listed in pars. (a) to (g) of s. 1 (1) but only those in pars. (h), (g) and (r), to give a meaning to the expression "arising under" in those two paragraphs different from, and narrower than, the meaning which it has in art. 1 (1) of the Convention and s. 47 (2) of the same Act. To attribute such an intention to the legislature would mean that the latter, when giving domestic effect to the adherence of the whole of the United Kingdom to the Convention, had enacted provisions applicable in England and Northern Ireland, which differed materially from those applicable in Scotland. I do not consider that it can be right to attribute to the legislature any such bizarre intention.

By contrast, the expression "relating to" was used in the same way in par. (k) of s. 1 (1) of the 1956 Act as in pars. (d) and (e) of art. 1 (1) of the Convention and in s. 47 (2) of the same Act, and there is nothing in the arrangement or wording of art. 1 (1) of the Convention, of the kind which there is in respect of the expression "arising out of", to indicate whether the former expression is to be given the wider or the narrower of the two meanings which it is capable of having.

The second difference concerns the authorities on the construction of the expression "arising out of", as used in par. (h) of both s. 1 (1) of the 1956 Act and s. 20 (2) of the 1981 Act. As the review of the authorities made by Lord Keith of Kinkel in the *Gatoil* case [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74 shows, the English authorities (*The St. Elefterio*, [1957] 1 Lloyd's Rep. 283; [1957] P. 179 and *The Sennar*, [1983] 1 Lloyd's Rep. 295) support a wide construction of the expression "arising out of" as so used. By contrast, both English authority (*The Zeus*, (1883) 13 P.D. 188) and Scottish authority (*The Aifanourios*, 1980 S.C. 346) support a narrow construction of the expression "relating to", as used in s. 2 of the 1869 Act in the former case and in pars. (d) and (e) of s. 47 (2) of the 1956 Act in the latter case. These authorities tilt the balance in favour of giving a narrow meaning to the expression "relating to", where it occurs in the 1956 and 1981 Acts, which, in the absence of such authorities, it might not be right to give it.

For these reasons I do not regard the decision of your Lordships' House in the *Gatoil* case [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74 on the construction of the expression "relating to", contained in par. (e) of s. 47 (2) of the 1956 Act as being determinative of the construction of the different expression "arising out of", contained in par. (h) of s. 20 (2) of the 1981 Act.

With regard to the sixth point, the expression in the French text of art. 1 (1) of the Convention corresponding to the expression "arising out of" in the English text of it, is "ayant l'une des causes". If the expression "arising out of" is to be regarded as ambiguous, which in the context of art. 1 (1) of the Convention I do not, for the reasons given when discussing the *Gatoil* case, [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74, think that it is, I accept that it would be open to your Lordships to look at the French text in order, if possible, to resolve the ambiguity. The difficulty, however, is that your Lordships have no evidence to show what meaning, as a matter of French law, the expression "ayant l'une des causes" has. It may well be a term of art in French law, in which case it is impossible to ascertain its meaning without expert evidence from a qualified French lawyer as to what that meaning is. No such expert evidence was put before your Lordships, and in its absence, I do not consider that any assistance can be derived from a comparative examination of the French text.

My Lords, having considered the six points argued by Mr. Saville, I am not persuaded that any one of those points singly, or any combination of them together, lead to the conclusion that the expression "arising out of" in s. 20 (2) (h) of the 1981 Act should be given the narrow meaning of the expression "arising under", rather than the wider meaning of the expression "connected with". On the contrary, I am satisfied, on four main grounds, that the expression "arising out of" should be given the second and wider meaning. The first ground is the principle, referred to earlier, that a domestic statute designed to give effect to an international convention should, in general, be given a broad and liberal construction. The second ground is that, for the reasons given when discussing the *Gatoil* case [1985] 1 Lloyd's Rep. 181; [1985] 2 W.L.R. 74, I think that there is a clear indication in the arrangement and wording of art. 1 (1) of the Convention that the expression "arising out of" is there used in the wider of the two meanings of which it is capable. The third ground is that, on the basis that the second ground is correct, the re-arrangement and rewording of art. 1 (1) of the Convention contained in s. 1 (1) of the 1956 Act, and followed in s. 20 (2) of the 1981 Act, cannot have

been intended to substitute a narrow meaning for the expression "arising out of" in those two sub-sections for the wide meaning which it clearly has in art. 1 (1) of the Convention. The fourth ground is that the English authorities, *The St. Elefterio*, [1957] 1 Lloyd's Rep. 283; [1957] P. 179 and *The Sennar*, [1983] 1 Lloyd's Rep. 295, support the wider meaning of the expression "arising out of" in s. 1 (1) (h) of the 1956 Act and s. 20 (2) (h) of the 1981 Act. *The St. Elefterio*, [1957] 1 Lloyd's Rep. 283; [1957] P. 179, as I said earlier, stood unchallenged for some 26 years until the present case, and, in the interval, the legislature saw fit, in the 1981 Act, to re-enact the provision construed in that case in the same terms as before.

My Lords, having dealt, somewhat at length, I fear, with the first contention for the appellants, I now turn to deal with the second. With regard to this part of the case your Lordships have the great assistance of the clear and cogent judgment of Lord Justice Parker in the Court of Appeal, which makes it possible for me to deal with it much more briefly than I have thought it necessary to deal with the first.

The reasoning on which Lord Justice Parker proceeded in rejecting the appellants' second contention can be formulated as follows. First, there were, in the factual context of the case, a number of agreements falling within the classes of agreements specified in s. 20 (2) (h) of the 1981 Act. Lord Justice Parker was there referring to the head-charter, the sub-charter and the sub-sub-charter. Secondly, unless the agreements referred to in s. 20 (2) (h) of the 1981 Act were limited to agreements made directly between the two parties to an action, the only question for consideration was whether the respondents' claim was one arising out of one or more of those agreements. Thirdly, s. 20 (2) (h) of the 1981 Act contained no words which, either expressly or by necessary implication, restricted the agreements referred to in it to agreements made directly between the two parties to an action. Fourthly, there was no good reason, in the absence of authority to the contrary, for importing into s. 20 (2) (h) restrictive words having that effect. Fifthly, there was no such authority to the contrary, both *The St. Elefterio*, [1957] 1 Lloyd's Rep. 283; [1957] P. 179 and *The Sennar*, [1983] 1 Lloyd's Rep. 295, having been cases in which the relevant agreement had in fact been made between the two parties to the action, so that the question did not arise for decision in them. Sixthly, having regard to these matters, the right view was that, if the respondents could establish that their claim arose out of an agreement of the relevant kind, i.e., an agreement relating to the carriage of goods in a ship or to the use or hire of a ship, then, even if

