Richard A. Zimmerman, Esq.
Attorney for Plaintiff
233 Broadway – Suite 2202
New York, NY 10279
Richard A. Zimmerman (RZ 0963)
(212) 962-1818
Patrick C. Crilley (PC 9057)
*Of Counsel*
(212) 619 -1919


**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
**PINK GOOSE, (CAYMAN) LTD.,**

<b>Plaintiff,</b>

<b>-against-</b>

**SUNWAY TRADERS LLC,**
**SUNWAY GROUP, SUNWAY TRADING**
**GROUP LTD., SUNWAY GROUP**
**INTERNATIONAL HOLDINGS,**
**SUNWAY GROUP IMPORT, SUNWAY**
**LOGISTICS, and LINTON EQUITIES B.V.I.,**

<b>Defendants.</b>

-------------------------------------------------------x

<b>ECF CASE</b>

<b>08 Civ. 02351 (HB)</b>

<b><u>SECOND DECLARATION OF ANTHONY ROBERT SWINNERTON</u></b>

Pursuant to 28 U.S.C. §1746, Anthony Robert Swinnerton, Solicitor of the Supreme

Court, of Cannongate House, 64, Cannon Street, London EC4N 6AE declares in this Second

Declaration as follows:

1.      I am the same Anthony Robert Swinnerton who made a declaration in this matter

on the 2nd May 2008.

2.      This second declaration is made to respond to a declaration of Michael Smith

made on May 9, 2008, in opposition to Sunway-Group Co. Ltd's Motion to Vacate.  In particular



I wish to deal with the *"SAINT ANNA"* decision relied on by Mr. Smith. I did not refer to this decision in my first declaration because it has been overruled and is therefore, in my view, irrelevant. As this is not accepted by Mr. Smith, I have to respond to this point and explain why he is wrong.

     3.    I do not agree with Mr. Smith that:

> *"there will be circumstances, when the claim leading to the award involves maritime matters, that a claim to enforce the Award will be a maritime claim"*

as stated in paragraph 2 of Mr. Smith's declaration. I find his wording vague and question whether, on his case, there are equally circumstances when a claim to enforce an award will <u>not</u> be a maritime claim and, if so, what are the criteria for deciding on which side of the line the claim falls. I submit this lack of clarity demonstrates an inherent flaw in his argument. A type of claim (such as a claim to enforce an arbitration award) either is or is not a maritime claim and if it is, then it will be a maritime claim for all purposes.

     4.    Mr. Smith has correctly quoted the wording of the relevant parts of Section 20(1) of the Supreme Court Act 1981 which sets out the admiralty jurisdiction of the High Court. However I disagree with Mr. Smith where he says at paragraph 4 that, *"an arbitration award on a claim pursuant to a charterparty falls within Section 20(2)(h)"*.

     5.    I note that at this stage he appears to refer to all arbitration awards in contradiction to what he says in paragraph 2.

     6.    Mr. Smith seeks to argue that the decision in the *"BUMBESTI"* does not correctly reflect English Law and he relies instead on the decision in the *"SAINT ANNA"*. As Mr. Smith says, both the decisions in the *"BUMBESTI"* and the



*"SAINT ANNA"* are first instance decisions but I consider that Mr. Smith has over

generalised the position as to precedent in respect of English Court decisions.

       7.      I attach as Exhibit 1 hereto a copy of the relevant paragraphs of

*Halsbury's Laws of England* dealing with the decisions of co-ordinate Courts (paragraphs

1244 to 1245) and I draw attention to the statement in paragraph 1244 to the effect that

> *"Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision; and the modern practice is that a judge of first instance will as a matter of judicial comity usually follow the decision of another judge of first instance unless he is convinced that the judgment was wrong. Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of earlier decisions."* [Underlining added.]

       8.      I also refer to paragraph 1245 which states that

> *"a long-standing decision of a judge of first instance ought to be followed by another judge of first instance, at least in a case involving the construction of a statute of some complexity, unless he is fully satisfied that the previous decision is wrong".* (Underlining added.)

       9.      On this basis, as I demonstrate, Mr. Justice Aikens' decision is binding because he

has not followed the *"SAINT ANNA"* after careful consideration and his decision is the later

decision.

      10.     Having set out the general principals as stated in Halsbury's Laws of England, I

analyse the decisions in the *"SAINT ANNA"* and the *"BUMBESTI"* and explain why the decision

in the *"BUMBESTI"* is to be preferred.

      11.     The *"SAINT ANNA"* decision of Mr. Justice Sheen was made in 1983. The

decision of Mr. Justice Aikens in the *"BUMBESTI"* was made in 1999. Therefore on the basic

premise that the *"BUMBESTI"* is the later decision it should be followed in preference to the

*"SAINT ANNA"*.

12.    The *"SAINT ANNA"* was a case in which the defendant did not appear. Whilst Counsel owes a duty to the Court, if he is unopposed, to address the Court on any arguments that he believes his opponent could have made, obviously there will be a difference to the extent of argument where there is no opposition in the case. That must be contrasted with the *"BUMBESTI"* where both parties appeared by Counsel. The *"SAINT ANNA"* was before the Court for one day whereas the *"BUMBESTI"* occupied three days suggesting, again, that the *"BUMBESTI"* was more carefully argued.

13.    The fact that the matter was not fully argued may be the reason why there are fewer authorities referred to in the judgment in the *"SAINT ANNA"*. As can be seen from the front of the report Mr. Justice Sheen referred only to 5 cases in his Judgment whereas Mr. Justice Aikens referred to a total of 14 authorities.

14.    Of the cases referred to by Mr. Justice Sheen in the *"SAINT ANNA"*, Mr. Justice Aikens referred to the *"BELDIS"*; *Bremer Oeltransport v. Drewry*; and the *"ESCHERSHEIM"*. Mr. Justice Aikens does not refer to the *"HENRICH BJORN"* or *Tarmarea S.R.L. v Rederiaktiebolaget Sally*, to which Mr. Justice Sheen referred (although this does not mean that the cases were not cited to him in argument); but he does refer to a further 11 cases which were not referred to in Mr. Justice Sheen's Judgment.

15.    It is clear Mr. Justice Aikens gave careful consideration to Mr. Justice Sheen's decision in the *"SAINT ANNA"*.

16.    The decision in the *"BUMBESTI"* runs to about twice the length of the decision in the *"SAINT ANNA"* which also, I respectfully submit, suggests that Mr. Justice Aikens had given the matter more detailed consideration than Mr. Justice Sheen.

17.    Mr. Justice Sheen in his decision in the *"SAINT ANNA"* stated at page 640 left hand column that:-

> *"...an action based on an award is an action for the enforcement of the contract which contains the submission to arbitration... there can be no doubt that an action for the enforcement of a voyage charter is a claim within the Admiralty jurisdiction of this Court".*

But, in his Judgment at pages 638-639 right hand column Mr. Justice Sheen acknowledged that the recital in the writ correctly stated that:-

> *"it was an implied term of the arbitration agreement contained in the charterparty that each party would pay to the other any sum found due by the arbitrators appointed in accordance with that agreement".*

Which, at the very least, is contradictory. It is a point to which I will return later in this declaration when discussing the effect of an arbitration award.

18.    Mr. Justice Sheen having noted that there was no defence to the claim in the *"SAINT ANNA"* referred to *Russell on Arbitration* 20th Edition page 350, the *"BELDIS"* and *Commercial Arbitration* which stated that an action on an award is, effectively, not a claim within the Supreme Court Act Section 20(2)(h). In order to say (wrongly in my respectful opinion) that the learned editors of the textbooks and the Court of Appeal were wrong, he then relied upon *dicta* in the *"ESCHERSHEIM"* as follows:-

> *"in my opinion there is no good reason for excluding from the expression "an agreement for the use or hire of a ship" any agreement which an ordinary businessman would regard as being within it".* (per Lord Justice Cairns in the Court of Appeal) and

> *"I see no reason in that context for not giving to them their ordinary wide meaning"* (per Lord Diplock in the House of Lords).



19.     While the these *dicta* support the view that the words of the Supreme Court Act Section 20(2)(h) should be construed in their usual way, that is not sufficient to establish that an Arbitration Award is a claim within Section 20(2)(h).

20.     I should, at this point, mention that *"dicta"* do not have any binding force in relation to legal proceedings. What is relevant is the *"ratio decidendi."* I refer to Halsbury's Laws of England at paragraph 1237-1238 a copy of which I attach as Exhibit 2. This makes it clear that the underlying principal decided in a case is the *"ratio decidendi"* and this alone has the force of law whereas *"dicta"* (cf Halsbury's at paragraph 1238) which is also referred to as *"obiter"* or *"obiter dicta"* are merely statements which are not necessary to the decision and have no binding authority on another Court, although they may themselves be "persuasive". Mr. Justice Sheen makes it clear, himself, that each of the statements that he relies on in the *"ESCHERSHEIM"* is *"dicta"*.

21.     Mr. Justice Sheen then refers to the nature of an action based on an arbitration award and the decision in *Bremer Oeltransport v. Drewry* in which the Court of Appeal said that

> *"the greater weight of authority is in favour of the view that in an action on the award the action is really founded on the agreement to submit the difference of which the award is the result…"*

22.     Mr. Justice Sheen relied on that decision. He also considered that the later decision of the Court of Appeal in the *"BELDIS"* was not consistent with that in *Bremer Oeltransport*. In the *"BELDIS"* Lord Justice Scott in the Court of Appeal said:-

> *"in my view it will be entirely wrong to hold that an action on an award arising indirectly out of such a maritime contract was included by the words of the above sections"* (referring to the relevant section of the Admiralty Courts Acts which were being invoked in order to arrest the ship).

I attach a copy of the decision in the *"BELDIS"* as Exhibit 3 hereto.

23.     Mr. Justice Sheen, therefore, relied on the fact that there were, in his view, conflicting Court of Appeal decisions which he considered left him free to decide which authority he would follow.  This is challenged by Mr. Justice Aikens at paragraph 23(5) of his judgment where he explains, correctly in my respectful submission, that there is no inconsistency between the decisions and that both cases establish that the submission to arbitration must be pleaded and proved.

24.     Accordingly, while Mr. Justice Sheen referred to the fact that the decision in *Bremer Oeltransport* was not referred to in the *"BELDIS"* it is, in my respectful opinion, not a case where Mr. Justice Sheen was free to decide which authority he should follow.  He should have followed the later authority, i.e. the *"BELDIS"*.

25.     The reason underlying Mr. Justice Sheen's judgment can be seen from the final paragraph of the decision where he said:-

> *"I cannot pretend that it does not give me pleasure to be able to decide this point as I have done, because the result enables this Court to do justice in a way which would be denied to it if creditors could not bring proceedings in rem merely because they faithfully honoured their agreement to submit to arbitration a dispute which is clearly within the Admiralty jurisdiction.  I have only heard argument from one side, but that argument was fully and fairly presented by Mr. Charlton, to whom I am indebted."*

26.     It seems, therefore, that Mr. Justice Sheen was anxious to do what he considered to be justice and, with the greatest respect, this may have coloured his decision in the case.

27.     Before leaving Mr. Justice Sheen's judgment I also refer, briefly, to the *"BELDIS"* (Exhibit 3).  This was a decision of the Court of Appeal.  As appears from the judgment of Sir Boyd Merriman at page 263 the issue as to whether or not the action arose out of a Charterparty or the Award appears to have surfaced in the Court of Appeal.  At the bottom of page 263 right hand column continuing on to page 264 left hand column the President stated:-



"...*as the validity of the arrest is at the root of the proceedings and raises <u>a point of great importance which has been very well argued by Counsel</u> on each side, I propose also to state my reasons for thinking that the judgment of the County Court Judge cannot in any event be supported.*"[Underlining added.]

28.   He then stated at page 264:-

"*But in my opinion the claim in this action was not based upon that foundation at all.  It was an action upon the award.*"

29.   He further stated at page 264:-

"...*I should not be prepared to hold, even if the matter were free from authority, that a claim upon an award held under the arbitration clause in a charter-party is a claim arising out of any agreement made in relation to the use or hire of a ship. I think that it is a common law claim upon an award and nothing else.*"

30.   The decision of Lord Justice Scott (read by Mr. Justice Swift) is, in my submission, of further assistance.  Lord Justice Scott identified that there was an issue whether a claim on an award came within the admiralty jurisdiction and felt that that issue should be disposed of first.

31.   At page 274 left hand column Lord Justice Scott reviewed the affect of an arbitration award at the time that the County Court Admiralty Jurisdiction Amendment Act 1869 was passed and concluded that:-

"*It was unlikely that an action on an award would in 1869 be assigned by Parliament to the High Court of Admiralty; and in the absence of clear words it would be wrong so to interpret the Act even assuming the words to be wide enough to include it...With the above history of Admiralty jurisdiction both before and since 1840, it would in my judgment be plainly wrong to say that...a County Court has admiralty jurisdiction to entertain an action on an award upon a voluntary submission, merely because the arbitration was held pursuant to an arbitration clause in a charter-party for the reference of disputes arising out of that charter-party.*"

32.   Mr. Justice Swift delivered a concurring judgment.

33.   In the circumstances it is clear that the Court of Appeal in the "*BELDIS*" carefully reviewed the issue of whether or not a claim on an arbitration award came within the



admiralty jurisdiction and unanimously decided that it did not. I submit that there was a careful consideration even though the point had not arisen in the court below.

34.    I turn now to the decision of Mr. Justice Aikens in the *"BUMBESTI"*, a copy of which was attached to my first Declaration and, for the Court's convenience, a second copy of which I now attach hereto as Exhibit 4. In my respectful view, this being the later decision and one in which the relevant authorities have been cited and it being a case where there was argument for both sides, it is a decision to be preferred. It is also, with respect to the learned Judge, analytically sound.

35.    Mr. Justice Aikens states at paragraph 8 of his judgment that the first principal issue is the nature of the claim to enforce the Award and *"whether the Admiralty has jurisdiction in rem to hear and determine a claim to enforce the arbitration Award"* and at paragraph 9 he says that *"Principal issue one: The nature of the claim to enforce Award"*.

36.    The possibilities suggested by Mr. Justice Aikens are that it could be a claim for a debt being the sum awarded or a claim for liquidated damages for breach of an implied obligation to fulfil the award. He does not suggest that the substantive claim continues to have a life of its own.

37.    Mr. Justice Aikens preferred the decision of the Court of Appeal in *Bremer Oeltransport* saying that a claim on an award is a claim for damages for breach of the implied term that an award would be honoured. Mr. Justice Aikens then referred to the advice of the Privy Council (a Committee of the House of Lords dealing with Appeals from Colonial Courts) in *J. Bloemen Pty Ltd. v. Council of the City of Gold Coast* [1973] AC 115 where Lord Pearson said that an Award, *"cannot be viewed in isolation from the submission under which it was made"*.

38.    Mr. Justice Aikens then asked whether the claim to enforce the Award came within Section 20(2)(h). He then expressly considered the decision of the *"SAINT ANNA"* which, obviously, was cited to him in support of the argument that the claim did come within the Act.

39.    Having considered the statutory history of Section 20(2)(h) Mr. Justice Aikens carefully analysed the authorities beginning at paragraph 15 of his judgment. I do not believe that I can add anything to that analysis other than to note that the decision in the *"BELDIS"* had stood from 1936 to 1983 and that Mr. Justice Brandon (a very highly regarded commercial Judge, a Judge of the Court of Appeal and subsequently a Law Lord) had said in the *"ESCHERSHEIM"* that the *"BELDIS"* did not seem to be consistent with *Bremer Oeltransport* which was apparently not cited in the *"BELDIS"*.

40.    At paragraph 20 Mr. Justice Aikens referred to the *"SAINT ANNA"* and at paragraph 21 he referred to the fact that the *"SAINT ANNA"* had been followed in Hong Kong and Singapore and there were no authorities subsequent following it or dissenting from it in England. He also referred to the fact that the *"SAINT ANNA"* was not cited in the *"ANTONIS P LEMOS"*. I would add that it was not ever referred to by Mr. Justice Sheen in his judgement in the *"ANTONIS P LEMOS"* or by the Higher Courts even though it is usual for a Judge to draw Counsel's attention to a relevant authority of which the Judge is aware which he thinks Counsel has overlooked.

41.    Mr. Smith does not refer to the fact that Mr. Justice Sheen (on whose judgment Mr. Smith relies heavily) decided the *"ANTONIS P LEMOS"* at first instance and his judgment was overturned unanimously by the Court of Appeal whose decision was upheld unanimously by

the House of Lords suggesting that on that occasion, at least, Mr. Justice Sheen's judgment did not find favour with the Higher Courts in England.

42.    Mr. Justice Aikens then gave his reasons for not following the *"SAINT ANNA"* at paragraph 22 all of which, with the utmost respect, I consider to be compelling.

43.    I would further respectfully submit that the decision of Mr. Justice Aikens is correct because of the English doctrine of merger.

44.    I refer to Halsbury's Laws at paragraph 1225 (copy attached hereto as Exhibit 5) which sets out the proposition that when a judgment has been given the cause of action is merged in the judgment and its place is taken by the rights created by the Judgment. This prevents a second claim being brought on the same cause of action.

45.    The position, in my submission, is the same in arbitration. Once the award has been issued the cause of action is merged into the award and replaced by the rights of enforcement that arise in relation to an award. In this respect I would respectfully differ from the references in the text books which were cited by Mr. Justice Sheen in the *"SAINT ANNA"*.

46.    I would add that the learned editors of Mustill & Boyd on *Commercial Arbitration* (Lord Mustill and Stuart Boyd Q.C.) in the 2001 Companion to the Second Edition correct the note which they had previously made following the *"SAINT ANNA"* and refer to the decision in the *"BUMBESTI"* which they consider to reflect the law (paragraph 418, copy attached as Exhibit 6).

47.    Furthermore, the Second Edition of *Commercial Arbitration* Mustill & Boyd at page 26 (copy attached as Exhibit 7) states that

> *"a valid award confers on the successful claimant a new right of action, in substitution for the right on which the claim was founded. Every submission to arbitration contains an implied promise by each party to abide by the award of the arbitrator, and to perform his award. It is on this promise that the claimant*

*proceeds, when he takes his action to enforce the award…the successful claimant is precluded by the award from bringing the same claim again in a fresh arbitration or action".*

48.     The decision in the *"BUMBESTI"* is also cited by Nigel Meeson QC in his textbook on *Admiralty Jurisdiction and Practice* (third edition) at paragraphs 2.76 and 2.78 where footnotes 190 and 195 state that the *"BELDIS"* was followed in the *"BUMBESTI"* and the *"SAINT ANNA"* was wrongly decided.  I would emphasis the Mr. Meeson's book is the leading textbook on the subject of Admiralty Jurisdiction and Practice.

49.     The *"BUMBESTI"* has also received some support in New Zealand where it was relied on in the case of the *"IRINA ZHARKIKH"* [2001] 2 Lloyd's Law Reports 319 (copy attached as Exhibit 8; see page 327).

50.     I would now like to refer to the three matters which Mr. Smith relies on to say that the decision of Mr. Justice Sheen is to be preferred over that of Mr. Justice Aikens.

51.     In his paragraph 5(a) Mr. Smith says that Mr. Justice Aikens' views were *obiter*.  With the greatest respect, I do not accept that the relevant parts of the decision are *obiter*.  Mr. Justice Aikens found two reasons for dismissing the claim and it is wholly incorrect to say that one is *ratio decidendi* and the other is *obiter*.  The reason for this is that he might have been appealed on one or both of the points.  He made two findings and it is more than clear that the findings in relation to the claim not being within Section 20(2)(h) were *ratio decidendi*.

52.     In his paragraph 5(b) Mr. Smith refers to the fact that Mr. Justice Sheen was an Admiralty Judge.  This is correct.  Mr. Justice Sheen was well known for his "wet" work and as Admiralty Judge his work was predominantly connected with collision cases as can be seen from the list of decided cases reported in Lloyds Law Reports a copy of which is attached as Exhibit 9.  With the greatest respect I do not consider that this means that his views on the meaning of the



statute have more weight than those of Mr. Justice Aikens who is, indeed, a well respected Commercial Court Judge. I refer to the judgment of the Master of the Rolls Lord Phillips in the Court of Appeal in *Times Newspapers and others -v- R* (copy attached as Exhibit 10) where, at paragraph 2 the Master of the Rolls praised the clarity of Mr. Justice Aikens' judgment.

53. Mr. Justice Aikens sits in the Commercial Court which deals with complex cases arising out of business disputes, both national and international. There is particular emphasis on international trade, banking, commodity and arbitration disputes giving Mr. Justice Aikens no less standing than Mr. Justice Sheen.

54. I attach as Exhibit 11, a list of the decisions reported in Lloyd's of Mr. Justice Aikens and, who was appointed as a High Court Judge in July 1999. This is shorter than that of Mr. Justice Sheen who sat as Admiralty Judge for 15 years up to his retirement just before his 75th birthday, but it is still an impressive list. Mr. Justice Sheen was not promoted either to the Court of Appeal or to the House of Lords. In addition, a perusal of Mr. Justice Aikens' list of decisions reveals the complexity of the cases which he has handled.

55. Finally, while the reasons referred to under Mr. Smith's paragraph 5(c) have been dealt with above, I would like to respond to the specific decisions that Mr. Smith relies on in a little more detail.

56. First Mr. Smith relies on the wide interpretation which the House of Lords said is applicable to Section 20(2)(h) in the *"ANTONIS P LEMOS"*. While in the *"ANTONIS P LEMOS"* Mr. Justice Sheen found, wrongly, that a sub-charterer's claim in tort for damages as a result of the vessel exceeding the maximum arrival draft at the discharge port was not a claim arising out of any agreement relating to the carriage of goods in a ship or the use or hire of a ship, the Court of Appeal and the House of Lords both found that it was. However the



distinction that has to be made is that the claim in that case had not been merged either into a judgment or an arbitration award and it is clear that the House of Lords and the Court of Appeal were seeking to give a broad meaning to the words so that they had commercial effect and so that a sub-charterer who could bring the claim in tort for negligence would not be shut out of his arrest.

57.    In addition, the *"BELDIS"* was not referred to in the *"ANTONIS P LEMOS"* and therefore was not expressly overridden by that case.

58.    The decision in the *"ANTONIS P LEMOS"* therefore does not assist Mr. Smith's argument.

59.    In this respect, I submit that the reasoning of Mr. Justice Aikens in paragraph 22(1) to (4) of the *"BUMBESTI"* is unassailable.  It is clear that the claim is the action on the award, and following the Court of Appeal decision in *Bremer Oeltransport*, a claim on an award arises out of or is in connection with the agreement to refer disputes to the arbitration.  This is not an agreement in relation to the use or hire of a ship.

60.    Whilst Mr. Smith, as he says in paragraph 12 of his statement, may believe that Mr. Justice Aikens was wrong, the *"BUMBESTI"* has not been appealed and, therefore, the Claimants who were represented by Messrs. Hill Dickinson (a highly eminent firm of maritime lawyers) and experienced Counsel appear not to have chosen to appeal the decision in the *"BUMBESTI"* suggesting that they accept that it was correct.

61.    The citation which Mr. Smith makes from the *Bremer Oeltransport* case at paragraph 16 of his report is, with respect, somewhat abbreviated.  I set out below the full paragraph.

> *"The few cases which appear to support the view that an action may be brought upon the award in my view do not exclude in any event an action brought upon*

*the agreement to refer differences, and for this purpose, in my view, the submissions are here sufficiently stated to be in the charter-party of Nov. 19, 1929. Without, therefore, finally determining whether an action may or may not be brought on an implied contract in the award itself, I am clearly of opinion that it may be brought upon an agreement containing a term to refer disputes, and that the present claim is properly pleaded as arising from such an agreement."*

62.     I believe that the first part of the paragraph is relevant showing the extreme degree of hesitancy which Lord Justice Slesser felt, and it is important to note that his wording is clearly *dicta* as he says he does not determine whether or not an action may be brought on an implied contract in the award and he is merely giving an opinion which is, certainly, not of any binding effect.

63.     This, in my respectful view, is not as forceful as the clear statements in Mustill & Boyd as to the effect of an arbitration award and also the parallel with the merger of the cause of action in a judgment as set out in Halsbury's Laws.

64.     The decision in *F.J. Bloemen Pty Ltd* on which Mr. Smith relies at paragraph 18 is one which was considered by Mr. Justice Aikens and is dealt with in paragraph 10 of his judgment.  What the Privy Council is saying in *Bloemen* is that the award cannot be viewed in isolation from the submission, and that the party seeking to enforce the award must prove the agreement to arbitrate which gives the arbitrators their power to make the award.  The decision is limited to the finding that where the contract provided at clause 35(c) that the claimant was entitled to interest and the claim for interest had not been referred to the arbitrator or dealt with by him then it was still open to the claimant to issue a Writ claiming the interest.  However the claimant failed in *Bloemen* on the further ground that it had accepted a repudiatory breach and could not, therefore, claim interest.

65.     *Bloemen* was a case where the arbitrator did not have the power to award interest and therefore it was still open to look at the underlying contract in relation to the interest claim.

66.     While I agree that an arbitration award is a consensual resolution whereas a Court judgment is imposed I do not consider that the Privy Council's opinion detracts from my submission that the cause of action is merged in an arbitration award in the same way as it is merged in a judgment of the Court.

67.     I do not, therefore, consider that the *Bremer Oeltransport* case was endorsed by the Privy Council other than to the limited extent that the submission was contained in a contract made in London and was therefore made within the jurisdiction.

68.     For all the above reasons it is my respectful submission that the decision of Mr. Justice Aikens in *"BUMBESTI"* should be followed and that, accordingly, the application to enforce an arbitration award is not an Admiralty action within the meaning of Section 20(2)(h) of the Supreme Court Act 1981.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____

Anthony Robert Swinnerton


Executed on May 16, 2008.

London, England

**EXHIBIT   1**

# HALSBURY'S

# Laws of England

FOURTH EDITION
REISSUE

Volume 37

29  *R v Newsome* [1970] 2 QB 711 at 716, 717, [1970] 3 All ER 455 at 458, CA.
30  *Boys v Chaplin* [1968] 2 QB 1, [1968] 1 All ER 283, CA; affd on other grounds sub nom *Chaplin v Boys* [1971] AC 356, [1969] 2 All ER 1085, HL. But see *Langley v North West Water* [1991] 3 All ER 610, [1991] 1 WLR 697, CA, explaining and emphasising that the earlier decisions related to appeals in interlocutory proceedings.
31  *Langley v North West Water Authority* [1991] 3 All ER 610, [1991] 1 WLR 697, CA.
32  *McGuignan v Pollock* [1955] NI 74 at 106, NI CA, per Black LJ; and see the discussion in *Beaufort Developments (NI) Ltd v Gilbert-Ash (NI) Ltd* [1997] NI 142 at 153, NI CA; cf, however, *R v McCandless* [2001] NI 86 at 97, NI CA, per Carswell LCJ.
33  *R (on the application of Ivanvskiene) v Special Adjudicator* [2001] EWCA Civ 1271, [2001] All ER (D) 456 (Jul), CA.

**1243. Divisional Court decisions.** A Divisional Court is generally bound by its own previous decisions[1], regardless of how many judges are sitting[2], with limited exceptions in criminal cases[3], and when exercising its supervisory jurisdiction[4], subject always to the per incuriam rule[5]. Faced with conflicting earlier decisions the court is free to decide which to follow[6]. Divisional Court decisions bind judges of first instance[7], even of a different division[8], but not the Employment Appeal Tribunal[9].

1  *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC, per Lord Goddard CJ, who applied to that court the rule in *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA (see para 1242 ante); *Harrison v Ridgway* (1925) 133 LT 238; *Phillips v Copping* [1935] 1 KB 15 at 18, CA; *Cogley v Sherwood* [1959] 2 QB 311, [1959] 2 All ER 313, DC. Earlier dicta to the contrary (eg *Kruse v Johnson* [1898] 2 QB 91, DC) were made when the structure of the courts was very different. *Younghusband v Luftig* [1949] 2 KB 354, [1949] 2 All ER 72, CA.
2  See *R v Taylor* [1950] 2 KB 368, [1950] 2 All ER 170, CCA, and para 1242 the text to note 23 ante.
3  [sic]
4  *R v Greater Manchester Coroner, ex p Tal* [1985] QB 67, [1984] 3 All ER 240, in which the supervisory jurisdiction of the Divisional Court was analysed and the authority of *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC distinguished and, in the light of later developments, doubted. See also *C (a minor) v DPP* [1996] AC 1, [1994] 3 All ER 190, DC (overruled on other grounds [1996] AC 1 at 14, [1995] 2 All ER 43, HL).
5  *Nicholas v Penny* [1950] 2 KB 466, sub nom *Penny v Nicholas* [1950] 2 All ER 89, DC; *Melias Ltd v Preston* [1957] 2 QB 380, [1957] 2 All ER 449, DC. As to the per incuriam rule see para 1242 ante.
6  See eg *Ratkinsky v Jacobs* [1929] 1 KB 24, DC. Where two judges of a Divisional Court disagree, the modern practice is to treat the appeal as dismissed, and the old practice by which the junior judge withdrew his judgment is no longer followed: see COURTS.
7  *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC; *John v John and Goff* [1965] P 289, [1965] 2 All ER 222. The same exceptions apply as apply to Court of Appeal decisions, as laid down in *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, [1944] 2 All ER 293, CA: *John v John and Goff* supra. The decisions of the old Court of Common Pleas sitting in banc probably bind a judge at first instance: *Rondel v Worsley* [1967] 1 QB 443 at 460, [1966] 1 All ER 467 at 473, per Lawton J; affd on another point [1967] 1 QB 443, [1966] 3 All ER 657, CA; [1969] 1 AC 191, [1967] 3 All ER 993, HL; now overruled in so far as it is laid down immunity for advocates against suits in negligence (see para 9 note 2 ante).
8  *Ettenfield v Ettenfield* [1939] P 377 at 380, [1939] 2 All ER 743 at 746; revsd on other grounds [1940] P 96, [1940] 1 All ER 293, CA.
9  See para 1244 note 2 post.

**1244. Decisions of co-ordinate courts.** There is no statute or common law rule by which one court is bound[1] to abide by the decision of another court of co-ordinate jurisdiction[2]. Where, however, a judge of first instance after consideration has come to a definite decision on a matter arising out of a complicated and difficult enactment, the opinion has been expressed that a second judge of first instance of co-ordinate jurisdiction should follow that decision[3]; and the modern practice is that a judge of first instance will as a matter of judicial comity[4] usually follow the decision of another judge of first instance unless he is convinced that that judgment was wrong[5]. Where there are conflicting decisions of courts of co-ordinate jurisdiction the later decision is to be preferred if reached after full consideration of earlier decisions[6].

1  For the view that decisions at nisi prius are not of binding authority see *Church v Brown* (1808) 15 Ves 258 at 262; *Fentum v Pocock* (1813) 5 Taunt 192 at 195; *Forster v Baker* [1910] 2 KB 636 at 638; *Gelmini v Moriggia* [1913] 2 KB 549 at 552; *Green v Berliner* as reported in [1936] 2 KB 477 at 493, 494; see also *R v Beynon* [1957] 2 QB 111, [1957] 2 All ER 513, where Byrne J did not follow a previous decision of

Devlin J in *R v Roberts* [1954] 2 QB 329, [1953] 2 All ER 340 at the same assizes, and *Monmouthshire County Council v Smith* [1956] 2 All ER 800, [1956] 1 WLR 1132, where Lynskey J felt himself compelled to differ from a judgment of Slade J given the previous week in *Metropolitan Police District Receiver v Croydon Corpn* [1956] 2 All ER 785, [1956] 1 WLR 1113. He was held to have been right when the appeals were heard together at [1957] 2 QB 154, [1957] 1 All ER 78, CA.

2    *The Vera Cruz (No 2)* (1884) 9 PD 96 at 98, CA; *Palmer v Johnson* (1884) 13 QBD 351 at 355, CA. See *Taylor v Burgess* (1859) 5 H & N 1 at 5, and *Casson v Churchley* (1884) 53 LJQB 335 at 336, for the opinion (doubted in *Huddersfield Police Authority v Watson* [1947] KB 842, [1947] 2 All ER 193, DC) that in a case where there is power to appeal the decision of a court of co-ordinate jurisdiction is binding on another court of co-ordinate jurisdiction. In *Secretary of State for Employment v Atkins Auto Laundries Ltd* [1972] ICR 76, [1972] 1 All ER 987, NIRC, and in *Chapman v Goonvean and Rostowrack China Clay Co Ltd* [1973] 1 All ER 218 at 223, 224, [1972] 1 WLR 1634 at 1641, NIRC (affd [1973] 2 All ER 1063, [1973] 1 WLR 678, CA), the National Industrial Relations Court (the jurisdiction of which is now exercised by the Employment Appeal Tribunal) held that it was not bound by previous decisions of the Divisional Court, with which it was co-ordinate.

3    *Re Smith, Vincent v Smith* [1930] 1 Ch 88 at 99; and see *Ex p Whitbread* (1812) 19 Ves 209; and *Re Rouse & Co and Meier & Co* (1871) LR 6 CP 212 at 219. On the construction of other instruments, whereas a judge should not regard himself as bound by the decision of another judge of equal jurisdiction: see *Re New Callao* (1882) 22 ChD 484, CA; *Re Masson, Morton v Masson* (1917) 117 LT 548, CA; and cf *Re Hotchkiss' Trusts* (1869) LR 8 Eq 643 at 647.

4    See *Mirehouse v Rennell* (1833) 1 Cl & Fin 527 at 546, HL; *Parkin v Thorold* (1852) 16 Beav 59 at 63; *Re Times Life Assurance and Guarantee Co, ex p Nunneley* (1870) 5 Ch App 389n; *Cramb v Goodwin* [1919] WN 86; revsd without affecting this point (1919) 35 TLR 477, CA; *Russian and English Bank v Baring Bros & Co Ltd* [1935] Ch 120 at 124, CA.

5    *Huddersfield Police Authority v Watson* [1947] KB 842 at 848, [1947] 2 All ER 193 at 196, DC, per Lord Goddard CJ, followed in *Metropolitan Police District Receiver v Croydon Corpn* [1956] 2 All ER 785, [1956] 1 WLR 1113; revsd on another point [1957] 2 QB 154, [1957] 1 All ER 78, CA. In *The Makedonia* [1958] 1 QB 365, [1958] 1 All ER 236, Pilcher J did not follow a prior decision of a court of co-ordinate jurisdiction (*The Telemachus* [1957] P 47, [1957] 1 All ER 72) on the ground that it was wrong, although in *Re Cohen, National Provincial Bank Ltd v Kotz* [1960] Ch 179, [1959] 3 All ER 740, Danckwerts J felt bound to follow a decision of Harman J which had been doubted, although not overruled, in a dissenting Court of Appeal judgment. It is undesirable that different judges of the same division should speak with different voices: *Re Howard's Will Trusts, Levin & Bradley* [1961] Ch 507 at 523, [1961] 2 All ER 413 at 421, per Wilberforce J; *Alma Shipping Co SA v VM Salgaoncar E Irmaos Ltda* [1954] 2 QB 94 at 104, [1954] 2 All ER 92 at 97, per Devlin J. See also *Osborne to Rowlett* (1880) 13 ChD 774; *Gathercole v Smith* (1881) 44 LT 439; affd on appeal 17 ChD 1, CA.

6    *Minister of Pensions v Higham* [1948] 2 KB 153, [1948] 1 All ER 863; applied in *Colchester Estates (Cardiff) v Carlton Industries plc* [1986] Ch 80, [1984] 2 All ER 601.

**1245. Decisions followed for long time.** A long-standing decision of a judge of first instance ought to be followed by another judge of first instance, at least in a case involving the construction of a statute of some complexity, unless he is fully satisfied that the previous decision is wrong[1]. Apart from any question as to the courts being of co-ordinate jurisdiction, a decision which has been followed for a long period of time and has been acted upon by persons in the formation of contracts or in the disposition of their property, or in the general conduct of affairs, or in legal procedure or in other ways, will generally be followed by courts of higher authority than the court establishing the rule, even though the court before which the matter arises afterwards might not have given the same decision had the question come before it originally[2].

The supreme appellate court will, however, not shrink from overruling a decision or series of decisions which establish a doctrine plainly outside a statute and outside the common law, when no title and no contract will be shaken, no person can complain, and no general course of dealing can be altered by the remedy of a mistake[3]; and, where the course of practice is founded upon an erroneous construction of an Act of Parliament, there is no principle which precludes at any rate that tribunal from correcting the error[4], although the construction of a statute of doubtful meaning, once laid down and accepted for a long period of time, ought not to be altered unless the House of Lords can say positively that it is wrong and productive of inconvenience[5]. The Court of Appeal may, in a proper case, overrule long-standing decisions of the Divisional Court[6].

In general the House of Lords will not overrule a long established course of decisions except in plain cases where serious inconvenience or injustice would follow from

perpetuating an erroneous construction or ruling of law[7]. The same considerations do not apply where the decision, although followed, has been frequently questioned and doubted. In such a case it may be overruled by any court of superior jurisdiction[8]. When old authorities are plainly wrong, and especially where the subsequent course of judicial decisions has disclosed weakness in the reasoning on which they were based and practical injustice in the consequences that must flow from them, it is the duty of the House of Lords to overrule them[9].

When, however, some words of doubtful meaning in a statute have received a clear judicial interpretation and the same words are repeated in a subsequent statute, the legislature must be taken to have read them on the second occasion according to the meaning given to them by that interpretation, and it is not then open to a higher court to reverse that interpretation[10]. This is merely a rule of construction for the guidance of the courts; it is not a presumption which courts are bound to make[11].

1  *Astley v IRC* [1974] STC 367 at 371, per Megarry J; affd on another point [1975] 3 All ER 696, [1975] STC 557, CA.

2  *Bourne v Keane* [1919] AC 815 at 874, HL, per Lord Buckmaster; *Cook v Rogers* (1831) 7 Bing 438 at 443, 444; *Baker v Tucker* (1850) 3 HL Cas 106; *Harvey v Farquhar* (1872) LR 2 Sc & Div 192, HL; *Re Hallett's Estate, Knatchbull v Hallett* (1880) 13 ChD 696 at 712, CA; *Pugh v Golden Valley Rly Co* (1880) 15 ChD 330, CA; *Smith v Keal* (1882) 9 QBD 340 at 352, CA; *Re Wright, ex p Willey* (1883) 23 ChD 118 at 127, 128, CA; *Fraser v Ehrensperger* (1883) 12 QBD 310, CA; *Re Rosher, Rosher v Rosher* (1884) 26 ChD 801 at 821; *Palmer v Johnson* (1884) 13 QBD 351 at 355, CA; *Pandorf v Hamilton, Fraser & Co* (1886) 17 QBD 670 at 674, CA; revsd on another point sub nom *Hamilton, Fraser & Co v Pandorf & Co* (1887) 12 App Cas 518, HL; *Airey v Bower* (1887) 12 App Cas 263 at 269, HL; *London Founders Association Ltd and Palmer v Clarke* (1888) 20 QBD 576 at 581, CA; *Philipps v Rees* (1889) 24 QBD 17, CA; *Tancred, Arrol & Co v Steel Co of Scotland* (1890) 15 App Cas 125, HL; *Re Wallis, ex p Lickorish* (1890) 25 QBD 176, CA; *R v Governor of Stafford Prison, ex p Emery* [1909] 2 KB 81 at 85 (practice established by judges at assizes and followed for many years); *R v Martin* [1911] 2 KB 450, DC; *Re Hooley Hill Rubber and Chemical Co Ltd and Royal Insurance Co Ltd* [1920] 1 KB 257 at 269, 272, CA; *John Smith & Son v Moore* [1921] 2 AC 13 at 39, HL (tax cases ought not to be unsettled); *Goss Millard v Canadian Government Merchant Marine Ltd* [1929] AC 223 at 239, HL; *Lord Eldon v Hedley Bros* [1935] 2 KB 1 at 20, CA; *Re Warden and Hotchkiss Ltd* [1945] Ch 270, [1945] 1 All ER 507, CA; *Birmingham Corpn v West Midland Baptist (Trust) Association (Inc)* [1970] AC 874 at 898, 908, 911, [1969] 3 All ER 172 at 180, 188, 190, HL; *The Annefield* [1971] P 168, [1971] 1 All ER 394, CA.
    As to the importance of following well-established rules in commercial matters see *United States Shipping Board v Frank C Strick & Co* [1926] AC 545 at 569, HL. However, the importance of correcting the law with regard to rating and taxation outweighs the doctrine of stare decisis: *Governors of Campbell College, Belfast v Valuation Comr for Northern Ireland* [1964] 2 All ER 705 at 710, 719, 728, [1964] 1 WLR 912 at 918, 930, 931, 942, 943, HL.

3  *Bourne v Keane* [1919] AC 815 at 874, HL; *Triefus & Co Ltd v Post Office* [1957] 2 QB 352, [1957] 2 All ER 387, CA. See also note 7 infra.

4  *Airey v Bower* (1887) 12 App Cas 263 at 269, HL; *The Sara* (1889) 14 App Cas 209, HL; *The Bernina* (1888) 13 App Cas 1 at 16, HL. See also *Evans v George* (1823) 12 Price 76 at 135–137.

5  *Bourne v Keane* [1919] AC 815 at 874, HL.

6  *Brownsea Haven Properties Ltd v Poole Corpn* [1958] Ch 574, [1958] 1 All ER 205, CA (a construction question where the enactment was one which was attended by penal consequences); *Braithwaite & Co Ltd v Elliott* [1947] KB 177, [1946] 2 All ER 537, CA; *Royal Crown Derby Porcelain Co Ltd v Russell* [1949] 2 KB 417, [1949] 1 All ER 749, CA; *St Marylebone Property Co Ltd v Fairweather* [1962] 1 QB 498, [1961] 3 All ER 560, CA; affd [1963] AC 510, [1962] 2 All ER 288, HL.

7  *Admiralty Comrs v Valverda (Owners)* [1938] AC 173 at 194, [1938] 1 All ER 162 at 174, HL. Even long-established conveyancing practice, although not as authoritative as a judicial decision, will cause the House of Lords to hesitate before declaring it wrong: *Bromley v Tryon* [1952] AC 265 at 275, [1951] 2 All ER 1058 at 1065, HL. See also *Public Trustee v IRC* [1960] AC 398, [1960] 1 All ER 1, HL; *Ross Smith v Ross Smith* [1963] AC 280, [1962] 1 All ER 344, HL; *Button v DPP, Swain v DPP* [1966] AC 591, [1965] 3 All ER 587, HL.

8  *R v Edwards* (1884) 13 QBD 586 at 590, 593, CA; *Pearson v Pearson* (1884) 27 ChD 145, CA; *The Bernina* (1888) 13 App Cas 1 at 16, HL, per Lord Watson; *Pontypridd Union v Drew* [1927] 1 KB 214 at 221, CA; *Hughes and Vale Pty Ltd v State of New South Wales* [1955] AC 241, [1954] 3 All ER 607, PC.

9  For more than a century trials had been conducted on the hypothesis that there could only be a conviction for an affray if the acts were done in a public place, but the House of Lords held that a conviction for an affray in a private place could be upheld: *Button v DPP, Swain v DPP* [1966] AC 591, [1965] 3 All ER 587, HL. See also *C Czarnikow Ltd v Koufos* [1966] 2 QB 695, [1966] 2 All ER 593, CA; affd [1969] 1 AC 350, [1967] 3 All ER 686, HL. In that case a decision of 1876 on delay in the carriage of goods by sea was not followed

**EXHIBIT   2**

Case 1:08-cv-02351-HB    Document 20-2    Filed 05/17/2008    Page 7 of 33

## (5) JUDICIAL DECISIONS AS AUTHORITIES

**1237. Ratio decidendi.** The use of precedent is an indispensable foundation upon which to decide what is the law and its application to individual cases; it provides at least some degree of certainty upon which individuals can rely in the conduct of their affairs, as well as a basis for orderly development of legal rules[1]. The enunciation of the reason or principle upon which a question before a court has been decided is alone binding as a precedent[2]. This underlying principle is called the ratio decidendi, namely the general reasons given for the decision or the general grounds upon which it is based, detached or abstracted from the specific peculiarities of the particular case which gives rise to the decision[3]. What constitutes binding precedent is the ratio decidendi, and this is almost always to be ascertained by an analysis of the material facts of the case, for a judicial decision is often reached by a process of reasoning involving a major premise consisting of a pre-existing rule of law, either statutory or judge-made, and a minor premise consisting of the material facts of the case under immediate consideration[4].

The concrete decision alone is binding between the parties to it, but it is the abstract ratio decidendi, as ascertained on a consideration of the judgment in relation to the subject matter of the decision[5], which alone has the force of law and which, when it is clear what it was, is binding; but, if it is not clear, it is not part of a tribunal's duty to spell out with difficulty a ratio decidendi in order to be bound by it[6], and it is always dangerous to take one or two observations out of a long judgment and treat them as if they gave the ratio decidendi of the case[7]. If more reasons than one are given by a tribunal for its judgment, all are taken as forming the ratio decidendi[8].

The House of Lords is entitled to question or limit a previous ratio decidendi of the House (1) where it is obscure; (2) where it is out of line with other authorities or established principles; and (3) where it is much wider than was necessary for the decision[9]. Where there is no discernible ratio decidendi common to the majority of the House of Lords the reasoning accepted in a long line of cases before that decision will be adopted by the House[10]. Where too rigid an adherence to precedent may lead to injustice in a particular case and an undue restriction of the proper development of the law, the House of Lords may depart from its previous decisions when it appears right to do so[11].

When construing a statute the court must not rely on judicial statements as to the construction, but must construe the words of the Act itself[12]. However, where there is ambiguity or obscurity the court may refer to reports of Parliamentary debates as an aid to construction[13]. Particularly in extempore judgments, wide expressions must be read according to the subject matter; an isolated phrase must not be taken as if it were intended to expound the whole law on the subject[14]. The court's authoritative opinion must be distinguished from propositions assumed by the court to be correct for the purpose of disposing of the particular case[15].

With effect from 9 April 2001, advocates are required to state, in respect of each authority that they wish to cite, the proposition of law that the authority demonstrates, and the parts of the judgment that support that proposition. If it is sought to cite more than one authority in support of a given proposition, advocates must state the reason for taking that course[16]. This demonstration is required to be contained in any skeleton argument and in any appellant's or respondent's notice in respect of each authority referred to in that skeleton or notice[17]. Any bundle or list of authorities prepared for the use of any court must bear a certification by the advocate responsible for arguing the case that these requirements have been complied with in respect of each authority included[18].

---

1   *Practice Note (Judicial Precedent)* [1966] 3 All ER 77, sub nom *Practice Statement* [1966] 1 WLR 1234, HL. The principle by which a court is bound to follow decisions in former cases is known as 'stare decisis'.

2   The only thing in a judge's decision binding as an authority is the principle upon which the case was decided: *Osborne to Rowlett* (1880) 13 ChD 774 at 785. Judicial authority belongs not to the exact words used nor even to all the reasons given, but only to the principles accepted and applied as necessary grounds

of the decision: Sir Frederick Pollock, quoted by Lord Denning in *Close v Steel Co of Wales Ltd* [1962] AC 367, [1961] 2 All ER 953, HL. The only use of authorities or decided cases is the establishment of some principle which the judge can follow out in deciding the case before him: *Re Hallett's Estate, Knatchbull v Hallett* (1880) 13 ChD 696 at 712, CA; *Smith v Harris* [1939] 3 All ER 960 at 965, CA; *Jolley v London Borough of Sutton* [2000] 3 All ER 409, [2000] 1 WLR 1082, HL. A subsequent court is not bound by a proposition of law which has been assumed by the previous court and not decided by it: *R (on the application of Kadhim) v Brent London Borough Council Housing Benefit Review Board* [2001] 2 WLR 1674, [2000] All ER (D) 2408, CA.

3    See 2 Austin's Lectures on Jurisprudence (5th Edn) 627, 628, and 63 LQR 461.

4    *FA and AB Ltd v Lupton* [1972] AC 634 at 658, [1971] 3 All ER 948 at 964, HL, per Lord Simon of Glaisdale, who added that where the decision constitutes new law, this may not be expressly stated as a proposition of law: frequently the new law appears only from subsequent comparison of the material facts inherent in the major premises with the material facts which constitute the minor premise.

5    Every judgment must be read as applicable to the particular facts proved, since the generality of expressions which may be found there are not intended to be expositions of the whole law, but governed and qualified by the particular facts of the particular case: *Quinn v Leathem* [1901] AC 495 at 506, HL, per Lord Halsbury; *Miller-Mead v Minister of Housing and Local Government* [1963] 2 QB 196 at 236, [1963] 1 All ER 459 at 476, CA, per Diplock LJ.

6    *The Mostyn* [1928] AC 57 at 78, HL.

7    *Monk v Warbey* [1935] 1 KB 75 at 81, CA.

8    *Jacobs v LCC* [1950] AC 361, [1950] 1 All ER 737, HL; *Cheater v Cater* [1918] 1 KB 247 at 252, CA; *London Jewellers Ltd v Attenborough, London Jewellers Ltd v Robertsons (London) Ltd* [1934] 2 KB 206 at 222, CA; *Behrens v Bertram Mills Circus Ltd* [1957] 2 QB 1 at 24, [1957] 1 All ER 583 at 593, 594, per Devlin J; *Cane v Royal College of Music* [1961] 2 QB 89, [1961] 1 All ER 12, CA; *Miliangos v George Frank (Textiles) Ltd* [1975] QB 487, [1975] 1 All ER 1076, CA; affd [1976] AC 443, [1975] 3 All ER 801, HL. If the House of Lords gives two reasons for its decision and afterwards finds one to be wrong, it is entitled to accept the right reason and reject the wrong: *Re Holmden's Settlement Trusts, Holmden v IRC* [1966] Ch 511, [1966] 2 All ER 661, CA; affd sub nom *IRC v Holmden* [1968] AC 685, [1968] 1 All ER 148, HL. Where a point is presented for consideration to a court with other points, and the court bases its decision entirely on the other points and says nothing about the first, no inference can be drawn that the court approved the point any more than it disapproved it: *Guaranty Trust Co of New York v Hannay & Co* [1918] 2 KB 623 at 647, CA.

9    *Scruttons Ltd v Midland Silicones Ltd* [1962] AC 446 at 476, 477, [1962] 1 All ER 1 at 12, HL, per Lord Reid; *Penn-Texas Corpn v Murat Anstalt (No 2)* [1964] 2 QB 647, [1964] 2 All ER 594, CA.

10   *Harper v National Coal Board* [1974] QB 614, [1974] 2 All ER 441, CA.

11   *Practice Note (Judicial Precedent)* [1966] 3 All ER 77, sub nom *Practice Statement* [1966] 1 WLR 1234, HL; *R v Shivpuri* [1987] AC 1, [1986] 2 All ER 334, HL.

12   *Ogden Industries Pty Ltd v Lucas* [1970] AC 113 at 127, [1969] 1 All ER 121 at 126, PC.

13   *Pepper (Inspector of Taxes) v Hart* [1993] AC 593, [1993] 1 All ER 42, HL; *Chief Adjudication Officer v Foster* [1993] AC 754, [1993] 1 All ER 705, HL.

14   *Miller-Mead v Minister of Housing and Local Government* [1963] 2 QB 196 at 236, [1963] 1 All ER 459 at 476, CA, per Diplock LJ. See also *Moss v Gallimore* (1779) 1 Doug KB 279 at 283; *Hood v Newby* (1882) 21 ChD 605, CA. It is never wise to take a passage out of a judgment and to treat it as though it were a statutory enactment: *Metropolitan Police District Receiver v Croydon Corpn* [1957] 2 QB 154 at 167, [1957] 1 All ER 78 at 85, CA, per Morris LJ. For a suggestion that an extempore judgment after inadequate argument may not be as authoritative as a judgment given after full argument and mature consideration see *Haley v London Electricity Board* [1965] AC 778 at 792, [1964] 3 All ER 185 at 188, HL, per Lord Reid.

15   *Baker v R* [1975] AC 774 at 778, [1975] 3 All ER 55 at 64, PC; *National Enterprises Ltd v Racal Communications Ltd* [1975] Ch 397, [1974] 3 All ER 1010, CA.

16   See *Practice Note* [2001] 2 All ER 510, sub nom *Practice Direction (citation of authorities)* [2001] 1 WLR 1001, CA, para 8.1. The statements referred to in para 8.1 must not materially add to the length of submissions or of skeleton arguments, but should be sufficient to demonstrate, in the context of the advocate's argument, the relevance of the authority or authorities to that argument and that the citation is necessary for a proper presentation of that argument: para 8.4.

17   *Practice Note* [2001] 2 All ER 510, sub nom *Practice Direction (citation of authorities)* [2001] 1 WLR 1001, CA, para 8.2.

18   *Practice Note* [2001] 2 All ER 510, sub nom *Practice Direction (citation of authorities)* [2001] 1 WLR 1001, CA, para 8.3.

**1238. Dicta.** Statements which are not necessary to the decision, which go beyond the occasion and lay down a rule that is unnecessary for the purpose in hand are generally termed 'dicta'[1]. They have no binding authority on another court, although they may have some persuasive efficacy[2]. Mere passing remarks of a judge are known as 'obiter dicta', whilst considered enunciations of the judge's opinion on a point not arising for

decision, and so not part of the ratio decidendi, have been termed 'judicial dicta'[3]. A third type of dictum may consist in a statement by a judge as to what has been done in other cases which have not been reported[4].

Rights of property should not be upset merely because, when historically traced through the reports of centuries, they rest upon a dictum[5], nor is it right to distrust a practice that follows on dicta when it is the practice and not the dicta that forms the binding authority[6]. Even dicta of individual members of the House of Lords, although of great weight, are not of binding authority[7], but, when dicta have been expressed unanimously by all the judges of a Divisional Court, it would not be seemly for the judges of another Divisional Court not to follow them[8]. Interlocutory observations by members of a court during the argument, while of persuasive weight, are not judicial pronouncements and do not decide anything[9].

It is dangerous in the exercise of discretion to take a reported case as a guide for that exercise in another case[10]. The Court of Appeal may lay down maxims to guide judges in exercising discretion, but will not compel them to follow them[11], although an exercise of discretion is always subject to review[12].

1  There is no justification for regarding as obiter dictum a reason given by a judge for his decision because he has given another reason also: *Jacobs v LCC* [1950] AC 361 at 369, [1950] 1 All ER 737 at 741, HL, per Lord Simonds.

2  *A-G v Dean and Canons of Windsor* (1860) 8 HL Cas 369; *G and C Kreglinger v New Patagonia Meat and Cold Storage Co Ltd* [1914] AC 25 at 39, HL; *Cornelius v Phillips* [1918] AC 199 at 211, HL; *Tindall v Wright* (1922) 127 LT 149, where the court refused to give a decision which, in the circumstances of the case, would have been essentially in the nature of an obiter dictum and not binding on any other court; *Leeds Industrial Co-operative Society Ltd v Slack* [1924] AC 851 at 864, HL; *Cassidy v Daily Mirror Newspapers* [1929] 2 KB 331 at 339, 340, CA; *Re Burradon and Coxlodge Coal Co Ltd, Martin's Bank Ltd v Burradon and Coxlodge Coal Co Ltd* (1930) 23 BWCC 7 at 14, CA; *Flower v Ebbw Vale Steel, Iron and Coal Co Ltd* [1934] 2 KB 132 at 154, CA; but cf *Tees Conservancy Comrs v James* [1935] Ch 544, where the court considered that it would be wrong to disregard dicta of two judges whose experience in matters of the kind in question was very great and of high authority.

3  *Richard West & Partners (Inverness) Ltd v Dick* [1969] 2 Ch 424 at 431, [1969] 1 All ER 289 at 292, per Megarry J; affd [1969] 2 Ch 424 at 435, [1969] 1 All ER 943, CA. See also *Slack v Leeds Industrial Co-operative Society Ltd* [1923] 1 Ch 431, CA; on appeal sub nom *Leeds Industrial Co-operative Society Ltd v Slack* [1924] AC 851, HL.

4  *Richard West & Partners (Inverness) Ltd v Dick* [1969] 2 Ch 424 at 431, [1969] 1 All ER 289 at 292, per Megarry J, who said that such a statement of the settled law or accustomed practice carries the highest authority that any dictum can bear; affd [1969] 2 Ch 424 at 435, [1969] 1 All ER 943, CA.

5  *A-G v Reynolds* [1911] 2 KB 888 at 930.

6  *Leeds Industrial Co-operative Society Ltd v Slack* [1924] AC 851 at 864, HL.

7  *Latham v R Johnson & Nephew Ltd* [1913] 1 KB 398 at 408, CA; *East London Rly Joint Committee v Greenwich Union Assessment Committee, East London Rly Joint Committee v Bermondsey Assessment Committee, East London Rly Joint Committee v Stepney Assessment Committee* [1913] 1 KB 612 at 623, CA; *Charles R Davidson & Co v M'Robb (or Officer)* [1918] AC 304 at 322, HL; *Harries v Crawfurd* [1919] AC 717 at 743, HL.

8  *Mills v LCC* [1925] 1 KB 213 at 224, DC. As to decisions of co-ordinate courts see para 1244 post.

9  *Practice Note* [1942] WN 89, PC, per Viscount Simon C.

10  *Bragg v Crosville Motor Services Ltd* [1959] 1 All ER 613, [1959] 1 WLR 324, CA.

11  *Watts v Manning* [1964] 2 All ER 267 at 272, [1964] 1 WLR 623 at 632, CA, per Salmon LJ.

12  *Sims v William Howard & Son Ltd* [1964] 2 QB 409, [1964] 1 All ER 918, CA.

**1239. Decisions on matters of fact.** Except as between the parties or their privies, decisions upon matters of fact are not binding on any other court[1], even when given by the House of Lords[2]. When a previous case has not laid down any new principle, but has merely decided that a particular set of facts illustrates an existing rule, there are few more fertile sources of fallacy than to erect a previous decision into a governing precedent merely because it contains what is simply resemblance of circumstances[3]; but a case may be of use to show the way in which judges regard facts[4], and a decision that certain legal consequences follow from certain facts is binding in another case raising substantially similar facts[5].

A decision on a question of foreign law is not binding, for such a question is a question of fact to be decided in each case on the actual evidence in that case[6].

**EXHIBIT    3**

Case 1:08-cv-02351-HB    Document 20-2    Filed 05/17/2008    Page 11 of 33
i-law.com
Page 1 of 23

## COURT OF APPEAL.

Oct. 17 and 18, and Nov. 4, 1935.

---

ANGLO-SOVIET SHIPPING COMPANY, LTD. v. "BELDIS." (APPEAL OF LAMBERT BROS., LTD., INTERVENERS).

Before Sir BOYD MERRIMAN (President), Lord Justice SCOTT and Mr. Justice SWIFT.

*Practice-Admiralty jurisdiction-County Court-Proceedings in rem-Action brought in County Court by plaintiffs against defendants for money due to plaintiffs under an award in an arbitration held by virtue of a clause in a charter-party concerning defendants' steamship Belfri-Arrest of steamship Beldis, also belonging to defendants, ad fundandam jurisdictionem-Judgment entered against defendants in default of appearance-Intervention by Lambert Bros. as mortgagees of Beldis-Issue submitted to Court by agreement between plaintiffs and interveners: "Whether the plaintiffs' action in rem against the s.s. Beldis is maintainable in view of the fact that the plaintiffs' claim in this action arose out of a charter-party of the s.s. Belfri being a ship belonging to the same owners"-Decision of learned County Court Judge, following dictum of C.A. in the Heinrich Bjorn, 10 P.D. 44, that an action in rem was maintainable -County Courts Admiralty Jurisdiction Acts, 1868 and 1869- "Any claim arising out of any agreement made in relation to the use or hire of any ship."*

*-Held, allowing interveners' appeal, that the plaintiffs' claim, which was upon an award made under an arbitration clause of a charter-party, was not a "claim arising out of any agreement made in relation to the use or hire of any ship," and therefore did not come within the admiralty jurisdiction of the County Court.*

*-Held, further, assuming that the claim under the award came within the admiralty jurisdiction of the County Court, that an action in rem could not be directed against property of the defendant other than that in respect of which the cause of action arose-Dictum of C.A. in the Heinrich Bjorn disapproved.*

This was an appeal by Messrs. Lambert Bros., Ltd., mortgagees of the steamship *Beldis*, and interveners in the action, from the decision of an issue by his Honour Judge L. C. Thomas at Newport County Court on June 27, 1935, when he answered in the affirmative the question, Was the action *in rem* of the Anglo-Soviet Shipping Company, Ltd., against the steamship *Beldis* maintainable in view of the fact that plaintiffs' claim in that action arose out of the charter-party of the steamship *Belfri*, another vessel belonging to the same owners, the Skibs.-A/S. Christen Smith's Rederi, of Oslo?

The question for the Court of Appeal was stated to be this: Having a claim against a vessel, can one arrest another vessel belonging to the same owner? The County Court Judge, in saving that this could be done, said that he thought he was bound by a passage in the judgment of Lord Justice Fry in the case of the *Heinrich Bjorn*, 10 P.D. 44. The appellants,

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

256

Messrs. Lambert Bros., Ltd., said that the observations of Lord Justice Fry in that case were *obiter*, and contended that the County Court Judge's decision was wrong in principle and unnecessary for the decision of the question.

Mr. O. L. Bateson (instructed by Messrs. Ince, Roscoe, Wilson & Glover, agents for Messrs. Allen Pratt & Geldard, of Cardiff) appeared for the appellant interveners; Mr. A. T. Miller, K.C., and Mr. Norman Richards (instructed by Messrs. Pettite, Kennedy, Morgan & Broad) represented the plaintiffs, the Anglo-Soviet Shipping Company, Ltd.

Mr. BATESON said that the question was a question of the jurisdiction of the County Court in admiralty matters. An action *in rem* arose out of a charter-party of the *Belfri* to recover a sum under an award in an arbitration. The owners took no interest in that action, and judgment was obtained by default. The action *in rem* against the *Beldis* was to recover the amount of the award. After the default judgment the mortgagees, to protect their security in the *Beldis*, got leave to defend, and an issue was prepared for the decision of the Judge. There was a right *in rem* under the County Courts Admiralty Jurisdiction Acts, 1868 and 1869. The point was, how far did it extend? Was the right *in rem* which was given by the County Courts Admiralty Jurisdiction Amendment Act, 1869, available against the ship concerned and against other property of the same defendant?

Mr. BATESON went on to say that his contention was that an action *in rem* created by the statute did not entitle the plaintiff to pursue *in rem* property of the defendant wherever he could find it, but only the property which was concerned.

Mr. MILLER said that he would contend that the jurisdiction of the High Court of Admiralty extended as far as he himself needed. If Mr. Bateson upheld a different view about the High Court, nevertheless, that would not govern the jurisdiction of the County Court, which depended on its own Acts and statutes.

Mr. BATESON submitted that this was a practice which had never been adopted before or since the statute, and was foreign altogether to English admiralty procedure. For the *Heinrich Bjorn* judgment, it was enough to assume that the right *in rem* was a right against the ship to which the necessaries had been supplied. The statement

of Lord Justice Fry that the County Court Judge relied on was no more than *obiter* and was wrong in point of fact in the way in which it was stated. His Honour Judge Thomas said that the *Heinrich Bjorn* case decided that where there was in existence no effective maritime lien there could only be a right to seize the ship on the institution of an action, and that that had been done in this case. In his judgment the County Court Judge said:—

Now, Mr. Bateson, in the course of his admirable argument, applied severe criticism to the judgment in the *Heinrich Bjorn*. He said that the judgment was based on false premises; that it was inconsistent with the law which had been authoritatively laid down in other cases, and he dealt with cases of actions *in personam* as distinct from actions *in rem*, and the question of the effect of a maritime lien in contradistinction to proceedings against the *res*.

This particular case really turned on fact. The headnote was: "A foreign vessel was in an English port, and the owner, being temporarily in England and in want of funds for the purchase of necessaries, made an agreement with the plaintiffs by which, in consideration of their advancing him by cash or acceptance £600 for necessaries supplied to and for the use of the vessel, he thereby undertook to return them the amount so advanced with interest and all charges on the return of the vessel from her voyage. And the plaintiffs were thereby authorised" to cover the amount advanced the owner by insurance on ship, &c., out and home at owner's cost."

An action *in rem* for necessaries in respect of the amount so advanced was brought, and it was held by the Court of Appeal (Bowen and Fry, L.JJ., Brett, M.R., doubting) first, that this agreement was not equivalent to a bottomry bond; secondly (by the whole Court) that there was no lien for necessaries; for that before 3 & 4 Vict. c. 65, Sect. 6 (1) (the Admiralty Court Act, 1840), there was no maritime lien on a foreign ship for necessaries supplied to her, that that section did not give any maritime lien but only a right to seize the ship on the institution of an action, and therefore that the plaintiffs were not entitled to recover against the vessel.

It seems to me that what the case of the *Heinrich Bjorn* decides is that where

I-law.com
Case 1:08-cv-02351-HB    Document 20-2    Filed 05/17/2008    Page 13 of 33
Page 29 of 23

[1935] Vol. 53                          Ll.L.Rep.                                257
C.A.                        Anglo-Soviet Shipping Co., Ltd. v.
                                      "Beldis."

there is in existence no effective maritime lien there can only be a right to seize the ship on the institution of an action, which is, in fact, what was said to be done in this particular case; and it appears to me that I am bound by the judgment in that case as expressed by Lord Justice Fry in delivering the judgment of the Court. It was said by Mr. Bateson that in any event the observations of Lord Justice Fry merely amounted to an *obiter dictum;* but it appears to me that his judgment goes beyond that, because in order to decide the case of *Heinrich Bjorn* he had to consider the question of the effect of maritime liens and actions *in rem* and what Mr. Bateson describes as an *obiter dictum* is really an authoritative statement of the law on the subject, by which I am bound. Therefore, having regard to the express language that the arrest need not be of the ship in question but may be of any property of the defendants within the realm, I feel constrained to decide that the plaintiffs are entitled to succeed, and there must be judgment in their favour, with costs.

The PRESIDENT observed that the dispute between the King's Bench Division and the Admiralty Division had a venerable antiquity, and in about 1632 there was a kind of compromise between the King's Bench Judges and the Admiralty Court. The Admiralty Court, before the statute of 1840, avoided prohibitions from the King's Bench Division by founding its jurisdiction *in rem.*

Mr. Justice SWIFT said that he gathered it would be said that there was no arrest unless there was a lien, and then the arrest extended only to the ship which was the subject of the arrest. If this decision meant what the County Court Judge had found, the result (it was said on one hand) might be that if somebody supplied £5 worth of goods to a ship and did not get paid he could start a County Court action for his £5, and as soon as he had issued his plaint might go and arrest the shipowner.

The PRESIDENT said that the Admiralty Marshal existed to arrest delinquent ships —somebody or something as preliminary to the action. Until 1780 he could and did arrest the person.

Mr. BATESON said that if there were the right to do what the County Court Judge had said, it was remarkable that from 1840 to 1885, the date of the *Heinrich Bjorn*

judgment, nobody had ever availed himself of the amazing opportunity indicated by the pronouncement of Lord Justice Fry. One could hardly believe that litigants and their advisors would have failed to take advantage of this tremendous chance, but Counsel could find no recorded case where the procedure was adopted. In foreign countries and in Scotland, however, he believed that there were almost general rights of arrest. His Honour had said that the judgment of Lord Justice Fry in the *Heinrich Bjorn,* where he used the words, "the arrest need not be of the ship in question, but may be of any property of the defendant within the realm," was a definite statement of the law by which he was bound, and that as the *Beldis* was the property of the defendants within the realm an action *in rem* would lie. Judge Thomas noted that the jurisdiction under the Act of 1840 was not inconsiderable. His Honour continued:-

It has, of course, been held that though the jurisdiction was exercisable by proceedings *in rem,* no maritime lien for the claim were conferred, as the words simply giving jurisdiction do not show so important a right as that conferred by a maritime lien, a right towards which the law of England was less friendly than the law of Rome and of the countries which have adopted the Civil Law. The case of the *Heinrich Bjorn* was one in which the Court consisted of three eminent judges-Lord Justice Brett, M.R., Lord Justice Bowen and Lord Justice Fry-a Court of the highest distinction -and the judgment of the Court was delivered by Lord Justice Fry, after time had been taken to consider the matter. The passage which Mr. Norman Richards, for the plaintiffs, the Anglo-Soviet Shipping Company, relied on was at p. 54 of the report, and was as follows:-

The arrest of a vessel under the statute is one of several possible alternative proceedings *ad fundandam jurisdictionem;* no right in the ship or against the ship is created at any time before the arrest; it has no relation back to any earlier period; it is available only against the property of the person who owes the debt for necessaries; and the arrest need not be of the ship in question, but may be of any property of the defendant within the realm.

Case 1:08-cv-02351-HB   Document 20-2   Filed 05/17/2008   Page 14 of 33
I-law.com
Page 4 of 23

[1935] Vol. 53          Ll.L.Rep.                                    258
C.A.            Anglo-Soviet Shipping Co., Ltd. v.
                         "Beldis."

And that is the important point of this case, that the arrest need not be of the ship in question, but of any property of the defendants within the realm, which would, of course, be applicable to any ship owned by the defendants. The judgment goes on to say that these two proceedings, though approaching one another in form, are different in substance. In the one case, the arrest is to give effect to a pre-existent lien; in the other the arrest is only one of several alternative modes of procedure, because, to use the language of Dr. Lushington,[*] "It offers the greatest security for obtaining substantial justice in furnishing a security for prompt and immediate payment."

COUNSEL said that discussing the fact that there are no cases on the point Judge Thomas said:-

The plaintiffs and the interveners agreed to the trial of one issue, which was whether the plaintiffs' action *in rem* against the steamship *Beldis* was maintainable in view of the fact that the plaintiffs' claim arose out of a charter-party of the steamship *Belfri*, which was a ship belonging to the same owners. It was agreed that if that question were answered in the affirmative there would be judgment for the plaintiffs; if in the negative, there would be judgment for the interveners. I understand there were proceedings arising out of the charter-party and that an award was made in favour of the plaintiffs, and the plaintiffs sought to recover the fruits of the award by these proceedings *in rem*.

The point, as it appears to me, is whether an action *in rem* is maintainable where the *res* is a ship other than a ship which is in default. Mr. Norman Richards argued that, by virtue of the County Courts Admiralty Jurisdiction Amendment Act of 1869 and the Rules under it an action *in rem* would lie. There is no case cited which expressly decides this point on similar facts and I have never known in my experience of these shipping matters (which has not been inconsiderable) any case in which proceedings were taken against a ship other than the offending ship, and neither Mr. Bateson, who has large experience of these matters, nor, indeed, Mr. Richards, knew of any such case. It does not follow from that that, in law, such an action could not be maintainable.

Where you have a big company owning several ships operating, if one is in default the usual practice is to give bail and, indeed, in the case of most foreign ships, where there may be one ship in a single ownership, in order to save expense and to get away, the practice is for the shipowners to furnish a bond, which is a perfectly simple matter, and thereafter justice can be done and the parties who are seeking to assert their rights can satisfy a claim out of assets which come into existence in this country without having, perhaps, to have recourse to difficult proceedings under foreign jurisdiction and that is probably the reason why there is no case which directly bears upon this point.

The PRESIDENT said that it had been said that before 1840 all the jurisdiction of the Admiralty Court was exercised *in rem* in cases where virtually there was a maritime lien. One of the most controversial issues was whether the jurisdiction *in rem* was inherently bound up with maritime lien.

Mr. BATESON said that before 1840 that jurisdiction was exercised owing to the nature of the claims which were entertained against the specific property with which the claim was concerned because there was no other property which entered into the matter. In bottomry and respondentia one had the pledge and the documents which were concerned only with the subjects of the pledge. In wages, collision and salvage, wether they were then regarded as being subject to maritime lien or not, clearly they were only concerned with the actual property concerned. Whatever it was- salvage, wages, possession, damage-all was in respect of the delinquent ship. Nobody ever regarded any other ship as being liable in a damage case.

The PRESIDENT said that the distinction had been drawn that while there was a claim of debt secured by a maritime lien which the law recognised, there was another type of process *in rem* where there was no maritime lien but there was an admiralty debt; and there it was the attachment of the ship that was distinct from the lien inherent in the commission of the wrong or the rendering of the services. It was the attachment of the ship which formed the nexus between the right and the property of the defendant. There was an old process *in rem* which at any rate was coexistent with cases where there was a maritime lien, but there was also a process *in rem* which was independent of maritime lien and

---

[*] The *Volant*, 1 Wm. Rob. 383.

[1935] Vol. 53
C.A.

**Ll.L.Rep.**

**Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."**

259

resulted from giving the admiralty process against the ship.

Mr. BATESON said that since the statute of 1840, which extended the jurisdiction, there was extension to cases where there was no lien. The *Dictator*, [1892] P. 304, distinguished between maritime lien and other claims on property. Up to 1840 there were lien cases where clearly one could attach property. After that, a slightly different set of cases arose, where the same remedy had been applied to cases where there was no lien. Subsequent to the lapsing of the right to arrest personal property, there was no right to arrest anything except the property actually concerned, except for the purpose of compelling appearance. Long before 1840 the general right of arrest of person or goods had fallen into desuetude. Before 1840 it was only exercised where there was some specific lien.

The PRESIDENT said that there continued jurisdiction *in personam* so long as it did not interfere with the King's Bench claim to deal with such matters within the body of the realm.

Mr. BATESON pointed out that between 1780 and 1840 the only thing one seized was the property concerned. In wages, collision and salvage there was no other property one could seize. That was the history of the matter as he saw it. He relied on a passage in the *Dictator, sup.*, at p. 313, as showing that the arrest of a person had fallen into desuetude and the right of arresting any other property of the defendant had also fallen into desuetude.

The PRESIDENT: The phrase is the "arrest of property merely to enforce appearance became rare or obsolete." Are you not converting that into a statement that it had completely fallen into desuetude by 1840? That is begging the question. You have to show that it had. You cannot cite that passage as showing that the thing had ceased to exist.

Lord Justice SCOTT referred to the title "Admiralty" in Halsbury's Laws of England, 2nd Ed., par. 94, at p. 81, as to the "Exercise of the jurisdiction." It was there stated that the jurisdiction possessed by the High Court of Admiralty seemed at first to have been exercised by means of arrest of the person of the defendant who was required to give bail and answer judgment. Where the defendant was not arrested (the statement continued) "there was apparently

always an alternative method of proceeding by arresting any property belonging to him in tidal waters, and then citing the debtor and all parties interested in the goods attached to appear at the suit of the plaintiff." The next paragraph noted the impression in admiralty that wherever there was a right to arrest there was also a maritime lien, and that belief would tend, unconsciously but inevitably, to create, so to speak, the inference that the right to arrest was limited to those cases where there was a maritime lien, which would confine it to the ship in question.

Mr. BATESON: Halsbury goes on to say: "These methods of procedure became obsolete." All the authorities state it in this way, that it became obsolete, and then the right and idea of a maritime lien grew up.

The PRESIDENT: Do you say that the maritime lien only began to grow up after 1780—which is the date of the last recorded instance of the arrest of the person?

Mr. BATESON: I do.

The PRESIDENT: I know this passage is written on the highest authority, but we are able to see the cases on which it is founded. It is said in Halsbury that "these methods of procedure became obsolete," but the passage in the judgment is "they became rare or obsolete." I come back to 1840, and put it, assuming they were becoming rare or obsolete, at some indefinite time before 1840; after 1840 there ceased to be any reason for their continuance.

Mr. BATESON said that he was prepared to accept it on that basis. If this were a procedure which had not been exercised since 1840, what reason was there for reviving it? A man who had a maritime lien might either pursue his defendant *in personam* or pursue the actual ship *in rem* into whosesoever hands she might go. A man who had a right *in rem* under the statute might proceed *in personam* in exactly the same way, or he might arrest the particular property so long as it remained in the possession of the original defendant, before judgment, in order to get security to answer the claim.

Mr. Justice SWIFT: But he cannot arrest the property if his action is *in personam*?

Mr. BATESON agreed.

The PRESIDENT asked if Mr. Bateson said that the remedy *in rem* and the remedy *in personam* were pursued together or successively.

Mr. BATESON replied that they were not concurrent in the sense that both were

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

260

always in existence at the same time. The action *in personam*, technically, was not in existence until the action *in rem* had failed to provide an adequate remedy.

The PRESIDENT: There is ample authority now that, given an action *in rem* to which the defendant appears, there is superadded an action *in personam* by the fact of his appearance.

Mr. Justice SWIFT: It becomes an action *in personam* by the fact that he appears.

Mr. BATESON: The right against the person only arises in execution after the judgment.

The PRESIDENT: You do not assert that, when the defendant has appeared, the right to go on with the remedy *in rem* ceases?

Mr. BATESON: You have to exhaust the right *in rem* before you can go against the person.

The PRESIDENT: But you have both remedies from the moment the defendant appears.

Mr. BATESON: Only if the *res* is not sufficient to satisfy your judgment. It is all set out in the *Dictator*, at pp. 319 and 320. If you start your action *in rem* you pursue it to an end and follow with the right *in personam* if your action *in rem* fails to provide the adequate remedy.

The PRESIDENT: The authorities show that as between persons subject to the jurisdiction of the. English Court, claims such as are now in question would, before the Judicature Acts, have been enforceable by successive actions *in rem* and *in personam*. Since the Judicature Acts these cumulative rights are enforceable in the High Court of Justice in one action. As Mr. Justice Swift pointed out, by the fact of appearing, the defendant makes the action an action *in personam* as well as an action *in rem*.

Mr. BATESON submitted that the position before the Judicature Acts was the same now. One might pursue both remedies successively and not concurrently. In his contention the passage of Lord Justice Fry on which the County Court Judge based himself was *obiter* and not binding, and, further, whether it was *obiter* or not, it was wrong as a statement of the law and should not be followed.

Mr. MILLER, for the respondents, submitted that the County Court Judge's finding was proper and valuable to many litigants interested in payment arising out of shipping matters. There was nothing really novel in it. It was inherent in the position. The County Court had been

given an extension of Admiralty practice, and it was in two forms. There could be an action *in rem* against property in which one had a right, but the same procedure *in rem* was available to enforce rights not only against a particular property but against a person. When it was against a person the action *in rem* was available and sufficed to secure the litigant and possibly bring the other party to the tribunal. It was fundamental that the action *in rem* was of that ambit and covered the two types of case, and was available in the present class of action where the claim was really against the person. Since, on the mass of authority, there was a good deal of apparent conflict, Counsel hoped it might seem that the time had come when those things should be clarified and people might know what really was the position on that important problem. The jurisdiction conferred by the County Courts Admiralty Jurisdiction Acts of 1868 and 1869 might be exercised either by proceedings *in rem* or by proceedings *in personam*. He contested Mr. Bateson's argument that in the Admiralty Division an action *in rem* lay only against a wrongdoing ship or against the property concerned in the suit.

The PRESIDENT asked if Mr. Miller said that County Courts had been given wider Admiralty jurisdiction than the Admiralty Court.

Mr. MILLER thought it might be that they had. The statute granted to the County Court right to exercise its jurisdiction by proceedings *in rem* without limitations. There was no limitation to the wrongdoing ship or property concerned in the suit.

Mr. Justice SWIFT observed that an action *in rem* must be against a specific thing. "Can there be an action *in rem* which is not founded on a lien of some sort- maritime lien, quasi-maritime lien or statutory maritime lien?"

Mr. MILLER said that action could be brought in the County Court to enforce a claim against an owner which did not give rise to any lien if the action was followed by arrest. The arrest secured to the litigant who put in motion the machinery for arrears the property as security for his judgment. But the same procedure *in rem* was available to enforce rights, not against a particular property but against the person.

The PRESIDENT observed that Lord Watson, when the *Heinrich Bjorn* went to the House of Lords (11 App. Cas. 270, at p. 277) distinguished between the cases in

which there was a maritime lien and the case where a creditor had an unsecured claim. The kinds of maritime debts were mortgage, bottomry, respondentia, claims against cargo, salvage, towage, necessaries, wages, master's disbursements, and Lord Watson was thinking in all of the attachment of a particular ship. What other *res* was there?

Mr. MILLER suggested that the *res* was the subject-matter against which the proceedings *in rem* were taken. The proceedings could be against some other *res* than the actual subject-matter, because the owner was alleged to be indebted in a maritime debt-ship, cargo or any other property, the subject of action.

The PRESIDENT: It is only the ship which is the subject-matter of discussion when Lord Watson says: "The remedy is obviously an appropriate one in the case of a plaintiff who has a right of property or other real interest in the ship, or a claim of debt secured by a lien which the law recognises."

Mr. MILLER, turning to the sentence on which the County Court Judge based himself, asserted that this was anything but *obiter*. It was, Counsel said, part of the considered reason which led the Judge in the cited case to his conclusion. When the *Heinrich Bjorn* went to the House of Lords there was no indication that this considered judgment was dissented from in any particular.

The PRESIDENT: But you know of no case of a similar collection of a maritime debt to this we are considering?

Mr. MILLER agreed that he knew of none.

. The PRESIDENT: You said that the judgment was extremely beneficial to the shipping community. Has the shipping community, in the fifty years that it has been available to it, ever taken advantage of the opportunity you say it possesses?

Mr. MILLER: The House of Lords did not differ from Lord Justice Fry.

Lord Justice SCOTT: The international committee presided over by Mr. Justice Hill on "Arrest," in 1928, never suggested there was any such law in Admiralty procedure as you assert, and they advised against its adoption.

Mr. MILLER submitted that jurisdiction against property was not merely a creature of the statute, but was an old right, dating from the origin of things, to arrest other property of the owners than the wrongdoing ship, but a right which had fallen into disuse. It was a right used by other nationals. The jurisdiction was one in

which the Admiralty Court proceeded by arrest of the goods quite as frequently as by arrest of the ship, and it was quite immaterial what the goods were so long as they were the goods of the defendant.

The PRESIDENT: Do not miss out that historically it sometimes became arrest of the defendant himself. The implication of your argument is that equally anyone may come and arrest the owner.

Mr. MILLER: I am content to admit that the Court of Admiralty has in that respect relinquished some of its jurisdiction-has ceased to arrest the person. It has been stated that the right long ago fell into disuse and that it is one that the Court does not exercise. But the arrest of property is quite a distinct thing, and it is material, where that property subject to arrest is any property of the defendant.

The PRESIDENT: I thought you had also agreed that *de facto* arrest of any property had also fallen into disuse and there had been none in fifty years since the *Heinrich Bjorn*. Has anybody discovered a case?

Mr. MILLER said he had not agreed quite so much as the Court supposed. He only agreed there was no later case, not that the right had expired because it had not been exercised. Judges had frequently said such a right was inherent in the Court; only it had not been exercised.

The PRESIDENT: While the right to arrest the person is dead?

Mr. MILLER submitted that action *in rem* was available to-day in the Admiralty Court for quite different purposes. It was available to enforce a maritime lien against the property subject to the lien, but one could not easily say where that right stopped; he would express it "to enforce claims within the admiralty jurisdiction against the owner, available against any of the owner's goods within the jurisdiction." Counsel added that when one served the writ on the goods it did not follow thereby that there was an arrest.

The PRESIDENT asked how that could be if the writ were attached to the goods; the attachment of the writ was commonly supposed to be the arrest.

Mr. MILLER contended that one could not get an arrest unless it was possible to satisfy the Marshal that there was a chance of the goods being taken out of the realm. That had to be sworn.

The PRESIDENT: In the Admiralty Division you get out your warrant and arrest your ship. There is an additional precaution in the County Court.

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

262

---

Mr. MILLER: And the right is available against any property within the realm of the person against whom the claim arises provided it is a claim within the jurisdiction of the Admiralty Court.

Mr. Justice SWIFT suggested to Mr. Miller that admiralty action was obsolete with regard to the arrest of the individual himself, and there was no reported case of arrest of "a" *res* as distinct from "the" *res* since the time when the arrest of the person became obsolete.

Mr. MILLER said he could not produce a case in which other property had been arrested than "the" *res*.

Mr. Justice SWIFT said that the right of arrest was originally exercised for the purpose of founding jurisdiction, and there was no interference by the King's Bench. But beyond that was a right which existed in the Admiralty Court of seizing the ship in order to enforce a maritime lien. Those things should be kept strictly apart, and not confused. His Lordship continued:

"I have found no right, in my investigations, which the Admiralty Court ever exercised of proceeding *in rem* except either for the purpose of keeping somebody there-person or property, which might have gone away-or of enforcing a maritime lien. One used to be able to arrest shipowner, ship or other chattel, even land, it was argued, in order to keep them to secure to both sides their rights and to found jurisdiction, but between the two sorts of action *in rem*-(1) to enforce a maritime lien, a kind which is very active to-day, and (2) to keep a man in the jurisdiction by imprisoning him or impounding his chattel or holding goods to bail-there was a great gulf fixed. Where there was no maritime lien, arrest or action *in rem* lay in order to create this nexus over the debtor's property."

Mr. MILLER persisted that the action was in effect or ultimately against the person. The person was always the object. He might have done damage by throwing a bomb against a ship. It was not a delinquent ship of his which was then in question, and, theoretically, the plaintiff could exercise his right of action against any of his property, wherever he found it, in any port, until the debtor met the claim. That was in accordance with the ancient practice of the Court, and that ancient practice had now been revived by the statute which gave admiralty jurisdiction to the County Courts. That being so, why limit it? The fact that there were no recent

instances was explicable by the confusion into which the subject had fallen and the attribution exclusively of the action *in rem* to maritime liens. One must consider the existence of the other right of action *in rem*. This was not a case under the admiralty jurisdiction, but under the County Courts Admiralty Jurisdiction Amendment Act, 1869, by which this express statutory power had been given in words unlimited and unrestricted. Those words should be given their full value, and their full value would be the value Counsel was seeking to say existed in the Admiralty Division to-day. The jurisdiction might be exercised *in personam* or *in rem*, and *in rem* meant against "goods of the defendants."

Mr. RICHARDS, who continued for the respondents, urged that they were dealing with arrest of "a ship," not of a particular ship-the wording of the Act was directed to any ship without any qualification whatever.

Mr. BATESON replied for the appellants.

During the course of the argument the Court directed attention to the question whether the issue was not based on a misconception, inasmuch as it asserted as a fact that the plaintiffs' claim in the action arose out of a charter-party, whereas the plaintiffs' cause of action appeared not to be upon the charter-party at all but upon an award, although the submission to arbitration was to be found in the arbitration clause of a charter-party.

It was argued in answer to this objection that the plaintiffs' action, although based on an award, was nevertheless a claim which arose out of all agreement made in relation to the use or hire of a ship (County Courts Admiralty Jurisdiction Amendment Act, 1869, Sect. 2 (1)).

Judgment was reserved.

---

Thursday, Dec. 19, 1935.

---

### JUDGMENT.

Sir BOYD MERRIMAN, P.: This is an appeal from the judgment of his Honour Judge Thomas, sitting in Admiralty in the Newport County Court. On Apr. 5, 1935, proceedings *in rem* were taken in that Court by the Anglo-Soviet Shipping Company, Ltd., against the owners of the steamship *Beldis*, then lying in Newport Docks, for the sum of £27 4s. 6d. payable

Case 1:08-cv-02351-HB     Document 20-2     Filed 05/17/2008     Page 19 of 33
Page 9 of 23
i-law.com

by the defendants to the plaintiffs under an award dated Jan. 24, 1935, made in a certain arbitration held by virtue of a clause in that behalf in a charter-party dated July 13, 1933, between the defendants of the one part and the agents of the plaintiffs, for and on behalf of the plaintiffs, of the other part. The owners of the *Beldis* failed to appear within the four clear days specified in the summons, and accordingly on Apr. 10, 1935, judgment was entered against them by default. On Apr. 24, 1935, Messrs. Lambert Brothers, Ltd., the appellants in this appeal, filed an affidavit showing that by virtue of a mortgage bond dated Apr. 23, 1929, they were mortgagees of the steamship *Beldis* and that the award upon which the plaintiffs were suing related to a claim arising under a charter-party which did not relate to the steamship *Beldis* at all, but to another ship of the same owners named the *Belfri*. It will be observed that the particulars of the plaintiffs' claim, to which I have already referred, did not specify the ship in respect of which the charter-party of July 13, 1933, was made, but it is common ground that in fact this charter-party related to the steamship *Belfri* and not to the *Beldis*, and it was upon that basis that the appellants were permitted to intervene in the suit.

By agreement an issue was submitted to the Court in the following terms:—

We, the plaintiffs and the interveners in the above-named action, herewith submit the following sole issue to be tried by this Honourable Court, pleadings being waived:

Whether the plaintiffs' action *in rem* against the s.s. *Beldis* is maintainable in view of the fact that the plaintiffs' claim in this action arose out of a charter-party of the s.s. *Belfri*, being a ship belonging to the same owners.

The said parties agree that in the event of the question raised in this issue being answered in the affirmative, there shall be judgment for the plaintiffs with costs, and in the event of the question raised in this issue being answered in the negative, there shall be judgment for the interveners with costs.

The issue, therefore, raised the important question whether an action *in rem* in a County Court having admiralty jurisdiction could be based upon the arrest of property of the defendant owners other than that in respect of which the cause of action arose. This was the sole point argued before the County Court Judge, who decided that an action *in rem* against the steamship *Beldis* was maintainable.

The argument in this Court proceeded on the same lines. In the course of the argument, however, we directed attention to the question whether the issue was not based on a misconception, inasmuch as it asserted as a fact that the plaintiffs' claim in the action arose out of a charter-party, whereas the plaintiffs' cause of action appeared not to be upon the charter-party at all but upon an award, although the submission to arbitration was to be found in the arbitration clause of a charter-party.

Having regard to the fact that the parties had agreed upon the framing of the issue, neither Mr. Miller nor Mr. Bateson betrayed any marked enthusiasm for this point, though they both recognised that no agreement of the parties could give this Court jurisdiction to deal with a point, however interesting and important, which did not arise upon the actual facts of the case.

Mr. Miller, however, argued that if this Court had no jurisdiction to deal with the appeal, the plaintiffs were entitled to hold the judgment in their favour by virtue of the express agreement in the issue. This argument appears to me to be quite untenable. If the truth of the matter is that the plaintiffs' cause of action is nothing but a common law claim upon an award, it would be impossible nor has Mr. Miller attempted to contend that the admiralty process *in rem* would be available whether the property against which the action was directed was or was not the very thing in respect of which the cause of action arose. But the County Court Judge purported to be dealing, as a Judge, with an admiralty action *in rem*, and it seems to me to be quite impossible to hold, if the foundation of that jurisdiction was lacking, that he unconsciously assumed the burden of a private arbitration between the plaintiffs and the interveners. I am of opinion, for reasons which I will proceed to give, that this point is fatal to the jurisdiction of the County Court Judge, and consequently of this Court, notwithstanding the agreed wording of the issue. But in case I am mistaken in this view, and as the validity of the arrest is at the root of the proceedings and raises a point

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

264

of great importance which has been very well argued by Counsel on each side, I propose also to state my reasons for thinking that the judgment of the County Court Judge cannot in any event be supported. Our decision on this point will also have an important bearing on the question of costs.

Now, the importance of ascertaining whether the plaintiffs' claim in the action did or did not, in the words of the issue, "arise out of a charter-party of the s.s. *Belfri*, being a ship belonging to the same owners as the s.s. *Beldis*," will be seen upon a consideration of one of the statutes on which the jurisdiction of the County Court in admiralty is founded. By Sect. 2 of the County Courts Admiralty Jurisdiction Amendment Act, 1869, it is enacted, as follows:-

> Any County Court appointed or to be appointed to have Admiralty jurisdiction shall have jurisdiction, and all powers and authorities relating thereto, to try and determine the following causes: (1) As to any claim arising out of any agreement made in relation to the use or hire of any ship . . . provided the amount claimed does not exceed £300.

And by Sect. 3:

> The jurisdiction conferred by this Act and by the County Courts Admiralty Jurisdiction Act, 1868, may be exercised either by proceedings *in rem* or by proceeding *in personam*.

Mr. Miller insisted, and the argument is valid whether it tells for or against him, that the jurisdiction of a County Court is defined for the present purpose by this statute. It is not suggested that the claim is covered by any other words in the section. Unless, therefore, it can be shown that the plaintiffs' claim arose out of an agreement made in relation to the use or hire of a ship, it cannot be the subject of an admiralty action *in rem* in the County Court.

There was in fact no evidence before the County Court Judge as to the nature of the dispute arising under the charter-party of the *Belfri*, but the arbitrator's award has been put in before us and I am prepared to assume that both the claim on which he gave big award in favour of the plaintiffs, and the counterclaim which he dismissed, arose in respect of matters relating to the use or hire of the *Belfri* under

the charter-party. In other words, I am prepared to assume that, if those same matters had been the actual subject of the litigation before the County Court Judge, the *Alina*, 5 Ex. D. 227, would have been decisive to show that he had jurisdiction in admiralty.

But in my opinion the claim in this action was not based upon that foundation at all. It was an action upon the award. The award does not in fact show upon its face what was the nature of the claim made by the plaintiffs; nor is there any reason why it should do so, though incidentally it happens to show the nature of the counterclaim, which was dismissed. The particulars of the claim contain no reference to the nature of the dispute or disputes arising under the charter-party. This is perfectly correct, because it is no part of the cause of action upon an award to show what was the nature of the dispute. All that the plaintiff has to prove is that certain matters in dispute have been submitted to an arbitrator and that he has made his award in the plaintiff's favour. As a matter of pleading it is unnecessary and, as I think, irregular to specify the nature of the dispute: see Bullen and Leake, Precedents of Pleadings, 3rd Ed., pp. 71-74. The modern edition of that classic follows the same precedent: see 9th Ed., pp. 86-89. Quite plainly the cause of action is founded, in the summons in this case, upon the award itself and has no relation to the original dispute which gave rise to the arbitration.

That being so, I should not be prepared to hold, even if the matter were free from authority, that a claim upon an award held under the arbitration clause in a charter-party is a claim arising out of any agreement made in relation to the use or hire of a ship. I think that it is a common law claim upon an award and nothing else. It may be that, as the defendants are out of the jurisdiction, this means that the award is difficult of enforcement, whether by action or by proceedings under Sect. 12 of the Arbitration Act; but that circumstance affords no ground for bringing an admiralty action *in rem* in respect of a common law claim.

This view of the matter is supported, even if it is not concluded, by the decision of the Court of Appeal in *Regina* v. Judge of the City of London Court, [1892] 1 Q.B. 273. This case, which is also of great importance upon the other point, decided that no greater jurisdiction, except with regard

i-law.com
Case 1:08-cv-02351-HB    Document 20-2    Filed 05/17/2008    Page 21 of 33
Page 21 of 33

to charter-parties, was conferred upon County Courts by the County Courts Admiralty Jurisdiction Acts, 1868 and 1869, than that which was possessed by the Admiralty Court itself.

The point at issue in that case was whether an Admiralty action lay in respect of the negligence of a pilot. There could be no question but that a common law action would lie (see per Lord Esher, M.R., at p. 286): but the claim in such an action would then have been limited to £50, whereas if the admiralty jurisdiction was available the limit was £300. There would, of course, as was pointed out in the judgments, be other distinctions between the two jurisdictions resulting from the difference between the admiralty and common law doctrines as to the distribution of blame. The plaintiff relied on the words "and also as to any claim in tort in respect of goods carried in any ship," which are also contained in sub-s. (1) of Sect. 2 of the Act of 1869, part of which I have already quoted. In his judgment on p. 291 Lord Esher, M.R., makes it quite clear that he was prepared to hold that the admiralty jurisdiction of a County Court extended to a claim upon a charter-party only because he was bound by the *Alina, sup.*, so to hold; but he said that he would follow that case so far as it actually went, but not one inch farther. With this exception the Court decided that the admiralty jurisdiction of a County Court was coextensive with that of the Admiralty Court itself. That being the inch to which plaintiffs in a County Court are entitled, it is not difficult to imagine what Lord Esher would have said about the present attempt to take an ell. However that may be, I am not prepared to hold that a claim upon an award made under the arbitration clause of a charter-party is within the words "any claim arising out of any agreement made in relation to the use or hire of any ship."

Assuming, however, that I am wrong, and that the claim upon this award comes within the admiralty jurisdiction of the County Court, there remains the question, raised by the issue, whether the action *in rem* can be directed against property of the defendant owner other than that in respect of which the cause of action arose. I have some difficulty in understanding what, in relation to a claim upon an award, the *res* would actually be. But that may be said to be immaterial, because it is certain that the ship actually arrested, the steamship *Beldis*, could not possibly be the *res* connected with the cause of action.

The learned County Court Judge was invited to decide this issue upon a passage in the judgment of the Court of Appeal in the *Heinrich Bjorn*, 10 P.D. 44, at pp. 53 and 54. It is evident from his judgment that, having regard to his own considerable experience in Admiralty, he would probably have decided the issue the other way if he had not felt himself bound by the particular passage in the judgment in the *Heinrich Bjorn*. The passage is as follows:-

But how and in what manner was the new jurisdiction thus given to the Admiralty Court by the statute of 1840 to be exercised? The answer is, that it must be exercised in the manner familiar to the Court of Admiralty and to all Courts regulated by the civil law, either by an arrest of the person of the defendant if within the realm, or by the arrest of any personal property of the defendant within the realm whether the ship in question or any other chattel, or by proceedings against the real property of the defendant within the realm: the *Charkieh*, L.R. 4 A. & E. 59, at p. 91; see also per Dr. Lushington, the *Alexander Larsen*, 1 Wm. Rob. 288, at p. 294.

But if the material man may thus arrest the property to enforce his claim, how does his claim differ from a maritime lien? The answer is, that a maritime lien arises the moment the event occurs which creates it; the proceeding *in rem* which perfects the inchoate right relates back to the period when it first attached: "the maritime lien travels with the thing into whosesoever possession it may come": the *Bold Buccleugh*, 7 Moo. P.C. 267, at pp. 284 and 285; and the arrest can extend only to the ship subject to the lien. But, on the contrary, the arrest of a vessel under the statute is only one of several possible alternative proceedings *ad fundandam jurisdictionem;* no right in the ship or against the ship is created at any time before the arrest; it has no relation back to any earlier period; it is available only against the property of the person who owes the debt for necessaries; and the arrest need not be of the ship in question, but may be of any property of the defendant within the realm.

Mr. Bateson admitted that this passage was decisive against him, but argued that it was *obiter*, and that in any case it was wrong. Seeing that the decision is already

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

266

fifty years old it would be a strong thing to ask this Court to differ from the statement of the law contained in the passage I have quoted, if it was, as Mr. Miller contended, an integral part of the decision itself.

It is therefore necessary to consider whether this passage was or was not *obiter*, and to examine the facts in that case in order to see what the point was. The claim was for necessaries, and the cardinal fact was that at the time when she was arrested the *Heinrich Bjorn* had been sold to parties who were complete strangers to the cause of action. Her former owner had entered into an agreement in writing in respect of the supply of the necessaries. It was attempted, unsuccessfully, to assert that this agreement was a bottomry bond; alternatively, it was argued that there was a maritime lien on the ship in respect of necessaries. If there were a maritime lien the ship would, of course, be subject to the lien even in the hands of the new owners; but it was held that there was no maritime lien for necessaries, though it was recognised that a claim for necessaries would give a right to seize the ship for which the necessaries had been supplied in an action *in rem* against owners on whose behalf the debt had been incurred. This right, however, did not relate back so as to be available against strangers to the claim for necessaries to whom the property in the ship had passed before action brought. In other words, when once the question whether the particular agreement amounted to a bottomry bond, which for present purposes is irrelevant, was out of the way, the only question remaining for decision was whether the supply of necessaries gave rise to a maritime lien. If not, the arrest of the *Heinrich Bjorn* could not be justified, since at the material date, namely, the commencement of the action, although she was the *res* in relation to which the cause of action arose, she was not a *res* belonging to the defendant owner. It follows that it was quite unnecessary to consider whether property of the owner, other than the ship itself, was liable to arrest in an action *in rem*. The passage relied upon cannot, therefore, be regarded as a binding statement of existing law on this point, though naturally a statement of the law by a Court, composed as that Court of Appeal was, must carry weight.

It is, however, material to notice that Fry, L.J., in the passage quoted, couples with the arrest of the ship in question, or any other chattel, the arrest of the person of the defendant, if within the realm, and

proceedings against the real property of the defendant within the realm. Now, the last-known instance of the foundation of admiralty jurisdiction by the arrest of the person was in 1780; see the passage in Dr. Lushington's judgment in the *Clara*, Swab. 1, at p. 3, quoted below. As regards the statement that the admiralty jurisdiction was founded by proceedings against the real property of the defendant, this appears to be open to considerable doubt, as appears from the introduction to the 3rd Edition of the late Mr. Roscoe's book on Admiralty Practice, p. 43, note (y). With this qualification as regards proceedings against the real property of the defendant, I have no doubt that the passage relied upon is an accurate statement of the practice of the old Admiralty Court in former days. As regards arrest of the person, I propose to leave the matter where Dr. Lushington left it in the *Clara*, with this further observation, that the *Clara* was tried in 1855, fifteen years after the Acts of 1840 establishing the High Court of Admiralty; that no one would know better than Dr. Lushington what was the practice prevailing in admiralty at the time when those Acts were passed; and that it is common ground that since that decision in 1855 there is no trace of any attempt to found an admiralty action by the arrest of the person of the defendant.

As regards the arrest of property, there can, I think, be no doubt that the old Admiralty Court asserted the right to found jurisdiction by the arrest of any property of the defendant within the jurisdiction of the Admiral. This appears quite clearly from the introduction by Mr. Marsden to the Select Pleas in the court of Admiralty, published by the Selden Society, p. lxxi, which was relied on by Mr. Miller. The passage, of which the marginal note is "Points of law and practice; arrest," reads as follows:—

The following points may be noted as to the practice of the Court and the law which it administered: The ordinary mode of commencing the suit was by arrest either of the person of the defendant or of his goods. Arrest of goods was quite as frequent as arrest of the ship; and it seems to have been immaterial what the goods were, so long as they were the goods of the defendant and were within the Admiral's jurisdiction at the time of arrest. As pointed out below, the Admiral at this period asserted and exercised a jurisdiction

over all public streams, rivers, and waters, whether the same were within the body of a county or not. Scarcely a trace appears of the modern doctrine of arrest being founded upon a maritime lien; the fact that goods and ships that had no connection with the cause of action, except as belonging to the defendant, were subject to arrest, points to the conclusion that arrest was mere procedure, and that its only object was to obtain security that judgment should be satisfied. The form of the article upon first decree shows that the defendant was always cited "at"-*apud*-the goods or ship arrested, and that if he did not give bail to satisfy judgment the suit proceeded against him in his absence as well as against the *res*.

At p. 40 of the Introduction to the 3rd Edition of Roscoe's Admiralty Practice, the learned author cites Clerke's Praxis to the effect that

> If the defendant could not be personally arrested in a civil cause by reason of being out of the kingdom, or because he had absconded, and he had any goods, wares, ship, or part of a ship, or vessel upon the sea, or within the flux and re-flux of the sea, a warrant could be taken out to arrest such goods or such a ship belonging to the defendant debtor, in whoso hands soever they were; and upon the attachment of such goods the debtor was cited specially in respect of the goods, and generally all others who had or pretended to have any right to, or interest in, the said goods, to appear on such a day to answer the plaintiff in a certain maritime and civil cause.

He proceeds (p. 44) to show that this process was a proceeding *in rem* in the sense that, if the defendant did not appear, the suit could go on without in any way touching the person, and that by the operation of the judgment the defendant was deprived of his property in the chattel, unless he appeared, in which case the proceedings went on in the ordinary course as an action *in personam*. He attributes the development of this form of action to the prohibitions to which the old Admiralty Court was subjected by the Courts of common law if it attempted to act *in personam*.

But in my opinion, it would be most unsafe to arrive at any conclusion as to the scope of admiralty jurisdiction at and after the passing of the Acts of 1840, without bearing in mind that the old Admiralty

Court was consistently asserting claims to exercise jurisdiction which the Courts of common law as consistently prohibited. Even with regard to the claim which was the subject-matter of *Regina* v. Judge of the City of London Court, *sup.*, if the Select Pleas in the Court of Admiralty had been published at the time when Lord Esher gave his judgment I doubt whether he would have asserted as emphatically as he does on p. 298 that "from the beginning of time until now not one case is to be found in the Admiralty Court of any such action being entertained against a pilot." There are in fact the records of two such cases in that volume.

Again, on p. 293, contrasting the English and American Courts of Admiralty, the learned Master of the Rolls asserted that it was undoubted that no jurisdiction over a policy of insurance in respect of ships or goods has ever been attempted in England. But the Patent of the Admiralty Judge is set out in an article by the late Lord Phillimore under the title of "The High Court of Admiralty" in the Encyclop? dia Britannica, 14th Ed., Vol. 1, pp. 171-2. The Patent had been, in form, substantially unchanged from Tudor times, though the significant words "the statutes to the contrary notwithstanding" do not appear in the more modern patents. Jurisdiction in respect of policies of insurance is expressly mentioned; as is also the widest possible jurisdiction to arrest goods (see Warner v. Wheler, Marsden's Select Pleas in the Court of Admiralty, Vol. 1, p. 220). But it is generally recognised that the Patent was extravagant in its claims. A history of the struggle over jurisdiction is set out by Mr. Roscoe in the Introduction to which I have already referred. It may be assumed that the Admiralty Court did not submit to the limitations imposed by the Courts of common law without a protest. For example, a forcible expression of the point of view of the civilian is to be found in the remonstrance by Dr. David Lewis, the Admiralty Judge of Queen Elizabeth's time, which can be seen in the article on Doctors' Commons in Stow's "Survey of London." Again, the Black Book of the Admiralty, Vol. 1, contains an Ordinance directing an inquiry to be made concerning

> all those whoe doe sue any merchant, mariner, or other person whatsover at common law of the land for any thing of auntient right belonging to the maritime law

and directing that on conviction the plaintiff shall be.

fined to the King for his unlawfull and vexatious suite and besides shall withdraw his suite from the common law and shall bring it in the Admiralty Court, if hee will prosecute any further. [See the reprint in the Rolls Series, p. 83].

It is, however, unnecessary to elaborate this aspect of the matter. The point of Lord Esher's judgment in *Regina* v. Judge of the City of London Court is that, even if a particular jurisdiction was asserted by the Admiralty Court, the assertion must be considered in light of the prohibitions from time to time imposed by the Courts of common law, to which it was in those days always subject. It must always be remembered that it was not until the Acts of 1840 that the High Court of Admiralty was established as a Court with a jurisdiction defined by statute and a Judge whose salary was chargeable upon the Consolidated Fund and who was given in express terms all the privileges and protection appertaining to the Judges of the Courts of common law. In my opinion, the only safe rule is to assume that Parliament intended that the jurisdiction and practice then existing, but as extended and improved by the specific enactments of the statute, should thenceforward be the jurisdiction and practice of the Admiralty Court.

It is admitted that the industry of Counsel has not resulted in a single instance in which, either between the passing of the Acts of 1840 and the decision in the *Heinrich Bjorn* in 1885, or from then until the present time, property, other than that directly connected with the cause of action, has been arrested as the *res* in an admiralty action. On the contrary, as Scott, L.J., pointed out in the course of the argument, one aspect of the subject under discussion in the *Heinrich Bjorn* is eloquent to show that no such right was believed to exist. In the passage quoted above from the Introduction to the Select Pleas in Admiralty, Mr. Marsden speaks of the modern doctrine of arrest being founded on a maritime lien. This doctrine is clearly expressed in the opinion of the Privy Council given by Sir John Jervis in the *Bold Buccleugh*, 7 Moo. P.C. 267, at p. 284, where it is laid down that

A maritime lien is the foundation of the proceeding *in rem*, a process to make

perfect a right inchoate from the moment the lien attaches; and whilst it must be admitted that where such a lien exists, a proceeding *in rem* may be had, it will be found to be equally true, that in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing, to be carried into effect by legal process.

This view as to the coincidence of the maritime lien and the action *in rem* was expressly disapproved in the House of Lords in the *Heinrich Bjorn*, 11 App. Cas. 270: see in particular the speech of Lord FitzGerald, at pp. 285 and 286. But the very fact that in 1851 it should be possible for the Privy Council to lay down that the action *in rem* was exactly co-extensive with the maritime lien, which was said to be its foundation, shows that no one then contemplated that an action *in rem* could be founded on the arrest of property of the defendant owner unconnected with the circumstances giving rise to the lien.

This brings me to a consideration of the decision of the House of Lords in the *Heinrich Bjorn*, affirming the Court of Appeal. In the opening paragraph of his speech Lord Watson used the following words:—

The action is *in rem*, that being, as I understand the term, a proceeding directed against a ship or other chattel in which the plaintiff seeks either to have the *res* adjudged to him in property or possession, or to have it sold, under the authority of the Court, and the proceeds, or part thereof, adjudged to him in satisfaction of his pecuniary claims. The remedy is obviously an appropriate one in the case of a plaintiff who has a right of property or other real interest in the ship, or a claim of debt secured by a lien which the law recognises. We have been informed that under the recent practice of the Admiralty Court the remedy is also given to creditors of the shipowner for maritime debts which are not secured by lien; and in that case the attachment of the ship, by process of the Court, has the effect of giving the creditor a legal nexus over the proprietary interest of his debtor, as from the date of the attachment.

The position of a creditor who has a proper maritime lien differs from that of a creditor in an unsecured claim in this respect-that the former, unless he

[1935] Vol. 53
C.A.

Ll.L.Rep.
**Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."**

269

has forfeited the right by his own laches, can proceed against the ship notwithstanding any change in her ownership, whereas the latter cannot have an action *in rem* unless at the time of its institution the res is the property of his debtor.

In this passage Lord Watson, while stating that a maritime lien does give rise to an action *in rem* and recognising that an action *in rem* is also available in respect of maritime debts which are not secured by lien, is engaged in showing that in the one case the action survives, and in the other case does not survive, change of ownership of the ship. This statement is not, of course, quite exhaustive, because under neither heading need the *res* necessarily be a ship: it may be the cargo, or the proceeds of the ship or cargo, and arrest of the cargo may include arrest of the freight. But it is quite plain that in stating the modern practice of the Admiralty Court Lord Watson is regarding the *res* as being the very thing in respect of which the maritime debt, or the maritime lien, as the case may be, has arisen. There is not a hint in the passage quoted of the bringing of a maritime action against anything other than that which gives rise to the cause of action. It is quite true that in the House of Lords, as in the Court of Appeal, it was unnecessary, since it was decided that there was no maritime lien for necessaries, to discuss all possible aspects of the action *in rem*. But of the two statements of the law, both of which are *obiter*, this is the higher tribunal. Even if it does not purport to be exhaustive, I am convinced that it is correct as a statement of admiralty jurisdiction and practice in recent times and I propose to follow it.

This view, in my opinion, is supported by the *Dictator*, [1892] P. 304. The point for decision in that case was whether, in an action *in rem* in which bail had been given to avoid an arrest, the *res* was or was not subject to execution by writ of *fieri facias* in respect of a sum recovered in excess of the amount of the bail. Sir Francis Jeune held that the ship was not exempt from execution. After reviewing the early history of the action *in rem* the learned President says, at p. 313:-

> Actions beginning with arrest of the person became obsolete in practice; as Dr. Lushington says in the *Clara*, Swabey 1, at p. 3, in the last century, the last recorded instance being in 1780; and

arrest of property merely to enforce appearance became rare or obsolete, though in theory such arrest of the person or property would seem still to be permissible (per Fry, L.J., in the *Heinrich Bjorn*, 10 P.D. 44, at pp. 53, 54). On the other hand, arrest of property over which a lien could be enforced became more common as the idea of a pre-existing maritime lien developed, and arrest of property, in order to assert, for the creditor, that legal nexus over the proprietary interest of his debtor, as from the date of the attachment, of which Lord Watson speaks in the *Heinrich Bjorn*, 11 App. Cas. 270, at p. 277, grew up.

It will be observed that though Sir Francis Jeune used the words "rare or obsolete" in connection with arrest of property, he evidently regarded arrest whether of the person or property merely for the purpose of compelling appearance as being in the same category and only mentioned either as being theoretically permissible because of the *dictum* in the Court of Appeal in the *Heinrich Bjorn*. It is unlikely that if there had been any other subsisting foundation for the arrest of property unconnected with the cause of action Sir Francis Jeune would not have said so. It is worthy of note that Lord Watson founds his statement as to the nature of that kind of action *in rem* which is unconnected with a maritime lien upon recent admiralty practice. In the 3rd Edition of Williams & Bruce, on Admiralty Practice, at p. 249, the following passage occurs:-

> Admiralty proceedings may be *in rem* or *in personam*. By proceedings *in rem* the *property in relation to which the claim has arisen*, or the proceeds of such property when in Court, can be proceeded against, and made available to answer the claim. This method of proceeding is peculiar to Courts exercising admiralty jurisdiction, and generally it is in order to avail themselves of the advantages thus afforded that suitors resort to their jurisdiction. But in cases where the plaintiff does not desire to proceed against the property, the method of proceeding *in personam* may be resorted to.

In the late Lord Phillimore's article on admiralty jurisdiction in Vol. 1 of the Encyclop? dia Britannica, 14th Ed., pp. 173-4, it is plainly assumed, though not

L.l.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

expressly stated, that the *res* must be that in relation to which the claim has arisen. Finally, in pars. 94 and 95 of the title "Admiralty" in the 2nd Edition of Halsbury's Laws of England, for which Lord Merrivale and Langton, J., are responsible, it is stated definitely that both arrest of the person and arrest of any property belonging to him in tidal waters have become obsolete. Even if these statements of the law are not, strictly speaking, authorities, they make a formidable collection of views about the modern law and practice held by those best qualified to know what the law and practice are.

But Mr. Miller argued that once it was shown that the old law and practice were in his favour, it was immaterial that text writers, however eminent, declared that the law and practice had become obsolete. It must be shown how and why they had become obsolete. I am inclined to think that the solution is to be found in the passage from the Introduction to the Select Pleas in Admiralty quoted above. It will be recalled that Mr. Marsden draws the conclusion that arrest was mere procedure, and that its only object was to obtain security that the judgment should be satisfied. It may be that this was not the only, or indeed the primary, object, and that the original object of arrest, as Mr. Roscoe suggested in the Introduction to which I have already referred, was to found jurisdiction at a time when any attempt to assume jurisdiction *in personam* was prohibited by the Common Law Courts. It would appear, however, that even before actions *in personam* were recognised by the statutes to which I am about to refer, this method of procedure was adopted in the old Admiralty Court. In the *Milan*, Lush. 388, at p. 397, Dr. Lushington says that

By the ancient law of the Admiralty with respect to damage by collision, whether the damage was occasioned to ship or to cargo, the mode of proceeding was twofold, either by an action *in rem* or by an action *in personam*.

There are indications of this in the text books: see Williams & Bruce, 3rd Ed., p. 321, and Roscoe, 3rd Ed., p. 45, note (*e*); but it is difficult to define when this practice grew up or whether, or to what extent, it was recognised by the Common Law Courts. Probably the action *in personam* developed out of the original practice of founding jurisdiction by arrest

of the person (see per Jeune, P., in the *Port Victor*, [1901] P. 243, at p. 249) and grew as the latter fell into desuetude.

With regard to the statute law, there is no mention in the Acts of 1840 of either form of action. The first statutory reference to an admiralty action *in personam* appears to be contained in Sect. 13 of the Admiralty Court Act, 1854. Seeing that the Act deals almost entirely with procedure, and that the subject-matter of the section is not referred to in the preamble, which merely recites the expediency of resolving doubts about the administering of oaths and for providing for the collection of fees, it is unlikely that Sect. 13 was regarded as effecting any very revolutionary change in the law or practice. The section reads as follows:-

In all cases in which a party has a cause or right of action in the High Court of Admiralty of England against any ship or freight, goods, or other effects whatever, it shall not be necessary to the institution of the suit for such person to sue out a warrant for the arrest thereof, but it shall be competent to him to proceed by way of monition, citing the owner or owners of such ship, freight, goods, or other effects to appear and defend the suit, and upon satisfactory proof being given that the said monition has been personally served upon such owner or owners, the said Court may proceed to hear and determine the suit, and may make such order in the premises as to it shall seem right.

The right to issue a monition *in personam* against the owner or owners is given, but the right to proceed *in rem* is not taken away. It is clear, however, that in the case of arrest, the ship, freight, goods or other effects to be arrested are those in relation to which the cause of action arises. The words "cause or right of action against any ship or freight, goods, or other effects whatever" are perfectly apt to describe the arrest of the ship, freight, cargo, tackle and other apparel connected with the ship in respect of which the cause of action arose, but would be inapt in connection with a supposed right to arrest any other property of the defendant owner. Moreover the Rules, Orders and Regulations made by Order in Council, in pursuance of the Acts of 1840 and 1854, on Nov. 29, 1859, and the forms the use of which is thereby enjoined (See Coote's Admiralty Practice, 2nd Ed., p. 190 *et seq.*) lead to

the same conclusion. When, therefore, by Sect. 35 of the Admiralty Court Act of 1861 Parliament enacted that the jurisdiction conferred by that Act upon the High Court of Admiralty might be exercised either by proceedings *in rem* or by proceedings *in personam*, it was merely enlarging the jurisdiction, but not changing the forms of action by which that jurisdiction might be exercised.

Arrest, either of person or property, has long ceased, therefore, to be necessary in order to found jurisdiction. Nor is arrest of property, other than the thing in relation to which the claim arises, necessary in order to obtain security that the judgment shall be satisfied. It is true that, unless the defendant appears to an action *in rem*, satisfaction of the judgment is limited to the value of the *res*, but if the defendant appears, the action proceeds *in personam* as well as *in rem*. In such a case, as where the action is brought *in personam* in the first instance, execution can issue against any property of the defendant, including any surplus value of the *res* over and above the amount for which bail has been given (See the *Dictator, sup.;* the *Gemma,* [1899] P. 285; and the *Joannis Vatis,* [1922] P. 213 *). In my opinion, arrest of property unconnected with the claim was merely procedural, and the maxim *"cessante ratione leges cessat ipsa lex,"* applies. I for one am not prepared, to quote Lord Esher's words in *Regina* v. *Judge of the City of London Court, sup.,* at p. 299, to "reopen the floodgates of admiralty jurisdiction" upon the public, especially when that public is an international public and I can see that the innovation would be disastrous to the prestige of the Court.

Mr. Miller, however, submitted that even if it was established that in the Probate, Divorce and Admiralty Division the right to proceed *in rem* is limited to the *res* which gives rise to the cause of action, that cannot apply to the statutory jurisdiction given to a County Court. He relied in particular on the fact that the Act of 1869, as construed in the *Alina, sup.,* gave to County Courts an admiralty jurisdiction in respect of charter-parties, which plainly is not possessed by the Probate, Divorce and Admiralty Divisions. By Sect. 3 of the Act this extended jurisdiction may be exercised by proceedings *in rem* as well as *in personam*. Therefore, he argued, the

meaning of the words "proceedings *in rem*" in the Act of 1869 cannot be restricted to the process *in rem* as understood in the High Court.

I am not convinced by this argument. Sect. 3 of the Act of 1869 merely repeats, with reference to the County Court, the corresponding enactment with reference to the High Court of Admiralty contained in Sect. 35 of the Admiralty Court Act, 1861, which, as has already been shown, was merely declaratory of the effect of Sect. 13 of the Act of 1854. I see no ground for supposing that the Legislature meant to enact that the nature of the process should differ in the two cases, even if the causes of action in relation to which it could be employed were more extensive in the one case than in the other (See per James, L.J., in the *Alina,* 5 Ex. D. at p. 238).

In support of his construction of the statute Mr. Miller also relied upon Dr. Lushington's judgment in the *Alexander Larsen,* 1 Wm. Rob. 288. I do not think, however, that that judgment really assists his argument. The question there was whether the Act of 1840, which gave the High Court of Admiralty jurisdiction to decide all claims for, among other things, necessaries supplied to any foreign ship, enabled the Court to try a claim for such necessaries which had arisen before the passing of the Act. Dr. Lushington said in effect that the action could not have been entertained before the statute because it would probably have been prohibited, though it was plainly within the original scope of the maritime law, but that as the Legislature had recognised the cause of action, and there were no words prohibiting the Court from entertaining after the passing of the statute a claim which had arisen before the statute, there was jurisdiction to try the action. Whether the actual decision was or was not in accordance with the general principles governing the construction of statutes it is unnecessary to inquire, as it does not seem to me to touch the present point. What is important is that in the above decision given in the year after the setting up of the High Court of Admiralty, Dr. Lushington uses these words (*sup.,* at p. 294):-

The statute therefore simply confers upon the Court a jurisdiction to be employed in every lawful mode which the Court has the power to exercise for enforcing the payment; it might be by arresting the person of the owner if he

---

* Sub nom. *Worsley Hall v. Joannis Vatis,* 10 Ll.L.Rep. 756.

were resident here, or by arresting the property in case a necessity occurred.

As this passage is one of the foundations of the *dictum* in the *Heinrich Bjorn*, in the Court of Appeal, *sup.*, it is worth noting that it is a little surprising, having regard to what he said 14 years later in the *Clara*, *sup.*, that Dr. Lushington should be speaking in 1841 of arrest of the person as a lawful mode of exercising jurisdiction; but it is significant that even in connection with arrest of the person he speaks of the arrest not of "his" property but of "the" property, by which the context seems to show that he means the property in relation to which the claim has arisen. This appears even more clearly from the relevant passage in his judgment in the *Clara*, Swabey 1, where he says (at p. 3):-

In the Admiralty Court there were two modes of proceeding-by arrest of the person, or arrest of the ship. The proceeding by arrest of the person has now for many years been obsolete; I cannot exactly say how long, but I think there was a precedent in 1780; the amount of damage done was the only limit to the amount that might be recovered. The proceeding by arrest of the ship-or *in rem*, as it is called-was the most sure, for to the extent of the value of the ship the plaintiff would be sure of any amount of damage decreed.

But Mr. Miller also relied on Mr. Carver's argument in the *Zeta*, [1893] A.C. 468, at p. 475, as being a statement by an eminent Admiralty practitioner of the existing law. I think, however, that we are bound by the decisions both in that case and in the case of *Regina* v. Judge of the City of London Court, *sup.*, followed, as they recently were, by a Divisional Court in the *Champion*, [1934] P. 1,[*] to hold that, except with regard to the special case of charter-parties, the admiralty jurisdiction given to County Courts is that which was then exercised by the High Court of Admiralty.

In this connection the proviso to Sect. 8 of the Maritime Conventions Act, 1911, is significant. This section, which applies expressly to all Courts exercising admiralty jurisdiction in this country, imposes a limitation of two years upon any action to enforce any claim against a vessel or her owners (that is to say, upon an action

whether *in rem* or *in personam*) in respect, among other things, of any damage or loss to another vessel, her cargo or freight, or any property on board her caused by the fault of the former vessel, or in respect of any salvage services, but provides that

any Court having jurisdiction to deal with an action to which this section relates . . . shall, if satisfied that there has not during such period been any reasonable opportunity of arresting the defendant vessel within the jurisdiction of the Court . . . extend any such period to an extent sufficient to give such reasonable opportunity.

It is true that this section does not cover all cases in which proceedings *in rem* are available: but, between them, the two classes of case mentioned form the majority of admiralty causes. It is improbable that Parliament would have enacted this proviso with regard to the arrest of the defendant vessel if in an admiralty action in a County Court there was also jurisdiction to arrest any other property of the defendant owner within the realm.

For these reasons, like Lord Esher, I find it impossible to suppose that in 1869 Parliament meant to give to County Courts any jurisdiction wider, with the exception mentioned, than it had conferred on the High Court of Admiralty in 1840. The appeal does succeed, therefore, on the point actually argued before the learned County Court Judge.

As regards costs, the respondents bear the responsibility for starting this misconceived litigation with the original arrest of the ship. It is true that by concurring in the issue, which is also misconceived, the appellants have enhanced the costs. But I think that costs should follow the event. The appeal will be allowed with costs here and below. The costs in the County Court will be on the "C" scale.

**Lord Justice SCOTT** (read by Mr. Justice SWIFT): This appeal is from a judgment of the County Court Judge for Monmouthshire sitting at Newport on an issue agreed between the interveners in the action and the plaintiffs on the record, in which the interveners challenged the right of the plaintiffs to proceed *in rem* against the steamship *Beldis* belonging to the defendants. The action was brought in that Court in its admiralty jurisdiction by a plaint *in rem* dated Apr. 5, 1935, against the steamship *Beldis*. The particulars of

---

[*] 47 Ll.L.Rep. 40.

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

273

claim were expressed to be for money due and payable by the defendants, the owners of the steamship *Beldis*, to the plaintiffs under an award dated Jan. 24, 1935, in an arbitration held by virtue of a clause in a charter-party dated July 13, 1933, and made between the defendants and the plaintiffs, whereby the arbitrator awarded to the plaintiffs the sum of £27 4s. 6d. composed of an item of £19 7s. 6d. for money due in account and an item of £7 17s. for costs. Judgment was in default of appearance signed for the amount claimed.

After judgment Messrs. Lambert Bros., Ltd., sought to intervene. By their affidavit they stated that they were mortgagees of the steamship *Beldis* under a mortgage for £20,000 sterling registered at Oslo on May 25, 1929; they challenged the plaintiffs' right to proceed *in rem* against that ship, asked leave to enter an appearance on the grounds (*inter alia*) that the arrest of the steamship *Beldis* was illegal and that the proceedings were wrongly taken *in rem*, and prayed that the judgment signed in the action in their absence might be set aside. An issue was agreed between them and the plaintiffs in the following terms:-

We, the plaintiffs and the interveners in the above-named action, herewith submit the following sole issue to be tried by this Honourable Court, pleadings being waived:

Whether the plaintiffs' action *in rem* against the s.s. *Beldis* is maintainable in view of the fact that the plaintiffs' claim in this action arose out of a charter-party of the s.s. *Belfri*, being a ship belonging to the same owners.

The said parties agree that in the event of the question raised in this issue being answered in the affirmative, there shall be judgment for the plaintiffs with costs, and in the event of the question raised in this issue being answered in the negative, there shall be judgment for the interveners with costs.

The County Court Judge tried this cause and held on the authority of certain *dicta* of the Court of Appeal in the case of the *Heinrich Bjorn*, 10 P.D. 44, that the contention of the interveners was wrong and gave judgment against them. The interveners then appealed to this Court, the plaintiffs being respondents.

On the hearing of the appeal the said

award was produced to us and it appeared on its face that the charter-party in question was made not in respect of the steamship *Beldis*, the ship against which the action in *re rem* was instituted, but in respect of a different ship altogether, also belonging to the defendants, namely, the steamship *Belfri*. It further appeared from the award that the said sum of £19 7s. 6d. was a balance due to the plaintiffs in account, being in fact, as we were informed by Counsel, an overpayment of charter hire of the steamship *Belfri*.

The phraseology of the issue indicates that in the view of both parties the plaintiffs' action, although based on the award, was nevertheless a claim which arose "out of an agreement made in relation to the use or hire of a ship," because the arbitration had been held pursuant to an arbitration clause in the charter-party of the steamship *Belfri* and because the dispute before the arbitrator "had arisen out of" that agreement.

In the above circumstances two questions call for decision. Question 1: Assuming that "the cause" was one which could have been prosecuted *in rem* against the steamship *Belfri* under Sect. 3 of the County Courts Admiralty Jurisdiction Amendment Act, 1869, as a claim which arose "out of any agreement made in relation to the use or hire of any ship" within the meaning of Sect. 2 (1) of that Act, could it be prosecuted *in rem* against another ship belonging to the same owners, the steamship *Beldis*, with which the said charter-party had no concern? Question 2: Is the above assumption legally sound, when the plaintiffs were suing not on the charter-party but on an award of an arbitrator, merely because the arbitration had been held pursuant to an arbitration clause in such an agreement? Do the words "claim arising out of any agreement, &c.," cover such a cause of action?

In the Court below the parties to the issue were in conflict over Question No. 1, but Question No. 2 was not discussed, both sides apparently being in agreement in thinking that the Court could entertain such an action on an award as an admiralty cause *in rem*. No argument was addressed to us on this point until we directed the attention of Counsel to the doubt as to whether the County Court had any admiralty jurisdiction over such an action.

It is convenient to dispose of Question No. 2 first. The answer depends upon the

[1935] Vol. 53          Ll.L.Rep.                          274
C.A.             Anglo-Soviet Shipping Co., Ltd. v.
                         "Beldis."

true interpretation of the Act of 1869, construed in the light of the state of the law at the time when the Act was passed. Are the words of Sect. 2 (1) wide enough and clear enough to cover this action? Voluntary arbitrations at that date were governed by the provisions of the Acts of 9 & 10 Wm. III, cap. 15, and 1 & 2 Vict., cap. 110, Sect 18, and the Common Law Procedure Act, 1854. Then, as now, an action lay at common law to enforce an award (see Bullen & Leake, 3rd Ed.; Russell on Arbitration, 3rd Ed. (1864), p. 505); but the only other means of enforcing an award was either (a) by making the submission a rule of Court of Queen's Bench–with the consequence that a party acting in disobedience to the award could be attached for contempt (Common Law Procedure Act, 1854, Sect. 17, and 9 & 10 Wm. III, cap. 15, Sect. 1; see also Russell on Arbitration, 3rd Ed., Part III, Ch. V, p. 565 *et seq.*); or (b) by obtaining from the Common Law Court a rule absolute for payment of the sum awarded (see 1 & 2 Vict., cap. 110, Sect. 18; Russell on Arbitration, 3rd Ed., p. 612, and Jones v. Williams, (1839) 11 Ad. & E. 175, there cited).

This being the state of the law about the enforcement of "voluntary" awards, it was unlikely that an action on an award would in 1869 be assigned by Parliament to the High Court of Admiralty; and in the absence of clear words it would be wrong so to interpret the Act even assuming the words to be wide enough to include it. But the words of the statute "any claim arising out of any agreement made in relation to the use or hire of any ship" not only are not clear in the sense supposed, but in my view for the following reasons cannot include it.

By the early part of the 19th century, as a result of the long war with the Common Law Courts (to which I shall return in connection with Question No. 1) the categories of "admiralty causes" had become limited to damage, salvage, wages, bottomry and certain other causes arising out of maritime events and affairs of which there was then in truth a fairly well-defined list. Indeed, it was just because the jurisdiction in admiralty had become thus restricted, that the aid of the Legislature had to be invoked in order to effect the extensions of it contained in the Admiralty Court Acts, 1840 and 1861.

It is true that the Court of Admiralty was thereby given jurisdiction over several causes of action cognisable in either Common

Law or Chancery Courts, but each one was defined in precise, plain and carefully guarded terms; and in the case of those founded on contract, the cause of action was one directly based upon the maritime contract described in the section, e.g., towage and necessaries supplied to foreign ships (1840 Act, Sect. 6); necessaries to any ship anywhere (1861 Act, Sect. 5) and certain claims on bills of lading for damage, but each of the last two cases only if the shipowner was not domiciled in England and Wales. In my view, it would be entirely wrong to hold that an action on an award arising indirectly out of such a maritime contract was included by the words in the above sections.

Precisely the same reasoning applies to the language of the County Courts Admiralty Jurisdiction Act, 1868, with even greater force, since the assignment of admiralty jurisdiction to County Courts was a new departure and in that Act made rather experimentally. By it certain County Courts were given admiralty jurisdiction to try a limited list of what the Act called "admiralty" causes; and they were not given the full right of admiralty procedure *in rem*, being authorised to arrest (otherwise than in execution) only if it was probable that "the vessel or property to which the cause relates" would be removed out of the jurisdiction (Sect. 22). It is true that by Sect. 3 of the Act of 1869 the right of admiralty procedure *in rem* was conferred for the purposes of both Acts, but there was no change in the method of describing the permitted field of admiralty jurisdiction: there was merely an extension of the list of particular admiralty causes over which the Court was to have jurisdiction.

With the above history of Admiralty jurisdiction both before and since 1840, it would in my judgment be plainly wrong to say that under Sect. 2 (1) of the Act of 1869 a County Court has admiralty jurisdiction to entertain an action on an award upon a voluntary submission, merely because the arbitration was held pursuant to an arbitration clause in a charter-party for the reference of disputes arising out of that charter-party.

This conclusion is sufficient to dispose of the appeal and to show that the judgment of the learned Judge cannot stand, but in case the above interpretation of the words "arising out of any agreement, &c." be held by the House of Lords to be

[1935] Vol. 53     Ll.L.Rep.     275
C.A.     Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

wrong, I give my conclusion and reasons on Question No. 1 also. It is one of great commercial importance, for it applies to all proceedings *in rem* whether in County Courts or the Admiralty Division.

In many continental systems of law and procedure (e.g., in Germany, Sweden, Belgium, and to a certain extent in France) there is a right of arrest for founding jurisdiction and obtaining bail in respect of any ship or other property of a defendant although wholly unconnected with the cause of action sued on. But in England I have never heard of such an arrest and I do not believe any attempt has ever been made here to exercise such a right in practice within the memory of any living practitioner in the Admiralty Court until the plaintiffs in the present action made it. In my view there is no such right in English law to-day.

Mr. Miller for the respondents naturally relied strongly upon the expression of opinion in the Court of Appeal in the case of the *Heinrich Bjorn*, 10 P.D. 44, which appears in the judgment of the Court (composed of Brett, M.R., Bowen and Fry, L.JJ.) and delivered by Fry, L.J., at p. 54. The learned Lord Justice there says in regard to the procedure *in rem*: "The arrest need not be of the ship in question, but may be of any property of the defendant within the realm." That observation was, however, purely *obiter*. Apart from an unfounded contention of a bottomry bond, which the Court rejected, the only question of law relevant to the decision of the case was whether a maritime lien attaches in English law to a valid claim for necessaries. That was necessarily the sole issue in that case, since the ship for which the necessaries had been supplied had passed by sale from the ownership of the shipowner for whom the necessaries had been supplied to that of new owners who had nothing to do with the voyage when the necessaries were supplied. If there was a maritime lien the new owners took subject to the lien; if there was no maritime lien their ship was free and the plaintiff had no right to arrest it in their hands. The opinion of the Court in the *Heinrich Bjorn* is entitled to great respect; but it is not binding on us, and in my view the *dictum* is erroneous.

My reasons are as follow. There is little doubt that historically the jurisdiction of the Admiralty Court was originally exercised by employing either of two methods of procedure for bringing the defendant before the Court: (1) the arrest

of his person; (2) the seizure of his goods. There is more than one case in Marsden's Select Pleas of the Court of Admiralty which illustrates the arrest of goods other than the goods or ship concerned in the particular cause of action for the purpose of founding jurisdiction. But it seems to be equally clear that both methods had fallen into disuse before the beginning of the 19th century, probably as a result of the incessant war of jurisdiction waged by the Common Law Courts on the Admiralty Court in the 16th and 17th centuries. A full account of this long quarrel is contained in the 3rd Edition of Roscoe's Admiralty Practice, and that account may, I believe, be accepted as substantially accurate.

During the first half of the 19th century there emerges a fact of dominant significance. A belief had grown up in the minds of Admiralty practitioners that the ambit of admiralty procedure *in rem* was coterminous with the ambit of the maritime lien; that where there was a maritime lien the right to proceed *in rem* existed, and where there was no maritime lien the right to proceed *in rem* did not exist. This belief, strongly held and widely prevalent until judicially corrected, actually found expression in 1851 in the judgment of the Privy Council in the *Bold Buccleugh*, reported under the name of Harmer v. Bell, 7 Moo. P.C. 267. There the Privy Council themselves said in the judgment at p. 284:

Having its origin in this rule of the civil law, a maritime lien is well defined by Lord Tenterden, to mean a claim or privilege upon a thing to be carried into effect by legal process; and Mr. Justice Story, 1 Sumner 78, explains that process to be a proceeding *in rem*, and adds, that wherever a lien or claim is given upon the thing, then the Admiralty enforces it by a proceeding *in rem*, and indeed is the only Court competent to enforce it. A maritime lien is the foundation of the proceeding *in rem*, a process to make perfect a right inchoate from the moment the lien attaches; and whilst it must be admitted that where such a lien exists, a proceeding *in rem* may be had, it will be found to be equally true, that in all cases where a proceeding *in rem* is the proper course, there a maritime lien exists, which gives a privilege or claim upon the thing, to be carried into effect by legal process. This claim or privilege travels with the thing, into whosesoever possession it may come. It

[1935] Vol. 53
C.A.

Ll.L.Rep.
Anglo-Soviet Shipping Co., Ltd. v.
"Beldis."

276

is inchoate from the moment the claim or privilege attaches, and when carried into effect by legal process, by a proceeding *in rem*, relates back to the period when it first attached.

The view thus expressed, that the right to proceed *in rem* was limited to those cases where a valid maritime lien was recognised in admiralty law, was considered in the very case of the *Heinrich Bjorn*, upon which the plaintiffs in the present appeal mainly rely, both in the Court of Appeal (10 P.D. 44) and in the House of Lords (11 App. Cas. 270), and there finally negatived as wholly erroneous; but the fact that it was so long and so widely entertained throws much light on the contention raised in the issue before us. If everybody practising in admiralty had a firm belief that in order to arrest you must have a lien, they must equally have been satisfied that where there was no lien you could not arrest. If they believed that the right of proceeding *in rem* was thus limited, it follows that they must have recognised the impossibility of arresting any ship other than the particular ship to which the cause of action related-since *ex hypothesi* there could be no lien over a ship wholly unconnected with the cause of action. They could never have supposed that *another* ship of the same owner could be arrested in a cause for, e.g., damage or salvage, because *ex hypothesi* no maritime lien for damage or salvage could possibly attach to any but the delinquent ship or the salved ship. This historical misconception is to my mind conclusive proof that during the period of its prevalence the universal practice was to treat the right of procedure *in rem* as applicable only to the ship or property to which the cause of action related, and that the archaic right of arresting *other* property of a defendant, i.e., other than that with which the cause of action was concerned, had before that period fallen wholly out of use and become obsolete.

The complete absence of any reported case in the last 100 years, in which the present attempt to arrest a ship or property unconnected with the cause of action has ever been made before, is, indeed, of itself almost conclusive that the procedure *in rem* was not regarded in the Admiralty Court as extending to such other ships or property, and from this fact, too, I draw the inference that it had ceased to be permissible.

And this view seems to me to be implicit in the language of Parliament in the

County Courts Admiralty Jurisdiction Act of 1868. The Act of 1869 is to be read as one with the Act of 1868 (Sect. 1). By Sect. 3 of the Act of 1869 the Court is empowered to exercise its admiralty jurisdiction (under either Act) either *in personam* or by the ordinary admiralty procedure *in rem* in respect of any causes within the combined Act. By Sect. 21 (1) of the Act of 1868 the admiralty jurisdiction thus conferred is locally limited to the district within which the vessel or property "*to which the cause relates*" is at the time when proceedings are commenced. These provisions justify two comments. In the first place, they seem to presuppose the impossibility of applying the procedure *in rem* to any ship or property *unless the cause relates to it;* in other words, it is almost a statutory recognition of the existing practice which had then for long prevailed. In the second place, as the County Court has no admiralty jurisdiction beyond what is expressly conferred by the statute, its concomitant power to proceed *in rem* is equally confined, and it seems to me more consistent with sound interpretation to regard the procedural power as conferred in respect of the same *res* as that upon which the substantive jurisdiction is founded, viz., the *res* "to which the cause of action relates."

The language of the Maritime Conventions Act, 1911, to which the learned President has referred, is consistent with and supports the above conclusion. But the argument must nob be pressed too far. The proviso to Sect. 8 which enacts a statutory limitation of two years for the bringing of collision and salvage actions, subject to a power in the Court to extend the time if there has been no reasonable opportunity of arresting the defendant ship within the jurisdiction, merely repeats Art. 7 of the Convention, and that article was accepted with the above proviso by many continental nations who had in their codes of procedure the right of arresting property wholly unconnected with the cause of action and had no intention of altering their procedure; and the proviso has, since then, been put into force by several of them in their national legislation without any change being made in their method of procedure. The truth is that those Conventions were not intended by the High Contracting Parties to touch national laws of procedure. The late Lord Sterndale and I were delegates of the British Government at

[1935] Vol. 53                          Ll.L.Rep.                                  277
C.A.                        Anglo-Soviet Shipping Co., Ltd. v.
                                        "Beldis."

Brussels and conducted the negotiations and signed those Conventions; and we were alive to this wide difference between the procedural laws prevailing in many continental countries on the one hand and the British Empire on the other. The correct view of the proviso to Sect. 8 of the Maritime Conventions Act, 1911, is in my opinion therefore simply recognised and leaves unaltered the English admiralty procedure *in rem* as it had existed for at least a century.

For the above reasons the conclusion seems to me plain that the respondents here, plaintiffs below, had no right to arrest the steamship *Beldis* even if the cause did "arise out of the charter-party of the steamship *Belfri*." My answer to Question No. 1 is therefore also in favour of the appellants, the interveners.

The appeal ought to be allowed and judgment entered for them, with costs here and below; and the County Court costs should in my view be upon scale "C."

**Mr. Justice SWIFT:** By a claim dated Apr. 5, 1935, filed in the County Court of Monmouthshire holden at Newport, the plaintiffs claimed against the owners of the steamship *Beldis* the sum of £27 4s. 6d. payable by the defendants to them under an award made by an arbitrator dated Jan. 24, 1935, and on the following day a summons directed to the defendants was issued out of the said Court. The award was based upon a submission to arbitration contained in a charter-party of the steamship *Belfri* which belonged to the same owners as the steamship *Beldis*. The claim was made under the admiralty jurisdiction of the Court and the action purported to be an action *in rem*.

On Apr. 5, the steamship *Beldis* was arrested under admiralty procedure. Messrs. Lambert Brothers, Ltd., claimed to intervene in the said action as being the mortgagees of the *Beldis* and on Apr. 25 they were permitted so to intervene. Thereafter, the plaintiffs and the interveners submitted a "sole issue" to be tried by the Court as to "whether the plaintiffs' action *in rem* against the s.s. *Beldis* is maintainable in view of the fact that the plaintiffs' claim in this action arose out of a charter-party of the s.s. *Belfri*, being a ship belonging to the same owners."

On June 27 the question raised by that

issue was decided by the Court and the learned Judge held that the plaintiffs were entitled to succeed on that question and judgment in their favour was entered with costs. From that judgment the interveners appeal.

The cause of action alleged is an ordinary common law claim for payment of money due under an award. Such a cause of action is not one of those upon which jurisdiction in admiralty is conferred upon the County Court by Sect. 2 of the County Courts Admiralty Jurisdiction Amendment Act, 1869, nor is it a cause of action for which an action *in rem* could be brought apart from the County Courts Act. In my view, the proceedings were quite misconceived. The action could not be brought in the admiralty jurisdiction of the County Court at all and it could not be brought as an action *in rem*.

I think, therefore, that the whole action fails, that the parties had no right to propound any issue in such action for the decision of the Court, that the decision of the Court upon such issue was invalid and that the action should have been dismissed for want of jurisdiction and judgment should have been entered for the defendants and the interveners. That is sufficient, in my opinion, to dispose of this appeal, which should be allowed and the judgment set aside.

The parties, however, on the hearing of the appeal, argued at length the question which was raised before the County Court Judge, namely, whether an action *in rem* would lie against a ship or other property belonging to a person who was a party to the cause of action, but in respect of which cause of action the ship or other property sought to be made liable was in no way involved. I have read and agree with the judgments of the President and Scott, L.J., on this point and it is not necessary for me to say anything further than that in my view at the present time an action *in rem* will not lie save as against the ship or other property which is the very *res* in respect of or out of which the cause of action arises.

I agree that this appeal should be allowed, with costs here and below, and I agree that the costs in the County Court should be costs on scale "C."

Leave to appeal to the House of Lords was asked for, and granted.

**EXHIBIT   4**

[1999] Vol. 2                    LLOYD'S LAW REPORTS                    481

## QUEEN'S BENCH DIVISION
### (ADMIRALITY COURT)

June 16, 17; 22, 1999

---

### THE "BUMBESTI"

Before Mr. Justice AIKENS

**Admiralty practice - Action in rem - Jurisdiction - Arrest of vessel - Abuse of process of Court - Dispute under charter referred to arbitration in Romania - Action founded on award - Whether Court had jurisdiction in rem in respect of claim made by claimants - Whether arrest an abuse of process because claimants already had security for claim made - Supreme Court Act, 1981, s.20(2)(h).**

By a charter-party dated Feb. 27, 1995, the defendant Romanian corporation bareboat chartered their vessel *Dacia* to the claimants for a period of three years expiring on Mar. 27, 1998. The charter was governed by Romanian law and all disputes under the charter were to be referred to arbitration in Romania.

The claimants alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. The Constantza Court of Arbitration made two awards. Award No. 1 dated Mar. 3, 1998 ordered the defendants to return her to the claimants for the balance of the charter period and awarded damages to the claimants of U.S.$186,532. In Award No. 12 dated Nov. 10, 1998 the claimants were awarded a further U.S.$238,072 as damages for the wrongful early determination of the charter.

The arbitration awards were appealed. The appeal from Award No. 1 was dismissed by the Constantza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constantza Court of Appeal in April, 1999 but leave was granted to appeal to the Supreme Court. The defendants obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

On Feb. 4, 1999, in attempting to enforce the awards the claimants applied to the Constantza Court for execution of all movables and immovables of the defendants. Subsequently two bulk carriers, *Tirgu Lapus* and *Tirgu Neamt* owned by the defendants were arrested in Constantza and remained detained by the order of the Constantza Court.

On June 8, 1999 a claim form in this action was issued stating that the claimants brought their actions founded on Award No. 12. On June 9, 1999 *Bumbesti* was arrested in Liverpool and the sworn evidence to lead to the arrest stated that Award No. 12 remained wholly unsatisfied and that the aid of the Court was sought "to enforce payment of or security for the same". In respect of Award No. 1 two bank letters of guarantee were put up following the arrest of *Bumbesti* in Greece and the Netherlands and were sufficient to

meet any liability that the defendants had on that award.

The defendants applied to set aside these proceedings and or to release *Bumbesti* from arrest the issues for decision being: (1) Whether the Admiralty Court had jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constantza Court; (2) assuming that the Court had jurisdiction, whether *Bumbesti* should be released from arrest because the claimants already had adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constantza so that the arrest of *Bumbesti* was an abuse of the process of the Court.

The only basis of the Court's in rem jurisdiction relied on by the claimants was s. 20(2)(*h*) of the Supreme Court Act, 1981 which provided inter alia that the Admiralty Court had jurisdiction to hear and determine -

. . . any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship . . .

—*Held*, by Q.B. (Adm. Ct.) (AIKENS, J.), that (1) in order to succeed on their claim the claimants had to plead and prove the individual submission to the Constantza Court of Arbitration and Award No. 12 that they made on Apr. 12, 1999 pursuant to that submission; but no more than that need be proved; there was no need to plead and prove the underlying dispute under the charter (*see* p. 484, col. 2; p. 485, col. 1);

(2) the claim in this case was the action on the awards and clearly arose out of the agreement to refer to arbitration the disputes that had arisen under the bareboat charter; but that agreement to refer disputes was not, itself, an agreement in relation to the use or hire of a ship since the arbitration agreement to refer was a contract that was distinct from the principal contract, i.e. the bareboat charter (*see* p. 487, col. 2);

(3) the agreement to refer to arbitration disputes that had arisen under a charter-party must be agreements that were indirectly "in relation to the use or hire of a ship", but they were not agreements that were sufficiently directly "in relation to the use or hire of a ship"; the arbitration agreement was, at least, one step removed from the "use or hire" of a ship; the breach of contract relied on to found the present claim had nothing to do with the use or hire of a ship; it concerned the implied term to fulfil any award made pursuant to the agreement to refer disputes; and the breach of contract relied on when suing on the award did not have the reasonably direct connection with the use or hire of the ship that was necessary to found jurisdiction (*see* p. 487, col. 2; p. 488, col. 1);

(4) on the proper construction of par. (*h*) an action on an award was not one on an agreement which was "in relation to the use or hire of a ship"; and the Court had no jurisdiction to consider the claim under par. (*h*) of s. 20(2) of the Supreme Court Act, 1981 (*see* p. 488, col. 1);

—*The Beldis*, (1936) 53 Ll.L.Rep. 255, applied.

(5) the action and the claim form must be struck out and the service of the claim form in rem must be set

aside; the arrest of the vessel could not be maintained in respect of the claim (see p. 488, col. 1);

(6) on the evidence it was very unlikely that the two detained vessels in Romania would achieve more than a scrap value price if sold at Constantza; it was inherently more likely that the vessels would be sold for delivery rather than further afield and the sale value of the vessels at Constantza was between U.S.$300,000 and U.S.$340,000, i.e. enough to meet the claimants' claim (see p. 489, col. 1);

(7) the security obtained by the claimants for Award No. 12 in the form of detention of the two vessels by the Constantza Court was adequate security for the enforcement of that claim; and provided that the defendants confirmed that they would undertake not to disturb the enforcement proceedings in Constantza, *Bumbesti* would be released from arrest (see p. 489, col. 2).

---

The following cases were referred to in the judgment:

*Alina*, The (C.A.) (1880) L.R. 5 Ex. 227;

*Antonis P Lemos*, The (H.L.) [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711;

*Beldis*, The (C.A.) (1936) 53 Ll.L.Rep. 255; [1936] P. 51;

Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G., [1981] 2 Lloyd's Rep. 446;

Bloemen (F.J.) Pty. Ltd. v. Council of the City of Gold Coast, (P.C.) [1973] A.C. 115;

Bremer Oeltransport G.m.b.H. v. Drewry, (C.A.) (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753;

*Eschersheim*, The (H.L.) [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; (Q.B. (Adm. Ct.)) [1974] 2 Lloyd's Rep. 188; [1975] 1 W.L.R. 83;

Gascoyne v. Edwards, (1826) 1 Y. & J. 19;

Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co., (H.L.) [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255;

Harbour Assurance (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd., (C.A.) [1993] 1 Lloyd's Rep. 455; [1993] Q.B. 701;

Heyman v. Darwins Ltd., (H.L.) (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356;

*Rena K*, The [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377;

*Saint Anna*, The [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895;

*Zeus*, The (1888) 13 P.D. 188.

---

This was an application by the defendants the owners and/or demise charterers of the vessel

*Bumbesti* to release the vessel from arrest and/or to set aside the proceedings brought against the vessel by the claimants S.C. Rolinay Sea Star Srl on the grounds inter alia that the arrest was an abuse of process of the Court because the claimants already had adequate security in respect of the claims made and that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants.

Mr. Christopher Smith (instructed by Messrs. Hill Dickinson, Liverpool) for the claimants; Mr. David Garland (instructed by Messrs. Ince & Co.) for the defendants.

The further facts are stated in the judgment of Mr. Justice Aikens.

Judgment was reserved.

Tuesday June 22, 1999

---

### JUDGMENT

**Mr. Justice AIKENS:** This is an application to set aside these proceedings and/or to release the vessel *Bumbesti* from arrest. The claim form was issued on June 8, 1999 and the vessel was arrested in Liverpool on June 9, 1999. Initially the application notice sought an order to set aside the arrest. The ground stated was that the arrest was an abuse of the process of the Court because the claimants already had adequate security in respect of the claims made. However, Mr. Garland for the defendants/applicants made it clear in opening his application that the defendants had a further ground, which was that the Admiralty Court had no jurisdiction in rem in respect of the claim made by the claimants. During the hearing I gave leave to amend the application notice to include this point. Accordingly the application is now put on two bases, which are: (1) that the action in rem and/or the claim form should be set aside under CPR Part 3, r. 3.4(2)(h), on the ground that the Court has no jurisdiction in rem in respect of the claim sought to be made by the claimants in these proceedings. If this ground is successful, then the vessel must be released from arrest, subject to any caveats against release. Ground (2) is that the vessel should be released from arrest pursuant to the Admiralty Court's power to do so under par. 6.6(1)(b) of the Admiralty Court Practice Direction which supplements CPR Part 49, on the basis that the arrest is an abuse of the Court process because the claimants

Case 1:08-cv-02351-HB    Document 20-3    Filed 05/17/2008    Page 4 of 43
i-law.com

already have adequate security for the claim made.

### 2. The facts

The defendants are Compania de Navigatie Mari- timie Petromin S.A., which is a Romanian corporation. They were the owners of the vessel *Dacia*. The vessel was bareboat chartered to the claimants by a charter-party dated Feb. 27, 1995. The charter was for three years and was due to expire on Mar. 27, 1998. The charter provided (by cl. 26) that it was governed by Romanian law. Clause 26 also stipulated that disputes would be "solved" by arbitration which was to be organized by the "Chamber of Commerce, Industry and Navigation of Constantza County in accordance with the Rules of Arbitrational Procedure" of that chamber. Clause 55 of the charter provided that disputes between the parties were to be "solved in accordance with the laws of the Romanian State, such laws governing this Charter (see Clause 26)". It was therefore common ground at the hearing that the proper law of the charter was Romanian law and that the procedural law of the arbitrations which have taken place was Romanian law.

3. Disputes did arise under the charter. The claimants, as charterers, alleged that the defendants wrongfully terminated the charter early in January, 1998. This resulted in two arbitration references. Two awards were made by the Constantza Court of Arbitration. They were called Arbitration Award No. 1 and No. 12. Award No. 1, dated Mar. 3, 1998, ordered the defendants, as owners of the vessel, to return her to the claimants for the balance of the charter period, i.e. 53 days. The claimants were also awarded damages of U.S.$186,532 and further sums in respect of stamp duty and legal fees. The vessel was not returned for the balance of the charter. In Arbitration Award No. 12, dated Nov. 10, 1998, the tribunal awarded the claimants a further U.S.$238,072 as damages for the wrongful early determination of the charter. It also awarded further sums in respect of stamp duty and costs. The total sum awarded to the claimants was therefore U.S.$424,604 plus stamp duty and lawyers' fees.

4. The claimants appealed the arbitration awards. The appeal from Award No. 1 was dismissed by the Constantza Court of Appeal on Mar. 30, 1999 and by the Supreme Court of Justice on Apr. 14, 1999. The appeal from Award No. 12 was dismissed by the Constantza Court of Appeal in April, 1999. However, leave has been granted to appeal to the Supreme Court and the hearing will take place on Dec. 2, 1999. The defendants have obtained an order from the Romanian Supreme Court for the general suspension of any enforcement of Award No. 12 until July 13, 1999.

5. The claimants have attempted to enforce the two awards. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution of all movables and immovables of the defendants in order to meet the sums due on both awards. In respect of Award No. 1 the claimants have put up two bank letters of guarantee following the arrest of *Bumbesti* in Greece and the Netherlands. Those bank guarantees are, in my judgment, sufficient to meet any liability that the defendants have on that award. The bank guarantee in Greece is the subject of proceedings there, but I am satisfied that, quite apart from the vessels in Constantza, the claimants have adequate security for Award No. 1.

6. On Feb. 4, 1999 the claimants applied to the Constantza Court for execution against the defendants in respect of the two awards. Subsequently, two identical bulk carriers that are owned by the defendants, *Tirgu Lapus* and the *Tirgu Neamt*, were seized in Constantza pursuant to commands of the Court of Constantza made on Feb. 9, 1999. The commands required the defendants to pay the sums due under the two awards within 24 hours, or, if they failed to do so, then the vessels, which were identified in the Commands, would be "prosecuted and auctioned off". The exact legal characterization of the process by which the vessels have been detained is in dispute between the parties. But the present position appears to be that both vessels remain detained by order of the Constantza Court, despite attempts by the defendants to rescind the orders. Further, an order for the sale, by public auction, of the two vessels was made by the Court at some date in April, 1999. The auction was set to take place on Apr. 30, 1999. A buyer was found for the two vessels at a price of U.S.$660,000 for the pair, but the deposit was not lodged in time. So the sale was cancelled. Subsequently, on June 8, 1999, the order permitting enforcement against *Tirgu Lapus* was cancelled by the Constantza Court. However, two stamped certificates (one for each vessel), both dated June 15, 1999 and issued by the Constantza harbour master's office, state, in English, that the vessels are arrested. That state of affairs is accepted by both parties.

7. The claim form in this action was issued on June 8, 1999. It states that the claimants bring their action "founded on" the arbitration award dated Nov. 10, 1998 (i.e. Award No. 12). On the following day, June 9, 1999, *Bumbesti* was arrested in Liverpool. The sworn evidence to lead the arrest states that the Award No.12 remains wholly unsatisfied and that the aid of the Court is sought "to enforce payment of or security for the same". The sworn evidence states that security of U.S.$300,000 is sought.

### 8. *The issues*

The principal issues are:

(1) whether the Admiralty Court has jurisdiction in rem to hear and determine a claim to enforce the arbitration Award No. 12 made by the Constantza Court. The only basis of the Court's in rem jurisdiction relied on by the claimants is s. 20(2) par. (*h*) of the Supreme Court Act, 1981. By that paragraph the Admiralty Court has jurisdiction to hear and determine "any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship". (It is common ground that if the claim comes within that paragraph then, pursuant to s. 21(4) of the 1981 Act the in rem jurisdiction of the Court could be invoked. No point was taken by the defendants on s. 21(4)(a) that this claim did not "arise in connection with a ship");

(2) assuming that the Admiralty Court has jurisdiction, then whether *Bumbesti* should be released from arrest because the claimants already have adequate security for their claim to enforce Award No. 12 because of the detention of the two vessels in Constantza, so that the arrest of *Bumbesti* is an abuse of the process of the Court.

### 9. *Principal issue one: The nature of the claim to enforce Award No. 12*

The proper law governing the arbitration procedure and Award No. 12 was agreed to be Romanian law. However, I received no evidence that Romanian law differs from English law on the nature of an arbitration award and the effect of an award being made. In English law it is clear that if a claim for damages is referred to arbitration and an arbitration award is made awarding the payment of damages, this creates a new right of action for the enforcement of the award that replaces the original cause of action. Strictly speaking the doctrine of "merger" does not apply in the way that it does to an action brought in Court and there could be debate on the precise juridical basis for the rule relating to awards: see Mustill & Boyd on Commercial Arbitration, 2nd. ed., p. 410. But it has been accepted since at least *Gascoyne v. Edwards*, (1826) 1 Y. & J. 19 that a claimant cannot bring a further claim in personam on the original cause of action (if the original cause of action was for damages) once he has an award. (As noted below, it is possible to bring an action in rem: (see *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377).)

10. The "brief details of claim" endorsed on the claim form in this case state:

The Claimants bring their action founded on the Arbitration Award dated 10 November 1998, made by The Chamber of Commerce, Industry, Navigation and Agriculture, (CCINA), Constantza, Romania. The said award was in respect

of the premature termination of the charterparty dated March 1995, of the *MV "Dacia"*, at that time owned by the Defendant.

It is therefore clear that the claim is one to enforce the award. What is the nature of a claim to enforce an award? It could be a claim for a debt, being the sum awarded. Alternatively it could be a claim for liquidated damages, for a breach, by the party due to pay, of an implied obligation to fulfil the award made. Both solutions have been suggested in the cases. However, the preferred analysis by the Court of Appeal in the leading case of *Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753 was that a claim on an award is a claim for damages for the breach of an implied term in the submission to arbitration that any award made would be fulfilled: see particularly per Lord Justice Slesser at p. 138; p. 764 with whom Lord Justice Romer agreed. That analysis was adopted by Lord Pearson in giving the advice of the Privy Council in *F. J. Bloemen Pty. Ltd. v. Council of the City of Gold Coast*, [1973] A.C. 115 at p. 126. He emphasized that in the case of an arbitration award a new cause of action arises once the award is made, but that the award "cannot be viewed in isolation from the submission under which it was made". Therefore a claimant wishing to enforce an award in English proceedings has to prove not only the award, but also the submission to arbitration which gave the arbitrators power to make their award and which contained the implied term that the parties would fulfil any award made pursuant to the submission.

11. That gives rise to a further question: which "submission" to arbitration is being referred to here? As Mr. Justice Mustill made clear in *Black Clawson International Ltd. v. Papierwerk Waldhof-Aschaffenburg A.G.*, [1981] 2 Lloyd's Rep. 446 at p. 455, there are two "submissions" which govern the arbitration of disputes under a substantive contract. First, there is the contract to submit future disputes to arbitration; this will often be annexed to the substantive contract between the parties, in this case the bareboat charter-party. Secondly, there is the contract that is created when a particular disputes arises and the parties refer that dispute to arbitration. The implied term to fulfil the award made must, in my view, be contained in the contract that is created between the parties when the individual dispute arises and it is referred to arbitration. However, in practice there is bound to be reference to the initial general submission to refer disputes to arbitration, as that is the basis upon which individual references will be made.

12. On this analysis, in order to succeed on their claim, the claimants must plead and prove the individual submission to the Constantza Court of arbitration and Award No. 12 that they made on

**LLOYD'S LAW REPORTS**
The "Bumbesti"

Apr. 12, 1999 pursuant to that submission. But no more than that need be proved. There is no need to plead and prove the underlying dispute arising under the charter-party.

13. *Is the claim to enforce the award within s. 20(2)(h) of the SCA, 1981*

The next question must be: does this claim to enforce the award fall within the terms of s. 20(2)(h) of the Supreme Court Act, 1981? Mr. Smith says that it does and he relies upon the decision of Mr. Justice Sheen in *The Saint Anna*, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895, in which the Judge held that an action to enforce an award made in respect of a contract for the hire of a ship was within par. (h). Mr. Garland has submitted that *The Saint Anna* was wrongly decided and that Mr. Justice Sheen should have followed the decision of the Court of Appeal in *The Beldis*, (1936) 53 Ll.L.Rep. 255; [1936] P. 51, which, he said, was binding. In view of these submissions, it is necessary to consider briefly the statutory history of par. (h) and some of the decisions that have dealt with it.

14. *The statutory history of par. (h)*

The history has been considered by the House of Lords in a number of recent cases: see *The Eschersheim*, [1976] 2 Lloyd's Rep. 1; [1976] 1 W.L.R. 430; *Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co.*, [1985] 1 Lloyd's Rep. 181; [1985] A.C. 255; and *The Antonis P Lemos*, [1985] 1 Lloyd's Rep. 283; [1985] A.C. 711. From these cases the history of par. (h) is established as follows:

(1) Paragraph (h) in the 1981 Act reproduced, in the same words, par. (h) of s. 1(1) of the Administration of Justice Act, 1956. That section had been enacted to give force in England to the International Convention for the Unification of Certain Rules relating to the Arrest of Seagoing Ships made in Brussels on May 10, 1952 ("the Arrest Convention"). In the Arrest Convention a number of "maritime claims" in respect of which a ship could be arrested are set out at art. 1 under the terms of the Convention. The wording of the Convention is exactly reproduced in the Scottish section of the 1956 Act (s. 47(2) (d) and (e)). But although two paragraphs have been rolled into one in s. 1(1)(h) of the 1956 Act, their effect is not materially different.

(2) The wording of the Arrest Convention list of "maritime claims" was itself based upon the list of the types of claim set out in s. 22(1)(a)(xii) (1) of the Supreme Court of Judicature (Consolidation) Act, 1925, for which the Admiralty jurisdiction of the High Court could be invoked. This re-enacted

s. 5(1)(a) of the Administration of Justice Act, 1920. That was the first Act to confer Admiralty jurisdiction on the High Court to consider this type of claim. Neither the High Court of Admiralty, nor its successor (from 1875), the Probate Divorce and Admiralty Division of the High Court, had jurisdiction over claims of the type now covered by par. (h).

(3) However, prior to 1920 the County Court did have a limited Admiralty jurisdiction for that type of claim. The jurisdiction was conferred by the County Courts Admiralty Jurisdiction Act, 1868, amended by the County Courts Admiralty Jurisdiction Amendment Act, 1869. Section 2(1) of the latter Act provided that County Courts appointed to have Admiralty jurisdiction could try and determine "any claim arising out of any agreement made in relation to the use or hire of any ship. . .".

(4) Therefore the wording in the 1981 Act can trace its ancestry back to the 1869 Act. The difference in the words used are not significant, as Mr. Justice Brandon observed in *The Eschersheim*: see [1974] 2 Lloyd's Rep. 188 at p. 195, col. 1; [1975] 1 W.L.R. 83 at p. 93G.

15. *The early cases on the construction of par. (h)*

The three House of Lords' cases I have referred to have also considered the Courts' construction of the predecessors of par. (h) and that paragraph in the 1981 Act. The Courts construed the 1869 Act paragraph restrictively. They were reluctant to give the County Court a wider Admiralty jurisdiction than the High Court, particularly in relation to charter-party disputes, as that would interfere with the common law Courts which had always asserted exclusive jurisdiction in such cases. Thus it was only in *The Alina*, (1880) L.R. 5 Ex. 227 that the Court of Appeal held that claims arising out of charter-parties were covered by s. 2(1) of the 1869 Act. But in a significant case after *The Alina*, *The Zeus*, (1888) 13 P.D. 188, the Divisional Court held that a claim arising out of a contract to load a ship with coals was not within s. 2 of the 1869 Act. Mr. Garland relied on that case and the fact that it was approved in the House of Lords in both the *Gatoil* case (see p. 187, col. 2; p. 270E per Lord Keith of Kinkel) and *The Antonis P Lemos* (see per Lord Brandon at p. 290; col. 2-p. 291, col. 1; p. 730 G-H). In those cases the House of Lords held that *The Zeus* was authority for a narrow construction of the words "relating to" in s. 2 of the 1869 Act and its statutory successor paragraphs.

16. *The Beldis, (1936) 53 Ll.L.Rep. 255 [1936] P. 51*

The wording of s. 2(1) of the 1869 Act was again considered by the Court of Appeal (The President,

Sir Boyd Merriman, Lord Justice Scott and Mr. Justice Swift) in *The Beldis*, (1936 53 Ll.L.Rep. 255; [1936] P. 51. A claim had been referred to arbitration to recover overpaid charter hire in respect of a charter for a ship called *Belfri*. An award was made in favour of the plaintiffs in the subsequent action, Anglo Soviet Shipping Co. They started a County Court action in rem against a sister-ship of *Belfri*, called *Beldis*. The claim was to recover the sum awarded by the tribunal. The defendant owners did not appear and judgment was entered against them in default. The mortgagees then intervened. The parties put one agreed issue before the County Court Judge. That was whether an Admiralty action in rem could be maintained against *Beldis* when the original claim arose out of a charter-party for *Belfri*. He decided that it could be maintained. When the matter came before the Court of Appeal the President raised the issue of whether there was jurisdiction in rem to deal with this type of claim at all. It appears from the report of the argument (see p. 58 of [1936] P.) that Mr. Owen Bateson for the appellant mortgagees did not take up the jurisdiction point, although he did refer the Court to three cases on the issue, including *The Zeus*.

17. In a reserved judgment the Court held that the claim on the award did not come within s. 2(1) of the 1869 Act. Therefore the County Court could not exercise jurisdiction in rem. The President accepted that if the action had been for the claim that was the subject of the reference to the arbitrator, then they would have fallen within the section, following *The Alina*: see p. 264; p. 61. But he held that this was entirely different from a claim on the award. He pointed out that a plaintiff claiming on an award has only to plead and prove "that certain matters in dispute have been submitted to an arbitrator and that he has made his award in the plaintiff's favour". The President emphasized that it was not necessary, indeed positively wrong, to plead the nature of the original dispute. He concluded that he was not prepared to hold that "a claim upon an award held under the arbitration clause in a charterparty is a claim arising out of any agreement made in relation to the use or hire of a ship". He held it was a "common law claim upon the award and nothing else". The President went on to hold that, if there had been jurisdiction, it was not possible to bring the action in rem against a sistership that was unconnected with the cause of action. Both Lord Justice Scott and Mr. Justice Swift agreed on the second point of decision.

18. Lord Justice Scott noted that when the 1869 Act was passed, there was a statutory means for enforcing arbitration awards by obtaining from one of the three common law Courts a rule absolute for payment of the sum awarded: see p. 274; p. 82.

Therefore, he remarked, it was unlikely that an Admiralty jurisdiction would be created to enforce an arbitration award, unless the statutory wording clearly did so. He concluded that the wording of s. 2(1) clearly did *not* confer this jurisdiction. He also pointed out that the history of the statutory extension of the Admiralty Court's jurisdiction in the 1840 and 1861 Acts was in –

. . .precise, plain and carefully guarded terms; and, in the case of those founded on contract, the cause of action was one directly based upon the maritime contract described in the section.

In his view, because of this approach, it would be "entirely wrong to hold that an action on an award arising out of such a maritime contract was included by the words of" the 1840 and 1861 Acts which gave the Admiralty Court jurisdiction over certain types of contractual claim e.g. in relation to towage and bills of lading. He concluded that the legislature must have adopted a similar approach to the County Court jurisdiction in Admiralty. He therefore concluded:

. . .it would in my judgment be plainly wrong to say that under s. 2 sub-s.1 of the 1869 Act a County Court has Admiralty jurisdiction to entertain an action on an award upon a voluntary submission, merely because the arbitration was held pursuant to an arbitration clause in a Charter-party for the reference of disputes arising out of that charter-party.

19. The decision in *The Beldis* stood undisturbed until 1983. In *The Eschersheim* Mr. Justice Brandon commented on it (at p. 196, col. 1; p. 94F-G), saying that the basis of the decision was that the relevant claim did not arise out of the agreement (i.e. the charter-party), although the agreement related to the use or hire of a ship. He commented that that ground of decision in the *The Beldis* "does not seem to be consistent with *Bremer Oeltransport G.m.b.H. v. Drewry*, (1933) 45 Ll.L.Rep. 133; [1933] 1 K.B. 753, which was apparently not cited". As already noted, the Court of Appeal in that case had held that an action on an award was founded on the breach of an implied term in the agreement to submit the differences of which the award was the result. Therefore the Court held that, for the purposes of the existing O. XI r. 1(e), the claim on an award was one "to enforce a contract made within the jurisdiction". (This was so, even though the award itself was made in Hamburg.) I am not sure that Mr. Justice Brandon was correct to suggest that in *The Beldis* the Court of Appeal was emphasizing that it was the first part of the sentence of the section (i.e. "claim arising out of any agreement") that was not fulfilled. The President

[1999] Vol. 2            **LLOYD'S LAW REPORTS**               **487**
Q.B. (Adm. Ct.)                  The "Bumbesti"               AIKENS, J.

refers to the whole sentence at p. 264, col. 1; p. 63 and Lord Justice Scott recognized that the action on the award arose "indirectly" out of the maritime contract; see p. 274, col. 2; p. 83. However, it should be noted that Mr. Justice Brandon did not say that *The Beldis* was decided per incuriam although he clearly had doubts about it.

### 20. *The Saint Anna, [1983] 1 Lloyd's Rep. 637; [1983] 1 W.L.R. 895*

The issue of whether an action on an award could be the subject of an Admiralty action in rem arose in this case, in which the plaintiffs sought judgment in default of defence. The action was on an award made in favour of charterers and against the owners of *Saint Anna*. That vessel had been arrested and sold by the Admiralty Marshal at the suit of numerous claimants. The plaintiffs had issued a writ in rem against the proceeds of sale of the vessel. Mr. Justice Sheen heard argument only from the plaintiffs, but both *The Beldis* and *Bremer Oeltransport* were cited, as were the passages of Mr. Justice Brandon in *The Eschersheim* and relevant text books. Having referred to both cases, Mr. Justice Sheen concluded: (1) that *Bremer Oeltransport* was clear authority for the proposition that an action based upon an award is an action for the enforcement of the contract which contains the submission to arbitration, i.e. the charter-party; (2) an action to enforce an award necessitates pleading and proving the arbitration submission and the award; (3) a claim to enforce a charter-party is within the Admiralty jurisdiction of the High Court; (4) because one ground of decision of *The Beldis* was inconsistent with *Bremer Oeltransport* -

. . .that leaves me free to decide which authority I should follow. As the decision in *[Bremer]* was not brought to the attention of the Court of Appeal during argument in *The Beldis* and as I find myself convinced by the reason in the latter case, I have no hesitation in following it.

21. Mr. Smith drew my attention to the fact that *The Saint Anna* has been followed in the Hong Kong and Singapore Courts. He also submitted that it has been referred to in text books without criticism, save for a cautionary note in Dicey & Morris on The Conflict of Laws (12th ed.; pp. 605 and 608). So far as Counsel can discern, there is no reported decision either following it or dissenting from it in England. However, in the *Gatoil* case in the House of Lords, Lord Keith of Kinkel refers, without comment, to the decision of the Court of Appeal in *The Beldis* but *The Saint Anna* was not cited. Nor was it in *The Antonis P Lemos*.

### 22. *Conclusion on principal issue one: Is a claim on an arbitration award within par. (h) of s. 20(2) of the Supreme Court Act, 1981?*

I have come to the conclusion that the answer 1 must give to this question is "no". I think that it is not within the paragraph as a matter of construction. I also consider that I am bound by the decision of the Court of Appeal in *The Beldis*. My reasons are as follows:

(1) The "claim" in this case is the action on the award. That "claim" clearly "arises out of" the agreement to refer the disputes that had arisen under the bareboat charter-party. In *The Antonis P Lemos* the House of Lords held that the phrase "arises out of" in par. (*h*) should be given a broad construction, so as to mean "in connection with": see p. 290, cols. 1 and 2; p. 731F. Upon the analysis of the Court of Appeal in *Bremer Oeltransport* a claim on an award "arises out of" or is "in connection with", the agreement to refer the particular dispute to arbitration, or the agreement to refer future disputes generally to arbitration.

(2) However, that agreement to refer disputes is not, itself, an "agreement in relation to the use or hire of a ship". This is because the arbitration agreement, whether it is the individual reference or the general agreement to refer, is a contract that is distinct from the principal contract, i.e. the bareboat charter-party in this case. The distinction between the contracts is, as Mr. Garland submitted, made clear in cases such as *Heyman v. Darwins Ltd.*, (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356; and *Harbour Assurance (U.K.) Ltd. v. Kansa General International Assurance Co. Ltd.*, [1993] 1 Lloyd's Rep. 455; [1993] Q.B. 701; and see s. 7 of the Arbitration Act, 1996.

(3) In *The Antonis P Lemos*, at p. 289, col. 2; p. 730 F-G, the House of Lords accepted that the authorities on par. (*h*) of the 1981 Act and its statutory predecessors made it clear that a narrow meaning must be given to the expression "in relation to" in that paragraph. The agreement to refer to arbitration individual disputes that have arisen out of a charter-party, or the agreement to refer future disputes in general that arise out of a charter-party, must be agreements that are *indirectly* "in relation to the use or hire of a ship". But, in my view, they are not agreements that are *sufficiently directly* "in relation to the use or hire of a ship". The arbitration agreement is, at least, one step removed from the "use or hire" of a ship. The breach of contract relied upon to found the present claim has nothing to do with the use or hire of the ship; it concerns the implied term to fulfil any award made pursuant to the agreement to refer disputes. In my view the breach of the contract relied on when suing on an award does not have the

[1999] Vol. 2        LLOYD'S LAW REPORTS        488
Q.B. (Adm. Ct.)        The "Bumbesti"        AIKENS, J.

"reasonably direct connection with" the use or hire of the ship that Lord Keith held in the *Gatoil* case was necessary to found jurisdiction under this paragraph: see p. 188, col. 1; p. 271A-B.

(4) Therefore, upon the proper construction of par. (*h*), an action on an award is not one on an agreement which is "in relation to the use or hire of a ship". This was the conclusion of the Court of Appeal in *The Beldis*. The current paragraph is the statutory successor to the wording that was considered in that case. Unless there is some material distinction in the wording, then I believe that I must follow the construction given by the Court of Appeal to the wording in that case. There is no significant distinction, as Mr. Justice Brandon pointed out in *The Eschersheim*: see p. 195, col. 1; p. 93G.

(5) With great respect to Mr. Justice Sheen I cannot accept his view that the decision in *The Beldis* was "inconsistent with" the *Bremer Oeltransport* case. The latter case was not dealing with the proper construction of this head of Admiralty jurisdiction. And the analysis in both cases of the constituents of an action on an arbitration award is remarkably similar. Both make it clear that the submission to arbitration must be pleaded and proved as well as the award itself.

(6) Even assuming that an action on an award is one "in connection with" the underlying submission to refer, there remains the question, critical to the present issue, of whether that submission is sufficiently directly related to the use or hire of a ship to make the matter fall within par. (*h*). That point was not at issue in *Bremer Oeltransport*, but it was in *The Beldis*, which decided the point against the claimants. I am satisfied that the decision was not "per incuriam" and that I must follow it.

23. Therefore I have concluded that Mr. Garland is correct in his submission that the Admiralty Court has no jurisdiction to consider this claim under par. (*h*) of s. 20(2) of the Supreme Court Act, 1981. Accordingly, the action and the claim form must be struck out and the service of the claim form in rem must be set aside. It must also follow that the arrest of the vessel cannot be maintained in respect of this claim.

*24. The second principal issue: that the arrest is an abuse of the process of the Court as the claimants already have adequate security*

This point obviously only arises if I am wrong on the first issue. Both parties accept that the Court has the power to release the vessel from arrest under par. 6.6(1) of the Practice Direction forming the Admiralty Court Guide. Mr. Smith for the claimants accepted that there should be a release if the Court

is satisfied that the claim to enforce Award No. 12 is otherwise adequately secured. The only "security" considered was the detention of the two vessels at Constantza. There was some debate as to how "adequate" the security had to be. Mr. Smith contended that the security had to be as good as the arrest of *Bumbesti* both in terms of amount and the "quality" of the protection. But he accepted that the nature of the protection of the security did not have to equate exactly with an arrest by the English Admiralty Court. Mr. Garland ultimately accepted these tests. Therefore there are two issues that I have to deal with under this heading: (1) is the correct value of the vessels, as detained in Constantza sufficient to discharge the claim: and (2) is the protection over the vessels that is provided by the Constantza Court order adequate?

*25. The amount of the claim on Award No. 12*

As already noted, the total claim under Award No. 12 is for damages of U.S.$238,072, plus stamp duty and lawyers' fees. The parties agreed that the latter two figures probably amount to about U.S.$9000, making a total of U.S.$247,072. Under the award there is no entitlement to interest on the principal sum. Even if I assume that interest can be awarded somehow, then the maximum figure for which the claimants could legitimately seek security is, in my view, U.S.$300,000.

*26. Value of the vessels as detained in Constantza*

The evidence on value was conflicting. *Tirgu Neamt* is 21 years old, is in class but is laid up. *Tirgu Lapus* is nearly 21 years old and has been out of class since October, 1998. A Romanian company has put a "market value" on *Tirgu Neamt* of U.S.$750,000. Mr. Garland says that should be accepted and as the vessels are identical, it is the market value of *Tirgu Lapus* also. But if the vessels were sold in Constantza, whether pursuant to a Court auction or privately, it would be at a "forced sale" value. The valuation report does not say that the figure of U.S.$750,000 represents the sum that would be obtained in a "forced sale" of the vessels in their present condition and I am sure that sum would not be realized.

27. Mr. Garland next relies on the figure that was offered by a Cypriot company that had agreed to buy the vessels through the Constantza Court but then failed to pay the deposit. The total price for both vessels was agreed at U.S.$660,000. As this sale did not go ahead I am sceptical about the utility of the sum agreed. I am also sceptical about the "offer" apparently made to the defendants by N. G. Moundress Shipping S.A. on June 9, 1999. The price "offered" for both vessels was U.S.$470,000. There was no evidence of how this offer came to be

[1999] Vol. 2                LLOYD'S LAW REPORTS                        489
Q.B. (Adm. Ct.)                  The "Bumbesti"                         AIKENS, J.

made and, given that the vessels were detained in Constanza at the time, I must doubt whether it was a genuine offer.

28. Lastly there is evidence of the value of the vessels from the well known ship sale and purchase brokers English White Shipping Ltd. That gives a valuation of U.S.$600,000 for each of the vessels, assuming them to be "in seaworthy condition, capable of proceeding under their own power, in average condition for their age and in Class". I have concluded that these conditions are not satisfied in either case. *Tirgu Lapus* is out of class and the Romanian company's valuation report on *Tirgu Neamt* states that "in order for the vessel to be operated on [sic], high investments are necessary". That must mean that *Tirgu Neamt* is probably neither seaworthy, nor capable of proceeding under her own power nor in average condition for her age, even if she is still, technically, in Class.

29. English White also gives a scrap valuation of the vessels. The net value would depend on where the vessels were to be delivered, because the cost of towage to any destination far from Constanza would be high. The two scrap markets suggested by English White are the Indian sub-continent and Turkey. If the vessels were sold for delivery to the former, the net sale proceeds would probably be only U.S.$40,000; if for delivery to the latter the net proceeds would be about U.S.$340,000. There is no evidence as to which destination would be more likely.

30. On the evidence I have concluded that it is very unlikely that the two vessels would achieve much more than a scrap value price if sold at Constantza. But there is evidence of an available scrap market in Turkey. It seems to me inherently more likely that the vessels would be sold for delivery there rather than further afield. Therefore, although the evidence is not entirely satisfactory, I have concluded that the sale value of the vessels at Constantza is between U.S.$300,000 and U.S.$340,000, i.e. enough to meet the claimants' claim.

31. *The nature of the protection of the security given by the Constanza Court order*

Mr. Smith submits that the vessels are not in the custody of the Constantza Court in the same way that vessels under arrest in an Admiralty action in rem are in the custody of the Admiralty Marshal. Therefore the protection given by the Constantza Court order is not as good as that of an arrest in England. There was some evidence of the nature of the detention of the vessels by the Constantza Court. The original application for execution was no specifically an "Admiralty" provision, but is a form of execution available against all assets. But

the "commandment" made on Feb. 9, 1999 against each vessel was issued under arts. 914 and 915 of the Romanian Commercial Code and is an Admiralty provision. That deals with the seizure and enforcement of existing judgments against vessels. The commandment gives the claimant a priority over subsequent claimants in receiving payment out of the proceeds of sale of the vessel. It is accepted by the Romanian lawyers acting for the defendants that the effect of the suspension (by the Supreme Court) of the execution of Award No. 12 does not affect the seizure of the two vessels: see the fax of Musat & Associatii dated June 17, 1999: exhibited to PEM 2. Mr. Smith also accepted that the effect of the seizure was that the defendants could not attempt to sell the vessels, except with the approval of the Constantza Court.

32. There was controversy as to whether the defendants could lawfully use the vessels for trading while remaining seized by the Romanian Court. I asked Mr. Garland if his clients would be prepared to give an undertaking not to use the vessels while remaining seized by the Constantza Court. The undertaking that the defendants are prepared to give, assuming that the arrest in the English proceedings was set aside, is set out in a fax from Ince. & Co. to the Court dated June 18, 1999 (although only sent on June 21), as follows:

Not to disturb the enforcement proceedings against the two vessels detained in Constantza pending determination of the appeal to the Romanian Supreme Court, this undertaking specifically reserving [the Defendants'] right to apply to the court on 13 July for the suspension of the right of sale to continue throughout that period.

That undertaking would, I think, adequately preserve the rights of the claimants on the two vessels given the existing orders of the Contantza Court over the vessels.

33. *Conclusions on the second principal issue*

I have concluded that the security obtained by the claimants for Award No. 12, in the form of the detention of the two vessels by the Constantza Court, is adequate security for the enforcement of that claim. Accordingly, provided that the defendants confirm that they will give the undertaking set out in Ince's fax of June 18, I propose to release *Bumbesti* from arrest in this action. I should, however, note two further points. First, I was informed by Mr. Smith that the claimants would be issuing further proceedings in rem against *Bumbesti* and so they had issued a caveat against the release of the vessel. The proposed proceedings were in the form of a claim, brought in rem, based on the original cause of action under the bareboat charter.

[1999] Vol. 2                    LLOYD'S LAW REPORTS                        490
Q.B. (Adm. Ct.)                      The "Bumbesti"                      AIKENS, J.

The right to bring this form of action is said to be based on the decision of Mr. Justice Brandon in *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377. In that case Mr. Justice Brandon held that a cause of action in rem does not merge with a judgment made in personam, but remains available so long as the judgment in personam remains unsatisfied. He also accepted that this principle could apply to arbitration awards: see p. 559, col. 2

to p. 560, cols. 1 and 2; pp. 405B to 406F. I do not know whether the claimants will maintain their caveat in the light of my conclusion on principal issue two.

34. Secondly, I note that the claimants were prepared to undertake to release their security over the two vessels in Constantza if the arrest of *Bumbesti* were to be maintained. As I have held that it should not be, this undertaking is irrelevant.

**EXHIBIT    5**

219

obtained the relief in the first proceedings. Moreover where there is but one cause of action, the damages (except in a case where an award of provisional damages is available) must be assessed once for all[20], and there would appear to be no distinction on this point between the award of an arbitrator and the judgment of a court[21].

1   As to appeals generally see para 1501 et seq post. Even where a judgment is reversed on appeal, acts done under an order made pursuant to the judgment are lawful if done before the appeal: *Hillgate House Ltd v Expert Clothing Service and Sales Ltd* [1987] 1 EGLR 65.

2   See para 1210 ante. For the right to go behind judgments in bankruptcy proceedings see BANKRUPTCY AND INSOLVENCY. A person ought to be entitled to act in pursuance of a court order without being at risk of his action being judged unlawful retrospectively: *Brent London Borough Council v Botu* (2000) 33 HLR 151, CA.

3   As to the conclusiveness of foreign judgments and their effect as implied contracts see CONFLICT OF LAWS. See the County Courts Act 1984 s 70, which provides that every judgment and order of a county court is final and conclusive between the parties, except as provided by that or any other Act or as may be prescribed. A judge ought not to disregard a previous order in the same proceedings which has not been appealed against even if he considered it was made without jurisdiction: *Cohen v Jonesco* [1926] 2 KB 1, CA; *Re Gale, Gale v Gale* [1966] Ch 236, [1966] 1 All ER 945, CA.

set   4   See EVIDENCE. In *Ampthill Peerage* [1977] AC 547, [1976] 2 All ER 411, HL, it was held that a declaration
is      made in 1926 by the High Court under the Legitimacy Declaration Act 1858 s 8 (repealed), was binding
s[5].    in 1976 on all persons, including the Crown and the House of Lords.
he    5   Default judgments and refusals to set them aside should, however, be carefully scrutinised before
urt     entertaining an estoppel: see *Pugh v Cantor Fitzgerald International* [2001] EWCA Civ 307, [2001] All ER
is     (D) 67 (Mar), [2001] CPLR 271, CA. For the earlier authorities see ESTOPPEL.
er    6   *Re Koenigsberg, Public Trustee v Koenigsberg* [1949] Ch 348 at 362, [1949] 1 All ER 804 at 809, CA, per
le      Somervill LJ, approved in *Re Wright, Blizard v Lockhart* [1954] Ch 347, [1954] 2 All ER 98, CA. For the
w      earlier authorities see ESTOPPEL.
       7   *Re Wright, Blizard v Lockhart* [1954] Ch 347, [1954] 2 All ER 98, CA, where an inquiry as to the
if      practicability of a charitable legacy after the death of the tenant for life was held not to estop the Attorney
e      General from arguing subsequently that the material date for the ascertainment of practicability was the
y      date of the testator's death.
r    8   See ESTOPPEL.
1    9   See EVIDENCE.
    10   *Gordon v Gonda* [1955] 2 All ER 762, [1955] 1 WLR 885, CA.
    11   See EVIDENCE.
    12   *Edwards v R* (1854) 9 Exch 628. See also CPR 40.7(1); and para 1207 ante.
    13   *Re Seaford, Seaford v Seifert* [1968] P 53 at 66, [1968] 1 All ER 482 at 486, CA, per Willmer LJ. Nor does
         it apply when judgment is entered against a foreign state: see CPR 40.10; and para 1207 ante.
    14   CPR Sch 1 RSC Ord 45 r 10 (revoked with effect from 25 March 2002: see the Civil Procedure
         (Amendment No 4) Rules 2001, SI 2001/2792, rr 1(c), 25, Sch 5); and see *Talbot v Blindell* [1908] 2 KB 114.
s    15   *Webster v Armstrong* (1885) 54 LJQB 236; *Stewart v Todd* (1846) 9 QB 767, Ex Ch. Note that in this case
         and other cases cited in this paragraph which predate the new civil procedure, the claimant is referred to
1         as 'the plaintiff': see para 15 ante. As to the new civil procedure see para 51 et seq ante; and as to the use
         of cases decided under the old rules as an aid to interpreting the new Civil Procedure Rules see para 60
         the text and note 2 ante.
    16   See *King v Hoare* (1844) 13 M & W 494 at 504, per Parke B; *Re Hodgson, Beckett v Ramsdale* (1885) 31 ChD
         177 at 188, 189, CA, per Bowen LJ; *Florence v Jenings* (1857) 2 CBNS 454; *Stewart v Todd* (1846) 9 QB 767
         at 777, 778, Ex Ch; *Isaacs & Sons v Sallstein* [1916] 2 KB 139, CA; cf *Savile v Jackson* (1824) 13 Price 715.
    17   *Stewart v Todd* (1846) 9 QB 767, Ex Ch; *Hills v Co-operative Wholesale Society Ltd* [1940] 2 KB 435, [1940]
         3 All ER 233, CA.
    18   *Clarke v Yorke* (1882) 52 LJ Ch 32; cf *Wright v London General Omnibus Co* (1877) 2 QBD 271; *Sanders
         v Hamilton* (1907) 96 LT 679. As to the abandonment of excess so as to give the county court jurisdiction
         see COUNTY COURTS.
    19   *Birmingham Corpn v S Allsopp & Sons Ltd* (1918) 88 LJKB 549, DC. For the effect of summary conviction
         or dismissal of information in respect of common assault or of aggravated assault see CRIMINAL LAW,
         EVIDENCE AND PROCEDURE.
    20   *Serrao v Noel* (1885) 15 QBD 549 at 559, CA, per Bowen LJ; distinguished in *Worman v Worman* (1889)
         43 ChD 296 at 308, 309 (relief claimed in second action entirely outside the former compromise); *Conquer
         v Boot* [1928] 2 KB 336, DC. See further DAMAGES. See also *Lord Bagot v Williams* (1824) 3 B & C 235.
         As to provisional damages see paras 1219–1223 ante.
    21   *HE Daniels Ltd v Carmel Exporters and Importers Ltd* [1953] 2 QB 242 at 254, [1953] 2 All ER 401 at 406,
         obiter, per Pilcher J.

**1225. Merger of cause of action in judgment.** When judgment has been given in a claim (formerly known as 'an action')[1], the cause of action in respect of which it was given is merged in the judgment and its place is taken by the rights created by the

judgment[2], so that a second claim may not be brought on that cause of action. Merger is not effected by an order which is not a judgment[3], nor by a judgment which is not final[4], or which is void[5].

There will be no merger unless the cause of action is the same in both claims[6], and the claimant (formerly 'the plaintiff')[7] had an opportunity of recovering in the first claim (namely the claim in which judgment was given) what he seeks to recover in the second; otherwise the defendant is not twice vexed for the same cause[8]. A claimant, therefore, is not precluded by an order in administration proceedings to which he was a party from afterwards beginning proceedings relating to the same subject matter for relief for which he was not in a position to ask in the earlier proceedings[9]; and this principle applies even though the claimant might have set up in the first claim the case which he made in the second, and did not do so[10].

The same applies where the matters in question in the second claim arose while the first was pending, and could only have been raised (if at all) in the first by amendment of the proceedings[11], or where, though the causes of action in the first and the second claim have a common origin, they are not the same[12], as in the case of a continuing trespass[13] or of successive breaches of the same contract[14]. A claimant is allowed to bring successive claims in respect of the same circumstances, provided those circumstances give rise to two different causes of action[15].

Under the court's case management powers, however, it has a duty to deal with as many aspects of the case as it can on the same occasion[16] and it has power to consolidate proceedings[17], to try two or more claims on the same occasion[18] and to take any other step or make any other order for the purpose of managing the case and furthering the overriding objective[19].

1   See para 15 ante.

2   *Greathead v Bromley* (1798) 7 Term Rep 455; *Langmead v Maple* (1865) 18 CBNS 255; *Re European Central Rly Co, ex p Oriental Financial Corpn* (1876) 4 ChD 33, CA. A judgment obtained by a mortgagee in an action on the personal covenant in the mortgage merely operated as an additional security for due payment of the debt, and if the debt was extinguished the judgment was extinguished too: *Aman v Southern Rly Co* [1926] 1 KB 59, CA. In a claim for the detention of goods, a judgment in favour of the claimant does not of itself and apart from special circumstances, without satisfaction, vest the property in the goods in the defendant from the time of the judgment: *Brinsmead v Harrison* (1871) LR 6 CP 584; affd (1872) LR 7 CP 547, Ex Ch; *Ellis v John Stenning & Son* [1932] 2 Ch 81. This is so whether the judgment is for the value of the goods or for damages for their conversion, or is one with an alternative provision for the return of the goods: *Ellis v John Stenning & Son* supra. See *Lloyds Bank plc v Hawkins* [1998] 3 EGLR 109, [1998] 47 EG 137, CA (plaintiff (now known as 'claimant') estopped from bringing second action (now known as a 'claim': see para 15 ante) following merger of cause of action in an earlier judgment despite inadvertent error in the judgment). As to the use of cases decided under the old rules as an aid to interpreting the new Civil Procedure Rules see para 60 the text and note 2 ante.

3   *Westmoreland Green and Blue Slate Co v Feilden* [1891] 3 Ch 15, CA.

4   *Langmead v Maple* (1865) 18 CBNS 255.

5   *Vibart v Coles* (1890) 24 QBD 364, CA.

6   *Leggott v Great Northern Rly Co* (1876) 1 QBD 599 (recovery by personal representatives of damages sustained by relatives of deceased from his death by accident was no bar to action for damage to his estate; followed in *Daly v Dublin, Wicklow and Wexford Rly Co* (1892) 30 LR Ir 514, CA); *Goldrei, Foucard & Son v Sinclair and Russian Chamber of Commerce in London* [1918] 1 KB 180, CA.

7   See para 15 ante.

8   See *Nelson v Couch* (1863) 15 CBNS 99; *Few v Backhouse* (1838) 8 Ad & El 789; *Webster v Armstrong* (1885) 54 LJQB 236 (High Court action on cause raised as counterclaim in county court, but as respects which the county court had no jurisdiction to give relief in excess of the plaintiff's claim in the county court action: no estoppel of High Court plaintiff by judgment in his favour on the counterclaim in the county court, and High Court defendant estopped by the county court judgment from denying the plaintiff's cause of action; as to the jurisdiction of county courts on a counterclaim see now para 115 ante); cf *Midland Rly Co v Martin & Co* [1893] 2 QB 172. A party who selects a tribunal having jurisdiction may not afterwards, however, seek the same remedy before another tribunal on the ground that the first had not power to award him adequate damages: *Wright v London General Omnibus Co* (1877) 2 QBD 271; *Birmingham Corpn v S Allsopp & Sons Ltd* (1918) 88 LJKB 549, DC. See generally *Henderson v Henderson* (1843) 3 Hare 100; and ESTOPPEL. The principle behind the rule is that to raise in subsequent proceedings matters which could and therefore should have been litigated in earlier proceedings is an abuse of process: *Yat Tung Investment*

Co Ltd v Dao Heng Bank Ltd [1975] AC 581 at 590, PC; *Brisbane City Council v A-G for Queensland* [1979] AC 411, [1978] 3 All ER 30, PC; and see para 931 ante.

9   *Guidia v Kinton* (1843) 6 Beav 517; cf *Whittaker v Kershaw* (1890) 45 ChD 320 at 327, CA; *Re Hampshire Co-operative Milk Co Ltd, Purcell's Case* (1880) 29 WR 170.

10  *Hunter v Stewart* (1861) 4 De G F & J 168; *Simpson v Fogo* (1863) 1 Hem & M 195 at 226–228, per Page Wood VC; *Stewart v Kennedy (No 2)* (1890) 15 App Cas 108, HL; *Wilding v Sanderson* [1897] 2 Ch 534 at 553, CA, per Chitty LJ; *Mulgrew v O'Brien* [1953] NI 10. For the position where the cause of action is really the same see ESTOPPEL.

11  *National Bolivian Navigation Co v Wilson* (1880) 5 App Cas 176 at 185, 198, 199, HL.

12  *Payana Reena Saminathan v Pana Lana Palaniappa* [1914] AC 618, PC.

13  *Clarke v Midland and Great Western Rly Co* [1895] 2 IR 294, CA, following *Thompson v Gibson* (1841) 7 M & W 456; and see *Bulmer Rayon Co Ltd v Freshwater* [1933] AC 661, HL.

14  *Bristowe v Fairclough* (1840) 1 Man & G 143; *Ebbetts v Conquest* (1900) 82 LT 560, DC (breaches of covenant to keep, and to deliver up, in repair).

15  *Brunsden v Humphrey* (1884) 14 QBD 141, CA (injury to a man's person and to his carriage). 'The test is not whether the plaintiff had the opportunity of recovering in the first action what he claims to receive in the second': *Brunsden v Humphrey* supra at 146 per Bowen LJ), but whether he in fact sought to do so; cf *Florence v Jennings* (1857) 2 CBNS 454 (plaintiff recovered the principal due on a bill in one action, and in another interest due on the bill under a separate agreement, but only down to the date of the first judgment, for thereupon the bill passed in rem judicatam); *Whittaker v Kershaw* (1890) 45 ChD 320, CA; *Gibbs v Cruikshank* (1873) LR 8 CP 454; see the cases cited in note 8 supra. See also *Derrick v Williams* [1939] 2 All ER 559 at 566, CA (different heads of damage arising from same cause of action, distinguishing *Brunsden v Humphrey* supra). An action for false imprisonment was no bar to a subsequent action for a malicious prosecution following on the same arrest, even though a jury improperly gave damages in the first action for imprisonment consequential on the prosecution: *Guest v Warren* (1854) 9 Exch 379.

16  See CPR 1.4(2)(i); and para 451 head (9) in the text ante.

17  See CPR 3.1(2)(g); and paras 131, 452 head (7) in the text ante.

18  See CPR 3.1(2)(h); and paras 131, 452 head (8) in the text ante.

19  See CPR 3.1(2)(m); and para 452 head (13) in the text ante. As to the overriding objective see para 60 ante.

**1226. Judgment against one of two jointly or alternatively liable.** At common law, if one of the two joint contractors was omitted from an action (now known as a 'claim'), even though the plaintiff (now known as the 'claimant')[1] was unaware of his existence, a judgment obtained in that action was a bar at common law to a subsequent action against the joint contractor who was omitted[2]. By statute, however, judgment recovered against any person liable in respect of any debt or damage[3] is no bar to a claim, or to the continuance of a claim, against any other person who is (apart from any such bar) jointly liable with him in respect of the same debt or damage[4]. A consent order regularly obtained, and not objectionable on its merits, cannot be set aside by consent of the parties so as to prejudice a third person in whose favour it is a bar[5]. In proceedings against a company for rescission of a contract on the grounds of fraudulent misrepresentation by its agent and damages against the agent, a judgment against the company for rescission of the contract is no bar to judgment against the agent for damages[6].

Where there are separate causes of action against different defendants for the same damage, a judgment against one of them in a foreign court which has been satisfied is not necessarily a bar to proceedings against the other for the same damnum in the English courts[7].

1   See para 15 ante.

2   *Hoare v Niblett* [1891] 1 QB 781, DC. A plaintiff was similarly barred if he omitted from the action a joint debtor of whom he was aware: *Morris v Wentworth-Stanley* [1999] QB 1004, [1999] 2 WLR 470, CA.

3   A person is liable in respect of any damage for this purpose if the person who suffered it, or anyone representing his estate or dependants, is entitled to recover compensation from him in respect of that damage, whether the legal basis of his liability is tort, breach of contract, breach of trust or otherwise: Civil Liability (Contribution) Act 1978 s 6(1).

4   See ibid s 3. However, if more than one claim is brought against the persons liable the plaintiff will be entitled to costs only in the first unless the court is of opinion that there was reasonable ground for bringing more than one claim: see s 4.

5   *Hammond v Schofield* [1891] 1 QB 453, DC.

6   *Goldrei, Foucard & Son v Sinclair and Russian Chamber of Commerce in London* [1918] 1 KB 180, CA.

7   *Kohnke v Karger* [1951] 2 KB 670, [1951] 2 All ER 179 (measure of damages different in foreign court from that in English courts and the award in the foreign court did not fully satisfy the claim for damages assessed according to the measure in English courts); and see CONFLICT OF LAWS.

**EXHIBIT   6**

# Commercial Arbitration

## 2001 Companion Volume to the Second Edition

LORD MUSTILL
*Lord of Appeal*
*Fellow of the British Academy*
*Doctor of Laws*

STEWART C BOYD
*One of Her Majesty's Counsel*

**Butterworths**
London
2001

law of the place of performance. (3) Where the illegality is 'palpable and undisputed' eg where it has been found as a fact by the arbitrator, as in *Soleimany v Soleimany*, the court will generally refuse enforcement. (4) There must however be a prima facie case of illegality before the court will embark on a more extensive inquiry, and the court will be reluctant to re-open the matter if the arbitrators have themselves considered the evidence in support of the defence of illegality, or if the party alleging illegality has foregone an opportunity to raise the defence, or to challenge the award before a foreign court. (5) Enforcement of an award may in principal be refused under the head of public policy if it was obtained by perjured evidence, subject to the rules regarding the reception of fresh evidence (see Second Edition, pages 561–562), and to the exhaustion of remedies to set aside the award.

A fuller discussion of these questions will be found in Part I of this work at pages 82 et seq, above, under the heading 'Foreign Awards.

**418**

Note 2. Add: *International Bulk Shipping & Services Ltd v Minerals and Metals Trading Corpn of India* [1996] 2 Lloyd's Rep 474, 476–477.

Note 8. The statement in the text can no longer be supported in the light of the decision in *The Bumbesti* [2000] QB 559, [1999] 2 Lloyd's Rep 481, in which Aikens J pointed out that the decision in *The St Anna* was inconsistent with the decision of the Court of Appeal in *The Beldis* [1936] P 51. The award must be enforced by obtaining a judgment upon it and issuing the usual processes of execution against the ship.

**419**

Note 15     ... the court would probably now only refuse the application where the objection cannot be properly disposed of without a trial' was approved and applied in *Caracao Trading Co BV v Harksundu & Co* [1992] 2 Lloyd's Rep 186, where the objection to the enforcement of the award had been fully argued on an application to set aside service of the summons abroad under Order 75.

**421**

Note 15. Leave may properly be given to serve the summons out of the jurisdiction even though the defendant has no assets here: *Russell NV v Oriental Commercial & Shipping Co (UK) Ltd* [1991] 2 Lloyd's Rep 625, 629.

**421–427**
## C. ENFORCING AWARDS OF FOREIGN ARBITRATORS

Rather than offer a detailed reformulation of the text in the light of the new statutory regime, we refer the reader directly to sections 100 to 103 of the 1996 Act (which create the regime for the enforcement of a 'New York Convention award'), and to the commentaries at pages 82–96, above and 381–384, below.

We note at the present stage only three points of minor importance—

**EXHIBIT  7**

# The Law and Practice of Commercial Arbitration in England

## Second Edition

SIR MICHAEL J. MUSTILL
*One of Her Majesty's Lords Justices of Appeal*
*of St. John's College Cambridge*
*and Gray's Inn*

STEWART C. BOYD
*of Trinity College, Cambridge*
*and of the Middle Temple*
*One of Her Majesty's Counsel*

**Butterworths**
London and Edinburgh
1989

CaSe 1:08-cv-02351-HB    Document 20-3    Filed 05/17/2008    Page 21 of 43

loser should be ordered to pay the costs of the successful party. This rule is, however, subject to various exceptions[15].

The arbitrator has a discretion not only to decide who shall pay the costs, but also to fix their amount. This is, however, not usually done except in simple cases. The usual practice is for the arbitrator to order that the costs shall be 'taxed if not agreed'. With the help of their lawyers, the parties are usually able to reach agreement on an appropriate figure for costs, but if they cannot do so they take steps to have the costs taxed (i.e. formally investigated and fixed) by a judicial officer of the High Court. Taxation is not intended[16] to give the successful party a full indemnity in respect of his outgoings.

## 5 The effect of an award

A valid award confers on the successful claimant a new right of action, in substitution for the right on which his claim was founded. Every submission to arbitration contains an implied promise by each party to abide by the award of the arbitrator, and to perform his award. It is on this promise that the claimant proceeds, when he takes action to enforce the award.

In addition to this positive effect of conferring a new right on the successful claimant, a valid award has two negative consequences.

First, the successful claimant is precluded by the award from bringing the same claim again in a fresh arbitration or action. In particular, the rule requires that damages resulting from one and the same cause of action, including anticipated future damages, must be assessed once and for all in one proceeding. If the claimant finds that he has suffered more damage than he claimed in the arbitration, he will not usually be permitted to start a further arbitration to recover his further loss.

The publication of a valid award also makes a radical change in the position of the arbitrator. His powers to make procedural orders, and his authority to bind the parties by his decisions comes to an end: he is said to be functus officio. Nothing which he does thereafter can have any effect on the rights of the parties. In particular, he has no power to alter his award, except for the very limited purpose of correcting 'any clerical mistake or error arising from any accidental slip or omission'. This allows the arbitrator to correct clerical errors but not to alter the substance of what he has decided, if he has changed his mind after publishing the award.

## H. APPEALS ON QUESTIONS OF LAW

For a period of about 60 years, a balance was struck in English arbitration law between the procedural and substantive aspects of judicial control. The great commercial judges who sat in the Court of Appeal during the 1920s stamped the law indelibly with the concept that parties who contract for arbitration can expect neither more nor less than the procedures for which they have contracted, and that where the arbitration agreement was made in the context of a trade where informal procedures were customary, it was these procedures, rather than

---

[15] See Chapter 26, pp. 394–403, post.

[16] Except in the rare case where the arbitrator orders a full indemnity for costs.

EXHIBIT   8

## NEW ZEALAND HIGH COURT IN ADMIRALTY CHRISTCHURCH REGISTRY

Mar. 7, 22; 29, 2001

---

### THE "IRINA ZHARKIKH" AND "KSENIA ZHARKIKH"

#### Before YOUNG, J.

**Admiralty practice - Action in rem - Stay of action - Charters in respect of fishing vessels - Ministry of Fisheries alleged breach of fisheries legislation - Charterers claimed indemnity - Charters contained arbitration clause - Whether action should be stayed - Whether arbitral award exhausted underlying cause of action - Whether rule that unsatisfied in personam judgment did not exclude subsequent in rem claim applied to unsatisfied arbitral award - Whether Mareva injunction should be discharged.**

Fishing Viv Ltd. and Spratt Ltd., were companies registered in Vanuatu and the owners of the fishing vessels *Irina Zharkikh* and *Ksenia Zharkikh* respectively. Both companies were linked in terms of their ultimate ownership and the ultimate ownership also appeared to be linked in some way to Prok Bank Ltd.

In September, 1998 the plaintiff Raukura Moana Fisheries Ltd., entered into charter arrangements with Fishing Viv Ltd. and Spratt Ltd. and two other Vanuatu companies in relation to two other vessels. Under these arrangements the four vessels were to catch fish against quota held by the plaintiff.

The Ministry of Fisheries were investigating the fishing activities of these four vessels and on Mar. 8, 2001 laid in the District Court of Wellington a number of charges against the plaintiff associated with offences said to have been committed by the masters and/or crews of the four vessels.

The plaintiff sought an indemnity against any adverse financial consequence which they might suffer as a result of breaches of the fisheries legislation by the masters and crew of *Irini Zharkikh* and *Ksenia Zharkikh*. The plaintiff commenced claims in rem against both vessels on Oct. 5.

The vessels were not arrested but under threat of arrest the plaintiff and the owners entered into an arrangement under which the owners gave security in respect of each vessel in the sum of N.Z.$150,000.

The owners applied to stay the proceedings and for the security to be paid back.

The plaintiff arrested the vessels and obtained a *Mareva* injunction on an ex parte basis on the evidence that sales or possibly charter arrangements were in the process of registration between the owners and third parties.

The owners applied for release of the vessels from arrest, discharge of the *Mareva* injunction and costs on an indemnity basis.

The owners submitted that by reason of a submission to arbitration contained in the charters the proceedings must be stayed pursuant to the Arbitration Act, 1996. They argued that if an arbitral award was made this would result in the underlying cause of action merging in the award so that there would never be a judgment in rem in relation to the vessel with the result that there was no justification for retaining in Court the N.Z.$300,000 paid by way of security.

The plaintiffs contended that the rule that an unsatisfied in personam judgment did not exclude a subsequent in rem claim applied to arbitral proceedings and should be applied where there was an unsatisfied arbitral award.

—*Held*, by N.Z. Ct. (YOUNG, J.), that (1) arbitral tribunals established pursuant to the charter agreements would not have an in rem jurisdiction in respect of the ships; judgments in rem in respect of these vessels would bind parties who were themselves not subject to the arbitration agreement; and an arbitral tribunal did not have power to bind parties who were not subject to the arbitration agreement (*see* p. 326, col. 2);

(2) under s. 10 of the Arbitration Act, 1996 the present dispute was not capable of determination by arbitration because an arbitrator could not make an award in rem and pursuant to cl. 8(1) of the First Schedule to the 1996 Act, the arbitration agreement was "inoperative" or incapable of being performed in respect of a statutory claim in rem; and the word "dispute" in cl. 18.1 of the charters had to be construed as being confined to a dispute which was capable of resolution by arbitration and a dispute as to the existence or otherwise, and/or quantum of a statutory in rem claim was not such a dispute (*see* p. 326, col. 2);

(3) on this analysis it might be that the proceedings should be stayed pending determination by arbitration of all in personam issues but on the basis that once those issues were resolved by arbitration, the plaintiff if successful could continue to pursue the in rem claims (*see* p. 327, col. 1);

(4) it was certainly well arguable that, at least to the extent to which the plaintiff sought to rely on the indemnity provisions, an arbitral award determining what was owed to it by the shipowners would be in the nature of a claim in debt and would not exhaust the underlying cause of action; if so, an award by arbitrators would not preclude the plaintiffs, after the award had been issued enforcing the debt by continued prosecution of the in rem proceedings; however the plaintiff might well have claims in damages against the shipowner, claims which could be regarded as the claims based on the indemnity provisions and an arbitral award fixing damages would exhaust the underlying causes of action (*see* p. 327, col. 2; p. 328, col. 1);

(5) if it was the case that an arbitrator's award determining the existence and quantum of a debt did not preclude the creditor suing in the Courts for that debt, then the possibility of there being eventually in rem judgments in these cases would not be able to be excluded (*see* p. 328, col. 1);

(6) as a matter of authority as well as logic the rule that an unsatisfied in personam judgment did not exclude a subsequent in rem claim applied by way of

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

320

analogy in the case of an unsatisfied arbitral award (*see* p. 328, col. 2);

-*The Rena K*, [1978] 1 Lloyd's Rep. 545, applied.

-*The Indian Grace (No. 2)*, [1998] 1 Lloyd's Rep. 1, considered.

(7) there was no doubt that it was the case that the plaintiff, if successful at arbitration might well not be able to secure payment from the shipowners in that the shipowners were shadowy entities registered in a secrecy respecting jurisdiction and had not made any disclosure of their assets or given any undertaking as to preservation of their assets pending determination of this dispute; the shipowners and those behind them had no apparent continuing link with New Zealand other than the continuing presence here of the two vessels; and there was limited information as to the financial circumstances of the two shipowning companies so that the security in each case ought not to be repaid (*see* p. 333, col. 2; p. 334, col. 1);

(8) the costs associated with the prosecution and the possible consequences of prosecution were a subset of costs incurred "in respect of" or "as a result of" the Ministry's investigation; the prosecution costs and expenses were within the scope of the claim as it stood when the undertakings not to arrest in the joint memoranda of Counsel were given; and there was nothing in the background material which suggested that the undertaking not to arrest would cease to apply if there was a prosecution; the vessels must be released from arrest (*see* p. 335, cols. 1 and 2; p. 336, col. 1);

(9) the plaintiff had a good arguable case; the shipowners were foreign companies with assets in New Zealand but had not made full disclosure of their assets so that "any prudent, sensible commercial man" would infer a danger of default; but on the facts and the evidence a modified version of the *Mareva* injunction could only remain in place if accompanied by appropriate security from the plaintiff covering any likely loss which might be recoverable against it by the shipowners in the event that the plaintiff was called on to meet its undertaking not to arrest the vessels (*see* p. 336, cols. 1 and 2; p. 338, cols. 1 and 2);

(10) the applications seeking return of all or part of the security would be declined; the vessels would be released from arrest; the *Mareva* injunction would not be discharged but it must be conditional on security being provided by the plaintiff; and the issue whether the shipowners were entitled to a stay of the proceedings would be adjourned for further consideration (*see* p. 338, col. 2).

---

This was an action brought by the plaintiff Raukura Moana Fisheries Ltd. against the owners of the vessels *Irina Zharkikh* and *Ksenia Zharkikh* seeking an indemnity against any financial consequences which it might suffer as a result of breaches of the fisheries legislation by the masters and crews of the two vessels which the plaintiff had chartered to catch fish against quotas held by the plaintiff.

T. J. Broadmore (M.S. Sullivan & Associates, Nelson) for the plaintiff; A. N. Tetley (on Mar. 7, 2001) and P. David (on Mar. 23, 2001), (Russell McVeagh, Auckland) for the defendants.

The further facts are stated in the judgment of Young, J.

Judgment was reserved.

Thursday Mar. 29, 2001

---

## JUDGMENT

| Index | Paragraph No. |
|---|---|
| Introduction | [1] |
| Factual background | [4] |
| The plaintiffs' claims | [14] |
| The commencement of proceedings and the giving of security | [18] |
| The initial applications by Fishing Viv Ltd. and Spratt Ltd. | [25] |
| Procedural steps taken since the hearing of Mar. 7, 2001 | [27] |
| Further application by Fishing Viv Ltd. and Spratt Ltd. | [30] |
| Overview of the argument for the shipowners | [32] |
| Are the shipowners entitled to an automatic stay of the in rem proceedings? | [36] |
| Where there is an arbitral award does the underlying cause of action merge in the award so that there is no longer any entitlement to sue on that cause of action? | [53] |
| The rule that an unsatisfied in personam judgment does not exclude a subsequent in rem claim | [62] |
| *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377 | [66] |
| *The Republic of India v. India Steamship Co. (The Indian Grace) (No. 2)*, [1998] 1 Lloyd's Rep. 1; | [76] |

[1998] A.C. 878

The continued                                    [95]
applicability of *The Rena
K* principles in New
Zealand

Application of *The Rena                          [97]
K* principles in this case

Was the security                                 [100]
excessive?

Were the subsequent                              [104]
arrests of the vessels in
breach of the undertaking
in the joint memoranda of
Counsel?

The *Mareva* injunction                          [116]

Disposal of applications             [140]

### YOUNG, J.:

*Introduction*

[1] This Admiralty case raises many questions including one which is of considerable jurisprudential interest and practical importance: in an Admiralty dispute in which the plaintiff has a statutory *in rem* claim which is apparently subject to a submission to arbitration contained in an agreement between the plaintiff and the shipowners, can the shipowners defeat the claim in rem by requiring the claim to be arbitrated under the provisions of the Arbitration Act, 1996?

[2] The litigation has so far spawned two hearings before me: one on Mar. 7 and the other on Mar. 23. I reserved my judgment on the issues discussed at the Mar. 7 hearing and before I had an opportunity to deliver judgment, there were further developments which resulted in the hearing on Mar. 23.

[3] For reasons of convenience, I have decided to issue a single judgment resolving, as far as I can, all questions which have been argued before me so far.

*Factual background*

[4] The case primarily concerns two vessels, *Irina Zharkikh* and the *Ksenia Zharkikh* which are owned respectively by Fishing Viv Ltd. and Spratt Ltd. These companies are registered in Vanuatu. The companies are managed by a third company, Xtra Enterprises Ltd., also registered in Vanuatu.

[5] It seems reasonably clear that:

1. *Irina Zharkikh* is the only asset of any substance of Fishing Viv Ltd.

2. The *Ksenia Zharkikh* is the only asset of any substance of Spratt Ltd.

3. Fishing Viv Ltd. and Spratt Ltd. are linked in terms of their ultimate beneficial ownership.

That ultimate beneficial ownership also appears to be linked, in some way, to Prok Bank Ltd., a company which will be mentioned later in this judgment.

[6] It is not entirely clear to me just when dealings between Raukura Moana Fisheries Ltd. and the shipowners began. It is, however, clear that, in September, 1998, Raukura Moana Fisheries Ltd. entered into charter arrangements with Fishing Viv Ltd. (in relation to *Irina Zharkikh*), Spratt Ltd. (in relation to *Ksenia Zharkikh*) and two other Vanuatu companies in relation to two other vessels, *Kapitan Lomaev* and *Mys Chaykovskogo*. The two Vanuatu companies which own *Kapitan Lomaev* and *Mys Chaykovskogo* are in the same ultimate bene-

ficial ownership as Fishing Viv Ltd. and Spratt Ltd.

[7] Under these arrangements the four vessels were to catch fish against quota held by the plaintiffs.

[8] These charters terminated on Sept. 30, 1999 with the conclusion of the 1998-1999 fishing year. *Kapitan Lomaev* and *Mys Chaykovskogo* have since left New Zealand waters. *Irina Zharkikh* and *Ksenia Zharkikh* are, however, both laid up at Lyttelton and thus within the jurisdiction of this Court.

[9] The Ministry of Fisheries has been investigating the fishing activities carried on from these four vessels during the 1998-1999 fishing year.

[10] These investigations culminated on Mar. 8, 2001 in the laying, in the District Court at Wellington, of a number of charges against Raukura Moana Fisheries Ltd. and two of its management staff associated with offences said to have been committed by the masters and/or crews of the four vessels which I have mentioned.

[11] I should explain briefly why Raukura Moana Fisheries Ltd. may be held criminally liable for actions primarily committed by the shipowners and/or the masters and crews of the four vessels. This is because, in the circumstances of the case, any breaches of the fisheries legislation by those parties can be attributed to Raukura Moana Fisheries Ltd., see s. 105C, Fisheries Act, 1983.

[12] The four fishing vessels fished off the west coast of the South Island. They were primarily targeting hoki. As I understand the material which has been placed before me, the Ministry's primary complaints relate to failures to declare by-catch and small and damaged hoki. The Ministry's allegations seem to rely, mainly, on a comparison of the fishing activities of the four vessels, as reported, and the catches which could fairly be expected. On the draft summary of facts which has been exhibited to one of the affidavits, it appears that the Ministry does attach some blame to Raukura Moana Fisheries Ltd. and its management staff. In part this relates to a failure to allocate sufficient by-catch quota to the vessels so as to provide an appropriate incentive for vessel masters to report the taking of by-catch. As well, the summary of facts refers to a number of factors which the Ministry contends should have alerted Raukura Moana Fisheries Ltd. to the fact that quota management offences were being committed.

[13] In these proceedings, Raukura Moana Fisheries Ltd. seeks an indemnity against any adverse financial consequences which it may suffer as a result of breaches of the fisheries legislation by the masters and crews of *Irina Zharkikh* and *Ksenia Zharkikh*.

| [2001] Vol. 2 | LLOYD'S LAW REPORTS | 322 |
| N.Z. Ct. | The "Irina Zharkikh" | YOUNG, J. |

*The plaintiffs' claims*

[14] These claims are based on the charter agreements which were entered into by the plaintiff with Fishing Viv Ltd. and Spratt Ltd.

[15] Each charter is in identical terms. It provides for the owner to charter the vessel to Raukura Moana Fisheries Ltd. for the 1998-1999 fishing year. The relevant clauses of the agreements provide as follows:

### 9. Owner's Responsibilities

The Owner shall be responsible for the following:

9.1 **Fishing plan** - The efficient organisation and management of fishing operations with a view to fully realising any fishing plan agreed between the parties. . . .

9.8 **Identification of fish product** - Accurately identifying and marking all fish product produced by the vessel in full compliance with the requirements of the Fisheries Act 1983 and 1996 and Regulations.

. . .

### 11. Operation of vessels

11.1 **Fishing methods and areas** - The owner shall fish for the species and using the fishing methods authorised by the Charterer's quota and fishing permit and in the fishing areas designed [*sic, semble* designated] for that quota and species.

11.2 **Compliance with New Zealand Laws** - The Owner shall ensure that the master of each vessel, his officers and crew are fully aware of their strict obligations under all New Zealand laws and regulations pertaining to fishing operations within the EEZ and the master's, officer's and crew's strict liability for offenses under these laws including the Fisheries Act 1983 and 1996. . . .

11.3 **Reporting** - The Owner shall ensure that the master of each vessel is fully aware of and carries out his strict obligations to comply with all the requirements to accurately complete as required, Catch Landing Returns, Trawl Catch Effort and Processing Returns as set out in the Fisheries (Reporting) Regulations 1990 and all other reports, returns and documentation as may be required by MFish, the Department of Conservation and the Charterer.

11.4 **Excess of Quota** - The Owner agrees to ensure that no vessel will take any fish species in excess of quota allocated to it in this charter agreement apart from unavoidable by-catch taken as a result of the lawful taking of quota allocated to the vessels in the charter agreement. Should any vessels unlawfully take any fish

species being in excess of allocated quota the Owner will indemnify the Charterer against all losses, fines, penalties or costs, seizures and forfeitures imposed on the Charterer arising from any vessel over fishing or taking of fish without quota or howsoever.

11.5 **By catch** - The Charterer shall bear all costs of product seized by, or surrendered to, or penalties imposed by the New Zealand Government for by-catch taken in excess of quota resulting from the lawful taking of fish species against quota allocated to charter vessels in this charter agreement.

11.6 **Indemnity** - The Owner shall bear all risk of the fishing operation and hereby indemnifies the Charterer against all costs, claims, demands, liabilities, expenses and any loss or damage incurred by the Charterer, or against the Charterer, including but not limited to fines, seizures and forfeitures ordered against the Charterer, or otherwise incurred by the Charterer arising howsoever out of any act, neglect or default of the Owner, master, officers or crew,. . .The foregoing includes but is not limited to . . .

11.6.3 Breach of the provisions of the Fisheries Act 1983 and 1996 and any regulations thereunder. . .and any other laws, regulations or statutes applicable to fishing operations or the operation of fishing vessels.

. . .

### 12. Compliance with Charter Agreement and New Zealand Fisheries Laws

12.1 **Compliance by masters and crew** - The owner shall prior to the commencement and throughout the term of the charter:

12.1.1 Ensure that all masters and crews of vessels are fully informed of the terms and conditions of the charter agreement and the equipment, catch, vessel and forfeiture provisions of the fisheries laws and regulations of New Zealand.

12.1.2 Inform masters and crew of the severe penalties (including fines up to $NZ250,000.00 and the seizure of vessel and cargo per offense) under New Zealand law for breach of or failure to comply with the fisheries law for breach of or failure to comply with the fisheries laws and regulations of New Zealand [sic].

12.1.3 Ensure strict compliance by masters and crews with the requirements of all New Zealand fisheries laws and regulations including the strict obligations to keep, maintain and furnish on demand, records, returns and documentation as required by the MFish in respect of the catch and operations of vessels operating within the EEZ . . .

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

323
YOUNG, J.

12.4 **Owner's Acknowledgement** - The Owner on signing of this agreement acknowledges the strict obligations placed on vessels, masters, officers and crews to comply with all New Zealand legislation and the severe consequences to it and the Charterer in the case of a guilty conviction for any breach. . . .

[16] If the offences alleged by the Ministry were, indeed, committed by the masters and crews of *Irina Zharkikh* and *Ksenia Zharkikh*, then, under the charter agreement, Fishing Viv Ltd. and Spratt Ltd. must indemnify Raukura Moana Fisheries Ltd. against the resulting adverse consequences. Further, breaches of the quota management system, on the part of the masters and crews of the two vessels, would necessarily involve breach of the charter agreements and would thus expose Fishing Viv Ltd. and Spratt Ltd. to claims for damages at the suit of Raukura Moana Fisheries Ltd. If, however, it is the case that Raukura Moana Fisheries Ltd. (via its senior staff) were directly parties to any quota management frauds, then there may be an issue as to the enforceability of the indemnities.

[17] On the facts alleged by Raukura Moana Ltd., it has claims against Fishing Viv Ltd. and Spratt Ltd. which, in each case, can be said, broadly, to arise out of an "agreement relating. . .to the use or hire of a ship" which is accordingly within s. 4(1)(h), Admiralty Act, 1973 and thus to give rise to a statutory action in rem pursuant to s. 5(2) of that Act.

*The commencement of proceedings and the giving of security*

[18] The plaintiff commenced claims in rem in relation to both vessels on Oct. 5.

[19] In each case, the notice of proceedings in rem contained the following averment:

The plaintiff claims the sum of $37,801.54 being legal fees incurred to date, and such other sums as may be incurred by the plaintiff for its liabilities, costs, expenses and losses in respect of an investigation by the Ministry of Fisheries into alleged breaches of the Fisheries Act 1983 and 1996 by the owner and/or the Master and the crew of the Defendant vessel, in respect of which costs and expenses the owner of the Defendant vessel has agreed to indemnify the plaintiff under the terms of a Charter Agreement entered into in 1998.

[20] In each case, in the statement of claim cl. 11.6 of the charter agreement is set out. There is then a pleading that the owner:

[i]s required to indemnify the Plaintiff for all the costs referred to in paragraph 7 above, including all on-going costs.

The prayer for relief in each case seeks:

Judgment against the Defendant ship in the amount of all costs and expenses incurred as a result of the Ministry's investigation.

[21] I emphasize that at the time the proceedings were commenced, the Ministry had not laid any informations. Investigations, however, were underway and Raukura Moana Fisheries Ltd. had, in turn, commenced its own investigations into the allegations of quota management fraud.

[22] The vessels were not arrested. But, under threat of arrest, the plaintiff and the owners entered into an arrangement under which the owners gave security, in respect of each vessel, in the sum of N.Z.$150,000.

[23] This arrangement was recorded in joint memoranda of Counsel dated Dec. 1, 2000. These memoranda are in identical terms and provide:

1. This consent memorandum is filed on behalf of the Plaintiff and the Defendant in respect of security for the Plaintiff's claim. It is filed to record the terms upon which the parties have agreed to address this issue.

2. The Plaintiff has sought security in the sum of $150,000 for its claim. The Defendant says:

(a) That the Plaintiff is not entitled to security because its claim is based on a charterparty which is subject to an arbitration clause; and

(b) The security sought is excessive.

3. The Defendant wishes to ensure that it can deal with the Defendant vessel free from the Plaintiff's claim without further delay. The Plaintiff will not agree to withdraw its request for security.

4. In the circumstances, the Plaintiff and the Defendant are agreed that the Defendant will pay into court $150,000 with the Defendant reserving its rights in respect of 2(a) and 2(b). If those issues are not capable of agreement between the parties, the Defendant will make the appropriate application to the court.

5. Upon payment into court of the $150,000, the Plaintiff undertakes that it will not arrest or otherwise detain the Defendant vessel in respect of its claim in this proceeding.

[24] It will be necessary later to discuss exactly what is meant by this language and to refer in some detail to the context (or factual matrix) in which the agreements as to security were entered into.

*The initial applications by Fishing Viv Ltd. and Spratt Ltd.*

[25] Having given security, the owners then applied for orders that: (1) the proceedings be stayed; and that (2) the security for the claims (in

[2001] Vol. 2
N.Z. Ct.

**LLOYD'S LAW REPORTS**
The "Irina Zharkikh"

324
YOUNG, J.

the amounts of $150,000 plus interest in each proceeding) be paid back in part or in full to the owners.

[26] These applications were heard by me on Mar. 7, 2001. At the conclusion of the hearing I reserved judgment.

*Procedural steps taken since the hearing of Mar. 7, 2001*

[27] On Mar. 8 (that is the day after the hearing on Mar. 7) the charges to which I have referred were laid.

[28] The plaintiff then amended its claims. Very broadly, the differences between the claims as amended and the claims as filed are as follows: (1) the claims as amended expressly seek separate relief in relation to costs associated with the Ministry's investigation, costs associated with prosecution and deemed value assessments; (2) as well as claims on the indemnity provisions, the plaintiff now seeks damages (in a way which effectively mirrors its asserted rights to indemnity).

[29] The plaintiff arrested the two vessels on the basis of the amended claims and obtained a *Mareva* injunction, on an ex parte basis, based on evidence that sales, or possibly charter arrangements, were in the process of negotiation between the owners and third parties.

*Further application by Fishing Viv Ltd. and Spratt Ltd.*

[30] This produced, in turn, further applications by Fishing Viv Ltd. and Spratt Ltd. seeking release of the vessels from arrest, the discharge of the *Mareva* injunction and costs on an indemnity basis.

[31] I heard this application on Mar. 23.

*Overview of the arguments for the shipowners*

[32] The argument for the owners in relation to the application for stay and release of security proceeds along these lines:

1. By reason of submissions to arbitration contained in the charter agreements (to which I will refer shortly), the proceedings must be stayed pursuant to the Arbitration Act, 1996.

2. If arbitral awards are made, this would result in the underlying causes of action merging in the awards.

3. This means that there will never be a judgment in rem in relation to the vessel with the result that there is no justification for retaining, in Court, the N.Z.$300,000 paid in by way of security.

4. This Court does not have jurisdiction to require the owners to provide security against

awards which might eventually be made against them in arbitrations to be commenced under the charter agreements.

5. In any event, the security demanded and paid is excessive.

[33] In support of the application seeking release of the defendant vessels and discharge of the *Mareva* injunction and costs, the argument for the owners proceeds, broadly, along the following lines:

1. The earlier arguments just referred to are relied on.

2. In any event, by the Dec. 1, 2000 joint memoranda of Counsel, Raukura Moana Fisheries Ltd. agreed not to arrest the vessels in respect of its claims in these proceedings and its subsequent arrests of the vessels were in breach of the undertakings.

3. The *Mareva* injunction ought not to have been granted (either at all or in the terms as granted) because the necessary criteria had not been satisfied and/or the seeking of the *Mareva* injunction was inconsistent with the undertaking contained in the joint memoranda of Counsel.

4. In any event, on general considerations of justice grounds, the *Mareva* injunction ought to be discharged.

[34] The arguments, particularly those developed on Mar. 7, related very much a consideration of the English decisions, *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377 and *The Republic of India v. India Steamship Co. (The Indian Grace) (No. 2)*, [1998] 1 Lloyd's Rep. 1; [1998] A.C. 878. The arguments also involved debate as to the continued existence of a rule established in the Admiralty jurisdiction in the 19th century that an unsatisfied in personam judgment does not exclude a subsequent in rem claim.

[35] I propose to address the arguments raised by the shipowners, and the countervailing arguments put forward by Raukura Moana Fisheries Ltd., under the following headings:

1. Are the shipowners entitled to an unconditional stay of the in rem proceedings?

2. Where there is an arbitral award does the underlying cause of action merge in the award so that there is no longer any entitlement to sue on that cause of action?

3. The rule that an unsatisfied in personam judgment does not exclude a subsequent in rem claim.

4. The *Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377.

5. The *Republic of India v. India Steamship Co. (The Indian Grace) (No. 2)*, [1998] 1 Lloyd's Rep. 1; [1998] A.C. 878.

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

325
YOUNG, J.

6. The continued applicability of *The Rena K* principles in New Zealand.

7. The application of *The Rena K* principles in this case.

8. Was the security excessive?

9. Were the subsequent arrests of the vessels in breach of the undertaking in the joint memoranda of Counsel?

10. *Mareva* injunction.

11. Disposal of applications.

*Are the shipowners entitled to an automatic stay of the in rem proceedings?*

[36] Each of the charter agreements provides:

18. Arbitration and mediation

18.1 Any dispute between the Charterer and the Owner arising out of or in connection with this agreement shall be referred to arbitration in accordance with the Arbitration Act 1996, and except as herein expressly provided, the provisions of that Act shall apply. . . .

18.5 Schedules 1 and 2 of the Arbitration Act 1996 shall apply, save as amended by this Agreement. . . .

18.6 The provision for arbitration shall survive the expiration or early termination of this agreement but shall not prevent either party from exercising any express right of termination provided for at clause 19 of this agreement.

[37] Mr. Broadmore sought to argue that cl. 18.1 should not be read as providing for arbitration to be the only method of resolving legal disputes between the parties. His argument relied heavily on cl. 19.5 of the charter agreements which provides as follows:

Termination of this agreement shall not prejudice the legal rights of the Charterer to take such steps available at law and to pursue alternative remedies against the Owner.

His contention was that this clause pointed to the possibility of legal steps being taken by the parties otherwise than pursuant to arbitration. From this he argued that the submission to arbitration should not be treated as being exhaustive.

[38] This argument places more weight on cl. 19.5 than it can fairly bear. The provisions of cl. 18.1 are simple and direct and (subject to certain difficulties which I am about to discuss) it seems to me that the clause was intended to be exhaustive in the relevant sense. The existence of a clause such as 18.1 does not, of course, preclude the issue of proceedings. If there is no genuinely arguable issue associated with those proceedings then they may be taken to judgment notwithstanding the submission

to arbitration. As well, if both parties to any legal proceedings are content for the matter to proceed by way of litigation, rather than through the arbitral process provided for, then those proceedings may continue to be prosecuted through the Court. Further, cl. 19.5 was probably intended simply to make it clear that legal rights associated with the agreements, which accrue prior to their termination, continue to enure after that termination. So, having regard to all those factors, I am of the view that cl. 19.5 does not warrant the argument advanced by Mr. Broadmore and I put it on one side.

[39] The shipowners' contention that they can invoke the submissions to arbitration so as to require unconditional stays of the proceedings rests on the Arbitration Act, 1996. It is appropriate, therefore, that I should refer to the provisions of that Act which are relevant to the present case.

[40] Section 5 provides:

The purposes of this Act are -

(a) To encourage the use of arbitration as an agreed method of resolving commercial and other disputes; and

(b) To promote international consistency of arbitral regimes based on the Model Law on International Commercial Arbitration adopted by the United Nations Commission on International Trade Law on the 21st day of June 1985; and

(c) To promote consistency between the international and domestic arbitral regimes in New Zealand; and

(d) To redefine and clarify the limits of judicial review of the arbitral process and of arbitral awards; and

(e) To facilitate the recognition and enforcement of arbitration agreements and arbitral awards; and

(f) To give effect to the obligations of the Government of New Zealand under the Protocol on Arbitration Clauses (1923), the Convention on the Execution of Foreign Arbitral Awards (1927), and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (1958) (the English texts of which are set out in the Third Schedule).

[41] Section 10 provides:

(1) Any dispute which the parties have agreed to submit to arbitration under an arbitration agreement may be determined by arbitration unless the arbitration agreement is contrary to public policy or, under any other law, such a dispute is not capable of determination by arbitration.

(2) The fact that an enactment confers jurisdiction in respect of any matter on the High Court or

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

326
YOUNG, J.

a District Court but does not refer to the determination of that matter by arbitration does not, of itself, indicate that a dispute about that matter is not capable of determination by arbitration.

Section 12 provides:

(1) An arbitration agreement, unless otherwise agreed by the parties, is deemed to provide that an arbitral tribunal -

(a) May award any remedy or relief that could have been ordered by the High Court if the dispute had been the subject of civil proceedings in that Court:

(b) May award interest on the whole or any part of any sum which -

(i) Is awarded to any party, for the whole or any part of the period up to the date of the award; or

(ii) Is in issue in the arbitral proceedings but is paid before the date of the award, for the whole or any part of the period up to the date of payment.

(2) Nothing in this section affects the application of section 10 or article 34(2)(b) or article 36(1)(b) of the First Schedule.

[43] Clause 8 of the First Schedule provides:

(1) A court before which proceedings are brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting that party's first statement on the substance of the dispute, stay those proceedings and refer the parties to arbitration unless it finds that the agreement is null and void, inoperative, or incapable of being performed, or that there is not in fact any dispute between the parties with regard to the matters agreed to be referred.

(2) When proceedings referred to in paragraph (1) have been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.

[44] Clause 9 of the First Schedule provides:

(1) It is not incompatible with an arbitration agreement for a party to request before or during arbitral proceedings, from a court an interim measure of protection and for a court to grant such measure.

(2) For the purposes of paragraph (1), the High Court or a District Court shall have the same power as it has for the purposes of proceedings before that court to make -

(a) Orders for the preservation, interim custody, or sale of any goods which are the subject-matter of the dispute; or

(b) An order securing the amount in dispute; or

(c) An order appointing a receiver; or

(d) Any other orders to ensure that any award which may be made in the arbitral proceedings is not rendered ineffectual by the dissipation of assets by the other party; or

(e) An interim injunction or other interim order.

(3) Where a party applies to a court for an interim injunction or other interim order and an arbitral tribunal has already ruled on any matter relevant to the application, the court shall treat the ruling or any finding of fact made in the course of the ruling as conclusive for the purposes of the application.

[45] The fundamental problem in this case is that arbitral tribunals established pursuant to the charter agreements would not have an in rem jurisdiction in respect of the ships. The reason is simple enough: judgments in rem in respect of these vessels would bind parties who are, themselves, not subject to the arbitration agreement. An arbitral tribunal does not have the power to bind parties who are not subject to the arbitration agreement.

[46] The parties did not seek to argue otherwise. Nonetheless, and for the avoidance of any doubt, I record that, in reaching this view, I have had regard to ss. 10(2) and 12(1)(a), Arbitration Act.

[47] In my view, s. 10(2) should be construed as applying only to legislative provisions that apply inter partes (e.g. as to an entitlement to claim interest under the Judicature Act or the particular provisions which may govern contractual rights pursuant to, for instance, the Illegal Contracts Act, the Contractual Mistakes Act, and the Contractual Remedies Act). The same is true of s. 12(1)(a).

[48] In the course of the argument before me, I raised with Counsel the possibility that the inability of an arbitrator to make an award in rem meant that the present claims by the plaintiff were not properly justiciable by way of arbitration. Such a result could be reached by one or more of the following analyses:

(1) Under s. 10, Arbitration Act, 1996, the present dispute is not capable of determination by arbitration because an arbitrator cannot make an award in rem. (2) Pursuant to cl. 8(1), First Schedule, the arbitration agreement is "inoperative, or incapable of being performed" in respect of a statutory claim in rem. (3) The word "dispute" in cl. 18.1 of the charter agreements must be construed as being confined to a dispute which is capable of resolution by arbitration and a dispute as to the existence, or otherwise, and/or the quantum of a statutory in rem claim is not such a dispute.

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

327
YOUNG, J.

[49] If this line of argument is taken on to its logical conclusion, it means that there would be no overall stay of the proceedings albeit that, in the context of the two claims, disputed issues of fact and law might be subject to arbitration. The existence and quantification of any in personam claim as between Raukura Moana Fisheries Ltd. and the shipowners can be regarded, fairly, as being a subset of the ultimate issue as to the existence or otherwise of an in rem claim. So it may be that, on this analysis of the situation, the proceedings should be stayed pending determination by arbitration of all in personam issues but on the basis that, once these issues are resolved by arbitration, Raukura Moana Fisheries Ltd., if successful, can continue to pursue the in rem claims.

[50] This is the simplest approach to the problems thrown up in this part of the case. But it was not relied on by Mr. Broadmore as a discrete ground of opposition to the stay application. The point was effectively dropped on Counsel by me and they had no opportunity to reflect upon it and consider any relevant authorities. Furthermore, I am conscious of the fact that this argument, if it is sound, could well have been deployed in other cases which have been decided on other grounds, notably *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377.

[51] In those circumstances, I simply note that my preliminary view is along the lines set out in pars. [48] and [49].

[52] In the balance of this judgment, I will assume that Counsel were right to approach the case on the basis that the shipowners are entitled to an unconditional stay of the proceedings - an approach which was, of course, subject to Mr. Broadmore's argument based on cl. 19.5 of the agreement which I have rejected.

*Where there is an arbitral award does the underlying cause of action merge in the award so that there is no longer any entitlement to sue on that cause of action?*

[53] Mr. Tetley's argument was that, in general, an arbitral award exhausts the underlying cause of action. So, even if the award is not performed, there is no right to sue on the underlying cause of action. This proposition is supported by *Gascoyne v. Edwards*, (1826) 1 Y. & J. 19; 148 E.R. 569. In that case, two causes of action were alleged, the first upon a lease and the second upon a submission to arbitration by deed which had been intended to resolve the dispute over the lease. The defendant by way of defence to the first cause of action pleaded the arbitral award. There was no plea of performance and it is, therefore, to be inferred that the award had not been complied with. The Court of

Exchequer held that the defence was good and that the parties were confined to a claim on the award.

[54] Where a claim which can be the subject of the in rem procedure is referred to arbitration and is the subject of an award, the in rem procedure cannot then be invoked by way of an action on the award, see *The Bumbesti*, [1999] 2 Lloyd's Rep. 481. That decision was to the effect that a claim on an award pursuant to a submission to arbitration contained in a charter agreement was not, itself, a "claim arising out of any agreement relating. . .to the use or hire of a ship", within the meaning of the English provision corresponding to s. 4(1)(h), Admiralty Act.

[55] So, relying on these cases, Mr. Tetley was able to argue that if the present proceedings were stayed, there would never be a judgment in rem because the eventual award of the arbitral tribunal would exhaust the in rem claims and the award, itself, could not be the subject of in rem claims.

[56] Mr. Broadmore, in his submissions, pointed out that law as to merger of underlying causes of action in arbitral awards was of some difficulty. But he did not seek to dispute Mr. Tetley's contentions as just set out. I have to say, however, that the underlying legal principles are not necessarily quite as simple as Mr. Tetley contended.

[57] It is certainly arguable, on the authorities, that an award on an arbitration which merely establishes the existence and quantification of a debt does not exhaust the underlying cause of action. This was, indeed, the conclusion reached in *The Argo Hellas*, [1984] 1 Lloyd's Rep. 296. In *F. J. Bloeman Pty Ltd. v. Gold Coast City*, [1973] A.C. 115, Lord Pearson referred to:

[t]he distinction between an award which merely establishes and measures a liability under the contract and so does not create a fresh cause of action and an award of damages which supersedes the liability under the contract and creates a fresh cause of action . . .

[58] So the cases do seem to draw a distinction between claims for damages which are settled by arbitral award (in which case there is judicial unanimity that the underlying cause of action merges in the arbitral award) and claims for debt (where the prevailing view is, rather, that there is no merger).

[59] As I have already indicated, there are different ways in which the claims by the plaintiff can be analysed. It is certainly arguable that, at least to the extent to which the plaintiff seeks to rely on the indemnity provisions, an arbitral award determining what is owed to it by the shipowners would be in the nature of claim in debt (i.e. being for a liquidated amount, that is a sum which would be liquidated at least as at the date of trial) and would

not exhaust the underlying cause of action. If so, an award by arbitrators would not preclude the plaintiff, after the award had been issued, enforcing that debt (and thereby indirectly the award) by continued prosecution of the in rem proceedings. On the other hand, as I have indicated, the plaintiff may well have claims in damages against the shipowners, claims which, in effect can be regarded as being the same as the claims based on the indemnity provisions. An arbitral award fixing damages would exhaust the underlying causes of action.

[60] On the face of it, it would be open to Raukura Moana Fisheries Ltd. to avoid the merger arguments by abandoning claims for damages and focusing solely on its claims in relation to the indemnity provisions.

[61] The absence of argument focused on this issue means that I am reluctant to decide the case on the basis of the distinction between an arbitration award which determines liability in relation to a debt as opposed to one which fixes damages. However, if it is the case that an arbitrator's award determining the existence and quantum of a debt does not preclude the creditor suing in the Courts for that debt, then the possibility of there being eventually in rem judgments in these cases would not be able to be excluded.

*The rule that an unsatisfied in personam judgment does not exclude a subsequent in rem claim*

[62] Mr. Broadmore, while not really challenging the contention that, in general, an arbitral award precludes a claim on the underlying cause of action, relied on what he says is the rule that an unsatisfied in personam judgment does not exclude a subsequent in rem claim, a rule which he says is applicable to arbitral proceedings.

[63] There are, indeed, many cases in which earlier in personam proceedings and judgments have been held not to preclude a subsequent in rem claim. Cases in this category include *The Bengal*, (1859) Swab. 468; 166 E.R. 1220, *The John and Mary*, (1859) Swab. 471; 166 E.R. 1221, *Yeo v. Tatem (The Orient)*, (1871) L.R. 3 P.C. 696 and *The Cella*, (1888) 13 P.D. 82.

[64] Because the point will be material later, I note that most of these cases involved maritime liens rather than statutory in rem claims. *The Cella*, however, undoubtedly involved a statutory in rem claim.

[65] Mr. Broadmore's argument was that this rule should be applied in cases where there is an unsatisfied arbitral award as well as where there is an unsatisfied in personam judgment. In this regard he relied on *The Sylph*, (1867) L.R. 2 A. & E. 24 a case concerning an arbitration. The submission to

arbitration had expressly reserved all rights and remedies of the plaintiff in the event that the award of the arbitrator should not be performed (which turned out to be the case). So the contention which was raised in opposition to the plaintiff's subsequent in rem claim, that it was barred by the award, was not long on merit. The reservation of all rights, in the submission to arbitration, was probably decisive against this argument. But Sir Robert Phillimore, in rejecting the argument, went on to say that:

> . . .I have borne in mind also the other objections which were stated by the counsel for the plaintiff, among them, that arbitration could not be put higher than a judgment; and the case of *Nelson v. Couch* 15 CB (NS) 99 was cited, establishing the principle that a judgment in another court upon the question of personal damages would not prevent proceedings *in rem* in the Court of Admiralty.

So, as a matter of authority as well as logic, the rule that an unsatisfied in personam judgment does not exclude a subsequent in rem claim applies, by way of analogy, in the case of an unsatisfied arbitral award. Indeed, as will become apparent, this was the view taken in *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377 which I now turn to discuss.

*The Rena K, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377*

[66] The case closest to the present in terms of its underlying facts is *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377. This involved claims by cargo-owners relating to damage to cargo. The agreement between the cargo-owners and the shipowners provided for any dispute to be settled by arbitration in London. The cargo-owners commenced in rem proceedings and had the vessel arrested. This resulted in an arrangement under which security was provided on terms that it would be cancelled if the Court should subsequently decide that the shipowners were entitled to a stay of the action and, as at the date the ship was arrested, had been entitled to the unconditional release of the ship from arrest and that the cargo-owners were not entitled to a *Mareva* injunction by way of alternative security.

[67] Section 1 of the Arbitration Act, 1975 (United Kingdom) was in terms which were, in substance, the same as cl. 8 to the First Schedule to the Arbitration Act, 1996. So the shipowners claimed that a stay of the proceedings was mandatory and that there was no jurisdiction to make such stay conditional on the provision of security. They further argued that this meant that their entitlement to an unconditional stay meant that they

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

329
YOUNG, J.

had been entitled to secure the release of the ship from the moment it was arrested. They also contended that the in rem procedure did not provide a mechanism by which claimants could obtain security to ensure payment of arbitral awards. Their contention was that security could only be provided against what might later be awarded in the in rem proceedings and, because of their entitlement to a stay, there never would be an in rem judgment. So their argument was very much the same as that which has been advanced to me for the shipowners in the present case.

[68] No argument was advanced to Mr. Justice Brandon along the lines indicated in pars. [45]-[49] of this judgment. The cargo-owners, however, did argue that the impecuniosity of the shipowners (which they alleged) meant that the arbitration agreement was "incapable of being performed", a contention which was rejected by the Judge in these terms:

It follows. . .that the context in which the words "incapable of being performed" are used is the context of the recognition and enforcement or [*sic semble* of] arbitration agreements which, if valid and effective, will result in awards being made; and not the context of the recognition and enforcement of such awards themselves after they have been made. Having regard to that context it appears to me that the words "incapable of being performed" should be construed as referring only to the question whether an arbitration agreement is capable of being performed up to the stage when it results in an award; and should not be construed as extending to the question whether, once an award has been made, the party against whom it is made will be capable of satisfying it.

The Judge also rejected, on the facts, the contention that such impecuniosity had been proved.

[69] Mr. Justice Brandon, having, therefore, on the basis of the arguments addressed to him (which did not extend to the arguments which I have identified in pars. [45]-[49] of this judgment) concluded that the shipowners were entitled to an unconditional stay of the proceedings from the moment they were commenced.

[70] Mr. Justice Brandon then addressed a number of background issues which enabled him to identify the fundamental issue which required determination in the case. As part of this exercise he concluded that:

1. The Court had no jurisdiction to keep the ship under arrest in order to provide the cargo-owners with security for an award in the arbitration. It only had jurisdiction to keep the vessel under arrest in order to provide security for a judgment or settlement in the action.

2. The possibility that the stay might be removed because supervening events would render the arbitration agreement inoperative or incapable of performance was too remote to justify the keeping of a vessel under arrest.

3. A failure by the shipowners to satisfy any award which the cargo-owners might later obtain in the arbitration would not "necessarily be good cause for removal of the stay". In the view of the Judge, the charterers would be entitled to either enforce the award as a judgment or to sue for breach of the arbitration agreement. In any event, he was not satisfied that there was sufficient evidence before the Court to show that the shipowners would not meet an award against them.

4. Upon a stay of proceedings being granted, the issue as to what should happen to any security which had been provided was a matter of discretion under the relevant rules of Court. In a case in which, in all probability, there would be no judgment in the in rem proceedings, the security ought to be unconditionally released. But in a case where this was not the case, the Court, in its discretion, might retain the security.

[71] That background analysis meant that the fundamental issue which the Judge had to address was whether there was any significant prospect of a judgment *in rem* ever being obtained by the cargo-owners. If there was no such prospect, there could be no basis for the cargo-owners retaining security. If there was such a prospect, then the Court, in its discretion, could retain the security.

[72] The Judge then concluded that there was, indeed, a significant prospect of a judgment in rem ultimately being obtained. His reasons were as follows:

Mr. Howard for the shipowners contended that it was wrong to suggest that, if an award should be made against the shipowners and they should be unable to satisfy it, the cargo-owners' would then be in a position to have the stay of the action removed and to obtain a judgment in rem in it. It was wrong, he said, because, once an award was made, the cargo-owners' cause of action would become merged in the award and would therefore no longer be available to them for prosecution in the action. In these circumstances the whole argument for the cargo-owners broke down, and the whole basis for keeping the ship under arrest, or only releasing her subject to a term for the provision of alternative security, disappeared.

This contention involves a consideration of the law of merger in relation, firstly, to arbitral awards, and, secondly, to causes of action in rem. I am prepared to assume, without finally deciding, that, just as a cause of action in personam which is adjudicated upon by an English court

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

330
YOUNG, J.

merges in the judgment of that court, so also a similar cause of action which is adjudicated upon by an English arbitral tribunal merges in the award of the tribunal. . . .

It has, however, been held that a cause of action in rem, being of a different character from a cause of action in personam, does not merge in a judgment in personam, but remains available to the person who has it so long as, and to the extent that, such judgment remains unsatisfied: *The Bengal*, (1859) Swab. 468; *The John and Mary*, (1859) Swab. 471; *The Cella*, (1888) 13 P.D. 82; see also *The Sylph*, (1867) L.R. 2 A. & E. 24 (although this may have turned partly on an express reservation made in the submission to arbitration concerned) and *Yeo v. Tatem (The Orient)*, (1871) L.R. 3 P.C. 696. The situation must, in my view, be the same as in the case of an arbitral award, which is likewise based on a cause of action in personam.

It was argued for the shipowners that this exception to the general rule of merger applied only when the cause of action in rem was founded on a maritime lien, which the cargo owners' claim in the present case is not. The first two cases referred to above, *The Bengal*, Swab. 468 and *The John and Mary*, Swab. 471 were certainly maritime lien cases, the claim in the former being for wages and in the latter for damages by collision. But the observations of Sir James Hannan P. in the third case, *The Cella*, 13 P.D. 82 at p. 85 related to a claim for repairs and necessaries made under s. 4 of the Admiralty Court Act, 1861, in respect of which the plaintiff had no maritime lien, but only, like the cargo-owners in the present case, a statutory right of action in rem. I cannot see any good reason in principle for distinguishing in this respect between a cause of action founded on a maritime lien and one founded on a statutory right in rem. It appears to me, therefore, both on principle and authority, that the distinction suggested is not a valid one.

[73] On the basis of this reasoning, the Judge concluded that the shipowners were not entitled, as at the date the vessel was arrested, to its unconditional release. This resolved this particular issue in favour of the cargo-owners. It left the Judge in a situation where, upon the grant of a stay, he had a discretion whether or not to retain the security.

[74] This issue of discretion turned on the Judge's assessment of the likelihood of the shipowners being able to meet an award made against them in the arbitration proceedings. It is apparent from the way the Judge dealt with this issue that he did not consider there was any particular onus of proof on the cargo-owners. He had earlier identi-

fied, in relation to the arguments and considerations identified in pars. [68] and [70] hereof, issues of fact which, broadly could be said to relate to the claim by the cargo-owners that if they were successful at the arbitration, any resulting award would not be satisfied. He held that the cargo-owners had not made out that contention because "the evidence shows a clear possibility" that the award would be met. But when he came to address the issue at hand, he said:

I have no hesitation in concluding that this is a case in which, if the cargo-owners should obtain an award in respect of the full amount of their claim, the shipowners might well be unable to satisfy it, either themselves or through the medium of the club.

[75] *The Rena K* has been followed in New Zealand and Australia, see *Marine Expeditions Inc. v. The Ship "Akademik Shokalskiy"*, [1995] 2 N.Z.L.R. 743 and *Ocean Industries Pty Ltd. v. Owners of the Ship "Steven C"*, [1994] 1 Qd.R. 69. It was also approved and applied by the English Court of Appeal in *The Tuyuti*, [1984] 2 Lloyd's Rep. 51; [1984] Q.B. 838. The approach taken in *The Rena K*, however, has now been overtaken by legislation in the United Kingdom. The reasons why this legislation was passed were explained by Lord Justice Lloyd in *The Bazias 3*, [1993] 1 Lloyd's Rep. 101; [1993] Q.B. 673:

The decision in *The Rena K*, [1978] 1 Lloyd's Rep. 545; [1979] Q.B. 377 was very welcome at the time and the principle was, as I understand it, frequently applied. But it was in a sense a compromise and, although the solution found by Mr. Justice Brandon was ingenious, it was over-cumbersome. In particular it had this disadvantage that much time was taken up at the early stages of every dispute, where a vessel had been arrested and where the claim was subject to arbitration, in determining on affidavit evidence whether an award was likely to be met or not. It was to deal with those disadvantages, as well as to bring proceedings in arbitration in line with proceedings in foreign Courts, that Parliament enacted s. 26 of the 1982 Act.

*The Republic of India v. India Steamship Co. (The Indian Grace) (No. 2), [1998] 1 Lloyd's Rep. 1; [1998] A.C. 878*

[76] Mr. Tetley's principal argument to me was that the legal premises which underpinned the conclusions of Mr. Justice Brandon in *The Rena K* had been so undermined by the judgment of the House of Lords in *The Republic of India v. India Steamship Co. (The Indian Grace) (No. 2)*, [1998] 1 Lloyd's Rep. 1; [1998] A.C. 878 that *The Rena K* must now be regarded as having been overruled. So

I must discuss this later case in some detail as well.

[77] The case concerned a cargo of munitions loaded on board the vessel *Indian Grace* in Sweden for carriage to Cochin in India. The cargo-owner was the Republic of India and the owner of the vessel was India Steamship Co. Ltd. In the course of the voyage there was a fire on board which the crew managed to extinguish. As a direct result of the fire, a small part of the ammunition cargo (amounting to only 51 artillery shells and 10 charges) was thrown overboard. As well, at least on contention of the Indian government, there was also extensive damage to the balance of cargo caused either by the fire or the fire-fighting efforts of the crew.

[78] The Indian government commenced proceedings in a Court at Cochin against the shipowners in respect of the cargo shortage (that is the munitions which had been thrown overboard). This was on Sept. 1, 1988. On Aug. 25, 1989, a writ in rem was issued in England against *Indian Grace* and 15 other vessels in the same ownership. The claim was for loss of, or damage to, the cargo. The amount claimed was £2,600,000. The proceedings in Cochin came to trial and resulted, on Dec. 16, 1989, in judgment for the full amount claimed (which was approximately £7500). The shipowners then applied to have the English proceedings struck out on the basis of s. 34 of the Civil Jurisdiction and Judgments Act, 1982. This section provides:

No proceedings may be brought by a person in England and Wales or Northern Ireland on a cause of action in respect of which a judgment has been given in his favour in proceedings between the same parties, or their privies, in a court in another part of the United Kingdom or in a court in an overseas country, unless that judgment is not enforceable or entitled to recognition in England or, as the case may be, in Northern Ireland.

[79] Broadly, the argument for the shipowners was that the cause of action in Cochin was the same as the cause of action in the in rem proceedings in England and, further, that the proceedings were between the same parties or their privies.

[80] I will not set out in detail the convoluted history of the proceedings in England (where the litigation went through the High Court, Court of Appeal and House of Lords not once but twice). It is sufficient to say that in the second round of the litigation, Mr. Justice Clarke held, at first instance, that s. 34 did not apply because the parties to an action in personam were not the same as the parties to an action in rem even though the cause of action was the same. In reaching this conclusion he relied on, inter alia, *The Rena K* and *The Cella* and, in

reliance in particular upon *The Cella* he rejected the contention that the cases referred to in pars. [63]-[65] establish a principle of relevance only to claims involving maritime liens.

[81] The shipowners' appeal to the Court of Appeal was allowed and a further appeal by the cargo-owner in the House of Lords was dismissed.

[82] In the Court of Appeal, Lord Justice Staughton noted:

*It is well established since the time of Dr. Lushington that a plaintiff who has an unsatisfied judgment in personam can proceed by an action in rem. Presumably there would be no advantage in doing so unless there had been a change in ownership of the vessel; otherwise the plaintiff could employ ordinary methods of execution. . .Similarly a plaintiff who has proceeded in rem, recovered judgment against the vessel, and is left with it only partially satisfied, may start a second action in personam. Those two propositions emerge from The John and Mary, (1859) Swab. 471; Nelson v. Couch, (1863) 15 C.B. (N.S.) 99, The Cella, (1888) 13 P.D. 82, The Joannis Vatis (No. 2), [1922] P. 213 and The Rena K, [1979] Q.B. 377. In the last case Mr. Justice Brandon said, at p. 405:*

It has, however, been held that a cause of action *in rem*, being of a different character from a cause of action *in personam*, does not merge in a judgment *in personam*, but remains available to the person who has it so long as, and to the extent that, such judgment remains unsatisfied. . ..

. . .

*Can it be that by s. 34 Parliament has, in a case where the first of two actions is brought in a foreign court. . .abolished the well established rule that a judgment in personam is no bar to an action in rem and vice versa? If so, it is hard to see the rhyme or reason of it.* We are however convinced that s. 34 must have been intended. . .to prevent the same cause of action being tried twice over between those who are, in reality, the same parties. Where the owners of the vessel served in an Admiralty action in rem are the same persons as would be liable in an action in personam, that test is satisfied, as it is in this case. We therefore hold that the Government's claim is barred by s. 34. The effect of s. 34 where an action *in rem* is brought against a ship in new ownership, or where for any other reason some other person acknowledges service in such an action, can be left until another day. (Emphasis added.)

[83] This is a suitable point at which to pause. The judgment of the Court of Appeal proceeds on

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

332
YOUNG, J.

the basis that s. 34 of the Civil Jurisdiction and Judgments Act, 1982 reversed the old rule that an unsatisfied judgment in personam did not prevent a subsequent claim in rem in respect of the same cause of action. Such an approach has no implications for the continued application of *The Rena K* principles in New Zealand and, in particular, in respect of this case. This is because there is no legislation in New Zealand analogous to s. 34 of the Civil Jurisdiction and Judgments Act.

[84] In the House of Lords, the principal speech is that of Lord Steyn (with all other law Lords expressing concurrence in his conclusions). So, in effect, Lord Steyn was speaking for the House of Lords and, plainly, I must pay considerable respect to what he said. For all that, however, it is also true that what he said in that speech must be read secundum subjectam materiam.

[85] The fundamental argument which Lord Steyn addressed and rejected was the Indian government's contention that the proceedings in Cochin did not involve the same parties as the proceedings in England because the proceedings in England were against the ship. By arguing that the proceedings were against the ship, the government of India invoked what has been referred to as "personification theory of maritime liability". That theory is not purely metaphorical. In the event that the shipowners had not entered an appearance in the in rem proceedings, there would have been no possibility of judgment against them in those proceedings but the ship itself would have been sold.

[86] The cases establishing the rule that an unsatisfied in personam judgment does not preclude a later in rem claim were not directly relevant. This is because the Cochin judgment had, in fact, been satisfied. They were indirectly relevant to the issue which Lord Steyn determined for two reasons. First, Counsel for the Indian government relied on these cases as being exemplars of the personification theory of maritime liability. Secondly, as Lord Justice Staughton had recognized, the existence of the rule established by these cases sat uneasily with a literal approach to s. 34. Section 34, on a literal interpretation, would exclude application of the rule in the case of prior in personam judgments in foreign jurisdictions but not where the prior in personam judgment was in English proceedings.

[87] In his speech, Lord Steyn unequivocally rejected the personification theory of maritime liability. So, for this (and indeed) other reasons, the arguments of the Indian government were rejected.

[88] Lord Steyn did, however, as well, deal with the cases which established the rule that an unsatisfied in personam judgment does not preclude a later in rem claim. He did this by setting out those

parts of the judgment of Lord Justice Staughton, which I have italicized in the extract set out in par. [82] and then saying:

Counsel were agreed that the rule to which Staughton L.J. referred was established in cases involving maritime liens. The House was not referred to authority extending the rule beyond maritime liens. It is an ancient and strange rule which I would not wish to extend beyond the limits laid down by authority. To that extent the scope of any anomaly is less than may have been apparent in the Court of Appeal.

Then, after addressing an issue upon which he, in the end, expressed no view on, Lord Steyn went on:

Finally I must point out that there is an argument that the old rule has simply been abolished by section 34; see Briggs and Rees, Civil Jurisdiction and Judgments, 2nd ed., (1977), p. 359. Since this point has not been explored in argument, I will express no final view on it. If any anomaly exists, it is quite insufficient to displace the compelling arguments in favour of the applicability of s. 34 in the present case.

[89] Understandably, Mr. Tetley, for the shipowners, relied heavily on Lord Steyn's speech. Lord Steyn was of the view that the rule that an unsatisfied in personam judgment did not preclude a subsequent in rem claim was confined to cases involving maritime liens. If that is the case, *The Cella* was wrongly decided. Indeed, if it is the case the rule applies only in the case of maritime liens, then an essential step in the reasoning of Mr. Justice Brandon in *The Rena K* was also wrong. So Mr. Tetley was able to argue that, in substance, *The Rena K* has been overruled.

[90] The remarks made by Lord Steyn which were relied on by Mr. Tetley, however, are, at least to my mind, puzzling. Lord Steyn said:

The House was not referred to authority extending the rule beyond maritime liens.

Yet, two cases (*The Cella* and *The Rena K*) in which the rule was applied beyond maritime liens, are referred to in the passage from Lord Justice Staughton's judgment which Lord Steyn set out. Indeed, the proposition that the rule was confined to maritime liens cases had been considered at first instance by Mr. Justice Clarke and rejected by reference to *The Cella* and *The Rena K*.

[93] Mr. Tetley's argument relies essentially on the following two sentences in the speech of Lord Steyn:

The House was not referred to authority extending the rule beyond maritime liens. It is an ancient and strange rule which I would not wish

| [2001] Vol. 2 | LLOYD'S LAW REPORTS | 333 |
| N.Z. Ct. | The "Irina Zharkikh" | YOUNG, J. |

to extend beyond the limits laid down by authority.

[92] At the very best, this is an overruling by implication of *The Rena K*. But the reasons given by Lord Steyn indicating that he was not aware of any authority which extended the rule "beyond maritime liens" would be an odd way of overruling a case which had, in fact, extended the rule beyond maritime liens.

[93] Further, if Lord Steyn had appreciated that the rule had been applied in cases dealing in statutory in rem claims, it is far from clear to me that he would have seen the need to overrule those cases. His view would presumably still have been that:

[I]f any anomaly exists, it is quite insufficient to displace the compelling arguments in favour of the applicability of section 34 in the present case.

[94] Finally, I note that the demolition of the personification theory of maritime liability does not, in itself, undermine the continued applicability of *The Rena K*. Although it is possible to read some of the cases establishing the rule that an unsatisfied in personam judgment does not exclude a later in rem claim as at least referable to the view that a claim in rem is against the ship, there is also the view, which also runs through the cases, that a claimant who has an in rem claim should be regarded as having a "two-fold security" and when the first, a claim in personam, fails to produce any tangible result, is entitled to resort to the second (namely the in rem claim). This is the way the situation was analysed by Dr. Lushington in *The John Mary*, sup.

*The continued applicability of the Rena K principles in New Zealand*

[95] There are other reasons why I should be slow to hold that *The Rena K* is no longer good law in New Zealand:

1. It has been followed in New Zealand.

2. It is highly likely that there has been legislative inaction in New Zealand largely because of the assumption that maritime lawyers that an arbitration submission does not exclude statutory in rem claims. There must be many submissions to arbitration which have been agreed to by parties whose legal advisers assumed that the in rem procedure will still be available.

3. The practical effect of Mr. Tetley's submission is that, in any maritime case, contracting parties who agree to a submission to arbitration thereby exclude their right to pursue an in rem claim in the event that the other party to the submission invokes the Arbitration Act, 1996. If this is correct, this

would have the practical effect of allowing agreements as to procedure (that is to refer disputes to arbitration) to have considerable impact on the substantive rights of the parties, impact which was unlikely to have been appreciated when those agreements were entered into. I am reluctant, therefore, to uphold such a contention unless compelled by plain authority to do so. I do not believe that I am so compelled.

[96] In those circumstances, I am of the view that it would not be right for me, as a New Zealand Judge, to conclude that *The Rena K* has been overruled.

*Application of the Rena K principles in this case*

[97] The issue as to whether the security must be returned to the owners therefore turns on whether I can say fairly that, assuming success by Raukura Moana Fisheries Ltd. at arbitration, it might well not be paid by the shipowners, see par. [74] above. This test does not involve the imposition of a burden of proof on the plaintiff to show impecuniosity. I simply have to form a judgment on the issue based on the material I have before me.

[98] I have no doubt that it is the case that Raukura Moana Fisheries Ltd., if successful at arbitration, might well not be able to secure payment from the shipowners. The reasons for this conclusion are:

1. The shipowners are shadowy entities, registered in a secrecy respecting jurisdiction. They have not made any disclosure of their assets or given any undertakings as to preservation of their assets pending determination of this dispute. They do not need to do so and I well know that fleet ownership is often enough organized through a structure of companies registered in such jurisdictions where each company owns only a single ship. However, it is inescapable that those who organize fleet ownership in this way make clear their intention to minimize exposure to creditors.

2. The shipowners and those behind them have no apparent continuing link with New Zealand other than the continuing presence here of the two vessels. If they go to arbitration and lose, and by then the vessels are out of the jurisdiction, there is no ground for confidence that any award will be able to be enforced against the owners and little reason to suppose that the owners will voluntarily meet their obligations under such award.

3. Such limited material as has emerged (both before and after the hearing on Mar. 7) as to the financial circumstances of the two ship-owning companies while, in part, answered, still leave me a little uneasy about the very limited and specific disclosure made on their behalf in these proceedings. For instance, taxes in Belize for the period

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

334
YOUNG, J.

1998-2000 in respect of the vessels were unpaid as at late last year. According to affidavits now filed, all money now outstanding in Belize has been paid. Further, although it was asserted in affidavits filed on behalf of the shipowners that they had no debts, a search of the relevant company records in Vanuatu showed that each, on Mar. 19, 1999, had granted security over their assets to Prok Bank Ltd., a company which, perhaps, has some involvement in their ultimate beneficial ownership. The response, again very specific, was simply that Prok Bank Ltd. is being liquidated, no money is owing, and the charges are to be released. Yet there was no disclosure as to what the floating charges related to, how whatever money was originally secured came to be repaid and what, if any, implications the liquidation of Prok Bank Ltd. may have for the two shipowing companies. There is no evidence as to how the acquisition of the two vessels by these companies was financed or as to their underlying capital structure.

4. The primary positive arguments of Mr. Tetley for the shipowners as to their willingness and ability to meet any award relate to the payment in of security and the association between the shipowners and Raukura Moana Fisheries Ltd. But the payment of security was, in a sense, compulsory in the sense of being required if arrests were to be avoided. The pre-investigation relationship between Raukura Moana Fisheries Ltd. and the shipowners, of course, occurred in a very different environment from the present.

I note that a broadly similar issue is discussed later in this judgment, see pars. [121]-[127].

[99] So for those reasons I am of the view that the security, in each case, ought not to be repaid. This does, however, leave outstanding the issue whether the security paid was excessive.

*Was the security excessive?*

[100] In accordance with the views which I have just expressed, the issue as to whether the security demanded and paid was excessive falls to be determined by reference to the test expressed by Mr. Justice Brandon in *The Moschanthy*, [1971] 1 Lloyd's Rep. 37 at p. 44:

The plaintiff is entitled to sufficient security to cover the amount of his claim with interest and costs on the basis of his reasonably arguable best case.

[101] Mr. Tetley's argument to me on Mar. 7 that the security demanded and paid was excessive focused on a very narrow view of the nature of the claim. He, in effect, sought to confine the claims to indemnity for investigation costs actually incurred up to Oct. 5, 2000. If the claim by Raukura Moana Fisheries Ltd. in the proceedings should be treated

as being confined to investigation costs as at Oct. 5 or, indeed, as at December, 2000, there can be no doubt that the security was excessive.

[102] The shipowners have, however, now resiled from this narrow view of the claim as espoused by Mr. Tetley on Mar. 7. This is because the apparent correlative of Mr. Tetley's Mar. 7 argument is that it would be open to Raukura Moana Fisheries Ltd. to amend its proceedings (as it has done) to seek broader relief and arrest the vessels in relation to the amended claim (which it has now also done). In other words, Mr. Tetley's Mar. 7 argument is consistent with the view that the claims for which security was given were confined to investigation costs only. If so, the undertakings given by Raukura Moana Fisheries Ltd. could hardly, fairly, be treated as precluding arresting the vessels for more extensive claims associated with the consequences of prosecution.

[103] For reasons which I am going to come to shortly, I am of the view that a narrow view of the claim, either generally or for the purposes of the joint memoranda of Counsel, is not tenable. In turn this means that the argument that the security which was sought and paid was excessive is also untenable.

*Were the subsequent arrests of the vessels in breach of the undertaking in the joint memoranda of Counsel?*

[104] The shipowners maintain that the subsequent arrests of the vessels by Raukura Moana Fisheries Ltd. were in breach of the undertakings contained in the joint memoranda of Counsel. Whether this is so depends upon whether the claims in the proceedings referred to in the memoranda should be construed as confined to reimbursement of costs associated with the pre-prosecution investigations conducted by the Ministry or whether the claims extended to reimbursement for all costs arising out of the Ministry's underlying complaint that the masters and/or crews of the two vessels breached New Zealand's fisheries laws and thereby exposed the plaintiff to the risk of criminal liability and associated financial and perhaps other loss. If the former is correct then the undertaking has not been breached. If the latter is correct then there has been a breach of undertaking.

[105] At the time the undertakings were given, Raukura Moana Fisheries Ltd. had identified what "its claim" was, in respect of each of the proceedings. This was in two ways. The nature of the claim was referred to in the notices of proceeding in rem in these terms:

The plaintiff claims the sum of $37,801.54, being legal fees incurred to date, and such other sums as may be incurred by the Plaintiff for its

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

335
YOUNG, J.

liabilities, costs, expenses and losses in respect of an investigation by the Ministry of Fisheries into alleged breaches of the Fisheries Act 1983 and 1996 by the owner and/or the Master and the crew of the Defendant vessel in respect of which costs and expenses the owner of the defendant vessel has agreed to indemnify the Plaintiff under the terms of a Charter Agreement entered into in 1998.

Further, in each case the statement of claim sought:

Judgment against the Defendant ship in the sum of all costs and expenses incurred as a result of the Ministry's investigation.

[106] So, following down this line of reasoning, the issue whether the undertaking had been breached depends upon whether costs associated with the current prosecutions (and their possible consequences) can be said to be "in respect of an investigation by the Ministry of Fisheries into alleged breaches of the Fisheries Act 1983 and 1996", to use the phraseology used in the notice of proceeding in each case or, if the statement of claim is regarded as paramount, whether they are included in the concept of "costs and expenses incurred as a result of the Ministry's investigation".

[107] I am of the view that costs associated with the prosecution and the possible consequences of prosecution are a subset of costs incurred "in respect of" or "as a result of" the Ministry's investigation. So, as a matter of ordinary English, prosecution costs and expenses seem to me to be within the scope of the claim as it stood when the undertakings were given.

[108] There are a range of other considerations which point in the same direction. It was always likely that the proceedings would be amended to cope with events as they unfolded and the underlying, in substance, claims seem to me to have been for relief from the adverse consequences of the actions of the masters. Further, the amount of the security sought and paid suggested that it was intended to cover more than the investigation phase of the overall Ministry operation. I do, however, accept that the N.Z.$300,000 sought could hardly have reflected a considered view as to Raukura Moana Fisheries Ltd.'s complete exposure associated with the activities alleged to have been committed from the two vessels in question.

[109] Mr. Tetley, who appeared as Counsel on Mar. 7, has now filed an affidavit in which he has set out in detail the background to the agreement which resulted in security being provided. I do not propose to review the law as to the admissibility of this material because it does, in fact, do no more than confirm the interpretation which I would have

reached without this material. For the sake of completeness, however, I should refer to it.

[110] It is perfectly clear that the shipowners were seeking to be free to deal with the vessels as they chose and this was understood by Raukura Moana Fisheries Ltd.'s solicitors. There is absolutely nothing in the background material which suggests that the undertaking not to arrest would cease to apply if there was a prosecution. Indeed, the demand for security in the sum of N.Z.$300,000 was backed up by reference to the possibility of prosecution costs being incurred. It is clear Raukura Moana Fisheries Ltd. anticipated that the shipowners would be taking steps, involving the expenditure of money and possible transactions with third parties, on the faith of the undertakings.

[111] In saying that, I recognize that, at the time security was negotiated, there was no guarantee that freedom from arrest at the suit of Raukura Moana Fisheries Ltd. would necessarily give the shipowners complete commercial freedom to deal with the vessels as they chose. Obviously, the possibility of a seizure and, later, forfeiture under the fisheries legislation was real enough. However, for reasons which are not entirely clear to me, the Ministry has not seized the vessels and it rather appears to me as though their owners took a calculated (and possibly informed) risk based on their assessment that the Ministry would not, in fact, seize the vessels.

[112] Mr. Broadmore also suggested that if the issue of security had been determined by the Court in December last year, it would have required security only in relation to the investigation costs. I doubt very much if that is so. In a situation where the practical effect of the availability of an in rem claim meant that the vessels were to stand as security against liabilities of which some would only crystallize in the future, I find it difficult to see why a Judge would have directed the release of the vessels on any basis other than security in respect of all liabilities which could be regarded as being likely to accrue.

[113] This is not to say that Raukura Moana Fisheries Ltd. necessarily acted foolishly in providing the undertakings. Given the possibility of seizure and forfeiture by the Ministry, the N.Z.$300,000 provided by the shipowners by way of security did have a significant bird in the hand quality.

[114] Finally, I note two other points. The first is as to the possibility of release from the undertakings. I record that there has been no application by Raukura Moana Fisheries Ltd. for release from the undertakings. I make no comment on whether such a release is likely to be granted. The other issue relates to whether the undertakings preclude post-judgment arrest. I do not need to determine this issue at the moment.

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

336
YOUNG, J.

[115] The result will be that the vessels must be released.

*The Mareva injunction*

[116] I granted an ex parte *Mareva* injunction on Mar. 14. This was on the basis of evidence pointing to the proposed sale or charter of these vessels. The shipowners now seek the discharge of those orders.

[117] In the circumstances, it is appropriate that I start from first principles.

[118] Rule 236B(1), High Court Rules provides:

Without limiting the generality of the Court's powers in relation to the granting of injunctions, it is hereby declared that the Court may grant an interlocutory injunction restraining a party from removing from New Zealand, or otherwise dealing with, assets in New Zealand whether or not the party is domiciled, resident, or present in New Zealand.

[119] In the context of this case, it seems to me that the following issues must be addressed:

1. Whether there is an arguable case.

2. Whether there is a risk of dissipation of assets.

3. Whether, and if so to what extent, a *Mareva* injunction would be inconsistent with the undertakings given by Raukura Moana Fisheries Ltd. in the joint memoranda of Counsel.

4. General considerations of justice including issues as to non-disclosure and Raukura Moana Fisheries Ltd.'s ability to make good on its undertaking as to damages.

[120] Plainly, Raukura Moana Fisheries Ltd. has a good arguable case.

[121] As to risk of dissipation of assets, the situation thrown up by this case is not unusual, at least at a reasonably high level of generality. There is a substantial absence of evidence as to the financial position of the shipowners. Instead of making a complete and frank disclosure as to their position and intentions, they have, instead, put Raukura Moana Fisheries Ltd. to proof and, where specific instances have been provided by that company by way of evidence in support of its contentions as to the risk of dissipation, these have been answered but only in a very specific way. One of the cases cited to me, *The Niedersachsen*, [1983] 2 Lloyd's Rep. 600 involved a broadly similar situation.

[122] It is perfectly clear that a Judge must not infer a risk of dissipation merely because a foreign defendant has assets within the jurisdiction of the

Court. Nor is a risk of dissipation to be inferred merely because the defendant plays its financial cards close to its chest as in *The Niedersachsen*. On the other hand, the test which the plaintiff must satisfy is not unduly exacting. The plaintiff must point to circumstances from which a "prudent, sensible commercial man, can properly infer a danger of default". This phraseology comes from the judgment of Lord Justice Lawton in *Third Chandris Shipping Corporation v. Unimarine S.A.*, [1979] Q.B. 645 at p. 671.

[123] Here the shipowners are foreign companies with assets in New Zealand. They have not made full disclosure of their assets. On the authorities those factors do not warrant a conclusion that there is a risk of dissipation of assets. But the facts do, however, go a little further than that. I refer to what I have said in par. [98] above. For the reasons given there is no reason to suppose that the shipowners would meet any award voluntarily if they then had no assets subject to the jurisdiction of the New Zealand Courts.

[124] In that context, I am of the view "that any prudent, sensible commercial man (or woman)" would infer a danger of default. I see the case as well within the principles stated by Lord Justice Lawton in *Third Chandris Shipping Corporation* case.

[125] There are two additional matters I should mention.

[126] The first is that the underlying allegations relate to fraud, that is fraud on the quota management system. The Ministry's allegations are that the masters and crew of all four vessels, which were subject to charter arrangements and which have the same ultimate beneficial ownership, engaged broadly the same fraudulent activities in the 1998-1999 fishing year. Assuming that the Ministry's case is correct, it would be perhaps an unusual coincidence that all four vessels with the same common ultimate beneficial ownership engaged in the same activities without the owners being implicated other than simply vicariously via the actions of the masters and crews. I invited Mr. Broadmore to comment on whether this would, itself, be a factor which might be relevant to whether there was a risk of dissipation. He specifically disavowed any reliance on this argument and, accordingly, I put it to one side.

[127] The second argument is a related one. If it is the case that the proceedings result in convictions, then the vessels will be forfeited to the Crown. Since the vessels are the sole assets owned by the shipowners, such forfeiture would have a serious effect on the continuing financial viability of the shipowners. Mr. Broadmore did not rely on this line of argument either. This is understandable.

[2001] Vol. 2    **LLOYD'S LAW REPORTS**    337
N.Z. Ct.    The "Irina Zharkikh"    YOUNG, J.

The risk of forfeiture is of debatable relevance in the present context, because such a forfeiture would take effect ahead of any in rem claim which Raukura Moana Fisheries Ltd. might have in respect of the vessels. The practical effect of forfeiture would depend upon the vessels being within New Zealand's jurisdiction at the time of conviction. But the risk of forfeiture (and the possible necessity for the shipowners to come up with redemption payments if they are to secure the release of the vessels) may point perhaps, in a very general sense, to significant financial problems for the shipowners in the foreseeable future; this providing a context in which dissipation of assets might occur. This point, as I have noted, was not relied on by Raukura Moana Fisheries Ltd. I mention it here simply to note that I have not overlooked its possible relevance. Again, however, I put it on one side for the purposes of the present exercise.

[128] The third issue relates to the impact of the undertaking. Raukura Moana Fisheries Ltd.'s undertaking is not confined to not arresting the vessels but also to any other detention. Obviously I should not grant an injunction which has the practical effect of detaining the vessels if this would be a breach of Raukura Moana Fisheries Ltd.'s undertaking.

[129] Mr. Broadmore accepted that this was so, but contended that any injunction as to the proceeds of any sale ought not to be regarded as being in breach of the undertaking. I agree. I do not see the *Mareva* injunction as granted as involving a detention of the vessels although I would be prepared to entertain argument as to amendments if the shipowners are concerned as to this. I am of the view that an order which requires the shipowners, upon the sale of the vessels (or either of them), to set aside those proceeds of sale and not to dissipate them, does not involve a detention of the vessels. I recognize that the proceeds of sale might not be an "asset in New Zealand" and so directly within r. 236B, High Court Rules. But the vessels are assets in New Zealand and I think that, even within the confines of the language of the rule, it would be open to me to make an order prohibiting the sale of the vessels otherwise than on terms which provided for the setting aside and retention of the proceeds of sale. Further, it is clear that r. 236B is not an exclusive definition of the jurisdiction of the Court and a *Mareva* injunction may apply to assets that are not within the jurisdiction of the Court, see *Zietlow v. Simon*, (1991) 4 P.R.N.Z. 373 and *Fitzherbert v. Faisandier*, (1995) 8 P.R.N.Z. 592.

[130] The evidence now available points to there having been conditional sale agreements entered into in respect of the vessels. No ground was advanced by the shipowners as to why there would

be any injustice in funds produced as a result of completed agreements for sale being set aside to stand as security for Raukura Moana Fisheries Ltd.'s claims other than the issues which I am about to address.

[131] That leaves in issue the considerations relevant to ultimate justice including non-disclosure. Mr. David for the shipowners was very critical of the failure of Raukura Moana Fisheries Ltd. to make full disclosure relating to the strengths of the argument available to the shipowners in respect of the undertakings. He was also dissatisfied about the failure of Raukura Moana Fisheries Ltd. to disclose details of its own financial position and the use to which Raukura Moana Fisheries Ltd. has put the *Mareva* injunction in negotiations with the shipowners.

[132] I am not troubled by the complaints relating to the undertakings. Given the hearing which had taken place on Mar. 7, I was well aware, in general terms, of the undertakings (although the hearing on Mar. 7 did not focus, in any sophisticated way, on the scope or significance of those undertakings).

[133] Of more concern to me are issues associated with Raukura Moana Fisheries Ltd.'s own financial position and its negotiating stance vis-à-vis the shipowners.

[134] Mr. Paki Rawiri, the general manager of Raukura Moana Fisheries Ltd., swore an affidavit on Mar. 23 in which he discussed, in fairly general terms, the financial position of Raukura Moana Fisheries Ltd. He declined to make available, on an open basis, financial statements. He contended, however, that Raukura Moana Fisheries Ltd. is in a reasonably sound financial position.

[135] The affidavit prompted a further affidavit from Mr. Tetley referring to a without prejudice discussion which took place on Mar. 16, 2001. He referred, in particular, to remarks made by the solicitor acting for Raukura Moana Fisheries Ltd. in these terms:

While I cannot now recall the exact words used, in the course of that meeting [the solicitor] said to me that if the Plaintiff could not recover its losses against the Defendants, it could plead guilty (thereby rendering forfeit the Defendants ships), and go into liquidation rather than pay the consequential fines or meet any obligations to make deemed value payments to the Crown. The clear threat made was that in those circumstances there would be no funds to meet any eventually successful claim by the vessel owners for unpaid charter hire and/or damages. [The solicitor] said that while there was some value in the name of the Plaintiff, if the numbers did not add up then the company could be wound up.

[2001] Vol. 2
N.Z. Ct.

LLOYD'S LAW REPORTS
The "Irina Zharkikh"

338
YOUNG, J.

[136] Although this discussion took place at the without prejudice meeting, Mr. Broadmore did not challenge the admissibility of the affidavit. Nor was leave sought to file an affidavit denying or explaining away the remarks attributed to the solicitor. Mr. Broadmore's position was that the solicitor was talking about a worst case situation in which convictions were entered which would mean that the plaintiff was then no longer a going concern. He said that Mr. Rawiri was talking about the financial position of the company on the assumption that it remained a going concern.

[137] I am of the view that there has been a good deal of game playing on the part of the shipowners. The contrast between the contentions made on behalf of the shipowners at the hearing on Mar. 7 and those advanced on Mar. 23 provides an example of this. But there has also been a good deal of game playing on the part of Raukura Moana Fisheries Ltd. It was not my intention, when I granted the *Mareva* injunction, to facilitate a situation where threats of the kind attributed to the solicitor acting for Raukura Moana Fisheries could be made. If it is truly the case that Raukura Moana Fisheries Ltd. is considering the course of action postulated by its solicitor, then that should have been disclosed to me when the ex parte order was made. Further, in a situation where convictions for these offences would invalidate the going concern assumption for Raukura Moana Fisheries Ltd., this should have been explained to me. I was, however, not told that Raukura Moana Fisheries Ltd. was considering the course of action postulated by its solicitor. Nor was I told that the going concern assumption for Raukura Moana Fisheries Ltd. was placed in jeopardy by the prosecutions.

[138] As the *McGechan* commentary to r. 236B (par. HR 236B.12) indicates, New Zealand Courts have not attributed the same significance to non-disclosure as have English Courts. So it would not be right simply to set aside the *Mareva* injunction by way of a sanction for non-disclosure.

[139] The fundamental problem, however, is that there is a serious question-mark as to Raukura Moana Fisheries Ltd.'s ability to meet any liability on its undertaking as to damages. There are also some indications of game playing behaviour associated with the possibility that Raukura Moana Fisheries Ltd. will go into liquidation.

[140] In those circumstances, a modified version of the *Mareva* injunction can only remain in place if accompanied by appropriate security from Raukura Moana Fisheries Ltd. covering any likely loss which might be recoverable against it by the ship

owners in the event that Raukura Moana Fisheries Ltd. is called upon to meet its undertaking.

[141] In the circumstances I propose to hear the parties as to the terms of any continued *Mareva* injunction and those terms will have to include appropriate security from Raukura Moana Fisheries Ltd. as just mentioned.

*Disposal of applications*

[142] As to the disposal of the applications:

1. I decline the applications seeking return of all or part of the security.

2. I order the immediate release of the vessels.

3. I decline to discharge the *Mareva* injunction. I am prepared to make any necessary amendments to it which may be suggested by Counsel to make it crystal clear that it does not involve a detention of the vessels. Further, it must be made conditional upon security being provided by Raukura Moana Fisheries Ltd. in accordance with the indications given in par. [140] of this judgment.

4. I adjourn for further consideration the issue whether the shipowners are entitled to a stay of proceedings.

5. I reserve all issues as to costs. Broadly, I am of the view that Raukura Moana Fisheries Ltd. is entitled to costs associated with the first hearing and the shipowners are entitled to costs in relation to the second hearing. I do not regard Raukura Moana Fisheries Ltd. as being culpable in any sense relevant to costs in respect of the breach of the undertakings given the narrow argument espoused by Mr. Tetley at the hearing on Mar. 7. I have taken into account the remarks attributed to Raukura Moana Fisheries Ltd.'s solicitors and associated issues of non-compliance in my conclusion that the shipowners are entitled to costs in relation to the second hearing (at which Raukura Moana Fisheries Ltd. has been partly successful). I am presently minded to deal with issues of costs on the basis that the two entitlements are broadly equivalent to each other and no further order is necessary.

6. I direct that the case is to be called before me by way of telephone conference at 8.45 am on Friday Mar. 30. On this occasion I will endeavour, with the assistance of additional argument then to be presented and any further evidence the parties may care to lay before me, to resolve the outstanding issues as to whether the shipowners are entitled to a stay of proceedings, the form the *Mareva* injunction is to take and costs (should either of the parties wish to challenge my tentative view).

**EXHIBIT  9**

Sheen J.

THE "CERRO COLORADO"

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 19  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Sale of ship - Sale by order of Court - Vessel subject to various encumbrances - Whether sale by Admiralty Marshal gave purchaser title free of all liens and encumbrances. ...

THE "MALOJA II"

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 48  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision off the coast of Newfoundland - Both vessels failed to comply with the Collision Regulations 1972 - Faults in navigation - Apportionment of liability. ...

THE "DA YE"

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 30  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Passing vessels - Collision in approaches to Port Said - Failure to keep proper look out - Faults in navigation of vessel - Wrong decision to alter course to starboard - Apportionment of liability. ...

THE "PRINSENGRACHT"

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 41  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Bail - Arrest of vessel - Shipowners domiciled in one of Contracting States of EC voluntarily gave bail to avoid arrest - Whether Admiralty Court deprived of jurisdiction to hear plaintiffs' claim - Whether defendants submitted voluntarily to jurisdiction - Whether arrest valid - Civil Jurisdiction and Judgments Act. 1982. ...

THE "AL TABITH" AND "ALANFUSHI"

Lloyd's Law Reports

[1993] 2 Lloyd's Rep. 214  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Writ - Application for extension of time - Collision between plaintiffs' vessel and defendants' vessel - Negotiations between P. and I. Clubs - Plaintiffs obtained extension of six months - Writ issued out of time - Whether application for further extension of time should be granted. ...

THE "AL BATTANI"

Lloyd's Law Reports

[1993] 2 Lloyd's Rep. 219  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Jurisdiction - Stay of action - Plaintiffs alleged breach of oral agreement that vessel would proceed direct to Hamburg - Defendants denied oral agreement - Whether parties agreed disputes should be decided in a Court in Egypt - Whether Egyptian Court more appropriate forum - Whether action should be stayed. ..

THE "MARGARETA"

Lloyd's Law Reports

[1993] 2 Lloyd's Rep. 13   QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

- Collision - Scuttling v Fault - Collision between German vessel and fishing vessel - Substantial damage
caused to fishing vessel - Fishing vessel sank after collision - Whether vessel scuttled - Whether loss
attributable to any negligent act or omission occurring after collision ...

#### NESTE CHEMICALS S.A. AND OTHERS v. D K LINE S.A. AND TOKUMARU KAIUN K.K. (THE "SARGASSO")

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 424  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Application to set aside - Jurisdiction - Carriage of goods by sea - Cargo contaminated -
English and Dutch proceedings brought - Whether English Court first seised of proceedings - Whether
English and Dutch proceedings involved same cause of action and between same parties - Whether English
Court should decline jurisdiction and set aside writ - Civil Jurisdiction and Judgments Act 1982. ...

#### DEN NORSKE BANK A/S AND IRISH INTERCONTINENTAL BANK LTD. v. OWNERS OF THE SHIPS "EUROSUN" AND "EUROSTAR" AND EURO MARINE CARRIERS B.V. (THE "EUROSUN" AND "EUROSTAR")

Lloyd's Law Reports

[1993] 1 Lloyd's Rep. 106  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Title to bunkers - Mortgaged vessels on time charter - Vessels off hire until charter
expired - Owners failed to make payment under loan agreement - Vessels appraised and sold - Whether
bunkers at date of sale property of charterers - Whether bunker fuel part of security mortgaged to plaintiffs. ...

#### THE "BLITZ"

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 441  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Sale of ship - Ship's mortgage - Non-payment of harbour dues - Harbour authority sold vessel to bona fide
purchaser - Whether sale free from encumbrances - Whether new owners liable to mortgagees. ...

#### THE "BREYDON MERCHANT"

Lloyd's Law Reports

[1992] 1 Lloyd's Rep. 373  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Limitation of liability - Limitation fund - Damage to cargo by fire on board vessel - Shipowners entitled to limit
liability - Whether claim by cargo-owners to be made against limitation fund - Whether shipowners not entitled
to limit liability in respect of such claim - Convention on Limitation of Liability for Maritime Claims, 1976, arts. 2
and 3 - Merchant Shipping Act, 1979, s. 17, Schedule 4 Part I. ...

#### PREKOOKEANSKA PLOVIDBA v. FELSTAR SHIPPING CORPORATION AND SOTROMAR Srl. AND STC SCANTRADE A.B. (THIRD PARTY) (THE "CARNIVAL")

Lloyd's Law Reports

[1992] 1 Lloyd's Rep. 449  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Negligent navigation - Damage to vessel and cargo - Plaintiffs' vessel being moored at Setramar berth at
Ravenna - Defendants' vessel proceeded past plaintiffs' vessel - Plaintiffs' vessel and cargo damaged by
fender penetrating plating - Whether defendants' vessel negligently navigated - Whether plaintiffs guilty of
contributory negligence - Whether plaintiffs failed to take steps to mitigate amount of damage caused-Charter-
party (Voyage) - Unsafe berth - Damage to vessel and cargo - Charterers ordered vessel to Ravenna - Vessel
being moored alongside Setramar berth - Defendants' vessel proceeded past plaintiffs' vessel - Damage to

plaintiffs' vessel and cargo caused by tender proceeding plainy - Whether Setrame has been unsafe berth - Contribution between defendants - Civil Liability (Contribution) Act 1978

THE "REGINA D" (No. 2)

Lloyd's Law Reports

[1992] 1 Lloyd's Rep. 555 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT).

THE "RUBI SEA"

Lloyd's Law Reports

[1992] 1 Lloyd's Rep. 634 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Costs of arrest - Vessel arrested and released by caveators and re-arrested by mortgagees - Mortgagees obtained judgment against owners - Vessel ordered to be appraised and sold - Moneys paid into Court - Whether caveators entitled to recover costs incurred in first arrest of vessel. ...

THE "PAN OAK"

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 36 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Payment out - Priority - Sale of bunker oil carried on vessel - Proceeds paid into Court - Plaintiffs claimed priority in payment out on ground they were secured creditors - Whether bunkers part of security for loan granted by plaintiffs - Whether proceeds of bunkers available for distribution pari passu between all creditors. ...

BALLI TRADING LTD. v. AFALONA SHIPPING CO. LTD. (THE "CORAL")

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 158 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Bills of lading - Damage to cargo - Summary judgment - Collapse of cargo stow during voyage - Plaintiffs claimed damages - Bills of lading incorporated charter-party clauses and Hague-Visby Rules - Whether plaintiffs had title to sue - Whether carriers had arguable defence - Whether plaintiffs entitled to summary judgment. ...

STEEDMAN v. SCOFIELD AND ANOTHER

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 163 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Limitation of time - Personal injuries - Jet skier in collision with speedboat towing water skier - Jet skier injured - Whether jet ski a "vessel" or a "ship" within Merchant Shipping Acts - Whether jet skiers action time barred by s. 8 of the Maritime Conventions Act, 1911. ...

THE "JOHNNY TWO"

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 257   QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Writ in rem - Application to set aside - Extension of validity of writ - Writ issued in respect of damage to cargo - Vessel visited Felixstowe on five occasions before writ served on vessel - Validity of writ

extended - Whether proper disclosures made - Whether order extending validity should be discharged - Whether service of writ should be set aside ...

### THE "KHERSON"

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 261 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Jurisdiction - Damage to cargo - Sister ship arrested - Proceedings already begun in Netherlands - Whether English Court should decline jurisdiction - Whether plaintiffs justified in obtaining warrant of arrest - Whether warrant of arrest should be set aside - Civil Jurisdiction and Judgments Act, 1982, arts. 17, 21, ...

### NCNB TEXAS NATIONAL BANK AND OTHERS v. EVENSONG CO. LTD. (THE "MIKADO")

Lloyd's Law Reports

[1992] 1 Lloyd's Rep. 163 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Practice - Application to set aside - Injunction obtained by plaintiffs restraining defendants from dealing with yacht - Whether plaintiffs an "interested person" - Whether Court had jurisdiction to grant injunction - Merchant Shipping Act, 1894 s. 30 as amended by Merchant Shipping Act, 1988 Schedule 2, s. 20. ...

### THE "LAKHTA"

Lloyd's Law Reports

[1992] 2 Lloyd's Rep. 269 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Forum non conveniens - Dispute as to ownership of vessel between Latvian plaintiffs and Russian defendants - Russian forum more appropriate - Whether action should nevertheless be tried in England - Whether application for stay should be granted. ...

### THE "REWIA"

Lloyd's Law Reports

[1991] 1 Lloyd's Rep. 69 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Stay of action - Forum convenien - Plaintiffs claimed damages for short delivery - Whether carrier a proper or necessary party to action - Whether carrier domiciled and principle place of business in Germany - Whether Germany more appropriate forum - Whether action should be stayed - Civil Jurisdiction and Judgments Act, 1982, Schedule 1, arts. 2, 17. ...

### THE "SYLT"

Lloyd's Law Reports

[1991] 1 Lloyd's Rep. 240 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Action commenced by cargo-owners to obtain security - Shipowners gave bail bond as security - Whether bail bond could be used for satisfaction of judgment given by Sierra Leone Court - Whether plaintiffs' application to stay their own action should be granted - Civil Jurisdiction and Judgments Act, 1982, s. 26 .

### THE "WALTRAUD"

Lloyd's Law Reports

[1991] 1 Lloyd's Rep. 369 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Summary judgment - Application for interim payments - Bill of lading incorporated Hague-
Visby Rules - Vessel captured - Cargo lost - Whether vessel unseaworthy - Whether plaintiffs entitled to
summary judgment - Whether approach for interim payments should be greater ...

## SMIT TAK OFFSHORE SERVICES AND OTHERS v. YOUELL AND GENERAL ACCIDENT FIRE & LIFE ASSURANCE CORPORATION PLC.

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 420 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (Marine) - Indemnity - Umbrella liability policy - Plaintiffs operating in Dubai waters - Associate
company of plaintiffs rendered salvage service to vessel - Vessel anchored outside Dubai territorial waters
but sank - Dubai port authorities threatened plaintiffs with withdrawal of licence unless wreck removed -
Whether insurers liable to indemnify plaintiffs for costs of removal. ...

## THE "NORDIC FERRY"

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 591 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Liability - Collision between plaintiffs' vessel and defendants' vessel in area over which Harwich
Harbour Board had jurisdiction - Whether vessels being navigated at safe speed - Whether vessel keeping to
own side of channel - Liability for collision - Apportionment of liability. ...

## STATE TRADING CORPORATION OF INDIA v. DOYLE CARRIERS INC. AND OTHERS (THE "JUTE EXPRESS")

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 55 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - General average - Collision gave rise to general average expenditure - Plaintiffs'
contribution to general average assessed - Plaintiffs alleged vessel not manned by competent crew - Carriers
counterclaimed general average contribution -Whether plaintiffs should have leave to defend counterclaim -
Whether carriers entitled to judgment for fixed sum - Whether damages should be assessed. ...

## THE "APJ SHALIN"

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 62 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Application for release - Dispute under shipbuilding contracts - Plaintiffs
arrested defendants' vessel to obtain security for claim - Defendants alleged value of vessel did not exceed
value of other claims which took priority over plaintiffs' claims - Whether application for release of vessel
should be granted. ...

## THE "LU SHAN"

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 386 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Leave to re-amend writ -Collision between vessels - Part of cargo of oil lost - Dispute as
to ownership of cargo - Application to re-amend writ to include additional plaintiffs more than five years after
collision - Whether application should be granted - R.S.C. O. 15, r. 6. ...

## THE "MACIEJ RATAJ"

Lloyd's Law Reports

[1991] 2 Lloyd's Rep. 456 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Stay of action - Forum non conveniens - Damage to goods - Actions brought in Rotterdam and England -Whether proceedings in Rotterdam involved same cause of action as proceedings in England - Whether action should be stayed - Whether Rotterdam more appropriate forum - Civil Jurisdiction and Judgments Act, 1982. ...

THE "MARE DEL NORD"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 40 - QUEEN'S BENCH(ADMIRALTY COURT)

Admiralty practice - Jurisdiction - Short delivery - Defendants refused to permit plaintiffs' surveyor to board vessel to inspect and take samples - Plaintiffs' ex parte application granted by Admiralty Registrar - Whether Registrar had jurisdiction to make order. ...

THE "M. VATAN"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 336 - QUEEN'S BENCH DIVISION(ADMIRALTY OURT)

Salvage-Reward-Pro rata rule-Salvors engaged on behalf of shipowners only-Original arbitrator departed from pro rata rule in awarding salvage remuneration-Appeal arbitrator reassessed award-Whether departure from pro rata rule justified-Whether original arbitrator's award should be reinstated. ...

THE "MONTANA"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 402 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Short delivery - Title to sue - Bulk cargo of barley discharged at Singapore bagged and reloaded for shipment to Jeddah - Plaintiff consignee alleged short delivery - Whether defendants liable in damages for failing to deliver all cargo loaded in Singapore - Whether plaintiff had title to sue. ...

THE "TACOMA CITY"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 408 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Maritime lien - Shipowners ceased trading - Crew claimed severance pay and wages in lieu of notice - Vessel ordered to be sold pendente lite in earlier mortgagee's action - Whether claim for severance pay gave rise to maritime lien - Whether certain members of crew entitled to wages in lieu of notice. ...

THE "VITA"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 528 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Writ - Extension of validity of writ - Time for serving writ expired before writ served - Whether application to extend validity of writ should be granted. ...

THE "BOWBELLE"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 532 - QUEEN'S BENCH DIVISIONADMIRALTY COURT

Admiralty practice - Arrest of vessel - Limitation of liability - Collision in river Thames - Payment into Court of
limitation fund - Whether security of bail beyond that provided by limitation fund could be given - Whether
caveat against arrest of vessel could be entered in caveat book - Merchant Shipping Act 1979 - Convention
on Limitation of Liability for Maritime Claims, 1976, arts. 2, 4, 11, 13, 14.

---

### CHRISTIAN SALVESEN PLC. AND CHRISTIAN SALVESEN (SHIPPING) LTD. v. CORY LIGHTERAGE LTD. AND WM. CORY AND SON LTD. (THE "GENERAL VII")

Lloyd's Law Reports

[1990] 2 Lloyd's Rep. 1 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in river Thames - Whether vessels maintained proper lookout -
Whether faults in navigation - Liability for collision - Apportionment of liability. ...

---

### THE "MOUNA"

Lloyd's Law Reports

[1990] 2 Lloyd's Rep. 7 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Writ - Validity of extension - Application to discharge - Plaintiffs' solicitors issued writ but
did not serve it - Negotiations between parties - Writ expired before it was served and plaintiffs obtained
extension - Whether order extending validity of writ should be discharged. ...

---

### ASIANAC INTERNATIONAL PANAMA S.A. AND TRANSOCEAN TRANSPORT CORPORATION v. TRANSOCEAN RO-RO CORPORATION (THE "SEASPEED AMERICA")

Lloyd's Law Reports

[1990] 2 Lloyd's Rep. 150 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Limitation of time - Collision - Damage caused to plaintiffs' vessel - Defendants admitted liability -
Negotiations about cost of repairs - Plaintiffs allowed time for issuing writ to pass because of oversight -
Application for extension of time - Whether Court should exercise its discretion to extend time - Maritime
Conventions Act, 1911 s. 8. ...

---

### "THE REGINA D"

Lloyd's Law Reports

[1990] 2 Lloyd's Rep. 227 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Approaching vessels - Collision in river Scheldt - Plaintiffs' vessel proceeding at excessive speed
and in wrong water - Whether defendants' vessel also at fault - Apportionment of liability. ...

---

### THE "PO"

Lloyd's Law Reports

[1990] 1 Lloyd's Rep. 418 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Jurisdiction - Forum non conveniens - Collision between American ship
and Italian ship in Rio de Janiero - Whether English Court had jurisdiction - Whether action should have been
brought in Italy - Whether Brazil more appropriate forum - Civil Jurisdiction and Judgments Act, 1982 ...

---

### THE "VISHVA ABHA"

Lloyd's Law Reports

[1990] 2 Lloyd's Rep. 312 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Forum non conveniens - Collision in Red Sea - Defendants commenced action in South Africa - Whether South Africa more appropriate forum - Whether English action should be stayed. ...

## THE "PULKOVO" AND "ODEN"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 280  - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Collision - Crossing vessels - Collision in Baltic Sea - Whether plaintiffs' vessel had substantial headway at moment of collision - Whether collision caused by negligent navigation of vessels - Liability for collision - Apportionment of liability. ...

## THE "GLUCOMETER II" AND "ST. MICHAEL"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 54  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Plaintiffs yacht competing in City of Plymouth Round Britain Race - Yacht failed to hoist effective radar reflector - Yacht under way in dense fog with visibility restricted to 75 metres or less - Yacht in collision with defendants' vessel - Liability for collision. ...

## THE "ZIRJE"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 493 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Limitation of time - Application for extension of time - Collision between plaintiffs' vessel and defendants' vessel in Kiel Canal - Negotiations between parties representatives - Plaintiffs failed to issue writ within time - Whether application for extension of time should be granted - Maritime Conventions Act, 1911, s. 8. ...

## THE "POWSTANIEC WIELKOPOLSKI"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 58  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Remuneration - Salvage services rendered to defendants' vessel in Gravesend Reach of River Thames - Whether services performed within harbour - Whether salvors entitled to reward - Merchant Shipping Act 1894 ss. 546, 742. ...

## INDUSTRIE CHIMICHE ITALIA CENTRALE AND CEREALFIN S.A. v. ALEXANDER G. TSAVLIRIS & SONS MARITIME CO., PANCHRISTO SHIPPING CO. S.A. AND BULA SHIPPING CORPORATION (THE 'CHOKO STAR')

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 42  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Reward - Vessel and cargo grounded in River Parana - Master engaged European salvors - Whether master and shipowner had implied actual authority to make reasonable contracts with salvors on behalf of cargo-owners - Whether cargo-owners liable for their share of reward. ...

## The "NORD SEA" AND "FRECCIA DEL NORD" (THE "FRECCIA DEL NORD")

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 388 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Jurisdiction - Action in rem - Collision in Bay of Biscay - Writ issued in London - Vessel arrested in Rotterdam 20 minutes later - Writ served in English action on July 9 - Moment when Court seized of the action - Civil Jurisdiction and Judgments Act 1982, Schedule 1, arts. 21, 22. ...

CHLORIDE INDUSTRIAL BATTERIES LTD. AND THE STATE OF JERSEY TELECOMMUNICATIONS BOARD v. F. & W. FREIGHT LTD.

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 410 - QUEEN'S BENCH DIVISION

Carriage by road - CMR - Goods carried from Manchester to Jersey - Whether Jersey a different country for purposes of Convention - Whether carriage international carriage - Whether CMR Convention applied. ...

THE "TENES"

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 367 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in Mediterranean Sea - Plaintiffs' vessel sank - Faults in navigation - Vessels proceeding at excessive speed - Apportionment of liability. ...

THE "EGLANTINE", "CREDO" AND "INEZ"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 593 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Overtaking vessels - Collision in Dover Strait - Second defendants' vessel proceeding in wrong direction in traffic lane - Collision between plaintiffs' and first defendants' vessels - Navigation of vessels - Liability for collision. ...

THE "VISHVA AJAY"

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 558 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Forum non conveniens - Collision between plaintiffs' vessel and defendants' vessel at port in India - Plaintiffs founded jurisdiction in England by arresting sister ship - Whether India more appropriate forum - Whether action should be stayed. ...

THE "EMRE II"

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 182 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Stay of action - Order for sale of vessel pendente lite - Whether parties agreed Turkish jurisdiction - Whether Turkey a more convenient forum - Defendants unable to provide security - Whether action should be stayed - Whether vessel should be sold by order of the Court. ...

THE "ARGONAFTIS"

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 487 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Damage to vessel - Quantum - Plaintiffs' vessel an F.P.S.O. at moorings in Kalkara Bay Malta - Defendants' vessel collided with her causing damage - Value of vessel at date of collision - Whether value diminished by damage done by collision - Amount of damages plaintiffs entitled to recover. ...

THE "LINDA"

Lloyd's Law Reports

[1988] 1 Lloyd's Rep. 175 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Jurisdiction - Application to set aside or stay proceedings - Collision in Scheur Channel -
Defendants arrested vessel at Flushing and commenced proceedings in Netherlands Court - Plaintiffs
commenced proceedings in England - Whether English Court should decline jurisdiction in favour of Dutch
Court - Civil Jurisdiction and Judgments Act, 1982. ...

THE "MEKHANIK EVGRAFOV" AND "IVAN DERBENEV" (No. 2)

Lloyd's Law Reports

[1988] 1 Lloyd's Rep. 330 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Limitation of liability - Damage to cargo of newsprint - Plaintiffs brought action for
damages against defendants - Defendants gave notice of intention to bring limitation action if judgment was
for greater sum than the limit - Whether defendants entitled to bring separate limitation action. ...

THE "DAGMARA" AND "AMA ANTXINE"

Lloyd's Law Reports

[1988] 1 Lloyd's Rep. 431 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Application to set aside - Plaintiffs' and defendants' vessels fishing 50
miles off south-west coast of Ireland - Plaintiffs alleged that defendants navigated vessel dangerously -
Plaintiffs' vessel forced to leave fishing grounds - Whether plaintiffs entitled to damages - Whether Court had
jurisdiction to hear claim - Supreme Court Act, 1981 s. 20(2)(e). ...

THE "RUBEN MARTINEZ VILLENA" (No. 2)

Lloyd's Law Reports

[1988] 1 Lloyd's Rep. 435 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Costs - Dispute as to damage to cargo - Admiralty Registrar stayed action
and ordered defendants to pay half of plaintiffs' costs - Whether action should have been stayed - Whether
costs should be varied. ...

THE "FALSTRIA"

Lloyd's Law Reports

[1988] 1 Lloyd's Rep. 495 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Limitation of liability - Vessel collided with quay and gantry crane - Dock
company commenced action in Denmark against owners and charterers - Charterers commenced limitation of
liability action in England - Whether limitation action should be stayed. ...

TOGO AMUSEMENTS CORPORATION SARL AND ANOTHER v. ESTONIAN SHIPPING CO. (THE "VASILIY
SHELGUNOV")

Lloyd's Law Reports

[1988] 2 Lloyd's Rep. 34 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Costs - Payment into Court - Damage to cargo of sugar - Plaintiffs accepted payment 20
days later - Whether acceptance within a reasonable time - Whether plaintiffs entitled to their costs up to date
of acceptance - R.S.C., O. 22, r. 3. ...

THE "IRAN TORAB"

Lloyd's Law Reports

[1989] 2 Lloyd's Rep. 38 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Overtaking vessels - Collision in River Maas bar channel - Duty of overtaking ship to keep out of way of overtaken ship - Overtaking ship failed to keep proper lookout - Whether overtaken ship should have altered course - Liability for collision - Apportionment. ...

THE "SYDNEY EXPRESS"

Lloyd's Law Reports

[1988] 2 Lloyd's Rep. 257 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Disputes to be referred to Courts in Bremen - Damage to cargo - Writ served but vessel not arrested - Whether defendants submitted to jurisdiction of English Court - Whether action should be stayed - Civil Jurisdiction and Judgments Act, 1982. ...

THE "DEICHLAND"

Lloyd's Law Reports

[1988] 2 Lloyd's Rep. 454 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Jurisdiction - Damage to cargo - Plaintiffs applied for judgment in default of acknowledgement - Defendants domiciled in Federal Republic of Germany - Whether Court had jurisdiction - Whether Court should decline jurisdiction - Civil Jurisdiction and Judgments Act 1982. ...

THE "MAWAN" NOW NAMED "MARA"

Lloyd's Law Reports

[1988] 2 Lloyd's Rep. 459 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Application to set aside - Loss of cargo - Vessel sold after writ in rem issued - Plaintiffs arrested vessel - New owners entered acknowledgment of service - Whether new owners should have intervened in action - Whether plaintiffs entitled to bring action against vessel - Whether writ and warrant of arrest should be set aside. ...

THE "JANGMI" KNOWN AS "GRIGORPAN"

Lloyd's Law Reports

[1988] 2 Lloyd's Rep. 462 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Application to set aside - Damage to cargo - Date of voyage changed in writ - Validity of writ extended - Whether particulars of general endorsement on writ defective - Whether change in date a new cause of action - Whether writ should have been extended - Whether writ should be set aside. ...

THE "GOOD HERALD"

Lloyd's Law Reports

[1987] 1 Lloyd's Rep. 236 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Writ in rem - Application to set aside - P. and I. Club gave undertaking to secure release of vessel from arrest - Club in liquidation - Whether Court had power to order substituted service of writ in rem - Whether application to set aside should be granted. ...

Collision - Limitation of time - Application for extension of time - Plaintiffs failed to issue writ within time limit - Whether application could be granted - Whether writ issued by plaintiffs should be struck out - Maritime Conventions Act 1911 s. 8. ...

### THE "TRANSOCEANICA FRANCESCA" AND "NICOS V"

Lloyd's Law Reports

[1987] 2 Lloyd's Rep. 155 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Collision - Assessment of damages - Collision off Portuguese coast - Plaintiffs' claim made in lire - 3 1/2 years later plaintiffs' reamended claim made in U.S. dollars - Currency in which claim should be assessed - Correct method of setting off amounts of claim and counter-claim. ...

### THE "ITALY II"

Lloyd's Law Reports

[1987] 2 Lloyd's Rep. 162 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Arrest of ship - Delay in prosecution of action - Plaintiff arrested defendants' vessel for non-payment of costs of repairs - Vessel remained under arrest for 2 1/2 years - Plaintiff took no steps to prosecute the action - Whether application of Admiralty Marshal that the arrest be ended should be granted.

### THE "JALAMATSYA"

Lloyd's Law Reports

[1987] 2 Lloyd's Rep. 164 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Arrest of ship - Application to set aside arrest - Dispute between plaintiffs and defendants referred to arbitration - No security provided by defendants - Plaintiffs arrested vessel - Whether an abuse of process of Court - Whether arrest should be set aside - Civil Jurisdiction and Judgments Act, 1982, s. 26. ...

### THE "SIDI BISHR"

Lloyd's Law Reports

[1987] 1 Lloyd's Rep. 42 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Stay of action - Alternative forum - Collision in Alexandria Inner Harbour - Action brought in England - Whether Court in Alexandria a more suitable forum - Whether action should be stayed. ...

### THE "OURO FINO"

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 466 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Liability - Collision with barge in River Schelde - Whether barge anchored in an improper position - Whether failure of barge to exhibit anchor lights causative of collision - Whether vessel failed to keep proper lookout - Whether vessel guilty of other faults in navigation - Apportionment of liability. ...

### THE "SILVER ATHENS" (No. 1)

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 580 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Vessel employed on liner service - Cargo-owners claimed damages for alleged damage and non-delivery - Charterers claimed to be indemnified by owners - Vessel arrested -

'Vessel subsequently released and security discharged – Charterers issued second writ claiming similar sum by earlier writ – Vessel re-arrested – Whether issue of writ an abuse of the process of the Court – Effect of Civil Jurisdiction and Judgments Act, 1982, s. 26 ...

### THE "SILVER ATHENS" (No. 2)

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 583 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice – Stay of action – Arrest of vessel – Vessel employed on liner service – Claims by cargo-owners against charterers – Charterers claimed indemnity from owners – Vessel arrested and subsequently released – Action stayed – Arbitration Act, 1975 s. 1 applied to dispute – Whether stay should be lifted – Whether plaintiffs entitled to rearrest vessel – Whether Civil Jurisdiction and Judgments Act 1982 s. 26 applicable. ...

### THE "PETROSHIP B"

Lloyd's Law Reports

[1986] 2 Lloyd's Rep 251 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision – Crossing vessels – Collision in Great Biter Lake – Whether proper lookout by sight and hearing maintained – Whether defendants' vessel under duty to keep out of the way – Apportionment of liability. ...

### THE "FILIATRA LEGACY"

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 257 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision – Liability – Collision in dense fog in approaches to Flushing – Whether proper radar observation being maintained – Whether defendants' vessel solely to blame for collision – Apportionment of liability. ...

### THE "WORLD STAR"

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 274 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice – Stay of action – Arbitration clause in charter-party – Dispute regarding loss of cargo – Writ issued for purposes of securing security for award in arbitration – Whether action should be stayed and vessel released from arrest – Arbitration Act, 1975, s. 1 – Civil Jurisdiction and Judgments Act, 1982, s. 26 ...

### JOHN MALCOLM HOLMAN v. F. T. EVERARD & SONS LTD. (THE "JACK WHARTON")

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 382 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Damages – personal injury – Vessel weighing anchor in heavy seas – Chief officer supervising the weighing of the anchor – Struck by heavy wave and suffered injuries – Whether injuries caused by negligence of master – Whether defendant employers liable. ...

### THE "HONSHU GLORIA"

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 63 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice – Sale of ship – Fees of classification society – Admiralty Marshal ordered payment of fees out of proceeds of sale – Whether appeal against order should be allowed ...

THE "HONSHU GLORIA" (NO. 2)

Lloyd's Law Reports

[1986] 2 Lloyd's Rep. 67 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

THE "GOLDEN MISTRAL"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 407 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Bad lookout - Collision off Singapore - Whether vessels should have seen each other much earlier - Liability for collision - Apportionment. ...

THE "CORAL ISIS"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 413 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Stay of action - Collision - Plaintiffs' and defendants' vessel in collision in international waters off Denmark - Defendants took out a writ in Court in Holland - Plaintiffs issued a writ out of the English Admiralty Registry - Whether justice between parties would be done if action in England stayed - Whether defendants' application should be granted. ...

THE "DERBYSHIRE"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 418 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Personal injury - Vessel sank with loss of all hands - Plaintiffs claimed damages on behalf of deceased third engineer's estate - Plaintiffs alleged construction of vessel defective - Whether vessel "equipment" provided by defendants - Whether defendants liable - Employer's Liability (Defective Equipment) Act, 1969, s. 1. ...

THE "FRANK PAIS"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 529 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Bill of lading - Exclusive jurisdiction clause - Short delivery and damage to cargo - Action brought in England - Whether action should have been brought in Cuba - Whether Cuba more convenient forum - Whether English action should be stayed. ...

THE "GULF VENTURE"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 130 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

...

THE "LUSITANIA"

Lloyd's Law Reports

[1986] 1 Lloyd's Rep. 132 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Salvage - Unclaimed wreck - Title to contents of wreck - Whether vessel derelict -
Whether salvors entitled - Whether claimants entitled to possession of wreck found outside territorial waters
- Merchant Shipping Act 1894 (Merchant Shipping Act 1894) ...

### THE "GORING"

Lloyd's Law Reports
[1986] 1 Lloyd's Rep. 127 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)
Salvage - Remuneration - Vessel saved in non-tidal waters - Salvors claimed reward - Whether Court had
jurisdiction to award salvage - Whether writ should be set aside. ...

### THE "SAUDI CROWN"

Lloyd's Law Reports
[1986] 1 Lloyd's Rep. 261 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)
Bill of lading - Misrepresentation - Plaintiffs unaware bill of lading incorrectly dated - Plaintiffs took up and paid
for goods - Whether agents authorized to insert date of issue on bill of lading - Whether plaintiffs entitled to
claim damages. ...

### THE "FREIGHTLINE ONE"

Lloyd's Law Reports
[1986] 1 Lloyd's Rep. 266 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)
Admiralty practice - Sale of ship pendente lite - Port authority claimed pre-arrest charges - Whether port
authority entitled to the amount claimed. ...

### ATHENS SKY COMPANIA NAVIERA S.A. v. THE PORT SERVICES CORPORATION LTD. (THE "TRIBELS")

Lloyd's Law Reports
[1985] 1 Lloyd's Rep. 128 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)
Admiralty practice - Salvage - Salvage services rendered to shipowners' vessel - Salvors demanded security
in the sum of £3,323,000 - Value of salved property £16,150,000 - Whether demand excessive - Whether
injunction restraining salvors from requiring provision of salvage security in excess of £1,000,000 should be
granted. ...

### THE "INDIAN FORTUNE"

Lloyd's Law Reports
[1985] 1 Lloyd's Rep. 344 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)
Admiralty practice - Stay of action - Jurisdiction clause - Shortage of delivery - Action brought in English
Courts - Parties agreed disputes to be decided in India - Whether action should be stayed. ...

### THE "MYRTO" (NO. 3)

Lloyd's Law Reports
[1985] 2 Lloyd's Rep. 567 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)
Admiralty practice - Writ - Jurisdiction - Action by plaintiffs claiming reimbursement of costs of discharging cargo -
Application to extend validity of writ - Whether application should be granted - R.S.C., O. 6, r. 8. ...

### THE "STATE OF HIMACHAL PRADESH"

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 573 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision off Bombay - Navigation of both vessels - Whether failure to keep proper lookout - Whether negligent in altering course - Liability for collision - Apportionment ...

### THE "ACHILLEUS"

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 338 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in approaches to Kieler Forde - Whether vessels complied with collision regulations - Liability for collision - Apportionment of blame. ...

### THE "STEPHAN J"

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 344 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Containers washed overboard - Plaintiffs arrested alleged sistership - Whether plaintiffs entitled to arrest vessel in connection with which cause of action arose. ...

### THE "GREGOS"

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 347 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Shiprepairers - Contract - Lien - Validity - No specification of repairs provided - Whether price agreed for work carried out by initial contract - Whether price agreed for repairs of generators - Plaintiffs claimed balance of moneys due - Plaintiffs exercised lien on vessel - Whether defendants could counterclaim for breach of contract and wrongful detention of vessel. ...

### THE QUEEN v. SECRETARY OF STATE FOR TRANSPORT Ex parte SUNDERLAND MARINE MUTUAL INSURANCE CO. LTD. (THE "ARD AIDHAM" AND "NORDLAND")

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 412 - QUEEN'S BENCH DIVISION

Navigation - Merchant shipping notice - Fishing vessels to be constructed so that person steering had a clear view ahead - Whether notice issued without proper consultation - Whether notice valid - Fishing Vessels (Safety Provisions) Act, 1970, s. 7 - Fishing Vessels (Safety Provisions) Rules, 1975, rr. 45 (4), 46 (4). ...

### THE "LASH ATLANTICO"

Lloyd's Law Reports

[1985] 2 Lloyd's Rep. 464 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Collision - Assessment of damages - Currency of claim - Costs - Whether plaintiffs entitled to recover damages in U.S. dollars - Whether order as to costs should be varied - Whether plaintiffs lost opportunity of carrying a cargo during period vessel under repairs. ...

### THE "TILIA GORTHON"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 552 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Damage to cargo - Most of deck cargo washed overboard - Whether cargo-owners could claim damages from carriers - Whether loss caused by perils of the seas. ...

THE "ETERNAL PEACE"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 136 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Charterers counter damages for breaches of charter - Vessel arrested -

Released on bank's bail bond - Whether bank could be added as defendants. ....................

THE "GULF VENTURE"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 131 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Appraisement and sale of vessel - Plaintiffs alleged cost of maintaining vessel under

arrest exceeded £5000 per month - Whether vessel should be sold for benefit of creditors. ...

THE "WORLD PROTECTOR"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 227 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Procedure - Order for discovery of documents - Defendants failed to comply with order -

Whether application for extension of time for complying with order should be granted. ...

THE "SATYA PADAM"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 336 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in the river Danube - Whether vessel at all times on her correct side of

channel - Liability for collision - Apportionment of blame. ...

THE "TRAUGUTT"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 76 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Jurisdiction clause - Cargo-owners' goods damaged by fire - Action

commenced by other cargo-owners in Antwerp - Whether Belgian Court forum conveniens - Whether action

should be stayed. ...

THE "LUCKY WAVE"

Lloyd's Law Reports

[1985] 1 Lloyd's Rep. 80 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Bill of lading - Damage to cargo - Cargo delivered to warehouse in damaged condition - Whether damage

caused by insufficiency of packing - Whether damage occurred when goods not in custody of shipowners. ...

THE "PIA VESTA"

Lloyd's Law Reports

[1984] 1 Lloyd's Rep. 169 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Bill of lading - Exclusive jurisdiction clause - Non-delivery of container and

contents - Whether action should have been brought in Denmark - Whether action should be stayed. ...

THE "GULF VENTURE"

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 446 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

### ZEA STAR SHIPPING CO. S.A. v. PARLEY AUGUSTSSON (INVEST) A/S

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 605 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

### THE "FORUM CRAFTSMAN"

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 102 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Jurisdiction clause - Damage caused to vehicles on board vessel -
Whether action should be brought in Tokyo - Whether English action should be stayed. ...

### THE "ST. LOUIS"

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 174 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Liability - Vessel at anchor - Collision in Bay of Algeciras - Whether vessel at anchor contributed to
collision - Whether collision could have been avoided - Apportionment of liability. ...

### THE "ROYAL WELLS"

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 255 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Priority - Wages - Vessel ordered to be sold - Master, officers and crew claimed wages -
Whether crew's wages had priority over master's wages - Whether master's claim to rank pari passu with
claim by crew members. ...

### KLEINWORT BENSON LTD. v. SHERKATE SAHAMI SAKHT (THE "MYRTO") (No. 2)

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 341 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Costs of discharging cargo - Court ordered sale of mortgaged vessel laden with cargo -
Whether expense in discharging cargo part of expenses of Admiralty Marshal - Whether a first charge on
proceeds of sale of ship - Whether cargo-owners liable for discharging costs. ...

### ATHENS CAPE NAVIERA S.A. v. DEUTSCHE DAMPFSCHIFFAHRTSGESELLSCHAFT "HANSA" AKTIENGESELLSCHAFT AND ANOTHER (THE "BARENBELS")

Lloyd's Law Reports

[1984] 2 Lloyd's Rep. 388 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Sale of ship - Maritime lien - Sellers guaranteed vessel free from lien - Vessel detained for non-payment of
sellers' debts - Whether buyers liable for claim - Whether sellers bound to indemnify buyers. ...

### THE "SALVISCOUNT" AND "OLTET"

Lloyd's Law Reports

[1984] 1 Lloyd's Rep. 164 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Renewal of writ - Extension of validity of writ - Admiralty Register - extended validity writ to re-issued writ - Whether Admiralty Register in act in making order. ...

### THE "KAPITAN ALEKSEYEV", "PANAGIOTIS XILAS" AND "NORDMARK"

Lloyd's Law Reports

[1984] 1 Lloyd's Rep. 173 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Apportionment of liability - Collision at Tarous Harbour - Vessels collided with each other and with barges - Whether reasonable care and skill exercised by masters of vessels - Liability for collision. ...

### THE "BENARTY"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 50  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Exclusive jurisdiction clause - Damage to cargo - Actions in rem and personam brought in England - Whether jurisdiction clause valid - Whether actions should be brought in Indonesia - Whether actions should be stayed - Hague-Visby Rules. ...

### THE "BISKRA"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 59  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Exclusive jurisdiction clause - Damage to cargo - Action brought in England - Whether action should have been brought in Algeria - Whether English action should be stayed. ...

### THE "ATLANTIC SONG"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 394 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Jurisdiction clause - Damage to cargo - Action brought before English Court - Whether dispute under bill of lading - Whether Sweden more convenient forum - Whether action should be stayed. ...

### THE "JALAKRISHNA"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 628 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Damages for personal injury - Indian seaman injured on board Indian vessel on high seas - Action brought in England - Whether stay would cause injustice to plaintiff - Whether action should be brought in India. ...

### THE "SAINT ANNA"

Lloyd's Law Reports

[1983] 1 Lloyd's Rep. 637 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action on arbitration award - Arbitrators found in favour of plaintiffs - Plaintiffs issued writ in rem against proceeds of sale of vessel - Whether Court had jurisdiction to give judgment for plaintiffs - Whether plaintiffs could be paid out of proceeds of sale of vessel. ...

THE "PINDAROS"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 135 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Short delivery - Penalty payable in respect of deficiency in quantity of goods landed - Whether plaintiffs liable for payment of penalties - Whether defendants liable to reimburse plaintiffs ...

THE "ANTONIS P. LEMOS"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 310 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Warrant of arrest - Application to set aside warrant and writ - Whether action lay outside jurisdiction of High Court - Whether application should be granted. ...

THE "LLOYDIANA"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 313 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Application to set aside - Claim in respect of wet damage to and short delivery of cargo of sugar - Defendants' name appeared on bills of lading but defendants not charterers of vessel - Whether Court had jurisdiction in rem - Whether application to set aside writ and undertaking should be granted. ...

THE "SENNAR" (No. 2)

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 399 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Exclusive jurisdiction clause - Action brought in England - Whether action should have been brought in Sudan - Whether action an action under the contract of carriage - Whether issue already decided by Dutch Courts - Whether plaintiffs precluded from contending to the contrary - Whether action should be stayed. ...

THE "JIN PING"

Lloyd's Law Reports

[1983] 1 Lloyd's Rep. 641 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in Suez Bay between dredger and defendants' vessel - Whether collision caused solely by the fault of the dredger or the vessel. ...

THE "SONIA S."

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 63 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Jurisdiction - Agreement for lease of containers - Claim for rent - Whether claim arising out of an agreement relating to the carriage of goods in a ship - Whether plaintiffs could invoke Admiralty jurisdiction - Supreme Court Act, 1981, s. 20 (2). ...

THE "ALBANY" AND "MARIE JOSAINE"

Lloyd's Law Reports

[1983] 2 Lloyd's Rep. 195 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Limitation of time - Delay in issue of writ - Parties in negotiation - Whether in circumstances application for extension of time for issue of writ should be granted - Maritime Conventions Act, 1911, s. 8. ...

### THE "SENNAR"

Lloyd's Law Reports

[1983] 1 Lloyd's Rep. 295  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Procedure - Acknowledgment of service - Application for stay of proceedings - Whether defendants entitled to leave to amend notice of motion - Whether application to withdraw acknowledgment of service should be granted. ...

### JENKIN v. GODWIN GODWIN v. JENKIN (THE "IGNITION")

Lloyd's Law Reports

[1983] 1 Lloyd's Rep. 382  - QUEEN'S BENCH DIVISION(DIVISIONAL COURT)

Navigation - Vessel in compulsory pilotage area - Authorized pilot refused to take charge of vessel on ground unsafe to proceed on flood tide before sunset - Offered to take charge of vessel next morning - Whether reasonable offer by pilot - Pilotage Act 1913, s. 11, as amended.Navigation - Pilotage - Refusal of authorized pilot to take charge of vessel - Master successfully navigated vessel without pilot in compulsory pilotage area - Whether omission to do something required to preserve vessel from loss or serious damage - Merchant Shipping Act 1970, s. 27. ...

### THE "MUNSTER"

Lloyd's Law Reports

[1983] 1 Lloyd's Rep. 20  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Application to set aside - Vessel arrested for non-payment of balance of fuel price - Vessel demise chartered to defendants - - Defendants repudiated charter - Owners intervened - Whether writ issued before charter terminated - Whether owners entitled to set aside writ and to release of vessel from arrest. ...

### THE "BLUE WAVE"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 151  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Bill of lading - Damage to cargo - Jurisdiction clause - Limitation of time - Whether defendants' principal place of business in Greece - Whether indorsee of bill of lading had same rights as original shipper - Whether fact that action time barred in Greece to be taken into account - Whether application for a stay should be granted.

### THE "SAUDI PRINCE"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 255  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Damage to cargo - Arrest of vessel - Defendants denied ownership of vessel - Whether jurisdiction of Court could be invoked - Whether vessel beneficially owned by defendant - Whether writ and all subsequent proceedings should be set aside - Administration of Justice Act, 1956, s. 3 (4).

### The "DESPINA G.K."

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 555 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Application for warrant of arrest - Maritime lien - Plaintiff's cargo dumped at sea - Judgment against defendants obtained in Swedish Court - Whether judgment could be enforced here - Whether plaintiffs had a maritime lien - Whether application for warrant of arrest should be granted. ...

### THE "ARGO HOPE"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 559 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Collision - Crossing vessels - Manchester Ship Canal - Vessels should have passed port to port - Whether alteration of heading a cause of collision - Whether infringement of bylaws a cause of collision - Liability - Apportionment - Manchester Ship Canal Bylaws. ...

### THE "SMJELI"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 74 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Limitation of liability - Damage caused to groynes by dumb barge - Whether damage caused without privity of defendants - Whether plaintiffs could claim damages against both tug and barge - Whether defendants entitled to limit their liability - Whether limit of liability to be calculated by reference to tonnage of tug only - Merchant Shipping Act, 1894, s. 503. ...

### THE "CLIFFORD MAERSK"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 251 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Carriage by sea - Limitation of time - Damage to cargo - Extension of time limit granted - Last day of extended time limit Sunday - Writ issued on Monday - Whether proceedings brought within time. ...

### THE "HELENUS" AND "MOTAGUA"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 261 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Salvage - Reward - Assistance rendered to vessels off Sheerness Docks and in the River Medway - Assessment of salvage reward for such services. ...

### THE "MARITIME HARMONY"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 400 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Collision - Crossing vessels - Collision in the River Scheldt - Visibility reduced by fog - Vessel fitted with two operational radar sets - Vessel not maintaining a proper radar lookout - Whether vessel proceeding at excessive speed - Apportionment of liability - Collision Regulation, 1972, r. 1 (b), r. 6, r. 9. ...

### THE "GRACE"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 429 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Automatically arooduse - Action in rem - and in personam - Wrong named defendant etc. etc - Whether amendment
ought to be allowed - Whether leave to amend and the next writ of summons and to serve notice thereof should
be granted.

### THE "CORAL I"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 441 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Vessel at anchor - Collision with incoming vessel in Suez Bay Waiting Area - Whether anchored
vessel displaying anchor lights - Whether incoming vessel proceeding through Waiting Area at excessive
speed - Whether incoming vessel failed to keep proper look out - Liability - Apportionment of damages. ...

### THE "NEA TYHI"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 606 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Bill of lading - Damage to cargo - Bill of lading claused "shipped under deck" - Cargo carried on deck -
Whether shipowners in breach - Whether shipowners negligent in stowage of cargo - Whether charterers
authorized to issue and sign claused bills - Whether cargo damaged before property passed to plaintiffs. ...

### THE "MARION"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 52 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Limitation of liability - Vessel anchored off Hartlepool - Anchor fouled oil pipeline - Master
not using up to date charts - Whether plaintiffs had established that incident occurred without their actual fault
or privity - Whether plaintiffs entitled to limit their liability - Merchant Shipping Act, 1894, s. 503 - Merchant
Shipping (Liability of Shipowners and Others) Act, 1958, s. 2 (1). ...

### THE "SPAN TERZA"

Lloyd's Law Reports

[1982] 2 Lloyd's Rep. 72 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Vessel ordered to be appraised and sold - Bunkers on board vessel -
Whether intervener/charterers of vessel could claim proceeds of sale of bunkers. ...

### YORKSHIRE ELECTRICITY BOARD v. ESTONIAN SHIPPING CO. (THE "VIRTSU")

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 272 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Liability - Vessel's anchor fouled and broke plaintiffs' electricity cable -
Exchange of correspondence - Terms of settlement agreed - Whether plaintiffs offered to accept 95 per cent
of their claim as proved or agreed and to forgo any interest thereon. ...

### THE "TESABA"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 397 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Jurisdiction - Arrest of vessel by salvors for breach of salvage agreement - Whether salvors' claim
within Administration of Justice Act, 1956, s. 1 (1) (g), (h) and (j), s. 3 (4). ...

THE "MERDEKA"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 401 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Contempt of Court - Master broke arrest and took vessel out of jurisdiction - Whether master should be committed to prison for contempt ...

---

THE "ILO"

Lloyd's Law Reports

[1982] 1 Lloyd's Rep. 39 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Remuneration - Vessel took the ground in River Thames - Plaintiffs rendered salvage services - Amount of salvage award plaintiffs entitled to. ...

---

THE "STAR OF LUXOR"

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 139 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Shortage of cargo on delivery - Cargo-owners brought action in England - Bills of lading provided disputes to be heard where carrier had principal place of business, i.e., Egypt - Whether defendants' application for a stay should be granted. ...

---

THE "EL AMRIA" AND "EL MINIA"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 539 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Damage to cargo - Cargo-owners brought action in England - Whether contract of carriage contained exclusive jurisdiction clause - Whether action should have been brought in Egypt - Whether application for stay should be granted. ...

---

THE "MARITIME TRADER"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 153 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Jurisdiction - Arrest of vessel - Plaintiff commenced arbitration proceedings - Whether vessel sister ship of chartered vessel - Whether vessel beneficially owned by charterers - Whether vessel could be arrested to provide security for award in arbitration - Whether writ should be set aside- Administration of Justice Act, 1956, s. 3 (4). ...

---

THE "SILIA"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 534 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Appraisement and sale of vessel - Oil in vessel's tanks sold with vessel - Whether oil part of ship - Plaintiffs obtained leave to enforce award as judgment - Whether proceeds of sale of oil available to plaintiffs for purpose of enforcing their judgment ...

---

THE "JEMRIX"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 544 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Arbitration clause in charter-party - Damage to cargo - Cargo-owners claimed damages - Shipowners claimed indemnity from charterers in third party proceedings - Disputes between shipowners and charterers, to be referred to arbitration - Whether application for stay of third party proceedings should be granted. ..

### THE "TOLUCA"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 548  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision in narrow channel - Whether vessels at fault in navigating channel - Liability for collision - Apportionment of blame.....

### THE "MORVIKEN"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 61  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Exclusive jurisdiction clause - Damage to cargo - Bill of lading provided all disputes to be brought before Court in Amsterdam - Whether clause valid - Whether dispute strongly connected with England- Whether Hague-Visby Rules applicable - Whether English action should be stayed - Carriage of Goods by Sea Act, 1971. ...

### THE "NETTY"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 57  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Damage to cargo - Cargo loaded in England - Delivered to consignee in Germany - Action brought in English Courts - Whether England the natural forum - Whether action ought to be stayed - Convention on Jurisdiction and the Enforcement of Judgments in Civil and Commercial Matters, 1968. ...

### THE "ROSELINE"

Lloyd's Law Reports

[1981] 2 Lloyd's Rep. 410  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Collision off coast of Norfolk in dense fog - Both vessels operating radar sets - Whether vessels being navigated in accordance with Collision Regulations, 1972 - Apportionment of liability. ...

### THE OWNERS OF THE SHIP "DIEGO SILANG" AND OF THE CARGO LATELY LADEN ABOARD HER v. THE OWNERS OF THE SHIP "VYSOTSK" (THE "VYSOTSK")

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 439  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Approaching vessels - Duty of stand-on vessel to keep her course - Whether gyro course record a true record of defendant vessel's course - Whether a forgery - Duty of give-way vessel - Whether discharged - Second collision with a third vessel - Whether caused by the first - Failure to take compass bearings of approaching vessel - Collision regulations 1965, rr. 19, 21, 22 and 27. ...

### THE "JOGOO"

Lloyd's Law Reports

[1961] 1 Lloyd's Rep. 513 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Mortgage - Sale of vessel - Order of priority of claims - Whether cost of discharging cargo before vessel sold should become a first charge on the proceeds.

### THE "ALEXA"

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 11 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Writ - Service out of jurisdiction - Ex parte application by plaintiffs for leave to serve out of jurisdiction - Admiralty Registrar refused unless further information provided on affidavit - Whether Admiralty Registrar's decision wrong in principle - Whether this a proper case for service out of jurisdiction. ...

### THE "FALCON"

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 13 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Arrest of vessel - Cost of maintaining vessel under arrest - Cargo-owners arrested vessel already arrested by mortgagees - Whether cargo-owners required to contribute towards costs of maintaining vessel under arrest - Whether such expenses should be recoverable from proceeds of sale of the vessel as first priority charge. ...

### THE "ARZEW"

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 142 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Negligence - Fire - Damage to plaintiffs' fishing trawlers - Welding operations being carried out on plaintiffs' trawler - Defendants' tanker discharging gas oil - Oil floating in vicinity of trawlers - Whether oil escaped from tanker - Whether gasoline or gas oil ignited - Whether defendants liable - Whether plaintiffs guilty of contributory negligence. ...

### THE "PANSEPTOS"

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 152 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Stay of action - Exclusive jurisdiction clause - Damage to cargo - Cargo-owners brought action in England - Disputes under contract of carriage to be decided by Ethiopian Court - Whether defendants' application for stay should be granted. ...

### CRESTA MARINE LIMITED v. THE OWNERS OF THE SHIP "CAPITAINE LE GOFF" (THE "CAPITAINE LE GOFF")

Lloyd's Law Reports

[1981] 1 Lloyd's Rep. 322 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Expert evidence - Collision by ferry with plaintiffs' jetty - Whether damage claimed caused by collision - Whether claim exaggerated. ...

### THE "KISLOVODSK"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 183 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

;Carriage by sea - Stay of action - Damage to cargo - Foreign jurisdiction clause - Parties agreed disputes to
be decided by Russian Court. Plaintiffs brought action in England - Whether action should be stayed ...

### ARATRA POTATO CO. LTD. AND ANOTHER v. EGYPTIAN NAVIGATION CO. (THE "EL AMRIA")

Lloyd's Law Report:

[1980] 1 Lloyd's Rep. 390 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Bill of lading - Foreign jurisdiction clause - Cargo alleged to be damaged on unloading -
Cargo-owners commenced action for damage to cargo in England - Whether action should be stayed on the
ground that parties agreed to refer disputes to Egyptian Court. ...

### THE "AMERICAN SIOUX" (No. 2)

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 623 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Salvage - Owners put up security but did not claim arbitration within 42 days allowed by
salvage agreement - Whether application for extension of time should be granted - Lloyd's Standard Form of
Salvage Agreement - Arbitration Act, 1950, s. 27. ...

### THE "GEESTLAND"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 628 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Arbitration - Cargo interests failed to give notice of appeal in time - Appeal arbitrator issued award
in favour of salvors - Total sum as between cargo interests and owners not payable in proportion to values of
respective properties - Whether arbitrator had misconducted himself - Whether award should be remitted -
Lloyd's Standard Form of Salvage Agreement. ...

### H. KRUIDENIER (LONDON) LTD. v. THE EGYPTIAN NAVIGATION CO. (THE "EL AMRIA" No. 2)

Lloyd's Law Reports

[1980] 2 Lloyd's Rep. 166 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Charter-party (Voyage) - Stay of action - Limitation of time - Damage to cargo - Limitation period prescribed in
The Hague Rules expired - Whether application for stay should be granted - Whether application for
extension of time should be granted - Arbitration Act, 1975, s. 1 - Arbitration Act, 1950, s. 27 - The Hague
Rules. ...

### THE "KYOAN MARU"

Lloyd's Law Reports

[1980] 2 Lloyd's Rep. 233 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Pleadings - Amendment - Defendants applied to amend defence - Effect amendment
would have on plaintiffs - Whether amendment should be allowed. ...

### THE "SANSHIN VICTORY"

Lloyd's Law Reports

[1980] 2 Lloyd's Rep. 359 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Liability - Collision off south west coast of Korea - Whether vessels took proper steps to reduce
speed - Apportionment of liability for collision - International Regulations for Preventing Collisions at Sea,
1972 rr. 6, 8, 19. ...

GULF OIL BELGIAN S.A. v. FINLAND STEAMSHIP CO. LTD. (THE "WELLAMO")

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 229 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Stay of action - Collision six miles from Stockholm - Proceedings instituted in Swedish Court and English Court - Whether proceedings in England should be stayed - Whether Swedish Court natural forum. ...

THE "FRISO"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 469 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Unseaworthiness - Due diligence - Damage to deck cargo - Vessel encountered heavy weather - Suddenly developed list to port - Vessel abandoned - Cargo jettisoned - Whether damage to cargo caused by perils of the sea - Whether vessel seaworthy at beginning of voyage - Hague Rules art. 3, r. 1 and art. 4. ...

THE "HELENE ROTH"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 477 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Arrest of vessel - Interveners - Shipowners transferred ownership of vessel to interveners - Plaintiffs brought action in rem against shipowners - Whether interveners' application to set aside renewal of writ and service thereof and release of vessel unconditionally should be granted. ...

THE "BOSTON LINCOLN"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 481 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Award - Vessel stranded - Salvors rendered salvage services - Assessment of reward. ...

THE "AEGEAN CAPTAIN"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 617 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Practice - Collision - Damage to cargo - Service out of jurisdiction - Plaintiffs granted leave to serve notice of writ out of jurisdiction - Whether application to set aside should be granted - R.S.C., O. 75, r. 4. ...

THE "AMERICAN SIOUX"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 620 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Salvage - Arbitration - Owners put up security but did not claim arbitration - Whether injunction restraining first defendants from enforcing security should be extended - Lloyd's Standard Form of Salvage Agreement. ...

THE "ARYA ROKH"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 68 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)



Collision – Negligence – Plaintiffs' vessel lying at anchor – Defendant's vessel collided with her – Whether vessel anchored at an improper place – Whether plaintiffs failed to take adequate steps to bring vessel on proper bearing – Liability for collision. …

THE "NORTH GOODWIN NO. 16"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 71  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage – Towage contract – Volunteers – Plaintiff rendered salvage services to light vessel – Whether light vessel in situation of danger – Whether plaintiffs volunteers – Whether assistance rendered under towage contract – Whether plaintiff entitled to salvage reward. …

THE "SAINT ANNA"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 180  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice – Action in rem – Interveners – Admiralty Marshal ordered sale of vessel – Proceeds of sale of bunkers on board vessel to be separately accounted for – Whether interveners owners of fuel oil. …

THE "ABBEVILLE"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 187  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Sale of ship – Agreement – Defendants purchased vessels from director of Navy Contracts – Oral agreement between plaintiffs and defendants for sale and purchase of vessels – Whether defendants sold vessels to plaintiffs. …

THE "ANNA MARIA"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 192  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Practice – Arbitration – Salvage agreement – Injunction – Whether injunction restraining salvors from taking any further step in a reference to arbitration should be granted. …

SHELL TANKERS (U.K.) LTD. v. ASTRO COMINO ARMADORA S.A. (THE "PACIFIC COLOCOTRONIS")

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 366  - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Contract – Construction – Lightening contract – Vessel rendered "lightening" assistance by taking off part of cargo – Whether further lightening assistance required – Whether vessel carried out obligations under contract. …

THE "VENEZUELA"

Lloyd's Law Reports

[1980] 1 Lloyd's Rep. 393  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Bill of lading – Damage to cargo – Sub-charterers – Bill of lading signed by charterers' agents on behalf of master – Whether charterers party to contract of carriage evidenced by bill of lading. …

THE "GINA"

Lloyd's Law Reports

[1989] 1 Lloyd's Rep. 363 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Arrest of vessel - Shipowners refused to pay - plaintiffs' costs until outstanding freight and miscellaneous costs paid - Should the arrested vessel - Writ or application for release of vessel should be granted -Administration of Justice Act, 1956 ...

## THE "FATHER THAMES"

Lloyd's Law Reports

[1979] 2 Lloyd's Rep. 364  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Action in rem - Maritime lien - Collision - Vessel on demise charter - Whether jurisdiction to proceed against owners - Whether maritime lien attaching - Whether action should be stayed - Administration of Justice Act, 1956, ss. 1(1) (d), 3(3), (4). ...

## THE "VISHVA PRABHA"

Lloyd's Law Reports

[1979] 2 Lloyd's Rep. 286  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Conflict of laws-Stay of proceeding-Damage to cargo-Whether shipowners had defence to claim-Whether dispute should be submitted to Indian Court-Whether action should be stayed. ...

## THE "BULKNES"

Lloyd's Law Reports

[1979] 2 Lloyd's Rep. 39  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Carriage by sea - Damage to cargo - Hatch lid opened in gale - Sea water entered - Whether defendants could rely on Hague Rules, art. IV, r. 2. ...

## AFROMAR INC v. GREEK ATLANTIC COD FISHING CO. (THE "PENELOPE II")

Lloyd's Law Reports

[1979] 2 Lloyd's Rep. 42  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice - Limitation of liability - Bill of lading - Damage to cargo - Whether plaintiffs entitled to decree of limitation notwithstanding only one claim made or apprehended. ...

## WALKER v. PENNINE INSURANCE CO. LTD.

Lloyd's Law Reports

[1979] 2 Lloyd's Rep. 139  - QUEEN'S BENCH DIVISION

Insurance (Motor) - Indemnity - Personal injury - Passenger in plaintiff's car injured in collision - Insurers denied liability because plaintiff in breach of policy conditions - Passenger obtained judgment in default - Whether plaintiff entitled to be indemnified by insurers, ...

## THE "RILLAND"

Lloyd's Law Reports

[1979] 1 Lloyd's Rep. 455  - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Salvage - Remuneration - Salvage services rendered to vessel - Assessment of fair and proper reward - Interest ...

**EXHIBIT   10**

Neutral Citation Number: [2007] EWCA Crim 1925

Case No: 200702811D5

**IN THE SUPREME COURT OF JUDICATURE**
**COURT OF APPEAL (CRIMINAL DIVISION)**
**ON APPEAL FROM THE CENTRAL CRIMINAL COURT**
**The Honourable Mr Justice Aikens**
**T20060004**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 30/07/2007

Before :

**THE LORD CHIEF JUSTICE OF ENGLAND AND WALES**
**THE HONOURABLE MR JUSTICE ELIAS**
and
**THE HONOURABLE MR JUSTICE GRIFFITH WILLIAMS**

- - - - - - - - - - - - - - - - - - - -

Between :

**Times Newspapers Ltd & Others**                    **Appellant**
- and -
**R**                    **Respondent**

(Transcript of the Handed Down Judgment of
Smith Bernal Wordwave Limited, 190 Fleet Street
London EC4A 2AG
Tel No: 020 7404 1400, Fax No: 020 7831 8838
Official Shorthand Writers to the Court)

Mr A Nicol QC and Mr A Hudson for the Appellant
Mr D. Perry QC and Mr L. Mably for the Respondent

Hearing dates: 10th July 2007

- - - - - - - - - - - - - - - - - - - -

# Approved Judgment

**Lord Phillips of Worth Matravers CJ:**

**Introduction**

1.  This is an appeal that we gave permission to bring at the outset of the hearing. It is brought under section 159 of the Criminal Justice Act 1988 by Times Newspapers Ltd and many other publishers ('the media') against two orders made in the Central Criminal Court by Aikens J on 10 May 2007 at the conclusion of this trial. In the trial the first defendant David Keogh was convicted of two offences under sections 2 and 3 of the Official Secrets Act 1989 (the 'OSA') and sentenced to 6 months imprisonment. The second defendant Leo O'Connor was convicted of one offence under section 5 of the OSA and sentenced to 3 months imprisonment. The first order appealed against was made under section 4(2) of the Contempt of Court Act 1981 ('the CCA'). It postponed indefinitely any reporting of a question and answer ('the question and answer') given in open court during the evidence in chief of David Keogh. The second order appealed against was made under section 11 of the CCA in relation to evidence that the judge had directed should be given *in camera* at the trial.

2.  The judgment of Aikens J sets out with admirable clarity the facts, the relevant legislation, the issues, the argument and the reasons for his decision. Rather than repeat that exercise, we have decided to annexe his judgment to our own.

3.  This appeal is about restricting publication of matters that relate to court proceedings in the interest of the administration of justice. It is a basic principle of the administration of justice that court proceedings should take place in public and that there should be freedom to publish reports of those proceedings. There are, however, certain circumstances in which the law recognises that restrictions on publication are justified in the interest of the administration of justice:

    i)    The restriction is necessary in order to ensure the fair trial of the proceedings in which the restriction is sought, or subsequent proceedings. A typical example is the restriction on publishing details of a trial within a trial. This restriction is designed to ensure that the jury does not learn of matters that are not admissible as evidence.

    ii)   The restriction is necessary in order to protect a person involved in the proceedings. Typical examples are the restriction on publishing the name of the victim of an alleged rape, or of a child, or of the victim of blackmail.

    iii)  The restriction is necessary in order to protect the object of the proceedings. Typical examples are where the object of the proceedings is the protection of official or trade secrets.

    When considering the ambit of legislation that permits restrictions on reporting court proceedings it is helpful to consider the reason for the restrictions in question.

4.   This appeal relates to criminal proceedings in relation to the disclosure of official secrets in breach of the OSA. The overall object of such proceedings is the protection of official secrets. The specific object of the proceedings was the prosecution of two men who were alleged to have infringed the OSA. The orders that were made by the judge were not necessary to achieve the specific object of the proceedings. They were made in the interests of the overall object of the proceedings. The orders were not necessary to procure a fair trial of the two defendants – indeed they were made after the trial was over. Such orders may, however, be necessary for the general administration of justice. If the consequence of bringing prosecutions for breach of the OSA is that the secrets to which they relate become public, it will not, in practice, be possible to bring such prosecutions.

### The order under section 4(2) CCA.

5.   The order under section 4(2) was in the following terms:

> "Pursuant to section 4(2) of the Contempt of Court Act 1981
>
> It being necessary to avoid a substantial risk of prejudice to the administration of justice in these proceedings
>
> IT IS ORDERED THAT
>
> No report of the question and answer given by the defendant David Keogh at about 10.46a.m on 30th April 2007 whilst giving evidence in chief in the witness box should be published in any form.
>
> Until Further Order."

6.   This order was made in an attempt to protect against the consequences of a mishap that occurred in the trial process. Section 8 (4) of the Official Secrets Act 1920, which applies to the OSA by virtue of section 11(4) of the latter Act, permits the court to exclude the public from that part of a prosecution if publication of evidence to be given or of any statement to be made would be prejudicial to the national safety. Aikens J made an order pursuant to that section in relation to the letter whose disclosure formed the basis of the prosecution. By mishap a question was put and an answer was made in the public part of the trial that should have formed part of the evidence heard in the absence of the public. Aikens J made an immediate order under section 4(2) of the CCA, prohibiting the publication of the question and answer. He repeated that order, with indefinite effect, at the end of the trial.

7.   It was apparently common ground before Aikens J that if an order of this kind were to be made it had to be under s4(2). Counsel for the Crown conceded before the Judge that an order of that nature could not be made under s11. That was a concession, however, which he withdrew before us.

8.   Objection to this order was taken by the media on two inter-connected grounds:

   i)      The order was not necessary to 'avoid a substantial risk of prejudice to the

administration of justice *in those proceedings or any other proceedings pending or imminent'*.

    ii)    The order was an indefinite prohibition of publication whereas section 4(2) of the CCA only permitted postponement of publication, which was necessarily finite.

9. Aikens J rejected both objections. He held that the order was necessary to avoid prejudice to the administration of justice *'in those proceedings'* because it was necessary to prevent the undermining of the *in camera* order that had been made in the proceedings. As to the second point, 'postpone' meant the same as 'defer' and as a matter of language, publication of facts or evidence could be deferred indefinitely.

10. When considering whether the order was necessary to eliminate the "not insubstantial risk" to the administration of justice in the proceedings he held that it was. He observed that counsel for the media "did not suggest that there was any other way to overcome the risk by some other, less restrictive means. In my view there is none".

11. Mr Perry QC, for the Crown, supported the reason for an order of this kind. He urged the example of restricting the reporting of the name of a victim of blackmail. Such a restriction would be necessary to avoid the risk of prejudice to the administration of justice in respect the trial of the blackmailer, but the need for the restriction would persist indefinitely after the end of the trial. By the end of his submission Mr Perry appeared to accept that the order ought to have been made under s11 rather than s4(2).

12. We agree, on its natural meaning, section 4(2) is designed to enable the court to prevent the publication of the report of proceedings where the publication will prejudice the conduct of those proceedings, or specific pending proceedings. The section is designed to cater for the first of the three categories in paragraph 3 above. The section permits postponement and the need for postponement cannot subsist beyond the end of the proceedings in question. This construction receives some support from authority.

13. Before the CCA there was uncertainty as to whether a court had power to impose reporting restrictions in aid of the administration of justice or generally. This question received consideration in *Attorney-General v Leveller* [1979] AC 440. The issue in that case was whether, in an official secrets trial, it was a contempt of court to publish the name of a witness who had been permitted in court to describe himself simply as 'Colonel B'. Discussion, however, ranged wider than this issue and recognised the distinction between prejudicing the administration of justice in a particular case and prejudicing it generally.

14. Thus Lord Diplock said at p. 449:

    "Of those contempts that can be committed outside the courtroom the most familiar consist of publishing, in connection with legal proceedings that are pending or imminent, comment or information that has a tendency to pervert the course of

> justice, either in those proceedings or by deterring other people
> from having recourse to courts of justice in the future for the
> vindication of their lawful rights or for the enforcement of the
> criminal law."

With regard to the former situation, he added at p. 450:

> "So far as proceedings in the courtroom are concerned the trial
> within a trial is held in open court in the presence of the press
> and public but in the absence of the jury.  So far as publishing
> those proceedings outside the court is concerned any report of
> them which might come to the knowledge of the jury must be
> withheld until after they have reached their verdict; but it may be
> published after that."

15. At p. 463 Lord Edmund-Davies referred to a contempt case in which the names of two
victims of blackmail had been published at a late stage of the trial:

> "And it should be observed that no publication of the victims'
> names took place until the judge was about to sum up, and there
> was accordingly no question of the administration of justice in
> *that* case being prejudiced by their being deterred from giving
> evidence for the prosecution.  So the basis of the decision seems
> to be that publication was objectionable on the *general* ground
> that in any and every blackmail case the administration of justice
> in future prosecutions will be interfered with if victims names
> are published."

16. At p. 465 he referred to publication of evidence received *in camera*:

> "And what appears certain is that at common law the fact that a
> court sat wholly or partly in camera (and even where in such
> circumstances the court gave a direction prohibiting publication
> of information relating to what had been said or done behind
> closed doors) did not itself and in every case necessarily mean
> that publication thereafter constituted contempt of court.
>
> For that to arise something more than disobedience of the court's
> direction needs to be established.  That something more is that
> the publication must be of such a nature as to threaten the
> administration of justice either in the particular case in relation
> to which the prohibition was pronounced or in relation to cases
> which may be brought in the future."

17. Lord Russell of Killowen also drew the distinction between prejudicing the administration
of justice in the case reported and prejudicing the administration of justice as a continuing
process:

> "In my opinion it really goes without saying that behind the

application (and the decision) lay considerations of the due administration of justice. In the first place an alternative to the via media adopted would be an application that 'Colonel B's' evidence be taken in camera, and in principle the less that evidence is taken in camera the better for the due administration of justice, a point with which journalists certainly no less than others would agree. In the second place a decision on anonymity – the via media – would obviously, and for the same reasons, be highly desirable in the interest of the due administration of justice as a continuing process in future in such cases."

18. If these observations are applied to the facts of the present case, it is difficult to characterise the order made by Aikens J under section 4(2) as being necessary to avoid prejudice to the administration of justice in the case that he had been trying.

19. In *R v Horsham Justices ex parte Farquharson* [1982] 1 QB 762 the issue was whether the justices had had power under section 4(2) to impose reporting restrictions on committal proceedings pending the trial to which they related. The Court of Appeal held that they had. Lord Denning MR remarked at p. 791 that it had long been settled that at common law the courts had power to make an order *postponing* publication (but not prohibiting it) if the postponement was necessary for the furtherance of justice in proceedings which were pending or imminent. He went on to give detailed consideration to section 4(2):

"Section 4(1)

Before reading section 4 (2) it is very desirable to read section 4 (1) to understand the impact of it. It gives protection to every 'fair and accurate report of legal proceedings held in public, published contemporaneously and in good faith.' In so providing, Parliament was carrying out the recommendation contained in the Report of the Committee on Contempt of Court under the chairmanship of Phillimore L.J. (1974) (Cmnd. 5794), para. 141. It is significant that the Report contained no recommendation corresponding to section 4 (2). But, in view of the width of section 4 (1) (which contained no exceptions) it was obviously desirable to preserve the common law exceptions to it. (The Committee had recognised their existence in paragraphs 134 to 140). These exceptions were preserved by section 4 (2).

Section 4 (2)

Section 4 (2) retains the commons law about the occasions when a report (otherwise fair and accurate) may be a contempt of court – but with this improvement: Nothing is to be left to implication. It is for the court to make an order telling the newspapers what things they are not to publish. Thus giving the newspaper the warning which the Lords felt was desirable in *Attorney-General v. Leveller Magazine Ltd.* [1979] A.C. 440: see especially, *per* Lord Diplock at p.453 G-H and *per* Lord Edmund-Davies at p. 465E-H.

In short, section 4 (2) only applies to cases where the courts themselves would at common law have jurisdiction to make an order postponing publication: but now it needs an order, not an implication. Thus, when the jury is sent out, the judge should tell the newspaper reporters, 'You are not to publish anything of what takes place whilst the jury are out': or, when a pseudonym is sued, 'You are not to publish his true name or anything which may disclose his identity.'

Such an order operates now so as to bind not only persons within the courtroom but also those outside, thus clearing up the doubts expressed by some of the Lords in the *Leveller* case [1979] A.C.440, 464A-B, 471H, *per* Lord Edmund-Davies and Lord Scarman respectively. This is done by section 11 of the Contempt of Court Act 1981.

### The intention of the legislature

On this reading of the statute it will be seen that section 4 (2) is to be very strictly confined. It applies only to a very limited type of case. So read, the statue is not a measure for restricting the freedom of the press. It is a measure for liberating it. It is intended to remove the uncertainties which previously troubled editors. It is intended that the court should be able to make an order telling the editors whether the publication would be a contempt or not. Such as the report of a 'trial within a trial,' or publishing a name which the court for good reason orders should be kept secret, or if magistrates in committal proceedings order that the person blackmailed should not be named. Unless the court makes such an order then the newspaper is given complete protection by section 4 (2) from being subjected to proceedings for contempt of court."

20.  Ackner LJ's view of the object of section 4(2) appeared at p. 806:

"First of all, the power is a power to *postpone*, not to prohibit totally, publication. Secondly, the power may be exercised in relation to only a *part* of the proceedings. Thirdly, that in order for the jurisdiction to be exercised the court must be satisfied that an order is necessary for avoiding a substantial risk of prejudice to the administration of justice. The obvious case for the postponement of a report of proceedings is where the substantive trial or retrial has yet to take place, or where a fair and accurate report of one trial might still prejudice another trial still to be heard. The prejudice to the administration of justice which is envisaged is the reduction in the power of the court of doing that which is the end for which it exists – namely, to administer justice duly, impartially, and with reference solely to the facts judicially brought before it: *per* Wills J. in *Rex v. Parke* [1903] 2.K.B. 432, 438, 444. What the court is generally concerned with is the position of a juryman who, unlike the judge, has neither the training nor the experience to assist him in

> putting out of his mind matter which are not evidence in the
> case."

21. It is difficult, in the light of the passages referred to above. to say that the order that Aikens J made under section 4(2) on 30 April was 'necessary for avoiding a substantial risk of prejudice to the administration of justice in those proceedings'. Had the question and answer been published, the criminal proceedings would have continued as before. We find it impossible to say that the repetition of that order, with indefinite effect, after the trial had been completed fell within the jurisdiction conferred by that section. Accordingly that order must be quashed.

22. It does not follow that there was no way of preventing the mischief that might have been caused by the accidental inclusion of the question and answer in the evidence given in open court when it should have been given *in camera*. Mr Nicol submitted that, once the question had been posed and the answer given in open court, the evidence was in the public domain and publication could not be prevented.

23. We do not accept that submission. There is a world of difference between what is said in open court and what is published, and the CCA is concerned with the latter. The question and answer fell within the category of evidence that the judge had ordered should be withheld from the public by his ruling under section 8(4) of the OSA. It was open to him to make an order under section 11 of the CCA that embraced the question and answer, notwithstanding that the question and answer had, by mistake, been heard in public. Lord Denning plainly envisaged that this was the appropriate section under which to make an order of this nature, as the extract from his judgment in *Farquharson* set out above, demonstrates. Indeed, the question and answer was covered by the terms of his section 11 order, albeit that he may not have intended that it should have been.

24. Alternatively, we think that it would have been open to the judge, having made it plain that the question and answer had been given in open court in breach of his *in camera* direction, to have made it plain that to publish the question and answer would be a contempt of court. This it would have been as it would have constituted the frustrating of an order lawfully made by the court.

25. We are satisfied that the judge had jurisdiction to prevent publication of the question and answer and that it was proper to exercise that jurisdiction, albeit that an order under section 4(2) was not the correct way of achieving this. We shall consider submissions from counsel as to the appropriate order that we should make in these circumstances.

**The order under section 11 of the CCA**

26. The form of the order was as follows:

"Pursuant to section 11 of the Contempt of Court Act 1981

IT IS ORDERED THAT

1. There cannot be publication in connection with these proceedings of any material which would or might reveal evidence or statements concerning:

a. the content of a letter dated 16 April 2004 from Mr Matthew Rycroft (the Prime Minister's Private Secretary for Foreign Affairs at the time) to Mr Geoffrey Adams of the Foreign and Commonwealth Office ('the letter');

b. the actual, possible or alleged damage resulting from any alleged unauthorised disclosure of the letter.

2. For the avoidance of doubt, this Order does not apply to the following matters:

a. The date of the letter;

b. The 'Secret-Personal' marking on the letter or other markings on it;

c. The heading of the letter, viz. 'Iraq: Prime Minister's Meeting with President Bush';

d. The contents of the first paragraph of the letter;

e. The identities of the intended recipients of the letter, as set out in the last paragraph of the letter;

f. Subject to any order made under section 4(2) of the Contempt of Court Act 1981, evidence given or statements made in open court during the course of the proceedings."

27. The media make two objections to this order:

    i)    It prohibits publication of matter that is already in the public domain;

    ii)    It is in any event too wide in that it prohibits publication of matters which *might* reveal matter that was subject to the *in camera* hearing.

28. Mr Perry in his skeleton argument stated that the order was intended to cover two classes of material:

    i)    Any material covered by the *in camera* order;

    ii)    Any material whether or not it had been previously published which might directly or indirectly have the result of revealing the matters dealt with during the *in camera* proceedings.

He explained that the purpose of ii) was to ensure that there was no attempt by the press to link the existing reports in the press about the contents of the letter to the evidence given in open court as this would itself subvert the *in camera* order.

29. As Aikens J observed, section 12(1)(c) of the Administration of Justice Act 1960 ('AJA') already prohibits the publication of 'information relating to' the *in camera* proceedings. Such information would relate to 'matter allowed to be withheld from the public in proceedings before the court' under section 11 of the CCA, so there was jurisdiction to make an order under that section. This question remains whether the terms of Aikens J's order was too wide.

30. The following questions arise in relation to the order that he made:

   i)    Could section 11 of the CCA authorise an order that had wider effect than the provisions of section 12(1)(c) of the AJA?

   ii)   Did the order that Aikens J made fall within his powers under section 11 of the CCA?

   **Could section 11 of the CCA authorise an order that had wider effect than section 12(1)(c) of the AJA?**

31. Section 11 of the CCA gave Aikens J the power to prohibit the publication of *'the name or matter'* that he allowed to be withheld from the public by his *in camera* order *'in connection with the proceedings,'* in so far as this appeared to him to be necessary *for the purpose for which the information was withheld.* This is a restriction on the freedom of the press to report the proceedings and plainly prevents publication of evidence that was in fact given *in camera* pursuant to Aikens J's order, should by any means the media obtain possession of this information. His order purports, however, to go further and to prohibit publication in connection with the proceedings of matter which *might* reveal the matter by his *in camera* order. Thus is would appear to cover a publication based on speculation but which did not make it plain that it was mere speculation as to the evidence that was given *in camera* that was, in fact, wholly inaccurate. We do not consider that such a publication could fall within the wording of section 11. It would not be the publication of the name or matter withheld. Nor would prohibition be necessary for the purpose for which the name or matter was withheld, namely to prevent it becoming known to the public in the interests of national security.

32. That is not, however, the end of the story. Such publications would be attempts, albeit unsuccessful, to flout the order made by the court and would be seen by the public as a violation of the order of the court. We consider it likely that any such attempt would, itself, constitute a contempt of court at common law. In making the order that he did under section 11, Aikens J had the praiseworthy object of removing from the media any uncertainty as to what they were or were not permitted to publish having regard to the provisions of section 12(1)(c) of the AJA. His order removed uncertainty and provided the media with mandatory guidance as to how to involve any risk of being in contempt

of court, but it went beyond the powers conferred by section 11.

33.    In these circumstances we consider that the proper course is to amend the order made under section 11 by deleting the words 'or might' from that order. We have drawn attention to the risk that the media will run if they speculate about the content of the evidence that was given *in camera*.

34.    The object of the restrictions that are the subject matter of this appeal is the administration of justice. They protect from publication information that, pursuant to the order of the court, is withheld from the public at a trial in circumstances where, if such protection were not available, the due conduct of the trial might be inhibited or prevented. They apply to reports of or in connection with the proceedings in which the information is withheld. As such, the extent of the restriction on freedom of expression that is involved is limited, and the justification for that restriction plain to see.

35.    The restrictions themselves do not prevent the media from publishing the matter in question in publications that are not related to the relevant proceedings. Where, as in the present case, the matter in question is withheld from the public on the ground that its disclosure would be prejudicial to the national safety, there may be other legal inhibitions on the publication of that information, even if this is not in connection with the legal proceedings. This judgment is not concerned with such inhibitions.

36.    There have, in the past, been reports in the press of the contents of the letter of 16 April 2004. Aikens J referred to those reports and to the nature of them in the judgment that he gave on 18 July 2006, when he made his order in relation to hearing evidence *in camera*. He referred to the reports as 'inaccurate'. Repetition of those reports will not infringe the order made by Aikens J, as amended by this court. Should any publication allege that those reports accurately represent the evidence that was given *in camera* they will, for the reasons that we have given, be at risk of constituting a contempt of court.

37.    This appeal is allowed to the extent set out in this judgment.

**EXHIBIT    11**

Aikens J.

### KOLDEN HOLDINGS LTD v RODETTE COMMERCE LTD AND ANOTHER

Lloyd's Law Reports

[2008] 1 Lloyd's Rep. 197 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Conflict of laws - Jurisdiction - Proceedings commenced in England - Claimants asserting cause of action - Defendants bringing second set of proceedings in Cyprus against assignors and assignee - Whether proceedings were between "the same parties" - Whether English court first seised - Council Regulation 44/2001, article 27. ...

### OCEANOGRAFIA SA DE CV v DSND SUBSEA AS (THE "BOTNICA")

Lloyd's Law Reports

[2007] 1 Lloyd's Rep. 37 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Jurisdiction - Parties orally agreeing terms of charter-party containing London arbitration clause - Contract to be "subject to the signing of mutually agreeable contract terms and conditions" - Contract terms and conditions signed by one party only - Whether agreement binding - Whether collateral condition precedent - Whether waiver by election - Whether estoppel by convention - Arbitration Act 1996, section 67. ...

### ELEKTRIM SA v VIVENDI UNIVERSAL SA

Lloyd's Law Reports

[2007] 1 Lloyd's Rep. 693 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Allegation that award obtained by concealment of relevant document - Whether award procured by fraud - Whether implied term that parties must do all things necessary for proper and expeditious conduct of arbitral proceedings - Arbitration Act 1996, sections 40, 41, 42 and 68(2)(g). ...

### PARROTT v PARKIN (THE "UP YAWS")

Lloyd's Law Reports

[2007] 1 Lloyd's Rep. 719 - QUEEN'S BENCH DIVISION (ADMIRALTY COURT)

Admiralty practice - Possession - Claim to sole legal and/or beneficial ownership of motor yacht - Whether motor yacht held on resulting or constructive trust for claimant - Declaration as to beneficial ownership. ...

### ELEKTRIM SA v VIVENDI UNIVERSAL SA

Lloyd's Law Reports Plus

[2007] Lloyd's Rep. Plus 39 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration – Allegation that award obtained by concealment of relevant document – Whether award procured by fraud – Whether implied term that parties must do all things necessary for proper and expeditious conduct of arbitral proceedings – Arbitration Act 1996, sections 40, 41, 42 and 68(2)(g). ...

### PARROTT v PARKIN (THE "UP YAWS")

Lloyd's Law Reports Plus

[2007] Lloyd's Rep. Plus 31 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Admiralty practice – Possession – Claim to sole legal and/or beneficial ownership of motor yacht – Whether motor yacht held on resulting or constructive trust for claimant – Declaration as to beneficial ownership. ...

ELEKTRIM SA v VIVENDI UNIVERSAL SA (NO 2)

Lloyd's Law Reports

[2007] 2 Lloyd's Rep. 8 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Anti-suit injunction - Two sets of arbitration proceedings taking place between the parties - Application by claimant for anti-suit injunction in respect of first arbitration - Conditions for grant of injunction - Effect of Arbitration Act 1996 - Supreme Court Act 1981, section 37. ...

ELEKTRIM SA v VIVENDI UNIVERSAL SA (NO 2)

Lloyd's Law Reports Plus

[2007] Lloyd's Rep. Plus 36 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration – Anti-suit injunction – Two sets of arbitration proceedings taking place between the parties – Application by claimant for anti-suit injunction in respect of first arbitration – Conditions for grant of injunction – Effect of Arbitration Act 1996 – Supreme Court Act 1981, section 37. ...

HARPER v INTERCHANGE GROUP LTD

Lloyd's Law Reports Plus

[2007] Lloyd's Rep. Plus 89 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Asset sale agreement – Entitlement of claimant to commission – Proper construction of agreement – Whether claimant precluded from recovering by reason of failure to implement dispute resolution mechanism – Whether claimant precluded from recovering by reason of estoppel by convention – Rectification. ...

KOLDEN HOLDINGS LTD v RODETTE COMMERCE LTD AND ANOTHER

Lloyd's Law Reports Plus

[2007] Lloyd's Rep. Plus 106 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Conflict of laws – Jurisdiction – Proceedings commenced in England – Claimants assigning cause of action – Defendants bringing second set of proceedings in Cyprus against assignors and assignee – Whether proceedings were between "the same parties" – Whether English court first seised – Council Regulation 44/2001, article 27. ...

PRIMETRADE AG v YTHAN LTD (THE "YTHAN")

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 43 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration – Jurisdiction of arbitrators – Charter-party – Identity of holder of bills of lading – Carriage of Goods by Sea Act 1992, sections 2 and 3 – Whether party challenging jurisdiction of arbitrators can raise new objections during judicial challenge – Arbitration Act 1996, sections 67 and 73. ...

ENTERPRISE OIL LTD v STRAND INSURANCE CO LTD

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 12 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (liability) – Settlement reached by assured in respect of proceedings in Texas – Claim against liability insurers – Whether insurers' liability based on proof of assured's actual liability or proof that Texas could reasonably have reached a finding of liability – Whether assured faced liability in tort under Texas law – Whether coverage of policy for contractual liability extended to settlements – Whether settlement had to

allocate losses as between the various claims made against the assured – Whether assured could recover defence costs. ...

### CARBOPEGO-ABASTECIMENTO DE COMBUSTIVEIS SA v AMCI EXPORT CORPORATION

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 28 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Measure of damages for breach of contract – Agreement for supply of coal – Defendant wrongfully failed to deliver two shipments of coal – Whether claimant entitled to difference between contract price and market price on date of repudiation or on later date when the contract of sale was terminated for breach – Sale of Goods Act 1979, section 51(1). ...

### CARBOPEGO-ABASTECIMENTO DE COMBUSTIVEIS SA v AMCI EXPORT CORPORATION

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 28 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Measure of damages for breach of contract – Agreement for supply of coal – Defendant wrongfully failed to deliver two shipments of coal – Whether claimant entitled to difference between contract price and market price on date of repudiation or on later date when the contract of sale was terminated for breach – Sale of Goods Act 1979, section 51(1). ...

### THE REPUBLIC OF ECUADOR V OCCIDENTAL EXPLORATION & PRODUCTION CO (NO 2)

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 41 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration – Bilateral Investment Treaty between Ecuador and the US – US company commencing arbitration against Ecuador – Company obtaining award – Whether award in excess of arbitrator's jurisdiction – Proper construction of BIT – Whether arbitrators guilty of serious irregularity by granting remedies based on international law – Arbitration Act 1996, sections 67 and 68. ...

### AIG CAPITAL PARTNERS INC CJSC TEMA REAL ESTATE CO LTD v THE REPUBLIC OF KAZAKHSTAN

Lloyd's Law Reports

[2006] 1 Lloyd's Rep. 45 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Enforcement of award - Dispute arising between US company and Government of Kazakstan - Arbitration taking place under Bilateral Investment Treaty in accordance with Washington Convention on the Settlement of Investment Disputes (ICSID) - Company obtaining arbitration award - Whether award enforceable in England against assets held by third parties on behalf of National Bank of Kazakhstan - Validity of Third Party Debt Order and Charging Order - Effect of European Convention on Human Rights - Civil Procedure Rules, Part 72 - Charging Orders Act 1979 - State Immunity Act 1982, sections 13 and 14. ...

### PRIMETRADE AG v YTHAN LTD (THE "YTHAN")

Lloyd's Law Reports

[2006] 1 Lloyd's Rep. 457 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Jurisdiction of arbitrators - Charter-party - Identity of holder of bills of lading - Carriage of Goods by Sea Act 1992, sections 2 and 3 - Whether party challenging jurisdiction of arbitrators can raise new objection during judicial challenge - Arbitration Act 1996, sections 67 and 73. ...

### ENTERPRISE OIL LTD v STRAND INSURANCE CO LTD

Lloyd's Law Reports

[2006] 1 Lloyd's Rep. 500 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Insurance (liability) - Settlement reached by assured in respect of proceedings in Texas - Claim against liability insurers - Whether insurers' liability based on proof of assured's actual liability or proof that Texas could reasonably have reached a finding of liability - Whether assured faced liability in tort under Texas law - Whether coverage of policy for contractual liability extended to settlements - Whether settlement had to allocate losses as between the various claims made against the assured - Whether assured could recover defence costs. ...

### CARBOPEGO-ABASTECIMENTO DE COMBUSTIVEIS SA v AMCI EXPORT CORPORATION

Lloyd's Law Reports

[2006] 1 Lloyd's Rep. 736 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Measure of damages for breach of contract - Agreement for supply of coal - Defendant wrongfully failed to deliver two shipments of coal - Whether claimant entitled to difference between contract price and market price on date of repudiation or on later date when the contract of sale was terminated for breach - Sale of Goods Act 1979, section 51(1). ...

### REPUBLIC OF ECUADOR v OCCIDENTAL EXPLORATION & PRODUCTION CO (NO 2)

Lloyd's Law Reports

[2006] 1 Lloyd's Rep. 773 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Bilateral Investment Treaty between Ecuador and the US - US company commencing arbitration against Ecuador - Company obtaining award - Whether award in excess of arbitrator's jurisdiction - Proper construction of BIT - Whether arbitrators guilty of serious irregularity by granting remedies based on international law - Arbitration Act 1996, sections 67 and 68. ...

### TRAFIGURA BEHEER BV v KOOKMIN BANK CO

Lloyd's Law Reports

[2006] 2 Lloyd's Rep. 455 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Banking - Letter of credit - Issuing bank commencing proceedings against seller in Korea for breach of duty - Seller seeking declaration of non-liability and anti-suit injunction in England - Law governing claim by issuing bank against seller - Whether claim "relating to tort" - Place where most significant elements constituting the tort occurred - Whether claim more closely connected with some other jurisdiction - Private International Law (Miscellaneous Provisions) Act 1995, sections 9, 11 and 12. ...

### WESTERNGECO LTD v ATP OIL & GAS (UK) LTD

Lloyd's Law Reports

[2006] 2 Lloyd's Rep. 535 - QUEEN'S BENCH DIVISION (COMMERICAL COURT)

Contract - Construction - Contractor performing seismic survey work for offshore oil company - Damage caused to third party's wellhead installation by contractor's negligence - Whether contract entitled contractor to indemnity from company to extent that contractor's liability to third party exceeded payments received by contractor for work performed under the contract. ...

### TRAFIGURA BEHEER BV v KOOKMIN BANK CO

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 78 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Banking – Letter of credit – Issuing bank commencing proceedings against seller in Korea for breach of duty – Seller seeking declaration of non-liability and anti-suit injunction in England – Law governing claim by issuing bank against seller – Whether claim "relating to tort" – Place where most significant elements constituting the tort occurred – Whether claim more closely connected with some other jurisdiction – Private International Law (Miscellaneous Provisions) Act 1995, sections 9, 11 and 12.

### WESTERNGECO LTD v ATP OIL & GAS (UK) LTD

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 87  - QUEEN'S BENCH DIVISION(COMMERICAL COURT)

Contract – Construction – Contractor performing seismic survey work for offshore oil company – Damage caused to third party's wellhead installation by contractor's negligence – Whether contract entitled contractor to indemnity from company to extent that contractor's liability to third party exceeded payments received by contractor for work performed under the contract. ...

### OCEANOGRAFIA SA DE CV v DSND SUBSEA AS

Lloyd's Law Reports Plus

[2006] Lloyd's Rep. Plus 98  - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration – Jurisdiction – Parties orally agreeing terms of charter-party containing London arbitration clause – Contract to be "subject to the signing of mutually agreeable contract terms and conditions" – Contract terms and conditions signed by one party only – Whether agreement binding – Whether collateral condition precedent – Whether waiver by election – Whether estoppel by convention – Arbitration Act 1996, section 67. ...

### ACTION NAVIGATION INC. v. BOTTIGLIERE DI NAVIGAZIONE S.p.A. (THE "KITSA")

Lloyd's Law Reports

[2005] 1 Lloyd's Rep. 432  - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Charter-party (Time) - Vessel chartered by owners and then sub-chartered for time chartered trip - Discharge of cargo delayed and bottom of vessel became fouled - Whether owners had agreed to run risk of fouling - Whether vessel off-hire during time spent de-fouling hull - Whether arbitrators' decision correct in law - Arbitration Act, 1996. s. 69. ...

### ARGO FUND LIMITED v ESSAR STEEL LIMITED

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 203  - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Banking - Banks entering into syndicated loan facility agreement with borrower - Investment company purchasing debt on secondary debt market - Purchaser alleging borrower in breach of facility agreement by failing to repay debt on date due - Whether purchaser entitled to claim under facility agreement as transferee or assignee of debt. ...

### REPUBLIC OF ECUADOR v OCCIDENTAL EXPLORATION AND PRODUCTION COMPANY

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 240  - QUEEN S BENCH DIVISION (COMMERCIAL COURT)

International law - Doctrine of non-justiciability - Bilateral Investment Treaty between USA and Republic of Ecuador - Treaty providing for disputes to be determined by arbitration - Californian 'investor' granted exclusive rights by Ecuador state owned company to explore for oil - Disputes arising between investor and

Ecuador relating to refund of VAT payments - Dispute referred to arbitration in London - Award in favour of investor - Ecuador seeking to challenge award under section 67 of the Arbitration Act 1996 - Whether English court precluded from hearing application by reason of doctrine of non-justiciability. . .



### ROYAL & SUN ALLIANCE INSURANCE PLC AND ANOTHER v MK DIGITAL FZE (CYPRUS) LTD AND OTHERS

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 679 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Carriage by road - CMR - Jurisdiction - Second defendant contracted with second claimant for carriage of second defendant's goods from France - Second claimant understood goods to be carried to UK - Goods lost during transit in France - Claimants bringing proceedings in England for declaration of non-liability - Second defendant bringing proceedings in France asserting second claimant in breach of contract - Second defendant applying to set aside or stay English proceedings - Whether second claimant CMR carrier or freight forwarder - Whether "place designated for delivery" was UK or Italy - Whether action "pending" in France - Whether French and English actions involved same cause of action or related claims - Whether doctrine of forum non conveniens applicable - CMR article 31: EC Council Regulation 44 of 2001, articles 27, 28 and 30.



### SEA SUCCESS MARITIME INC v AFRICAN MARITIME CARRIERS LTD

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 692 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Charter-party (Time) - Clause requiring master to reject "any cargo that is subject to clausing of the bills of lading" - Shippers tendering damaged cargo - Master rejecting cargo on basis that it was "subject to clausing" on bills of lading - Whether master entitled to refuse to load cargo. ...



### PIRTEK (UK) LTD v DEANSWOOD LTD AND ANOTHER

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 728 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Award - Interest - Arbitrator awarding damages for breach of franchise agreement - No previous claim made for interest - Arbitrator subsequently purporting to make additional award of interest on amount outstanding - Whether additional award made in time - Whether court should extend time - Whether arbitrator had jurisdiction to make such award - Arbitration Act 1996, sections 57 and 79 - British Franchise Association Arbitration Scheme rules. ...



### ABSALOM (ON BEHALF OF SYNDICATE 957 AT LLOYD'S) v TCRU LTD

Lloyd's Law Reports

[2005] 2 Lloyd's Rep. 735 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Reinsurance - Broker - Entitlement to commission - Premium paid by way of deposit premium with subsequent payments based on adjustment - Broker's entitlement to commission "15 per cent applicable to deposit premium and minimum rate" - Whether broker entitled to commission on both deposit premium and on adjusted premium. ...

### MAMIDOIL-JETOIL GREEK PETROLEUM COMPANY S.A. AND ANOTHER v. OKTA CRUDE OIL REFINERY A.D.

Lloyd's Law Reports

[2003] 1 Lloyd's Rep. 1 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Contract - Construction - Manipulation of crude oil - Whether defendants' failure to perform 1993 contract attributable to government request not to perform contract with claimants - Whether 1993 contract binding on defendants and its privies - Whether claimants entitled to injunction restraining defendants from proceeding with action in the Macedonian Court.

MAMIDOIL-JETOIL GREEK PETROLEUM COMPANY S.A. AND ANOTHER v. OKTA CRUDE OIL REFINERY A.D. [2002] EWHC 2462 (Comm)

Lloyd's Law Reports

[2003] 1 Lloyd's Rep. 42 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Practice - Costs - Interest - Breach of contract - Rate of interest payable - Whether interest payable on any part of judgment debt on which tax payable - Basis on which costs awarded - Dates when interest should run - Appropriate rate of interest - Whether interest payable on part of damages on which tax payable - Effect of offer to settle - Whether leave to appeal should be granted. ...

RELIANCE INDUSTRIES LTD. v. ENRON OIL AND GAS INDIA LTD. AND ANOTHER

Lloyd's Law Reports

[2002] 1 Lloyd's Rep. 645 - QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

Arbitration - Award - Leave to appeal - Dispute under contracts referred to arbitration - Parties agreed principles of construction of contracts in Indian law same as in English law - Two partial awards made - Application for leave to appeal against awards - Whether point of construction of contract would be a question of law of England and Wales - Whether statutory criteria for grant of leave fulfilled - Whether leave to appeal should be granted - Arbitration Act, 1996, ss. 69, 82(1). ...

SEASHORE MARINE S.A. v. PHOENIX ASSURANCE PLC AND OTHERS (THE "VERGINA") (No. 3)

Lloyd's Law Reports

[2002] 1 Lloyd's Rep. 238 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - Costs - Interest - Part 36 offer - Defendants liable to indemnify claimants for salvage payments - Period of interest to which claimants entitled - Starting date for interest - Whether there should be interruption for delay in prosecuting claim - Whether claimants entitled to all of the costs - Defendants held liable for more than proposals contained in Part 36 offer - Whether claimant entitled to enhanced rate of interest and costs on an indemnity base from latest date on which Part 36 offer could have been accepted. ...

NAVIGATION MARITIME BULGARE v. RUSTAL TRADING LTD. AND OTHERS (THE "IVAN ZAGUBANSKI")

Lloyd's Law Reports

[2002] 1 Lloyd's Rep. 106 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Bill of lading - Arbitration clause - Anti-suit injunction - Bill of lading contained English arbitration clause - Dispute between claimants and defendants - Defendants brought proceedings in Marseille - Claimants applied for injunction restraining defendants from pursuing proceedings in Marseille - Whether anti-suit injunction to enforce arbitration clause within art. 1(4) of the Brussels and Lugano Convention - Whether anti-suit injunction should be granted. ...

THE "OCEAN GLORY"

Lloyd's Law Reports

[2002] 1 Lloyd's Rep. 679 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Practice - Costs - Post appraisement and sale costs - Priority - Vessel ordered to be appraised and sold - Claim by claimants for costs incurred post appraisement and sale of vessel - Whether claimants entitled to such costs - Whether such costs should have priority after the Admiralty Marshal's costs. ...

## THE "FEDRA"

Lloyd's Law Reports

[2002] 1 Lloyd's Rep. 453 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Damage to vessel - Collision - Ingress of water - Collision in Bay of Gibraltar - Liability for collision settled - Ingress of water discovered in hold No. 4 - Whether damage to No. 4 holds and cargo caused by collision. ...

## HIH CASUALTY AND GENERAL INSURANCE LTD. AND OTHERS v. CHASE MANHATTAN BANK AND OTHERS

Lloyd's Law Reports

[2001] 1 Lloyd's Rep. 30 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (Financial contingency) - Non-disclosure - Misrepresentation - Duty of utmost good faith - Contracts for and of insurance - Allegations of non-disclosure and misrepresentation - whether insurers entitled to avoid or rescind contract - Whether insurers entitled to damages for fraudulent and negligent misrepresentation - Whether breach of duty of utmost good faith. ...

## C INC. PLC v. L AND ANOTHER

Lloyd's Law Reports

[2001] 2 Lloyd's Rep. 459 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - Freezing order - Discharge - Claimant obtained judgment in default against first defendant for debt - Judgment not satisfied - Freezing order obtained against first defendant - First defendant alleged assets held as trustee or agent of third party - Freezing order obtained against assets of third party - Whether Court had power to grant freezing order over third party's assets against whom no substantive claim brought by claimant - Whether freezing order should be discharged. ...

## SEASHORE MARINE S.A. v. PHOENIX ASSURANCE PLC AND OTHERS (THE "VERGINA") (No.2)

Lloyd's Law Reports

[2001] 2 Lloyd's Rep. 698 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (Marine) - Salvage - Contributions - Insured perils - Vessel on voyage to Europe developed list to starboard of 23 deg. and crew abandoned ship - Salvage services rendered - Claimants claimed from defendant insurers their proportion of salvage liabilities - Whether salvage liabilities incurred in connection with avoidance of a loss of the vessel by insured perils i.e. perils of the seas or crew negligence. ...

## SEASHORE MARINE S.A. v. PHOENIX ASSURANCE PLC AND OTHERS (THE "VERGINA")

Lloyd's Law Reports

[2001] 2 Lloyd's Rep. 719 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - Procedure - Evidence - Perils insured against - Vessel developed list - Salvage services rendered - Claimants alleged list caused by peril insured against - Insurers denied list so caused but advanced no positive case - Evidence to be adduced by both parties on issue as to vessel's ballast system. ...

## TODD AND OTHERS v. ADAMS AND CHOPE (T/A TRELAWNEY FISHING CO.) (THE "MARAGETHA MARIA")

Lloyd's Law Reports

[2001] 2 Lloyd's Rep. 443 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Damages - Personal injury - Breach of statutory duty - Shore fisherman - Fishing vessel capsized and sank with loss of all crew - Crew of vessel worked as shore fisherman - Claimants alleged breach of statutory duty by owners of vessel - Whether Fishing Vessel (Safety Provisions) Rules, 1975 imposed civil liability on owners if rules breached - Whether shore fishermen were engaged under contracts of service - Whether owners entitled to limit liability. ...

## NEO INVESTMENTS INC. v. CARGILL INTERNATIONAL S.A.

Lloyd's Law Reports

[2001] 2 Lloyd's Rep. 33 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - CPR 51-PD19 - CPR 3.9 - Application to lift stay - Application to strike out - Dispute under contract for sale of goods - Transitional period covering change from old Rules of the Supreme Court to new Civil Procedure Rules - Action did not come before a Judge or on paper during transitional period - Action automatically stayed - Whether stay should be lifted - Prejudice to defendants if stay lifted. ...

## DUBAI ISLAMIC BANK PJSC v. PAYMENTECH MERCHANT SERVICES INC.

Lloyd's Law Reports

[2001] 1 Lloyd's Rep. 65 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration - Jurisdiction - Seat of arbitration - Award - Appeal against appeal award - Whether seat of arbitration England - Whether Court had jurisdiction to exercise powers in ss. 67, 68 and 69 of Arbitration Act, 1996 - Whether application for extension of time should be granted - Arbitration Act, 1996, ss. 2, 3, 67, 68, 69, 80. ...

## O.T. AFRICA LINE LTD. v. HIJAZY AND OTHERS (THE "KRIBI")

Lloyd's Law Reports

[2001] 1 Lloyd's Rep. 76 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Bill of lading - Exclusive jurisdiction clause - Article 17 - Construction - Alleged short delivery - Actions brought in Antwerp and England - Whether receiver parties bound by jurisdiction clause in bill of lading - Whether English Court bound to stay action - Whether jurisdiction clause fulfilled requirements of art. 17 - Whether claimants entitled to anti-suit and anti-arrest injunctions - Effect of Human Rights Act, 1998 - Civil Jurisdiction and Judgments Act, 1982, Schedule, art. 17. ...

## K/S MERC-SCANDIA XXXXII v. CERTAIN LLOYD'S UNDERWRITERS SUBSCRIBING TO LLOYD'S POLICY NO. 25T 105487 AND OCEAN MARINE INSURANCE CO. LTD. AND OTHERS (THE "MERCANDIAN CONTINENT")

Lloyd's Law Reports

[2000] 2 Lloyd's Rep. 357 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (Marine) - Indemnity - Duty of utmost good faith - Breach of contract term - Ship repairers insured in respect of negligent repairs to vessel - Claim by shipowner - Assured produced forged document - Forgery discovered - Insurers avoided liability for breach of utmost good faith - Whether entitled to do so - Assured failed to tell insurers document was forged - Whether breach of term - Whether defence to claim on policy. ...

## BROWNSVILLE HOLDINGS LTD. AND ANOTHER v. ADAMJEE INSURANCE CO. LTD. (THE "MILASAN")

Lloyd's Law Reports

[2000] 2 Lloyd's Rep. 458 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Insurance (Marine) - Total loss - insured peril - Construction - Yacht took in water and sank - Cause of loss - Whether caused by insured peril - Allegation that vessel deliberately cast away - Allegation of breach of warranty that vessel would have professional skippers and crew at all times - Whether vessel's owner privy to plan to sink vessel deliberately - Whether insurers liable under policy. ...

### WALKER AND OTHERS v. ROWE AND OTHERS

Lloyd's Law Reports

[2000] 1 Lloyd's Rep. 116 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Arbitration - Award - Costs award - Interest - Enforcement - Leave given to enforce an award on costs in same manner as judgment - No reference to post-award interest on sum awarded - Whether Court could award interest - Whether discretion should be exercised in favour of party that had entered award as judgment - Rate applicable - Arbitration Act, 1996, s. 66 - Supreme Court Act, 1981, s. 35. ...

### THE "MINERAL DAMPIER" AND "HANJIN MADRAS"

Lloyd's Law Reports

[2000] 1 Lloyd's Rep. 282 - QUEEN'S BENCH DIVISION(ADMIRALTY COURT)

Collision - Crossing vessels - Liability for collision - Collision in East China sea - Actions of stand-off and give-way vessels - Faults in navigation - Apportionment of liability. ...

### YOUELL AND OTHERS v. KARA MARA SHIPPING CO. LTD. AND OTHERS

Lloyd's Law Reports

[2000] 2 Lloyd's Rep. 102 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - Anti-suit injunction - Declaratory relief - Collision in Atlantic - Action brought in Louisiana - Insurers applied for anti-suit injunction and declaratory relief - Consideration of exclusive jurisdiction and English proper law clauses - Whether claim within CPR Part II(1) - Whether good arguable case - Whether application for leave to serve out of jurisdiction for anti-suit injunction should be granted - Whether application to set aside original claim for declaratory relief should be granted. ...

### THE "BUMBESTI"

Lloyd's Law Reports

[1999] 2 Lloyd's Rep. 481 - QUEEN'S BENCH DIVISION(ADMIRALITY COURT)

Admiralty practice - Action in rem - Jurisdiction - Arrest of vessel - Abuse of process of Court - Dispute under charter referred to arbitration in Romania - Action founded on award - Whether Court had jurisdiction in rem in respect of claim made by claimants - Whether arrest an abuse of process because claimants already had security for claim made - Supreme Court Act, 1981, s.20(2)(h). ...

### DONOHUE v. ARMCO INC. AND OTHERS

Lloyd's Law Reports

[1999] 2 Lloyd's Rep. 649 - QUEEN'S BENCH DIVISION(COMMERCIAL COURT)

Practice - Anti-suit injunction - Joinder of potential co-claimants - Application to set aside service of proceedings - Defendants sold insurance group to management buy-out - Negotiations conducted with claimant - Defendant alleged it had been victim of fraud - Defendant brought proceedings in New York - Claimant alleged New York proceedings vexatious and oppressive and in breach of exclusive English jurisdiction clause - Whether anti-suit injunction should be granted - Whether exclusive English jurisdiction

clause applicable - Whether potential co-claimants should be joined in English proceedings for anti-suit injunction - Whether service out of jurisdiction should be set aside.