Case 1:08-cv-02351-HB    Document 15    Filed 05/09/2008    Page 22 of 35

| [1985] Vol. 1 H.L. | Lloyd's Rep. The "Antonis P. Lemos" | 291 Lord Templeman |
|---|---|---|

such agreement was not one made directly between the respondents and the appellants, that claim fell with s. 2 (2) (h). Seventhly, the respondents were, in the action brought by them, asserting negligence of the appellants, their servants or agents in loading at Houston such a quantity of corn that the vessel's draught on arrival at Alexandria exceeded 32 ft. in salt water. Eighthly, if that claim was sustainable, a matter which did not presently arise, it could only be because (a) it had been guaranteed in the sub-sub-charter that the vessel's draught on arrival would not exceed 32 ft. in salt water; (b) the master or the appellants were aware of that guarantee; and, probably, (c) the sub-charter included provisions that the master should be under the supervision of the appellants as regards employment and that loading should be under the supervision of the master (with comparable provisions also in the head-charter). To that catalogue I would add: (d) that it was reasonably foreseeable that, if the vessel's draught on arrival exceeded the maximum draught guaranteed in the sub-sub-charter, the respondents would suffer damage in that they would incur additional costs and expenses. Ninethly, in the absence of authority to the contrary, the right view was that a claim based on the matters set out above plainly arose out of the sub-sub-charter, or the sub-charter, or both. This was so because, in the absence of the guarantee in the sub-sub-charter, and the master's or the appellants' awareness of it, it appeared impossible to contend that the latter owed a duty to the respondents to load only such a quantity of cargo as would enable the vessel to arrive at Alexandria with a draught not exceeding 32 ft. in salt water. Tenthly, there was again no authority to the contrary.

I find myself in complete agreement with the reasoning of Lord Justice Parker with regard to this second part of the case. On the grounds stated by him I am of opinion that the second contention for the appellants should be rejected.

My Lords, for the reasons which I have given, I conclude that the judgment of the Court of Appeal, reversing that of Mr. Justice Sheen and deciding in favour of the respondents, should be affirmed, and that the appeal should be dismissed with costs.

Lord TEMPLEMAN: My Lords, for the reasons given by my noble and learned friend Lord Brandon of Oakbrook, I would dismiss this appeal.

# EXHIBIT 3

Case 1:08-cv-02351-HB    Document 15    Filed 05/09/2008    Page 24 of 35

## COURT OF APPEAL.

Monday, Feb. 13, 1933.

### BREMER OELTRANSPORT, G.m.b.H.
v. DREWRY.

#### Before Lord Justice SLESSER and Lord Justice ROMER.

*Arbitration-Practice-Action to enforce award-Defendant resident abroad- Service of notice of writ out of the jurisdiction - Application by defendant to set aside-Dispute under charter-party entered into in London between plaintiffs and defendant- Clause providing for arbitration in Hamburg-Award-Plaintiffs' contentions (1) that the action was founded on the agreement to submit differences under the charter-party of which the award was the result and was therefore an action brought to enforce a contract made within the jurisdiction; (2) that the non-payment in England of the sum awarded amounted to a breach committed within the jurisdiction- Defendant's reply (1) that the action was brought on the award itself, which was made in Hamburg, and that consequently the action was not one to enforce a contract made within the jurisdiction; (2) that there was no provision for payment in England-Nature of action based on award- R.S.C., Order 11, r. 1 (e) -Held (1) that the plaintiffs were entitled to bring an action upon the submission in the charter-party and that their claim was properly pleaded as arising from that agreement to submit; and that therefore the action was one for the enforcement of a contract made within the jurisdiction; (2) that the award made no provision for the place of payment and that it must in consequence be assumed that payment should be made where the creditor resided, i.e., in Hamburg; and that therefore there was no breach within the jurisdiction- Application set aside on ground (1).*

This was an appeal by the defendant, Mr. H. P. Drewry, of Paris, against an order of Mr. Justice Goddard, in Chambers, dismissing an application by the defendant to set aside an *ex parte* order of Mr. Justice Branson for the service out of the jurisdiction of notice of a writ issued

Case 1:08-cv-02351-HB    Document 15    Filed 05/09/2008    Page 25 of 35
i-law.com
Page 2 of 7

by the Bremer Oeltransport, G.m.b.H., of Hamburg.

According to the affidavit on which the *ex parte* application was granted, in November, 1929, a charter-party was made in London for the hire by the defendant of a steamer belonging to the plaintiffs for a period of two years. A clause in the charter-party provided that in the event of any dispute arising between the parties the matter should be arbitrated upon in Hamburg. In the summer of 1931 disputes did arise and were submitted to arbitration in Hamburg, where an award was made that defendant should pay the plaintiffs about £21,000, payment to be made in English currency.

The plaintiffs issued a writ claiming £21,000 odd under the award dated April, 1932, in the arbitration. They obtained leave from Mr. Justice Branson to serve the writ out of the jurisdiction, and Mr. Justice Goddard refused defendant's application to set aside the order.

Sir Robert Aske (instructed by Messrs. Holman, Fenwick & Willan) appeared for the appellant; Mr. C. T. Miller (instructed by Messrs. Thomas Cooper & Co.) represented the respondents.

### JUDGMENT.

**Lord Justice SLESSER:** In this case Mr. Justice Branson, on an application *ex parte* by the plaintiffs, on Nov. 29, 1932, made the following order:-

That the intended plaintiffs be at liberty to issue a writ of summons against the intended defendant. And it is further ordered that the said intended plaintiffs be at liberty to serve notice of the said writ at Paris or elsewhere in the Republic of France and that the time for appearance to the said writ by the said intended defendant be within twelve days after the service of the said notice of writ.

On Jan. 5, 1933, the defendant applied to Mr. Justice Goddard for an order that the order

of the Honourable Mr. Justice Branson herein dated Nov. 29, 1932, the writ of summons issued herein, and the notice thereof ordered to be served and the service thereof on the defendant, and all subsequent proceedings herein be set aside on the ground that the award sued upon does not provide that the amount

awarded is payable in England and that there is, therefore, no breach within the jurisdiction of the award or of the charter-party referred to.

Mr. Justice Goddard after hearing the parties by Counsel on Jan. 13, 1933, ordered that the defendant's application be dismissed and that the costs of the application be the plaintiffs' in any event. From that order the defendant appeals to this Court.

The facts of the case, from an affidavit of Mr. John Essberger, of Hamburg, sworn on Nov. 19, 1932, at Hamburg in support of the *ex parte* application, appear to be as follows. On Nov. 19, 1929, by a charter-party made in London in the English language, the defendant agreed to hire a vessel of the plaintiff company called the *Mittelmeer* or a substitute sister ship for as many consecutive voyages as the vessel could perform over two years. The charter-party was exhibited to the affidavit, and in the charter-party, by Clause 18, it was provided that:-

Any dispute arising during the execution of this charter-party shall be settled in Hamburg, owners and charterers each appointing an arbitrator, merchant or broker, and the two thus chosen, if they cannot agree, shall nominate a third, whose decision shall be final. Should one of the parties neglect or refuse to appoint an arbitrator, merchant or broker, within twenty-one days after receipt of request from the other party, the single arbitrator appointed shall have the right to decide alone, and his decision shall be binding on both parties. For the purpose of enforcing awards, this agreement shall be made a rule of Court.

In the summer of 1931, disputes arose between the plaintiffs and the defendant and, in accordance with the terms of the charter-party, the parties proceeded to arbitration in Hamburg, and on Apr. 22, 1932, an award was duly made in Hamburg which decided as follows:-

Defendant, the complaint being refused, is sentenced to pay to plaintiff £20,913 13s. 7d., the cost of arbitration, stipulated at RM.10,000-and his expenses are to be presented by plaintiff; defendant has to indemnify plaintiff for 2/3rds of same. The non-judicial expenses are to be neutralised against one another.

And it was further added:-

As per Clause 2 of the charter, payment is to be made in English currency, i.e., effectively, the printed clause that the money can be changed into a continental currency has been cancelled.

The reference to "the printed clause that the money can be changed into a continental currency has been cancelled" is directed to a provision as to the freight in which in Clause 2 of the printed charter-party, after stating "the freight to be payable in London upon delivery of the cargo in cash without discount," the words "if on the Continent at the current rate of exchange on London at sight" were deleted.

It remains to set out the indorsement on the writ, which, so far as material, is as follows:-

The plaintiffs' claim is £21,333 4s. 7d. the amount due and payable by the defendant to the plaintiffs under an award in writing dated Apr. 18, 1932, of Dr. Rudolph Firle, Friedrich Joch and Dr. Knauer, the duly appointed arbitrators in an arbitration held between the parties pursuant to a submission in writing contained in a charter-party entered into by the plaintiffs and the defendant dated Nov. 19, 1929, for the chartering of the plaintiffs' tank steamer *Mittelmeer* or substitute.

The defendant, who, we are told, is a British subject so resident in Paris, and the plaintiffs claim to serve their writ out of the jurisdiction on two grounds. First, they say that the action is one brought against the defendant to enforce a contract made within the jurisdiction (Order 11, r. 1 (e), par. (1)), and, secondly, that the action is one brought against the defendant in respect of a breach committed within the jurisdiction (Order 11, r. 1 (e) final paragraph).

I deal with these two grounds separately. First, it was argued for the appellant that, in so far as Order 11, r. 4, requires that the grounds upon which the application is made shall be set out in the application in the affidavit, the first of these grounds was not so set out, and that the point was, therefore, not open to the plaintiffs. I am of opinion that this contention is not well founded. Par. 1 of Mr. Essberger's affidavit of Nov. 19, 1932, states that the charter-party was made in London. It is

true that, when he is arguing in par. 7 of that affidavit, he relied upon the fact that a breach arose within the jurisdiction of the Court. That is to raise the second ground, but, in my opinion, having averred that the charter-party was made in London, he has sufficiently indicated that he relies upon that fact. If he had relied solely on the second ground the place of making the contract would be irrelevant, for that rule expressly provides that if the breach be committed within the jurisdiction, service out of jurisdiction may be ordered with respect to a breach committed within the jurisdiction of a contract wherever made.

I proceed, therefore, to consider the case made on behalf of the plaintiffs that this award, on which they seek to sue, arose in respect of a contract made within the jurisdiction. This contention raises at the outset the following juridical problem: What is the nature of an action based upon an award? On the one hand, it is said for the respondents that, in so far as the submission is a contract whereby the parties to it impliedly undertake to abide by and carry out the award of the arbitrators, the submission is contained in the charter-party which is made in London, and, therefore, the enforcement of the award would be the enforcement of a contract made within the jurisdiction. On the other hand, it is contended for the appellant that the action is brought on the award itself, and that consequently, as the award was made in Hamburg, the action is not the enforcement of a contract made within the jurisdiction.

The respective contentions require for their proper consideration some study of the history of the legal principles which govern the enforcement of awards at common law and in equity. The contention of the respondents that the submission is the contract on which an action based on the award is founded is well supported by authority. In the case of Purslow v. Baily, 2 Lord Raymond 1039, Holt, C.J., said, at p. 1040:-

The submission is an actual mutual promise to perform the award of the arbitrators; and in such actions, while he was a practiser, and since he had been a Judge, the submission had been always held sufficient evidence to maintain the action.

This view is accepted in the latest edition of Russell on Arbitration (12th) at p. 276, and there are many later *dicta* to be found,

| [1933] Vol. 45<br>C.A. | **L.l.L.Rep.**<br>Bremer Oeltransport v. Drewry. | 136 |
|---|---|---|

more particularly in cases for the enforcement by or for specific performance on the equity side to the like effect. Thus in Wood v. Griffith, 1 Wils. Ch. 34, at p. 44, Lord Chancellor Eldon said:-

That a bill will lie for the specific performance of an award, is clear; for the award contains nothing more than an agreement, on terms which a third person points out.

In Nickels v. Hancock, 7 De G. M. & G. 300, Knight Bruce, L.J., said, at p. 314:-

The bill-the bill now before us-has been filed for the purpose of obtaining specific performance of the award, in the exercise by this Court, not of any jurisdiction peculiar to awards, but of its ordinary jurisdiction applicable to agreements. Many therefore, if not all of the principles applicable to ordinary cases or suits for the specific performance of agreements must apply to the present case.

And Turner, L.J., at p. 318, said:-

In considering, therefore, the question, whether the Court ought in any particular case to interfere for the purpose of enforcing an award, the first point to be looked at is, what have the parties agreed to submit to the arbitrator?

In Blackett v. Bates, L.R. 1 Ch. App. 117, Lord Cranworth, L.C., said at p. 124:-

The rights of the parties in respect of specific performance are the same as if the award had been simply an agreement between them.

See also Erle, C.J., in Lievesley v. Gilmore, L.R. 1 C.P. 570, at p. 572, where he says:-

There was, therefore, an agreement between the parties that the matters in difference should be referred, and that the award should be performed.

So far, it would appear clear that in the opinion both of common law and equity Judges the award is to be regarded as merely the working out of a term of the original agreement of submission; and there is other, perhaps more indirect, authority to the same effect, as in Llanelly Railway & Dock Company v. London & North Western Railway, L.R. 1 Ch. App. 942, at pp. 948 and 949, where James, L.J., said:-

It would be difficult to say that the real question between the parties could be determined by the arbitrator under that clause [in the agreement]; because, if the plaintiffs are right in their contention, they have determined that part of the agreement as well as everything else.

In Leake on Contracts, 8th Ed., at p. 740, it is said:-

A submission by consent . . . implies an agreement to perform the award; upon which an action will lie for non-performance. The action may be in the form of a claim for debt or damages, or for specific performance . .

On the other hand, Counsel for the defendant has cited to us certain decisions which seem to support the contrary view, that action may be brought upon the award itself. The most recent case cited was that of *In re* Norske Atlas Insurance Company, 23 Ll.L.Rep. 104. There the plaintiffs' claim was based on an award made in Norway by Norwegian arbitrators. The defendants said that the award was made pursuant to a submission in a treaty of reinsurance against marine risks in a written agreement and that the treaty was a treaty of marine insurance and was not expressed in a policy sufficient to satisfy the Stamp Act and the Marine Insurance Act. The plaintiffs argued that this agreement was not a contract of insurance at all. Mr. Justice MacKinnon was of opinion that, if the plaintiffs were suing upon the treaty for marine losses under insurances they were making, the pleas in defence would be fatal to the plaintiffs. They would be suing upon a contract of marine insurance which, first of all, was not expressed in a policy, and, secondly, was not stamped as a policy needs to be. He continues (at p. 106):-

But in my judgment the question is not that at all. The plaintiffs here are suing on the award. In order to sue on an award, it is, I think, necessary for the plaintiffs to prove, first, that there was a submission; secondly, that the arbitration was conducted in pursuance of the submission; and, thirdly, that the award is a valid award, made pursuant to the provisions of the submission, and valid according to the *lex fori* of the place where the arbitration was carried out and where the award was made.

Certainly in this MacKinnon, J., seems to treat the action as one upon the award as such and not as an action on the marine reinsurance contract, which he finds was invalid. The issue which I have here to consider was not directly argued before the learned Judge, the point being according to Counsel whether the contract of marine reinsurance was or was not invalid, and the authorities cited were none of them related to the problem whether the action was brought upon the award or upon the contract of submission. Nor does the learned Judge, although his decision on the point is clear, cite any authority on that head.

Nevertheless, there does exist earlier authority which supports his view, namely, the case of Hodsden v. Harridge, (1670) 2 Wms. Saund. 62. In that case, there being disputes between the plaintiff and the defendant, the parties submitted themselves to arbitration; and, the arbitrators disagreeing, an umpire awarded £15 to the plaintiff. The defendant pleaded in bar the Statute of Limitations, and the question was whether the action of debt on the award was within the statute of James I or not. Counsel for the plaintiff argued that the award was not within the statute because the words stated were "all actions of debt grounded upon any lending or contract without specialty" shall be sued within six years. He argued, first, that in so far as the umpire had made his award in writing under his hand and seal, it was a specialty, and so without the statute, and, secondly, that admitting there was no specialty, the action for debt on the award was not limited by statute, because only actions of debt without specialty were limited which were grounded upon any lending or contract, and that this action of debt was not so well founded upon any lending. In the result Kelynge, C.J., held that there was a sufficient specialty, while Twysden, J., held that it was not within the statute because it was not founded upon any lending or contract. It is stated that the other Judges agreed with both points, and Twysden, J., on motion for judgment, said in terms that it was resolved by the Court for the plaintiff on both points.

The second point concerns us not in the present case, but the decision of the Court that the action on the award was made on a specialty is a decision in favour of the appellant's contention in this case, because the specialty was only in the award itself.

and not in the agreement of submission to arbitration, so that clearly the Court held the action to be based upon the award itself and not upon the submission which was not under seal.

In Dilcey v. Polhil, 2 Strange 923, there is a distinction drawn by the Court between an action so brought upon a bond of submission and where it is upon the award. The question there arose whether in an action for debt on an award a mutual submission must be shown in the declaration. It was argued that an award is the determination of a third party between two others who submit to his judgment and that the submissions create a mutual obligation upon both to acquiesce in his decision. The Court said:-

There is a great deal of difference where the action is brought upon the bond of submission, and where it is upon the award; in the first case [the bond] the defendant . . . shows that there were mutual submissions, the condition always so reciting it: but in the other case [where it is upon the award] it must be averred, before you can properly introduce your award.

On a reference to arbitration the submission used sometimes to be made by mutual bonds, the obligation being in the form of a common money bond to abide the event of the award. And in Ferrer v. Oven, 7 B. & C. 427, the Court held that in an action in debt on an award it is necessary for the plaintiff to allege a mutual submission. In the language of Bayley, J., at p. 430:-

By declaring on the award, the plaintiff takes upon himself the onus of proving a mutual submission. By declaring on the bond, he transfers the burden of proof to the defendant; for it lies on the latter to discharge himself from the penalty by showing a performance of the conditions.

This view is expressed in the 3rd Ed. of Bullen and Leake, at p. 71, where the indebitatus count on an award is stated to be

money payable by the defendant to the plaintiff for money awarded by [the arbitrator] to be paid by the defendant to the plaintiff, by an award of the said [arbitrator] made under a submission to his arbitration by the plaintiff and defendant, of matters in difference between them.

[1933] Vol. 45
C.A.

**I.L.L.Rep.**
**Bremer Oeltransport v. Drewry.**

138

"The general issue *never indebted* to an *indebitatus* count on an award . . . denies the submission to arbitration," say the same learned authors at p. 488. So that it appears clear that under the old pleading the avement of submission was essential to an action upon the award though not to an action upon the bond of submission.

As I understand the argument of Sir Robert Aske, he asks us to consider the present action to be one analogous to the old action of debt on bond conditioned to perform an award, but the action in the present case cannot possibly be brought within the observations of the Court in such cases as Dilley v. Polhil and Ferrer v. Oven, where it is said that by declaring on the bond the plaintiff need not prove the mutual submission. In actions on bond before the statute 8 & 9 Wm. III, cap. 11, the plaintiff sued for the penalty without assigning the breaches, and in the earlier cases it must always be borne in mind that in actions in debt on the bond, the action may have been for penalty. They are not material for the present problem. I observe that in Welch v. Ireland, 6 East 613, the Court used the phrase: "The bond being to perform an award-in other words, to perform an agreement." In Lang v. Brown, 25 L.T. ( o.s.) 297, the Lord Chancellor said this:-

What we have to consider, therefore, is, whether the award which was then made is an award which the parties agreed should be binding on them.

And again:-

There is this provision in the deed of submission. The parties begin thus: they agree to submit all differences.

It would appear, therefore, that the greater weight of authority is in favour of the view that in an action on the award the action is really founded on the agreement to submit the differences of which the award is the result. The legislation dealing with awards supports this view. By 3 & 4 Wm. IV, cap. 42, Sect. 3, it was provided that:-

All actions of debt upon any award where the submission is not by specialty

should be commenced and sued within the there stated time. This points to the conclusion that the Legislature in 1833, in an Act said to be "for the better advancement of justice," in dealing with limitations

of actions, had regard to the nature of the submission in founding the action of debt upon the award. Interesting as these problems are, even if there still be recognised by the law such an action upon the award itself (where there is no order of Court under the Arbitration Act, 1889, Sect. 12, or under the Arbitration (Foreign Awards) Act, 1930, neither of which here apply) as appears to have been contemplated in the case of Hodsden v. Harridge and assumed by Mr. Justice MacKinnon in the Norske Atlas Insurance case, it is sufficient for the purpose of the plaintiffs here to show that, at any rate, they are entitled to say that on their claim they are suing on the charter-party made in London and more particularly on the submission to arbitration therein contained.

The few cases which appear to support the view that an action may be brought upon the award in my view do not exclude in any event an action brought upon the agreement to refer differences, and for this purpose, in my view, the submissions are here sufficiently stated to be in the charter-party of Nov. 19, 1929. Without, therefore, finally determining whether an action may or may not be brought on an implied contract in the award itself, I am clearly of opinion that it may be brought upon an agreement containing a term to refer disputes, and that the present claim is properly pleaded as arising from such an agreement.

It is, therefore, an action for the enforcement of a contract made within the jurisdiction. If it appears that a claim is partly within and partly without the order authorising service out of the jurisdiction the Judge may give leave for service; it is a matter within his discretion. (See Thomas v. Hamilton, 17 Q.B.D. 592.)

As regards the second contention, that the respondents are bringing an action in respect of a breach committed within the jurisdiction, I think that they fail. It is said in the first place that their affidavit, on which their *ex parte* order was obtained, contained a serious inaccuracy when it stated in par. 5 that the damages were assessed payable in England in cash. I agree with this contention. There is no authority for saying that the award requires the payment to be made in England, and such an inaccuracy on an *ex parte* affidavit might well vitiate the rights which were then won by them. In the language of Scrutton, L.J., in Lazard

| [1933] Vol. 45 | L.l.L.Rep. | 139 |
| C.A. | Bremer Oeltransport v. Drewry. | |

Bros. v. Banque Industrielle de Moscou, [1932] 1 K.B.
617, at p. 637:-

> Persons applying *ex parte* to the Court must use the
> utmost good faith, and if they do not, they cannot keep
> the results of their application.

But here, even were the affidavit to be unimpeachable, I
think the plaintiffs must fail. The award, in fact, states no
place of payment, and as no evidence of German law was
given it is to be assumed that English law prevails in such a
matter, and in such a case it is the duty of the debtor to
seek out his creditor.

> *Prima facie*, in commercial transactions, when cash is
> to be paid by one person to another, that means that it is
> to be paid at the place where the person who is to receive
> the money resides or carries on business (per Kay, L.J.,
> in Rein v. Stein, [1892] 1 Q.B. 753, at p. 758)

-in this case at Hamburg. Thus, if it is suggested that the
appellant committed a breach by non-payment of the sum
awarded, the alleged breach was not within the jurisdiction.
The allegation in the affidavit that payment was to be made
in England is thus irrelevant and need not be considered.

I think that this appeal should be dismissed solely upon
the ground that the agreement which it is sought to enforce
is based upon the charter-party and not upon the award
itself, and, therefore, was made within the jurisdiction.

In the result, therefore, this appeal must be dismissed,
with costs.

**Lord Justice ROMER:** I agree.

# EXHIBIT 4

# F J Bloemen Pty Ltd (formerly Canterbury Pipelines (Aust) Pty Ltd) v The Council of the City of Gold Coast

ADMINISTRATION OF JUSTICE; Arbitration

PRIVY COUNCIL
LORD WILBERFORCE, VISCOUNT DILHORNE, LORD PEARSON, LORD CROSS OF CHELSEA AND LORD SALMON
31 JANUARY, 1 FEBRUARY, 2 MAY 1972

*Arbitration – Award – Interest – Contract providing for submission of disputes to arbitration – Contract also providing for interest on all moneys payable but unpaid on date due – Parties submitting dispute to arbitration – Award by arbitrator in favour of plaintiffs – Plaintiffs claiming interest on amount of award – Whether interest payable on award under terms of contract – Whether rights of parties under the contract superseded by award.*

In 1965 the plaintiffs entered into a written agreement with the defendants to execute certain sewage works for them. Clause 35(*c*) of the contract provided: 'The [plaintiffs] shall be entitled to interest on all moneys payable to [them], but unpaid, from the date on which payments become due ... ' and cl 41 provided for the submission of disputes to arbitration. Differences arose between the parties in the course of which the defendants purported to rescind the contract. The disputes were submitted to arbitration and on 8 November 1966 the arbitrator made an award in favour of the plaintiffs in the sum of $478,478. That figure included a sum in respect of work carried out by the plaintiffs for which they had not been paid and a sum by way of damages for their loss of profit and loss of plant. The defendants paid the $478,478. On 13 May 1969 the plaintiffs issued a writ claiming, under cl 35(*c*) of the contract, the sum of $49,386 as interest at 7 per cent from 8 November 1966 on the amount of the award together with interest at 7 per cent on that sum from the date of the writ until payment. The defendants contended that they were not liable to make that payment, inter alia, on the ground that the arbitrator's award superseded the rights of the parties under the contract.

*Held* – (i) Prima facie the plaintiffs would be entitled to the sums claimed for, although in relation to the matters submitted to him the arbitrator's award, including as it did a sum by way of damages for breach of contract, constituted a fresh obligation replacing the original obligation to perform the contract according to its terms, the obligation of the parties to perform that substituted obligation flowed from the agreement to submit differences to arbitration contained in cl 41 and the amount awarded could fairly be said to be moneys payable by virtue of the contract and so within the scope of cl 35(*c*) (see p 362 *d* and *e* and p 363 *f* and *g*, post).

(ii) Since however on the evidence the plaintiffs had accepted the repudiation of the contract and as the obligation imposed by cl 35(*c*) was of a kind that could not be required to be performed after an accepted repudiation, the plaintiffs could not claim interest on the sum awarded by the arbitrator (see p 364 *a* to *d*, post).

*Heyman v Darwins Ltd* [1942] 1 All ER 337 applied.

## Notes

For the scope and effect of an award, see 2 *Halsbury's Laws* (3rd Edn) 43–46, paras 97, 98, and for cases on the subject, see 2 *Digest* (Repl) 597, 598, *1254–1269.*

For interest on money payable under an award, see 2 *Halsbury's Laws* (3rd Edn) 46, para 101, and for cases on the subject, see 2 *Digest* (Repl) 599, 600, *1270–1279.*

℅ 357b

## Cases referred to in opinion

*Allen v Milner* (1831) 2 Cr & J 47, 2 Tyr 113, 1 LJEx 7, 149 ER 20, 2 *Digest* (Repl) 672, *1835.*
*Bremer Oeltransport GmbH v Drewry* [1933] 1 KB 753, [1933] All ER Rep 851, 102 LJKB 360, 148 LT 540, CA, 2 *Digest* (Repl) 700, *2128.*
*Commings (Cummings) v Heard* (1869) LR 4 QB 669, 10 B & S 606, 39 LJQB 9, 20 LT 975, 2 *Digest* (Repl) 672, *1886.*
*Dobbs v National Bank of Australasia Ltd* (1935) 53 CLR 643.
*Heyman v Darwins Ltd* [1942] 1 All ER 337, [1942] AC 356, 111 LJKB 241, 116 LT 306, HL, 2 *Digest* (Repl) 492, *435.*

## Appeal

These were consolidated appeals against three orders of the Full Court of the Supreme Court of Queensland (Hanger ASPJ, Lucas and Hoare JJ) (i) dated 28 October 1969 allowing the demurrer of the respondents, the Council of the City of Gold Coast, to the statement of claim of the appellants, F J Bloemen Pty Ltd (formerly Canterbury Pipelines (Aust) Pty Ltd), that the claim, made in reliance on cl 35(*c*) of a contract entered into by the parties on 5 March 1965, for interest on a sum awarded by an arbitrator was bad in law; (ii) dated 14 November 1969 refusing the appellants leave to deliver an amended statement of claim in the form then proposed and by the third order, also dated 14 November 1969, judgment was entered for the respondents in the action. The facts are set out in the opinion of the Privy Council delivered by Lord Pearson.

*J G Le Quesne QC* and *Stuart McKinnon* for the appellants.
*P D Connolly QC* and *P V Loewenthal* (both of the Queensland bar) for the respondents.

2 May 1972. The following opinion was delivered.

**LORD PEARSON.** These are consolidated appeals against three orders of the Full Court of the Supreme Court of Queensland. The first order, which was dated 28 October 1969, allowed the demurrer of the respondents, the Council of the City of Gold Coast, to the statement of claim of the appellants, F J Bloemen Pty Ltd, formerly Canterbury Pipelines (Aust) Pty Ltd. The second order, which was dated 14 November 1969, refused the appellants leave to deliver an amended statement of claim in the form then proposed and by the third order, also dated 14 November 1969, judgment was entered for the respondents in the action.

The events leading up to the issue of the writ were—briefly stated—as follows. On 5 March 1965 the parties entered into a contract in writing under which the appellants, therein called 'the contractor', were to execute some sewage works for the respondents. Clause 35(*c*) of the contract provided that the contractor should be entitled to interest on all moneys payable to him but unpaid from the date on which payment became due at a rate therein specified and the contract contained an arbitration clause. Disputes arose between the parties in the course of which

*F J Bloemen Pty Ltd (formerly Canterbury Pipelines (Aust) Pty Ltd) v The Council of the City of Gold Coast*

the respondents purported to rescind the contract and the disputes were submitted to the arbitration of an engineer, Mr F W Laws. On 8 November 1966 he made an award in favour of the appellants in the sum of $478,478 and further awarded them the costs of the arbitration. The sum of $478,478 was composed of three elements. First the arbitrator awarded a sum of $200,242 in respect of work carried out by the appellants for which they had not been paid. Secondly he awarded a sum of $263,056 by way of damages for their loss of profit and loss of the use of their plant. He directed, however, that a sum of $1,000 be deducted from the aggregate of the two sums previously mentioned leaving a balance of $462,298. Finally, in purported reliance on cl 35(c). He awarded interest on that sum for a period of six months at the rate of 7 per cent. This interest amounted to $16,180—making up the total of $478,478. After the award was made the respondents applied to the Supreme Court of Queensland to set it aside on a number of grounds. The Supreme Court dismissed the application and the respondents then appealed to the High Court of Australia. After filing their notice of appeal they gave notice to the appellants that on the hearing of the appeal ⊕ 3580 they would seek to argue a further point not argued below or included in their notice of appeal—namely that the inclusion in the award of the sum of $16,180 for interest was an error of law apparent on the face of the award. The High Court by its judgment given on 2 February 1968(( 1968) 118 CLR 58) held (1) that there was no substance in any of the grounds advanced by the respondents (then appellants) for setting aside the award other than that relating to the inclusion of the sum for interest; (2) that in awarding interest on the sum of $462,298—or at all events on so much of that sum as consisted of an award of damages—the arbitrator had erred in law but (3) that as the point was not taken below or included in the notice of appeal and the sum involved was small in comparison with the total amount of the award the appeal should be dismissed. The award therefore stood (and, so far as this appeal is concerned, still stands) as a binding award notwithstanding the error of law contained in it and the respondents paid the sum of $478,478 due under it by two instalments—one of $403,478 made on 22 February 1968 and the other of $75,000 made on 28 March 1968. The appellants' costs of the arbitration were agreed at $13,808 and paid by the respondents on 17 April 1968.

By the writ in this action issued on 13 May 1969 the appellants claimed the sum of $49,386 as interest at 7 per cent from 8 November 1966 on the amount of the award and the costs together with interest at 7 per cent on that sum from the date of the writ until payment. The statement of claim was delivered on 15 May 1969. Paragraphs 1 and 2 set out the particulars of the appellants and respondents describing them as 'the contractor' and 'the principal' respectively. The pleading then continued as follows:

'3. By an agreement in writing bearing date the Fifth day of March 1965 the contractor covenanted faithfully to execute and complete several works and provisions in accordance therewith and the principal covenanted to pay to the contractor such sums as might become payable pursuant thereto at such times and in such manner as therein provided. The contractor craves leave to incorporate the said agreement in writing herein and will refer thereto at the trial of this action for its full terms true meaning and effect.

'4. Clause 35(c) and Clause 41 of the general conditions of the said agreement in writing bearing date the Fifth day of March 1965 respectively provide as follows:—"35(c) Contractor entitled to interest. The Contractor shall be entitled to interest on all moneys payable to him, but unpaid, from the date on which payments become due, and such interest shall be calculated at twice the maximum ruling rate of interest of the Commonwealth Savings Bank of Australia on deposit accounts. This rate of interest shall be applicable to the whole of the moneys due to the contractor 41(a) Submissions to arbitration. If any question, difference or dispute whatsoever shall arise between the principal and the contractor or the Engineer and the Contractor upon or in relation to or in connection with the contract which cannot be resolved by the contracting parties to their mutual satisfaction, either party may as soon as reasonably practicable by notice in writing to the other party clearly specify the nature of such question, difference or dispute and call for the point or points at issue to be submitted by settlement by arbitration. (b) Arbitration and arbitrators. Arbitration shall be effected—(i) by arbitrator agreed upon between the parties, or failing agreement upon such an arbitrator, (ii) by an arbitrator appointed by the President for the time being of the Institution of Engineers, Australia, or failing such appointment, (iii) by an arbitrator appointed in accordance with the provisions of the arbitration act of the state whose laws govern the contract. (c) Arbitration deemed to be under Arbitration Act. Submission to Arbitration shall be deemed to be submission to arbitration within the meaning of the Arbitration Act of the State whose laws govern the contract. (d) Costs. Upon every and any submission to ⊕ 3590 arbitration the costs of and incidental to the submission and award shall be at the discretion of the arbitrator, who may determine the amount thereof or may direct that the costs be taxed by a proper officer of the Court. The arbitrator shall direct by whom, in what proportion and in what manner costs shall be paid. (e) Continuation of work and payments during arbitration. If it be reasonably possible, work under the contract or any variation thereto shall continue during arbitration proceedings, and no payment due or payable by the Principal shall be withheld on account of the arbitration proceedings unless so authorised by the contractor."

'5. Each of the parties served upon the other a notice of dispute in relation to certain differences between the parties arising out of the said agreement in writing.

'6. On the Sixth day of January 1966 the parties executed a document entitled "Terms of Arbitration" whereby they appointed one F. W. Laws the Arbitrator pursuant to the said Clause 41 of the said agreement in writing, on the terms therein set out and referred to the said Arbitrator all matters and differences between them. The contractor craves leave to incorporate the said "Terms of Arbitration" herein and will refer thereto at the trial of this action for its full terms, true meaning and effect.

7. By a document in writing bearing date the Eighth day of November 1966 the said F. W. Laws made an award of and concerning the matters so referred to him in the following terms:—"1. I *award and direct* that the said Council of the City Gold Coast shall pay the said Canterbury Pipelines (Aust.) Pty. Ltd. the sum of FOUR HUNDRED AND SEVENTY-EIGHT THOUSAND FOUR HUNDRED AND SEVENTY-EIGHT DOLLARS ($478,478·00). 2. I award that the said sum of FOUR HUNDRED AND SEVENTY-EIGHT THOUSAND FOUR HUNDRED AND SEVENTY-EIGHT DOLLARS [$478,478.00] be paid and accepted in full satisfaction of all claims by each of the said parties against the other and of all matters and differences between them. 3. As to costs I award and direct that the said Council of the City of Gold Coast shall pay to the said Canterbury Pipelines (Aust.) Pty. Ltd. its costs of and attending to the said arbitration and shall also pay the costs of this my award."'

Paragraph 8 sets out the agreement as to the amount of costs; para 9 the payment of the sum awarded and the costs; para 10 the rate of interest of the Commonwealth Savings Bank by reference to which the rate of 7 per cent was calculated; and para 11 the manner in which the sum of $49,688 claimed was calculated.

On 4 June 1969 the respondents delivered a demurrer in the following terms:

'1. The Defendant says that the award referred to in paragraph 7 of the Statement of Claim contained as part of it certain reasons (which were delivered at the time of the award and formed part of it) paragraph 12 of which reads as follows: "Decision on payment.

"I have decided that (a) The work done by the Contractor was inadequately recompensed by the schedule rates forming part of the Contract. (b) The Contractor was justified in stopping work. (c) The Principal was not justified in refusing approval for the Contractor to start work in Southport. (d) The Principal was not justified in cancelling the Contract.

Case 1:08-cv-02351-HB   Document 15   Filed 05/09/2008   Page 34 of 35
*All England Law Reports 1936 –*
books on screen™
*All ER 1972 Volume 3 (06/05/2008 04:24pm)*

*F J Bloemen Pty Ltd (formerly Canterbury Pipelines (Aust) Pty Ltd) v The Council of the City of Gold Coast*

"There remains to be settled now the question of payment.

"In this respect the Contractor's Counsel has set out four alternative methods of payment. This is about the only information I have. The Principal has not assisted very much in helping me to assess any new values assuming a change. Under such circumstances I must be guided solely by the terms of the Contract.

"I am loath to accept the Contractor's new rates.

"The alternative (says Clause 22F of the General Conditions of Contract) is day labour or else the Arbitrator fixes new rate. The Arbitrator has insufficient ⅋ 3600 information to fix new rates. Therefore recourse must be had to the day labour principle.

"I therefore accept as proved (a) The Contractor's claim as set out in exhibit YY in the sum of £100,121·7·3 ($200,242·72). (b) The Contractor's claim as follows

| | | | | | | |
|---|---|---|---|---|---|---:|
| (i) For loss of profit on balance of Surfers Paradise | | .. | .. | | | £10,653 |
| (ii) For loss of profit on Southport | .. | | .. | .. | | £65,762 |
| (iii) Loss of use of plant at Surfers Paradise | .. | | .. | .. | | £28,233 |
| (iv) Loss of use of plant at Southport | | .. | .. | .. | | £26,880 |
| | | | | | Total | £131,528 |
| | | | | | or | $263,056 |
| (c) I agree to a deduction from the Contract Price in the sum of $1,000 (see para 6). | | | | | | |
| Total of (a) and (b) is | .. | .. | .. | .. | .. | $463,298 |
| Less (c).. | .. | .. | .. | .. | .. | $1,000 |
| Net Total | .. | .. | .. | .. | .. | $462,298 |

"It is not proposed to allow any additional payment for overheads.

"Clause 35C of the General Conditions of Contract says that the Contractor is entitled to interest on moneys owing to him and the rate is set out at 7%.

"Interest is therefore to be paid at this rate on the net total shown in (c) for a period of six (6) months that is an amount of (462298 x7)/(100 x 2) = $161180

"The grand total of the award is therefore

> $462298
> 16180
> $478478

"The formal award follows immediately hereafter."

'2. The Defendant demurrs to the Plaintiff's Statement of Claim and says that the same is bad in law on the following grounds: (a) The said award was in substitution for, and superseded the rights of the parties under the Contract; (b) The said award contains no provision relating to interest subsequent to the making of the award; (c) On the proper construction of Clause 35(c) of the General Conditions interest is not payable thereunder on the said award; and (d) The Plaintiff's claim is for interest on an award which itself contains provision for interest, which provision was bad in law. And on other grounds sufficient in law.'

On 28 October 1969 the Full Court by a majority (Hanger ASPJ and Hoare J, Lucas J dissenting) allowed the demurrer. One reason given by Hanger ASPJ for allowing it was that there was no sufficient allegation in the statement of claim that the arbitration was held and the award made under the agreement of 5 March 1965. Hoare J did not refer to this pleading point in his judgment and Lucas J rejected it. If and so far as it is well founded the defect could presumably be cured by an amendment of the statement of claim and the respondents did not rely on this point before the Board. The ground on which Hanger ASPJ and Hoare J concurred in allowing the demurrer was that the sums of $200,242 and $263,056 totalling (less the $1,000 deducted) $462,298 were not moneys payable to the appellants under the contract of 5 March 1965 and were consequently not moneys to which el 35(c) of that contract could apply. The pointed out that the cases—notably *Allen v Milner*, *Commings v Heard* and *Dobbs v National Bank of Australasia Ltd* ((1935) 53 CLR 643 at 653)—showed that on the one hand ⅋ 3610 an award may go no further than to establish the existence and measure the extent of a liability arising under the contract containing the agreement to submit differences to arbitration but that on the other hand it may go further and substitute a fresh obligation in place of an obligation arising under the contract. In this case it was clear that the award of damages for loss of profit and loss of the use of the plant created a fresh obligation to pay the sum awarded which superseded the obligation arising from the respondents' breach of contract. They further held—although Hoare J felt some doubt on this point—that the appellants' pleading did not show that the sum of $200,242 was a sum due under the agreement and that accordingly the obligation to pay it had also to be regarded as a fresh obligation arising by virtue of the award. In their view fresh obligations created by an award in substitution for obligations under the contract could not be regarded as moneys payable to the appellants within the meaning of el 35(c) of the contract. Hanger ASPJ further held that as the arbitrator was not entitled to include in his award any sum by way of interest for a period prior to the date of the award on damages awarded by him so much of the total award as consisted of such interest could not in any case be regarded as validly awarded so as to fall under el 35(c) notwithstanding the fact that the High Court had refused to set aside this award. Hoare J expressed no view on this point.

The dissenting judgment of Lucas J may be summarised as follows: (1) el 35(c) related only to moneys payable by virtue of the contract; (2) in relation to the matters submitted to him the arbitrator's award constituted a fresh obligation replacing the original obligation to perform the contract according to its terms; but (3) the obligation of the parties to perform the substituted obligation flowed from the agreement to submit differences to arbitration contained in el 41 of the contract and therefore (4) the amount awarded could fairly be said to be moneys payable by virtue of the contract and so within the scope of el 35(c). He further held that the fact that the arbitrator had wrongly included interest on damages in his award was irrelevant to the question to be determined since the High Court had allowed the whole award to stand as a valid award.

The demurrer having been allowed the appellants on 14 November 1969 applied to the Full Court—constituted in the same way—for leave to amend the statement of claim but their counsel conceded that although the proposed amendments would meet the pleading point taken by Hanger ASPJ, in the light of the reasons for the judgment on demurrer given by the majority of the court, even the amended statement of claim would appear to be demurrable. The court accordingly refused leave to amend the statement of claim. Counsel for the respondents foreseeing

*All England Law Reports 1936 -*

books on screen™

*All ER 1972 Volume 3 (06/05/2008 04:24pm)*

*F J Bloemen Pty Ltd (formerly Canterbury Pipelines (Aust) Pty Ltd) v The Council of the City of Gold Coast*

that if judgment was entered for his clients the appellants would probably be entitled to appeal as of right to Her Majesty in Council declined to move for judgment but the court gave judgment for the respondents of its own motion. On 19 December 1969 the Full Court—differently constituted—held that the judgment given on 14 November dismissing the action was a final judgment within the meaning of the rules governing appeals from Queensland to Her Majesty in Council and as they considered it desirable that the Board should deal with all the matters in controversy between the parties they gave the appellants leave to appeal from the orders allowing the demurrer and refusing leave to amend the statement of claim.

Their Lordships will deal first with the subsidiary question whether the inclusion by the arbitrator in his award of a sum by way of interest for a period prior to the award on damages awarded by him itself prevents the total sum awarded from being considered as moneys payable by the respondents within the meaning of cl 35(c). It is, of course, true that the arbitrator was not entitled to award such interest; but unless and until the award was set aside in whole or in part the total sum awarded including the sum for interest was a sum payment of which the appellants could enforce as having been validly awarded—as indeed the respondents recognised by paying it as soon as their appeal to the High Court was dismissed. Their Lordships agree with Lucas J that if the total sum awarded would otherwise fall under cl 35(c) ℀ 3628 the fact that it included this sum for interest would be no answer to the appellants' claim.

Their Lorships turn now to the main point in the appeal. It was common ground—it is indeed obvious—that cl 35(c) can in any event only relate to moneys which can be said to have become payable to the appellants under or by virtue of the contract. The contentions advanced by the respondents before the Board on this aspect of the case were two-fold. First they submitted that when an arbitrator awards a sum by way of damages for breach of the contract containing the submission his award gives rise to a fresh cause of action which supersedes the original cause of action arising out of the breach and that the sum awarded is a sum payable under the award and not under the contract. Secondly they submitted that even if a sum awarded by way of damages in an arbitration held during the currency of the agreement could be said to be moneys payable under the contract the same could not be said of the sum payable under an award such as this which followed a repudiation of the contract by the respondents accepted by the appellants. Mr Laws's function was to settle once and for all the liabilities of the parties to one another under the contract including cl 35(c) and that clause could not operate as it were a second time on the total sum awarded.

Before considering these contentions their Lordships would observe that even if they are ill-founded and the sum payable under this award can be said to fall prima facie within the scope of cl 35(c) it might still be that that clause read in the context of the whole agreement in which it appears bears a more limited construction—is for example, limited to sums payable by the respondents under certificates given by some quantity surveyor or other expert in the course of the execution of the works. But although by para 3 of the statement of claim the appellants sought to incorporate the whole agreement in their pleading it does not appear that any reference was made below to any parts of it other than cll 35(c) and 41 and the agreement itself was not placed before the Board. Their Lordships must, therefore, construe cll 35(c) and 41 as it were 'in vacuo' for the purpose of this appeal. So construing them they prefer, on the whole, the conclusion as to the prima facie scope of cl 35(c) reached by Lucas J to that favoured by Hanger ASPJ and Hoare J. It is true—as the cases above referred to show—that when an arbitrator fixes a sum to be paid by one party to the submission by way of damages for breach of contract the award creates a fresh cause of action superseding that arising out of the breach. But it does not appear to their Lordships to follow from that that the cause of action which comes into existence when the award is made cannot be said to arise under the contract which contains the submission. The award of an arbitrator differs materially from a judgment. The plaintiff's right to sue and the court's right to give judgment for him if he proves his case are not derived from the agreement of the parties and the judgment when given is an entirely fresh departure. The award of an arbitrator on the other hand cannot be viewed in isolation from the submission under which it was made. It was this sort of consideration which led the Court of Appeal in *Bremer Oeltransport GmbH v Drewry* to hold that an action brought to recover a sum awarded by an award made in Hamburg under a submission contained in a contract made in London was an action brought to enforce a contract made within the jurisdiction and their Lordships think that the same reasoning applies here. The distinction between an award which merely establishes and measures a liability under the contract and so does not create a fresh cause of action and an award of damages which supersedes the liability under the contract and creates a fresh cause of action, whatever its validity in other contexts, does not, in their Lordships' opinion govern the broad question at issue here. Accordingly on this point they agree with Lucas J that sums payable under this award albeit payable in part by way of damages can be fairly said to fall prima facie within the scope of cl 35(c).

℀ 3638

Turning now to the second contention advanced by the respondents their Lordships think that it is a fair, indeed an inevitable, inference from the facts pleaded not only that the respondents repudiated the agreement but that the appellants accepted the repudiation. The question is what was the effect of the accepted repudiation on the relevant clauses in the contract. It appears from *Heyman v Darwins Ltd* that an arbitration clause of a normal character can be invoked after acceptance of repudiation; but in their Lordships' opinion it follows from the same case, and from principle, that this is an exception to the general consequence that 'executive obligations' as they were called by Lord Macmillan or 'substantial obligations' of the contract as they were called by Lord Wright do not survive as effective obligations. Clause 35(c) of the contract, their Lordships consider to create an obligation of this kind, performance of which cannot be required after an accepted repudiation, and their Lordships do not see how the absence from the general law of Queensland of any provision for interest on arbitration awards can affect this result. On this view of the pleaded facts and of those provisions of the contract which alone are accessible to them, their Lordships must come to the conclusion, in agreement with the majority of the Supreme Court, that the claim for interest on the sum awarded by the arbitrator is bad in law and that the demurrer was rightly held to succeed. They will therefore humbly advise Her Majesty that these appeals should be dismissed. The appellants must pay the costs of the appeals.

*Appeals dismissed.*

Solicitors: *Park Nelson, Dennes, Redfern & Co* (for the appellants); *Light & Fulton* (for the respondents).

S A Hattena Esq  Barrister.
[1972] 3 All ER 364